E-FILED
Friday, 16 April, 2021  11:19:10 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

CHARLES PALMER,

          Plaintiff,

    v.

CITY OF DECATUR, AMY M. WAKS, as
Special Representative of the ESTATE of
TIM CARLTON, ROGER RYAN, BRIAN
BELL, ROGER MORVILLE, MICHAEL
APPLEGATE, FRANK HUBBARD, JOE
PATTON, JEREMY WELKER, STEVE
CHABAK, and as-yet UNKNOWN
OFFICERS OF THE DECATUR POLICE
DEPARTMENT,

          Defendants.

No. 17-cv-3268

Judge Colin S. Bruce

Magistrate Judge Eric I. Long

## JOINT MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

William Helmbacher was an attorney living and practicing in Decatur, Illinois.  On August 26, 1998, Helmbacher's apartment at 351 West Macon Street was burglarized while Helmbacher was out.  The following day, Helmbacher was beaten to death with a hammer in the living room of that same apartment.  The City of Decatur Police Department ("DPD") conducted an investigation into the murder, and each of the individual defendants in this case, all police officers with the DPD, played some role in that investigation.[1]  The investigation of the burglary led to Ray Taylor, who then implicated plaintiff in the murder.  On April 27, 2000, a Macon County jury found plaintiff guilty of the murder.   He was sentenced to natural life in prison.

---

[1] Plaintiff has advised defendants that defendant Jeremy Welker will be voluntarily dismissed.

The conviction was affirmed on appeal.  *People v. Palmer*, 324 Ill.App.3d 1158 (4th Dist. 2001), app. denied 198 Ill.2d 603 (2002).  Plaintiff then filed a post-conviction petition, which was dismissed in the trial court, and affirmed on appeal.  *People v. Palmer*, 352 Ill.App. 3d 877 (4th Dist. 2004).  In 2010, plaintiff then filed a petition in the circuit court seeking DNA testing of materials recovered during the investigation.  DNA testing ensued, and as a result plaintiff filed a successive petition for post-conviction relief.  On November 23, 2016, the Macon County State's Attorney conceded the petition, plaintiff's conviction was vacated, and plaintiff was released from incarceration.  Plaintiff filed a Petition for Certificate of Innocence under 735 ILCS 5/2-702, which was denied in the circuit court, and affirmed on appeal.  *People v. Palmer*, 2019 IL App (4th) 190148.  On April 15, 2021, the Illinois Supreme Court reversed and remanded the case to the circuit court for entry of a Certificate of Innocence.  2021 IL 125621.

Plaintiff sues the individual defendants here alleging that they denied him a fair trial, in violation of the Fourteenth Amendment Due Process Clause, by fabricating evidence against him and suppressing exculpatory evidence, and caused his unlawful detention in violation of the Fourth Amendment.  Plaintiff also alleges municipal liability against the City of Decatur under *Monell v. New York Department of Social Services*, 436 U.S. 658 (1978).  Plaintiff also seeks recovery from all defendants under state law.

Defendants are entitled to summary judgment.  Quite simply, there is no evidence to support plaintiff's allegation that defendants fabricated evidence against him or suppressed exculpatory evidence or did anything else to deprive plaintiff of a fair trial.  Plaintiff was convicted at trial by direct and circumstantial evidence that was legitimate, solid, and strong.  There is also no evidence any defendant did anything to cause an unlawful detention of plaintiff.  Indeed, the evidence does not even  support that plaintiff is innocent of the murder, despite his early release

from prison. Defendants are also entitled to qualified immunity on plaintiff's federal claims, and summary judgment on plaintiff's state law claims. Defendants are entitled to summary judgment on all claims.

## UNDISPUTED MATERIAL FACTS

1.      Filed in support of this Motion for Summary Judgment are the following exhibits:

A       Trial Court Transcript – Macon County – People v. Palmer 99 CF 139;

B       Plaintiff Deposition;

C       Roger Ryan Deposition;

D       Roger Morville Deposition;

E       Michael Applegate Deposition;

F       Frank Hubbard Deposition;

G       Joseph Patton Deposition;

H       Steve Chabak Deposition;

I       Gwen Tucker Deposition;

J       Mark Cheviron Deposition;

K       Jennifer Aper Deposition;

L       Dana Pitchford Deposition;

M       Petition for DNA Testing;

N       Lucy Davis Deposition;

O       Affidavit of Thomas L. Martin;

P       Roger Ryan Dep. Exh. #4 (Crime Scene Report);

Q       Roger Ryan Dep. Exh. #19 (Ryan Report 9-22-98);

R       Roger Ryan Dep. Exh. #20 (Carlton Report 9-22-98);

S        Morville Dep. Exh. #2, p. [2]Dec. 7053-7054 (Property record, Helmbacher Dried Blood Standard);

T        Morville Dep. Exh. #12 (Property Record, Fila Shoes);

U        Chabak Dep. Exh. #1 (Major Crime Lead Sheet);

V        Chabak Dep. Exhs. #3 and #5 (Interviews of Joseph Moyer);

W        Chabak Dep. Exh. #13 (Major Case Cover Sheet);

X        Patton Dep. Exh. #7 (Complaint for Arrest Warrant);

Y        Mark Cheviron Dep. Exh. #5 (Taylor Polygraph Report);

Z        Aper Dep. Exhibits #2-9;

AA       Aper Dep. Exhibits 12-14;

BB       Pitchford Dep. Exh. #7 (23 color photos of Fila Shoes);

CC       Plaintiff's Answers to Interrogatories;

DD       Brian Bell Deposition Transcript;

EE.      Brian Bell Dep. Exh. 11-16 (Reports 9-22-98);

FF       Decatur 0126-0128 (Carlton Report 9-26-98);

GG       Welker Dep. Exh. #2 (Burglary report).

### Parties

2.     Plaintiff, Charles Palmer, was convicted of the murder of William Helmbacher on April 27, 2000.  (Exh. A, p. Dec6181).  He was released from custody on November 23, 2016. (Doc. #43, ¶98).

3.     Defendant Amy Waks was appointed as a special representative of the Estate of Tim Carlton.  Carlton was a detective in the DPD's criminal investigations division ("CID") during

---

[2] Pages with bate-stamped prefix "Decatur" are designated as "Dec."  Pages with bate-stamped prefix "Palmer" are designated as "Pal."

4

the Helmbacher murder investigation.  Carlton died on February 15, 2018 (Doc. #28).  As a result, his estate was substituted as a defendant. (Doc. #43).

4.      Defendant Roger Ryan was a detective in the CID and worked on the Helmbacher murder investigation.   Ryan began working with the DPD as a police officer in 1980.  (Exh. C, p. 36)  He worked 19 years in CID and retired from the DPD in 2005.  (Exh. C, p. 41)

5.      Defendant Brian Bell joined the DPD as a police officer in 1979.  (Exh. DD, p. 19). He worked in the CID from 1986 until 1998, investigating over 100 homicides during that time period, including the Helmbacher investigation.  (Exh. DD, p. 23).

6.      Defendant Roger Morville worked as a patrol officer for the DPD.  At times, Morville was also the backup evidence officer to Dan Ashenfelter, and handled the DPD's evidence inventory and storage processes in Ashenfelter's absence. (Exh. D, p. 88-89).  Morville acted as the evidence officer for part of the time during the Helmbacher murder investigation. (Exh. D, p. 88-89).  He retired in 2007.  (Exh. D, p. 36).

7.      Defendant Michael Applegate became a DPD police officer in 1969. (Exh. E, p. 53)  Applegate worked in CID as a detective from 1980 until he retired in 2002. (Exh. E, p. 57) Applegate worked on the Helmbacher murder investigation.  (Exh. E, p. 43)

8.      Defendant Frank Hubbard was hired as a DPD police officer in 1990.  (Exh. F, p. 63-64).  In 1996 he was assigned to the CID as a detective, where he worked until he retired in 2017. (Exh. F, p. 68-69).  Hubbard also worked on the Helmbacher investigation.  (Exh. F. p. 53)

9.      Defendant Joseph Patton worked on the Helmbacher investigation as a detective in the CID. (Exh. G, p. 12).  Patton started with the DPD in 1991, was assigned to the CID in 1995 (Exh. G, p. 40), and retired in 2019 (Exh. G, p. 13)

10.     Defendant Steve Chabak was a sergeant in the CID at the time of the Helmbacher murder investigation.  Chabak started working with the DPD in 1984 as a patrol officer (Exh. H, p. 64), was assigned to the CID in the early 1990's, and became a sergeant in that division in 1997 (Exh. H, p. 69).  He retired from the DPD in 2012.  (Exh. H, p. 30).

### The Burglary and Murder

11.     On August 26, 1998, William Helmbacher reported to the DPD that his apartment, #1 at 351 West Macon Street, in Decatur, was burglarized.  According to the report, Helmbacher noticed when he came home about 11:15 that night, his front door was locked, but someone entered and rummaged through the apartment.  Helmbacher reported missing some bottles of unopened Ice House beer, and a glass mug containing loose change.  The report noted that the likely entry point for the burglar was a window. (Exh. GG)

12.     Gwen Tucker was Helmbacher's next door neighbor in the building at 351 West Macon. (Exh. I, p. 7)  Knowing of the burglary on August 26, she was concerned about Helmbacher.  The following day, she knocked on his door to check on him when she got home from work, which was about 4:30 to 5:30 p.m., or a little later. (Exh. I, p. 10)  Tucker found it unusual that Helmbacher did not answer.  His car was parked outside, and his windows were closed.  Helmbacher usually left his windows open when home. (Exh. I, p. 11-12).

13.     At approximately 11:00 that night, a 911 call came to the DPD from Joseph Moyer, reporting that he and Douglas Lee, the owner of the building at 351 West Macon, went to the apartment of their friend and colleague, William Helmbacher, and found him dead in his living room. (Exh. V)

### <u>The Murder Investigation</u>

14.     The DPD immediately began investigating the murder.  CID Lieutenant Todd Walker managed the investigation by keeping a "Lead Sheet" of the activities of the officers who

worked on the case. (Exh. H, p. 147-49).  The Lead Sheet for the Helmbacher murder investigation shows that about 30 DPD officers worked at various times on the investigation. (Exh. U) Practically all of the detectives in the CID participated in some way in the murder investigation. (Exh. A, p. Dec5931-5932).

15.     Ray Taylor lived in Apartment 5, on the upper level of 351 West Macon.  Taylor was interviewed about the burglary and murder in the early days of the investigation.  Taylor denied knowledge of either.  (Exh. A, p. Dec6052-6053, 6062-6064).

16.     As shown on the Lead Sheet, during the next several weeks, numerous interviews were conducted and leads investigated. (Exh. U)

17.     On September 10, 1998, William McGaughey, a volunteer who helped with gardening at the Milliken Homestead, a historic mansion owned by Milliken University, located 6 blocks from 351 West Macon, found a plastic garbage bag stuffed into a hedge on the property.  The bag contained  items reported to have been taken in the burglary of Helmbacher's apartment, including empty Ice House beer bottles, a beer mug and Helmbacher's business cards. (Exh. A, p. Dec5865-5869).

18.     The ISP crime lab processed the bag and its contents for fingerprints.  A fingerprint on the bag matched Ray Taylor's. (Exh. A, p. Dec96-97).

19.     Taylor was then taken into custody and interviewed about the burglary and the murder.  At first, he denied any involvement in either.  (Exh. EE, p. Dec0438)

20.     After Taylor was confronted with his fingerprint on the bag from the Milliken Homestead, and after continued interrogation, he admitted he knew plaintiff committed the burglary, and that plaintiff confessed to Taylor that he also committed the murder.  (Exh. EE, p. Dec0438)

21.     Taylor reported that on the evening of the murder, he went to the building at 501 W. Macon to see  his friend, John Bradford, who lived there.  While there he saw plaintiff, who told Taylor he committed the murder.  Plaintiff was wearing dark shoes which did not fit him.  His heels were sticking out of the back of the shoes with the back flattened down.  Taylor asked plaintiff why he was not wearing the Fila shoes he had on last.  Plaintiff told Taylor he had to get rid of them because they had blood on them (Exh. EE, p. Dec0648).

22.     Taylor was then given a polygraph examination by Mark Cheviron, a local polygrapher who performed lie detector testing for the DPD.  During the questioning, Taylor showed deception on questions pertaining to his being involved in the burglary, no deception about his not being involved in the murder, and no deception regarding his having knowledge of who committed the murder. (Exh. J, p. 69-74; Exh. Y).

23.     After the polygraph, interviews of Taylor continued. Eventually, Taylor admitted involvement in the burglary.  (Exh. DD, p. 287; Exh. EE, p. Dec0439, 0102). According to Taylor, plaintiff went in the apartment through a side window and opened the front door.  Taylor entered the apartment and acted as a lookout while plaintiff gathered goods to steal from the apartment. (Exh. EE, p. Dec0439)

24.     Taylor went on to say they then left Helmbacher's apartment and went up to Taylor's apartment.  Plaintiff kept some change and they both drank some beer taken from the apartment.  Taylor said they put the rest of the items into a plastic garbage bag. Taylor told the police they left his apartment carrying the bag.  Taylor dumped the bag with the contents into a dumpster at the Decatur Arts House, a few blocks away.  (Exh. EE, p. Dec0439).

25.     Police investigated that location and discovered it did not have a dumpster for garbage removal.

26.    Plaintiff had an outstanding warrant for his arrest.    (Exh. EE, p. Dec0441). Plaintiff was taken into custody, and brought to the DPD headquarters, and interrogated.  He was wearing a pair of white and black Fila athletic shoes.  Police seized the shoes and showed them to Taylor, who identified them as looking like the shoes plaintiff was wearing at the time of the murder.  (Exh. EE, p. Dec0119).

27.    On September 24, 1998, the Fila shoes were sent to the Illinois State Police ("ISP") Crime Laboratory in Springfield, with a request they be examined for blood. (Exh. Z, Pal0651)

28.    ISP scientist, Jennifer Lu (now Aper), performed the inspection.  The Fila shoes had some reddish brown spots on the top of them. She examined the spots, which turned out were not blood.  The shoes were returned to the DPD and placed back in inventory. (Exh. A, p. Dec6010)

29.    On September 26, 1998, Michael Calloway, plaintiff's friend who lived at 501 W. Macon,  was interviewed.  According to the reports, Calloway told the interviewers that plaintiff came to his home on the night of the murder, changed out of his clothes, washed clothes at Calloway's apartment, and put Calloway's clothes on.  Calloway had gone out to buy beer, and when he returned saw that plaintiff had put on Calloway's clothes.  Calloway was peeved with plaintiff for putting on Calloway's clothes. (Exh. FF).

30.    Calloway told police he saw plaintiff and Taylor talking together at 501 W. Macon on the night of the murder.  (Exh. FF).

31.    On October 15, 1998, the DPD sent plaintiff's Fila shoes back to the ISP Crime Lab, with direction to "tear them apart" in order to do a more thorough search for blood. (Exh. Z, p. Pal653).  On November 16, 1998, Jennifer Lu cut the shoes open at a number of different locations.  (Exh. BB).  Lu found three blood spots on the inner material portions of a shoe below mesh material.  One stain was 10mm x 4 mm, found under black mesh; one was on an interior

9

thread, that was 5mm long; and one was 1 mm by 1 mm, also under black mesh material.  (Exh. Z, p. Pal0134).

32.     The blooded material from the Fila shoes was then sent to the lab's DNA analysis section, where ISP DNA analyst Dana Pitchford compared DNA from the blood stains on the Fila shoes to a blood standard of Helmbacher's blood. The blood stains on plaintiff's Fila's shoes matched Helmbacher's.  (Exh. A, p. Dec6040)

33.     The Macon County State's Attorney approved murder charges  against plaintiff. Defendant Carlton obtained an arrest warrant, which was served on plaintiff at Hill Correctional Center, where plaintiff was  being held for an unrelated parole violation. (Exh. W, p. Dec.0144).

## The Criminal Trial Proceeding

34.     On February 18, 1999, Carlton testified at a preliminary hearing where the court found probable cause for the charges. (Exh. A, p. Dec5713)  Macon County Public Defender Rau was appointed to represent plaintiff. (Exh. A, p. Dec5725).

35.     At a fitness hearing on January 12, 2000, during discussions about plaintiff's fitness for trial, plaintiff complained to the court about the adequacy of the representation he was receiving from the public defenders assigned to represent him. (Exh. A, p. Dec5728-5729).

36.     On February 9, 2000, plaintiff's defense attorneys brought a motion to suppress evidence relating to the Fila shoes, arguing that the seizure of the shoes by the DPD when plaintiff was in custody on September 22, 1998, violated the Fourth Amendment. The court denied the motion.  (Exh. A, p. Dec5733-5768)

37.     Plaintiff's jury trial began in Macon County on April 24, 2000.  (Exh. A, p. Dec5776)

38.     Joseph Moyer testified at the trial about he and Doug Lee finding Helmbacher's body and reporting it to the DPD. (Exh. A, p. Dec5795).

39.     DPD Officer Jeremy Welker testified about being called to respond to the burglary of Helmbacher's apartment on August 26, 1998. (Exh. A, p. Dec5815).

40.     Ray Taylor testified that he is plaintiff's cousin, and positively identified plaintiff in court.  (Exh. A., p. Dec0518-0519).

41.     Taylor testified that in August, 1998, he lived in the same building as Helmbacher on Macon Street, in Decatur, and charges were pending against him for burglary of Helmbacher's apartment.  Taylor testified no promises had been made to him about his burglary charge, but that the State's Attorney would take his cooperation into consideration.  (Exh. A, p. Dec5821)

42.     Taylor testified that the day before the murder, he saw plaintiff break into Helmbacher's apartment, going in the side window of the building.  Taylor said plaintiff then asked Taylor to act as a look-out.  (Exh. A, p. Dec5823).

43.     Taylor testified he refused and went up to his own apartment. (Exh. A, p. Dec5283)

44.     Taylor testified plaintiff then came up to Taylor's apartment carrying some cards, change in a jar, and about five Ice House beers. Taylor testified plaintiff asked Taylor for a garbage bag to put the stolen goods in.  Taylor gave plaintiff a plastic garbage bag.  (Exh. A, p. Dec5824-5825).

45.     Taylor testified he and plaintiff drank the beer.  Plaintiff then put the jar, what he thought were baseball cards, and the beer carton box  in the garbage bag.  They then went down the alley about two blocks away and threw the bag in a dumpster behind the "Gallery" building there.  Taylor did not see plaintiff again that night.  (Exh. A, p. Dec5826)

46.     Taylor identified at trial some of the items he and plaintiff disposed of in the plastic garbage bag. (Exh. A, p. Dec5828-5829).

47.     Taylor testified that he next saw plaintiff the following day in front of his house, early in the day.  (Exh. A, p. Dec5830).

48.     Taylor testified that the next time he saw plaintiff was later that night at his friend John Bradford's house at 501 West Macon Street.  It was in the evening sometime.  Plaintiff was inside the building, in an apartment with the front door open.  Plaintiff called Taylor inside and they sat on the steps near the apartment. (Exh. A, p. Dec5831)

49.     Taylor testified that plaintiff was wearing some old shoes, which did not fit him, and which his feet could not fit all the way into them.  Plaintiff was walking on the back side of the shoes.  His heels were hanging out from the back of the shoe.  He was also wearing different clothes, an older type of clothes from what Taylor had seen earlier that day.  (Exh. A, p. Dec5832).

50.     Taylor testified that he asked plaintiff about the clothes and shoes, and plaintiff said something like "Man you know I had to beat the dude to death."  Taylor asked, "What dude?"  Plaintiff said, "The guy that stayed downstairs" from Taylor.  Plaintiff added that the guy "didn't have but 11 dollars."  (Exh. A, p. Dec5833).

51.     Taylor testified that he then asked plaintiff what happened to his shoes.  Plaintiff responded that there was blood everywhere, and Taylor testified he assumed that was why plaintiff was dressed the way he was.  (Exh. A, p. Dec5834).

52.     Taylor was then shown the Fila shoes taken from plaintiff.  Taylor commented that they had been pretty beaten up, and that he thought they were a different color, like red.  Taylor added, "It's been a while, but they might be the ones."  (Exh. A, p. Dec5834).

53.     Taylor testified that he was shown a pair of "tennis shoes" while he was in custody at the police station.  Taylor testified that he told the police those were the ones that plaintiff had on earlier the day of the murder.  (Exh. A, p. Dec5835-5838).

54.     Taylor admitted that he had denied any knowledge about the burglary or the murder before the day he was arrested and confronted with his fingerprints on the garbage bag.  (Exh. A, p. Dec5842).

55.     Taylor testified that some weeks later he saw Plaintiff in downtown Decatur. Plaintiff came up to him and asked him if the police were still coming to his house to talk to him. Taylor told plaintiff he had to go, and did not respond.  (Exh. A, p. Dec5843-5844).

56.     Taylor was then cross-examined.  He testified he didn't think the shoes that he saw in court were the same ones plaintiff had been wearing, but added "I am not for sure about that." (Exh. A, p. Dec5845).

57.     Taylor denied telling defendant Bell that he actually stepped inside the apartment and acted as a lookout for plaintiff as he went through Helmbacher's apartment.  (Exh. A, p. Dec5847-5848).

58.     Taylor was asked about his not reporting plaintiff's confession until he was confronted with his fingerprint on the bag.  Taylor answered it was "Cause I didn't want to be involved in it."  (Exh. A, p. Dec5856-57).

59.     The State called William McGaughey, who testified about finding the bag at the Milliken homestead.  (Exh. A, p. Dec5865-5869).

60.     The State then called Michael Callaway.  Callaway testified that he knew plaintiff. In August of 1998 Calloway was living on Macon Street at the corner with College.  He testified that on occasion plaintiff stayed with him at that apartment.  (Exh. A, p. Dec5882-5883)

61.     Callaway testified that on the night of the murder, plaintiff came to Callaway's apartment.  Callaway left the apartment to get some liquor, was gone about 45 minutes, and when he came back, plaintiff had changed into one of Callaway's shirts.  (Exh. A. p. Dec5884).

13

62.     The next day plaintiff was wearing one of Callaway's caps, had Callaway's shirt on, and Callaway objected.  Callaway told plaintiff he had to wash his clothes out.  Callaway saw plaintiff washing clothes in a tub where the two of them would sometimes wash clothes.  (Exh. A, p. Dec5885).

63.     Callaway could not say with any certainty what time plaintiff came to his apartment, but admitted that when he was first interviewed by the police, he told them plaintiff had "got there just before it started to get dark."  (Exh. A, p. Dec5891).

64.     Tim Carlton testified about his role in the investigation.  He testified that after interviewing Ray Taylor about the burglary and murder, and plaintiff was taken into custody, Carlton took plaintiff's Fila shoes.  He showed them to Ray Taylor, who was in the police station at the time, in custody, then placed them into evidence.  (Exh. A, p. Dec5922-5923).

65.     Carlton testified about his interview of Mike Callaway on September 26, 1998, and the report he prepared regarding his interview of Callaway.  Carlton refreshed his memory off of the Callaway report.  (Exh. FF).

66.     On cross-examination, Carlton testified about the two times the shoes were sent to the ISP crime lab, and the request that they be torn apart the second time.  (Exh. A, p. Dec5928)

67.     Carlton was cross-examined about the victim's fingernails having been inventoried, that defensive wounds might indicate somebody had been fighting, and was asked if it would be important to know if plaintiff's blood and skin was underneath Helmbacher's fingernails.  (Exh. A, p. Dec5932-5933).

68.     Roger Morville testified about the procedures for inventorying evidence in the DPD, and his transportation of the shoes back and forth between the DPD and the ISP lab in Springfield.  (Exh. A, p. Dec 5939-5946).

69.     ISP crime lab employee Mark Mills testified about the garbage bag fingerprint match with Ray Taylor. (Exh. A, p. Dec5960-61)

70.     Robert Martin testified about drinking beer with plaintiff and Taylor in front of 351 West Macon on the afternoon of the murder.  (Exh. A, p. Dec5968-5972).

71.     Jennifer Lu testified about finding the blood on plaintiff's shoe. (Exh. A, p.Dec6018).  Dana Pitchford testified that it matched Helmbacher's.  (Exh. A, p. Dec6035).

72.     Travis Hindman, a pathologist, testified about performing the autopsy.  (Exh. A, p. Dec5973).  Hindman testified that at times he will preserve blood specimens for testing, either by putting wet blood in a bottle, or will place blood on a card which creates a dried blood sample. Hindman testified that in this case he created a dried blood sample of Helmbacher's blood, packaged it, and gave it to the DPD police officer who attended the autopsy.  (Exh. A, p. Dec5995-5997).  The blood standard was sent to the lab and not returned to the DPD.

73.     At the close of the State's case, the court denied plaintiff's Motion for Directed Verdict.  (Exh. A, p. Dec6048).

74.     The defense called defendant Brian Bell to testify about Taylor's statement in which he admitted to a more active participation in the burglary.  Bell testified about Taylor saying that he actually entered the apartment and acted as a lookout while plaintiff gathered propery in the apartment.  (Exh. A, p. Dec6050).

75.     The defense called Jeremy Welker, who testified about Taylor's statement on August 28, 2998, in which he denied any knowledge about the murder.  (Exh. A, p. Dec6053). The defense also called defendant Applegate, who testified that he interviewed Taylor on September 1, 1998, and he denied any knowledge about the murder.  (Exh. A, p. Dec6063).

15

76.     Plaintiff's attorney then wanted a delay in the trial, because Sherry Allen, a person who had seen Taylor carrying the white bag down the street sometime after the burglary, had not responded to a subpoena.   The court denied the delay.   (Exh. A, p. Dec6064-6067).   As a compromise, the court allowed Carlton to testify to Allen's statements about her seeing Taylor carrying the bag down the street. (Exh. A, p. Dec6110)

77.     Plaintiff then testified in his own case in chief.  (Exh. A, p. Dec6070-6095)

78.     Plaintiff testified that on the day of the murder, he left Taylor's apartment at about 3:30 or 4:00, and went down to Callaway's house, where he stayed for the rest of the day.  Plaintiff admitted to washing out clothes, but contended it was Callaway's clothes he washed, and he changed into.  (Exh. A, p. Dec6078-6079).

79.     At the end of the trial on August 27, 2000, the jury returned a verdict of guilty. (Exh. A, p. Dec6181)

**Post Conviction Proceedings**

80.     Plaintiff's conviction was affirmed on appeal. *People v. Palmer*, 324 Ill.App.3d 1158 (4th Dist. 2001).

81.     Plaintiff filed a petition for post-conviction relief, which was denied, affirmed on appeal. *People v. Palmer*, 352 Ill.App. 3d 877 (4th Dist. 2004)

82.     In 2010, plaintiff filed a petition for DNA testing.  On June 13, 2011, the court allowed DNA testing on Helmbacher's fingernail substances.  (Exh. M).

83.     Cellmark Forensics was selected to perform the DNA analysis. On January 22, 2014, Cellmark issued its report, which excluded plaintiff's DNA from any materials from Helmbacher's fingernails.  (Exh. M)

84.     The ISP never examined the fingernail material because it was not considered forensically probative. (Exh. K, p. 139, 145-147; Exh. L, p. 157-158).  Fingernails are also easily contaminated. (Exh. K, p. 144).

85.     There is nothing about the physical evidence in this case which suggests in any way that Helmbacher ever struck the assailant, or had any opportunity to put hands on the assailant that would have deposited the assailant's DNA under Helmbacher's fingernails.  (Exh. O, p. 45-46).

86.     Bode Laboratories purchased Cellmark Forensics.  Bode would not recognize Cellmark's results regarding Helmbacher's fingernails because it did not use that protocol. (Exh. N, p. 85-86).

87.     Cellmark's conclusions were sub-threshold, failed to account for drop-in or dropout of DNA, and were scientifically unreliable.  (Exh. N, p. 75-80, 173-176).

88.     It would be next to impossible to create wet blood from a dry blood standard, or to transplant DNA rich blood to a surface in uncontrolled conditions. (Exh. N. p, 134-138).

89.     On October 5, 2016, plaintiff filed a successive petition for post-conviction relief. *People v. Palmer*, 2019 IL App (4th) 190148, ¶86.

90.     On November 16, 2016, the State conceded the petition and agreed to vacate plaintiff's conviction. (Id. at ¶87).

91.     On November 23, 2016, the state's attorney moved to dismiss the charges.  (*Id*, at ¶89).

92.     On August 30, 2018, plaintiff filed a petition for certificate of innocence based on the Cellmark DNAtesting. (*Id*, at ¶92).

93.     The State's Attorney opposed the petition for certificate of innocence, but took an unusual position.  Instead of contesting the validity of the Cellmark report, or that the lack of DNA

under Helmbacher's fingernails did not exonerate plaintiff or demonstrate in any way that he was not guilty of the murder, the State instead took the position that plaintiff could have been guilty but only as an accomplice who did not wield the actual murder weapon. *Id*, at ¶103.

94.     The circuit court denied plaintiff's petition for certificate of innocence.  That denial was affirmed on appeal. *Id*, at ¶177.

95.     On April 15, 2021, the Illinois Supreme Court reversed the appellate court and remanded to the circuit court for the issuance of a certificate of innocence to plaintiff.  2021 IL 125621.

## ARGUMENT

**Summary Judgment Standard**

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.Pro.56(a).   The court may consider "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"  (Fed.R.Civ.P.56(c)(A)), or "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact" (Fed.R.Civ.P. 56(c)(B)). When the moving party identifies an issue appropriate for summary judgment on which the non-moving party bears the burden of proof, the non-moving party must come forward with evidence to establish a factual dispute on that issue to defeat the motion.  *Celotex Corp., v. Catrett*, 477 U.S. 317, 323 (1986); *Spierer v. Rossman*, 798 F.3d 502, 508 (7th Cir. 2015); *Harper v. United States Beef Corp*., 2018 U.S. Dist. Lexis 139096, *13 (C.D. Ill.)  A party needs more than a scintilla of evidence to defeat summary judgment.  *Audusmilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.

1988).  For the reasons that follow, defendants are entitled to summary judgment on plaintiff's claims.

I.      **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL CLAIMS**.

Plaintiff's federal claims are plead in Counts I to IV of the Second Amended Complaint, each made under 42 U.S.C. §1983.  Count I alleges a due process violation for denial of a fair trial.  Count II alleges unlawful detention under the Fourth Amendment.  Counts III and IV allege failure to intervene and conspiracy, respectively.  The constitutional claims are brought against the remaining individual defendants, along with a *Monell* claim against the City of Decatur.

Defendants are entitled to summary judgment on plaintiff's federal claims.  Merely because plaintiff's conviction was vacated does not mean he was denied a fair trial or that his constitutional rights were violated in any way.  *Coleman v. City of Peoria*, 925 F.3d 336 (7th Cir. 2019).  Plaintiff cannot make out a due process violation of his right to a fair trial, or a Fourth Amendment violation for an unlawful detention, nor can he show liability based on a failure to intervene or conspiracy.  Moreover, the individual defendants are entitled to summary judgment based on qualified immunity, because the law was not clearly established that any defendant's actions were unconstitutional.  In addition, plaintiff cannot show that any municipal conduct caused a constitutional violation, to support his *Monell* claim.

A. **The Individual Defendants Are Entitled To Summary Judgment on Plaintiff's Due Process Claim in Count I of the Second Amended Complaint**

In Count I, plaintiff alleges he was deprived of a fair trial, in violation of the Due Process Clause, by defendants' fabricating evidence against him and suppressing exculpatory evidence.

Plaintiff cannot produce evidence to establish a triable fact issue on his claim of denial of a fair trial.  As a result, defendants are entitled to summary judgment on Count I.

At plaintiff's trial, the prosecution presented the testimony of Ray Taylor that plaintiff admitted murdering Helmbacher, and that the victim's blood was found on plaintiff's Fila brand athletic shoe. (Facts, ¶50,71)[3] Plaintiff's fabrication claims are based on his allegations that Ray Taylor was coerced into implicating plaintiff in the murder, and that Helmbacher's blood was planted on the Fila shoes.

Fabricating evidence can provide a basis for a due process claim. *E.g.*, *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *Whitlock v. Brueggeman*, 682 F.3d 567, 580 (7th Cir. 2012).  But plaintiff's claims that evidence was manufactured "are not magic talismans" that establish his due process rights were violated.  *Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014); *Munoz v. Rivera*, 169 F.Supp.3d 815, 817 (N.D. Ill. 2015).   As the Supreme Court established in *Celotex Corp.*, to defeat summary judgment plaintiff must produce evidence to establish a fact issue on any claim on which he bears the burden of proof at trial.  Moreover, plaintiff must also establish what each individual defendant did to cause any constitutional violation.  Plaintiff cannot do so.  Pleadings, speculation, and wild conspiracy theories will not create a fact question.  *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012); *Harper v. United States Beef Corp.*, 2018 U.S. Dist. Lexis 139096 *12 (C.D. Ill).

Plaintiff's due process claim that Taylor was coerced into implicating plaintiff in the murder is dead on arrival.  Coercing a witness statement does not itself violate the due process rights of an accused.  *Coleman v. City of Peoria*, 925 F.3d 336, 346 (7th Cir. 2019); *Petty v. City of Chicago*, 754 F.3d 416, 422 (7th Cir. 2014)  Coerced statements could be true, even though

---

[3] References are to paragraphs in the Undisputed Material Facts.

coerced, so merely showing that a witness statement was coerced does not violate due process. *Coleman*, at 346.  For plaintiff's fabrication due process claim to succeed, he must show that the police coerced a statement they knew to be false.  That is a high bar to clear, *Coleman* at 344, impossible here.  There is no evidence that any defendant improperly coerced Taylor's statement, knew it was false, or that the incriminating information even was false.  Indeed, everything about it would indicate it was true.

Taylor's statement implicating plaintiff was corroborated in many ways.  Plaintiff was in the area of the murder during the time that it was likely committed, corroborated by another witness, Robert Martin. (Facts, ¶70).  Plaintiff never denied it, even today, and there is a time period when the murder could have taken place where plaintiff could not explain his whereabouts. (Facts, ¶78). Plaintiff's own testimony about his activities that afternoon were suspect.  He claimed to be sick in bed, but Martin had plaintiff drinking beer with him and Taylor. (Facts, ¶70).  Michael Calloway corroborated plaintiff's being at the area where Taylor said Palmer confessed to him at the time when the confession occurred, (Facts, ¶59-61) and recalled seeing Taylor there talking to plaintiff. (Facts, ¶30).  Plaintiff's wearing an odd pair of shoes that did not fit was suspicious, (Facts, ¶49) as was plaintiff's changing and washing clothes and putting on Calloway's clothes. (Facts, ¶62)

The polygraph also supported Taylor's account.  Although polygraph results are generally not admissible, they can be useful investigatively and with other factors can support probable cause. *Booker v. Ward*, 94 F.3d 1052, 1058 (7th Cir. 1996); *Predmore v. Schwartz*, 141 F. Supp.2d 1150, 1156 (C.D. Ill. 2001).  Taylor's polygraph report showed no deception about knowing who committed the murder and himself not being involved in the murder, but showed deception on his

not being involved in the burglary the day before, which his fingerprint on the bag of goods also refuted. (Facts, ¶22). All indications were that the polygraph worked.

Plaintiff's Second Amended Complaint makes much of Taylor having told the police before implicating plaintiff that he knew nothing about the murder. Of course he did, and nothing about those earlier denials made his statement implicating plaintiff unbelievable. Taylor was not the world's first recalcitrant witness. *Coleman*, at 351. Plaintiff and Taylor were cousins. Certainly, Taylor had no intention of implicating his cousin. Taylor, like many would, wanted no part in blowing the whistle on a relative and companion in crime. The police certainly reasonably would not think Taylor was lying merely because of the earlier denials. After being confronted with the polygraph and his fingerprints on the burglary bag, the police could reasonably believe Taylor knew more than he had admitted, and decided it was time to come clean about his involvement in the burglary and plaintiff's confession.

Plaintiff's argument that the police violated his right to a fair trial by using Taylor's statement, in any way, has no traction. Taylor was thoroughly cross-examined at plaintiff's trial. He was confronted with his prior statements to the police, inconsistencies in his version of events, and his involvement in the burglary. At trial Taylor backed away some from his full involvement in the burglary, admitting only to taking possession of and disposing of items plaintiff took from Helmbacher's apartment, but denying he acted as a lookout or entered the apartment. (Facts, ¶43). To further impeach Taylor, plaintiff's defense attorney called defendant Bell as a witness to establish Taylor's earlier statement about his more active involvement in the burglary. (Facts, ¶74). The jury heard all there was to hear to determine Taylor's credibility. Nothing about the interactions between the police and Taylor denied plaintiff a fair trial.

Plaintiff goes on to allege that defendants deprived plaintiff of a fair trial by planting Helmbacher's blood on plaintiff's Fila gym shoes.  Like the claims regarding Taylor's incriminating statements being false, plaintiff's spurious claims of blood being planted could not have deprived plaintiff of a fair trial.  If establishing that the police fabricated Taylor's testimony "is a high bar to clear," *Coleman* at 344, this fabrication claim is even higher. *E.g*., *White v. Fitzpatrick*, 755 Fed. Appx. 563, 569-70 (7th Cir. 2018); *Brown v. Calloway*, 2017 U.S. Dist. Lexis 195767, *18 (N.D. Ill).  Plaintiff alleges the blood must have been planted because that the Fila shoes were sent to the lab twice, the second time after the ISP failed to find blood at first, and because of the request to "tear the shoes apart." Plaintiff also raises Taylor's testimony at trial that he could not be sure if the shoes shown him were plaintiff's.

It is difficult to follow plaintiff's argument that any of this deprived him of a fair trial.  The integrity of the Fila shoes and whether Helmbacher's blood was planted on them was central to plaintiff's defense at trial.  Carlton was cross-examined at length regarding whether the blood was planted, and the jury clearly did not buy it. (Facts, ¶66)  That Taylor could not be sure about the shoes, more than a year after he'd last seen them, and after they had been fileted on all sides, hardly supports plaintiff's position that the murder victim's blood was planted on them.  Plaintiff cannot produce plausible evidence any defendant planted blood on the Fila shoes.

The request for a second examination of the shoes is easily found reasonable.  Taylor and Calloway both gave police reason to believe plaintiff likely had blood on his shoes, and may have tried to wash it away.  There were reddish spots on the top of the Fila shoes, which appeared with the naked eye to resemble blood.  It was not blood.  The ISP's first examination of the shoes was cursory, at least more limited than the investigators expected. (Facts, ¶28). But Taylor and Calloway both gave the police reason to believe plaintiff had washed the shoes. Plaintiff came to

Calloway's house the night of the murder and began washing things in Calloway's bathtub, either the night of the murder or the next day, even putting on Calloway's clothes. (Facts, ¶29). Taylor told the police plaintiff was wearing an odd pair of shoes which didn't fit him, smashing down the back of the shoes to even get part of his feet into them. When asked about it, plaintiff answered he had to "get rid of" his shoes because "blood was everywhere." (Facts, ¶21). The police had every reason to believe plaintiff didn't get rid of them, only washed them, and blood might be found somewhere in lower levels of the shoe material. The shoes were returned to the ISP lab with a request for a more thorough review.

The give-and-take here between the crime lab and the police about what should be done with evidence was standard. According to the ISP crime lab personnel, the police always wanted all evidence they gathered thoroughly examined, but the lab had to triage the massive amounts of evidence regularly sent to it. They did not like cutting or tearing shoes, because it was time consuming and they could get cut. The lab had to make its own judgments about how to treat evidence. And this was not the only time the DPD asked the ISP to tear up shoes. After plaintiff's case the DPD asked the ISP to tear apart a pair of boots to check for blood. The lab did it, and no blood was found. But the ISP was concerned about setting a precedent in which this would be repeatedly expected, not just by the DPD, but other police agencies that sent evidence to the lab as well. (Facts, ¶28)

The shear impossibility of pulling off such a plot disputes that it happened, and mandates that plaintiff produce significant and positive evidence of such proof. The blood was ultimately found below the surface levels of the shoe, in a mesh area below leather striping. The only plausible explanation is precisely what the police suspected – plaintiff washed the shoes after the murder, which worked for most of any blood on the shoes, but not for all of it. Smaller amounts

embedded in deeper layers of one shoe did not come out. Plaintiff may offer wild and fantastic imaginations about syringes and ultra-sharp toothpicks, carefully placing blood at buried levels of material without leaving a trace above, but such conjecture should not substitute for actual evidence.

In addition, there was no wet blood at the DPD police station to pull off such a caper. Helmbacher's blood standard was there, part of the time, dried blood on filter paper, (Facts, ¶72) but speculation now turns into science fiction about turning dry blood on filter paper into enough DNA rich blood to create spots the size of what was found on plaintiff's shoes. Even the skimpy reasons for plaintiff's release and the vacation of his conviction did not impact the evidence that Helmbacher's blood was on plaintiff's Fila shoe.

Plaintiff cannot produce evidence to create a fact issue on his due process fabrication claim. Plaintiff's due process *Brady* claim also fails. In his Second Amended Complaint, and his Answer to Interrogatories (Exh. C), plaintiff claims that defendants violated due process by failing to disclose that they coerced Ray Taylor's statement implicating plaintiff, and that they planted Helmbacher's blood on plaintiff's shoe.

As already addressed, there is no evidence to support either alleged fabrication, nevertheless plaintiff cannot succeed on these theories because such *Brady* violation claims do not exist. Nevertheless, *Brady* does not require police to make exculpatory evidence, only disclose what is discovered. *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) (no *Brady* claim for police failure to disclose they planted plaintiff's blood at the crime scene); *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003) (no *Brady* claim for failure to disclose that confession coerced); *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) (no *Brady* claim for failure to disclose police officer lied about photo lineup).

25

Police interactions with Taylor were fully reported.  The police met and interviewed Taylor several times, confronted him with his involvement in the burglary shown by his fingerprint on the plastic bag containing the stolen items, all detailed in police reports.  It led to Taylor coming clean about both the burglary and his knowledge about the murder.  Nothing was suppressed about the police interactions with Taylor, and there is no evidence that anyone coerced a false statement from him.

Neither can the alleged planting of the blood form the basis for a *Brady* due process claim.  Once again, there is no real evidence to support the far fetched allegation that blood was planted on plaintiff's shoes.  Nevertheless, blood planting could not constitute *Brady* material.  To prove such a claim, plaintiff must show defendant suppressed the evidence that the blood was planted.  *Carvajal v. Dominguez*, 542 F.3d 561, 566-67 (7th Cir. 2008).  Evidence is not suppressed for *Brady* purposes if it was otherwise available to the defendant through the exercise of reasonable diligence.  *Id*. at 567.  If plaintiff had nothing to do with the murder, such that there would be no way for Helmbacher's blood to get on his shoes other than being planted, he would know that.  *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1028 (7th Cir. 2006); *Gauger*, at 360; *United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005).  Indeed, plaintiff's defense at trial was based on the blood being planted, and as a result he cannot claim he was denied a fair trial because of a *Brady* violation.  Plaintiff's *Brady* due process claim, like his fabrication due process claim, fails, and defendants are entitled to summary judgment on Count I of the Second Amended Complaint.

### B.  Plaintiff's Unlawful Detention Claim is Defeated by Probable Cause

In Count II plaintiff brings a Fourth Amendment claim for unlawful detention, based on his incarceration, apparently both before and after trial.  Plaintiff's unlawful detention claim is defeated by clear probable cause.  There was both direct and circumstantial evidence that provided probable cause for plaintiff's detention.

In *Manuel v. City of Joliet*, 137 S.Ct. 911, 920 (2017), the Supreme Court recognized that a plaintiff had a cause of action under the Fourth Amendment for unlawful detention even after legal process began. Prior to *Manuel*, the general understanding in the Seventh Circuit was that the Fourth Amendment covered detentions up to the beginning of legal process, at which time the Fourth Amendment fell out and the Due Process Clause governed. *Id*. at 916. In *Manuel*, the court clarified that a Fourth Amendment unlawful detention claim survives the initiation of legal process, until the point of conviction, at which time the Due Process Clause governs. *Id.* at 919. To the extent that plaintiff makes a post-conviction unlawful detention claim it should be rejected because such a claim is subsumed within his due process claim in Count I.

Nevertheless, defendants are entitled to summary judgment on plaintiff's unlawful detention claim, whether it encompasses pre-conviction or post-conviction incarceration, because there was probable cause for it. Probable cause is an absolute defense to a claim that a detainee's Fourth Amendment rights were violated. *Young v. City of Chicago*, 987 F.3d 641, 644 (7th Cir. 2021); *Cervantes v. Jones*, 188 F.3d 805, 811 (7th Cir. 1999). Probable cause is a low bar, which is met when evidence exists that creates reasonable grounds to believe that the detainee committed a crime. *Cervantes v. Jones*, *Id*. The evidence that provided the basis for plaintiff's conviction certainly established probable cause. That conviction was upheld on appeal, despite arguments that Taylor was an unbelievable witness, and that the blood was planted. *People v. Palmer*, 324, Ill.App.3d 1158 (4th Dist. 2001), appeal denied, 198 Ill.2d 603 (2002).

Even one or the other would have provided probable cause for plaintiff's detention. Helmbacher's blood on plaintiff's shoe certainly shows intimate involvement in the murder, even if he were not the one wielding the weapon. If he was there, he was accountable, and therefore probable cause existed for his detention merely on the basis of the blood on his shoe. Even apart

27

from blood on his shoes, however, Taylor's statements and testimony alone supported probable cause. Certainly there were changes in what Taylor was telling the police, and he gave prior statements inconsistent with his testimony. Those attacks on his credibility, however, did not erase probable cause. And Taylor's version of the events, though it varied at times, was highly corroborated. *Askew v. City of Chicago*, 440 F.3d 894, 897 (7th Cir. 2006).

Even the events that caused the Macon County State's Attorney to throw in the towel did not dent probable cause. The DNA testing of material drawn from Helmbacher's fingernails was later repudiated by Bode Laboratory, which bought Cellmark. (Facts, ¶85). The protocol Cellmark used was faulty and its conclusions unreliable. (Facts, ¶86). In addition, what might be found under Helmbacher's fingernails, as he's beaten to death with a hammer, with no evidence he ever laid a hand on his killer, is hardly probative at all, not even probative enough to impeach his conviction, let alone erase probable cause. (Facts, ¶8)

Probable cause for plaintiff's detention was established with either Taylor's own reports, or the bloody shoes, and certainly with both. Nothing that surfaced before or after plaintiff's conviction questions probable cause at all. The existence of probable cause defeats plaintiff's Fourth Amendment claim for unlawful detention. As a result, defendants are entitled to summary judgment on Count II.

### C.  Plaintiff's Failure to Intervene and Conspiracy Claims

In Counts III and IV, plaintiff alleges that he suffered constitutional violations as alleged in Counts I and II, and that the individual defendants are all liable regardless of their actual involvement, because they failed to intervene to prevent officers active in the misconduct, or they conspired with them. Both claims fail. First, that plaintiff cannot establish fact issues on the underlying allegations of constitutional violations defeats both the failure to intervene claim and the conspiracy claim. Nevertheless, there is no evidence to support either. A failure to intervene

claim exists when a police officer has clear and certain knowledge that an unconstitutional act is taking place, and has the opportunity to take effective action to prevent it. *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

There is no evidence to support such a claim against any defendant. A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act. To establish conspiracy liability in a §1983 claim, the plaintiff must show the individual conspirators reached an agreement to deprive the plaintiff of his constitutional rights, and committed overt acts in furtherance of the agreement that actually deprived the plaintiff of those rights. *Beaman v. Freesmeyer*, 776 F.3d. 500, 510 (7th Cir. 2015). These elements cannot be met here. A conspiracy claim cannot be based on attenuated inferences, speculation or conjecture. *Goetzke v. Ferro Corp*., 280 F.3d 766 (7th Cir. 2002). There is no evidence of any agreement to violate plaintiff's constitutional rights, and no actual constitutional violations.

In addition, the common law intracorporate conspiracy doctrine eliminates a conspiracy claim arising out of the actions of employees of a single entity. It is easy to argue that employees of a single entity, working toward a common goal, are conspirators, but it is misleading. That is the purpose for the intracorporate conspiracy doctrine. *Wright v. Illinois Department of Children and Family Services*, 40 F.3d. 1492, 1508 (7th Cir. 1994); *David v. Village of Oak Lawn*, 1996 WL 210072 at \*4 (N.D. Ill). The defendants are entitled to summary judgment on plaintiff's conspiracy claim.

### D.  The Individual Defendants are Entitled to Qualified Immunity

The Supreme Court has held that police officers and other government officials have immunity from liability as long as their conduct does not violate a clearly established right at the time of the officer's or official's actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Determining whether a government official has qualified immunity is a two-step process. *Saucier*

*v. Katz*, 533 U.S. 194, 200-01 (20010).  First, a court must decide whether the facts, taken in the light most favorable to the plaintiff, show that the official's conduct violated a constitutional right. Second, the court must decide whether the right was clearly established at the time of the alleged misconduct.  *Id*.

In prior sections of this motion, defendants established their right to summary judgment based on the first prong of the qualified immunity test.  Plaintiff cannot establish that defendants violated his constitutional rights.  Nevertheless, defendants are also entitled to summary judgment on the second prong of the qualified immunity test, whether the rights plaintiff is alleging were violated were clearly established at the time that the actions occurred.  For a right to qualify as clearly established it "must be sufficiently clear such that a reasonable official would understand that what he is doing violates that right."  *Bakalis v. Golumbeski*, 35 F.3d 318, 323 (7th Cir. 1994) Courts must look to the particularized circumstances, not the general law, when considering a qualified immunity defense. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004).  If the particular facts fall within the hazy border between proper and improper then qualified immunity should be applied.  *Saucier*, 533 U.S. at 206.

Defendants have qualified immunity on plaintiff's due process claims.  On the question of the defendants' interactions with Ray Taylor, there has never been any clearly established law that anything defendants did (which plaintiff could actually prove) violated due process.  The defendants' interactions with Taylor were nothing more than classic police work, where a recalcitrant witness, later implicated in a criminal act, finally comes clean about his own involvement in any criminality, as well as his knowledge of another's guilt.  Defendants did nothing that violated any clearly established right.  *See e.g. Gill v. City of Milwaukee*, 850 F.3d 335, 341 (7th Cir. 2017).

On the claim of planting blood, defendants certainly do not take the position that there was any uncertainty about the wrongfulness of doing anything like that. That fabricating evidence to cause an arrest is unconstitutional is not new. *Franks v. Delaware*, 438 U.S. 154 (1978). Nevertheless, the law on due process fabrication has, surprisingly, only recently started to clarify. In *Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015), the Court addressed the misunderstandings that district courts in the Seventh Circuit, and sometimes the Circuit Court itself, have expressed regarding due process fabrication claims. The court made the following observation:

> On the merits, *Saunders-El* maintains that allegations of evidence fabrication can support a due process claim under §1983. We agree with him. In its two-page opinion, the district court did not address our recent case law in this area and, instead, focused on our prior decisions in *Fox v. Hayes*, 600 F.3d. 819 (7th Cir. 2010); *Brooks v. City of Chicago*, 564 F.3d 830 (7th Cir. 2009); and *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) – interpreting them as an edict from this court that evidence fabrication-based due process claims can never form the basis of a constitutional tort. That reading, not uncommon among district courts in this circuit it seems, is inaccurate and requires clarification.

778 F.3d at 559

In *Saunders-El*, in 2015, the Court identified uncertainty in the law on whether a due process fabrication claim exists. According to *Saunders-El*, cases like *Whitlock v. Bruggemann*, 682 F.3d 567 (7th Cir. 2012), began to clarify that such a federal claim exists. All of the actions plaintiff complains about took place in 1998, long before the action here. Certainly, at that time, the law was not clearly established that a fabrication-based due process right existed.

The same applies to plaintiff's due process *Brady* claim. The general *Brady* rule certainly was clearly established long before plaintiff's prosecution. But the question of whether the law was clearly established cannot be framed in generalities. *City and Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 135 S.Ct. 1765, 1775-76 (2015). Whether evidence constitutes Brady material "is legally simple but factually complex." *United States v. Ballard*, 885 F.3d 500, 504

31

(7th Cir. 2018).  The court must look at the specific factual situation to determine the status of the law.

In *Beaman v. Freesmeyer*, 776 F.3d 500, 509 (7th Cir. 2015), the Court upheld qualified immunity for the defendants on the plaintiff's claim that his due process rights were violated by the failure to produce an alternate suspect's polygraph report.  The Court observed the following:

> Beaman argues that *Brady* "has been on the books since 1963 and easily qualifies as clearly established law."  (Citation omitted).  The withholding of materially exculpatory evidence violates the *Due Process Clause*.  He contends that the novelty of the factual circumstances cannot excuse the *Brady* violation where it is well-established that investigators who withhold exculpatory evidence violate the defendant's constitutional due process right.  While it is true that the idea that police officers must turn over materially exculpatory evidence has been on the books since 1963, it certainly has not been on the books since 1963 that polygraph reports are materially exculpatory evidence.

776 F.3d at 509.  Then the Court went on to conclude that "Beaman points to no cases pre-1995 [the date of the alleged violation] where the Illinois Supreme Court, or any Illinois court for that matter, found that inadmissible polygraph tests, or any type of inadmissible evidence, could constitute *Brady* material."  *Id*.

There have never been any cases that clearly identified as *Brady* material what plaintiff contends should have been disclosed here.  As stated, nothing the police did here in connection with bringing Taylor to the truth and admitting his full knowledge of the murder has ever been seen as requiring *Brady* disclosure. Likewise with the claim of blood planting. Defendants are entitled to qualified immunity on plaintiff's *Brady* claim.

Defendants also have qualified immunity under the second prong of the test on plaintiff's unlawful detention claim.  Defendants established their right to summary judgment on the first prong earlier in this brief, showing how there was probable cause for plaintiff's detention, even if the bloody shoe was taken out of the equation.  Qualified immunity on the question of probable cause introduces the concept of "arguable probable cause," in which even in a case where a court

may find probable cause lacking, qualified immunity applies if it is a close call. *McComas v. Brickley*, 673 F.3d 722, 725 (7th Cir. 2011)  Arguable probable cause can certainly be found in Ray Taylor's testimony alone. As a result, defendants have qualified immunity on plaintiff's unlawful detention claim as well.

### E.  The City of Decatur is Entitled to Qualified Immunity on Plaintiff's *Monell* Claim.

Plaintiff includes in his allegations of unconstitutional violations a claim under §1983 against the City of Decatur under *Monell*.  The City is entitled to summary judgment on plaintiff's *Monell* claim.  Respondeat superior liability does not apply to a government entity under §1983. To establish municipal liability, the plaintiff must show actions by the municipality itself that were the driving force behind any constitutional violation. *Board of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997).

Generally, there are three ways to establish *Monell* liability:  (1) an express policy that causes a constitutional deprivation when enforced;  (2) an entrenched and wide-spread unconstitutional practice or custom giving rise to the plaintiff's claim; or (3) the acts giving rise to the unconstitutionality were performed by high-level policy-making officials, such that the illegal actions can be attributed to the municipality itself.  *Lawrence v. Kenosha County*, 391 F.3d 837, 844 (7th Cir. 2004).

Plaintiff has identified no express policy here.  He instead alleges in the Second Amended Compliant (Doc. #43) the City caused constitutional violations by its practice of "profoundly flawed investigative techniques and witness identification procedures" (¶105); "a code of silence" among police officers that eliminates accountability and oversight (¶107);  and rewards to police officers for closing cases "no matter what the costs" (¶108)

There is no evidence to support any of these allegations.  First, on the question of flawed investigative practices, no person has a constitutional right to an unflawed investigation.  *Rossi v. City of Chicago*, 790 F.3d 729, 735 (7th Cir. 2015).  Nevertheless, plaintiff can produce no evidence to show any type of flawed investigation in this case.  On the question of a code of silence, this common boilerplate *Monell* allegation has no evidence to support it here. That theory required plaintiff to prove there was continuing misconduct in the DPD, which never came to the attention of supervisors or administrators who would have corrected it, because the police kept silent about it.  *Id.* at 737. There is no evidence to support this claim.  The only evidence that ever came out about a bad cop involved Jim Stinger, who the DPD investigated and terminated. (Exh. C, p23-24). In addition, there is no evidence of any type about rewards being given for closing cases. Certainly good police work that gets results would be rewarded, as it would be in every police agency, indeed in every successful organization.  However, there is no evidence to support a claim that plaintiff suffered any constitutional violations because of some reward program within the DPD.  The defendant City of Decatur is entitled to summary judgment on plaintiff's *Monell* claim.

## II.     DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

In Counts V to X, plaintiff alleges state law claims against defendants.  For the reasons that follow, defendants are entitled to summary judgment on the state law claims as well.

### A.  Count V – Defendants are Entitled to Summary Judgment on Plaintiff's Malicious Prosecution Claim

In Count V, plaintiff alleges defendants are liable for malicious prosecution for the murder charge against him.  Defendants are entitled to summary judgment on this claim.  Malicious prosecution under Illinois law requires proof of:  1) commencement or continuation of a criminal proceeding by the defendant; 2) absence of probable cause for the proceeding; 3) malice; 4)

termination of the proceeding in a manner indicative of the plaintiff's innocence; and 5) damages. *Beaman v. Freesmeyer*, 2019 IL 122654 ¶26; *Swick v. Liautaud*, 169 Ill.2d 504, 512 (1996).

Lawsuits for malicious prosecution are not favored under Illinois law. Public policy favors the exposure of and prosecution for criminal acts. As a result, the plaintiff's burden in proving the elements of malicious prosecution is quite high. *Swick v. Liautaud*, 169 Ill.2d 504, 512 (1996); *Joiner v. Benton Community Bank*, 82 Ill.2d 40, 44-45 (1980). This court should enter summary judgment on Count V because plaintiff cannot prove an absence of probable cause, malice, or that the prosecution was terminated in a manner indicative of plaintiff's innocence.

Probable cause is a complete defense to a malicious prosecution lawsuit. *Johnson v. Saville*, 575 F.3d 656, 659 (7th Cir. 2009). Probable cause is "a state of facts that would lead a person of ordinary caution and prudence to believe, or to entertain an honest and strong suspicion, that the person arrested committed the offense charged." *Reynolds v. Menard, Inc.*, 365 Ill.App.3d 812, 820 (1st Dist.) The existence of probable cause depends on the "totality of the circumstances" at the time of the arrest. *Gauger v. Hendle*, 2011 IL App (2d) 100316 ¶112. In response to plaintiff's claim of unlawful detention in Count II of the Second Amended Complaint, defendants set out the basis for probable cause for plaintiff's detention. That same probable cause defeats plaintiff's state law malicious prosecution claim.

Defendants are also entitled to summary judgment because plaintiff cannot prove the termination of his prosecution was indicative of his innocence. A plaintiff bears the burden of proving that termination of the prosecution in his favor was entered for reasons consistent with his innocence. *Swick*, at 513. To make that determination, the circumstances under which the dismissal is obtained must be examined, not the form or title given to it. *Id.* Plaintiff's conviction was vacated after the State's Attorney agreed to it. Nevertheless, the State's Attorney has

contested, and continued to contest all the way to the Illinois Supreme Court, that plaintiff is innocent of the murder.   Nothing about the conviction being vacated indicates plaintiff's innocence.   As a result, this court should enter summary judgment on plaintiff's malicious prosecution claim on that ground as well.


### B.  Count VI – Defendants are Entitled to Summary Judgment on Plaintiff's Intentional Infliction of Emotional Distress Claim

 In Count VI, plaintiff alleges a state law claim of intentional infliction of emotional distress (IIIED").   To prove that under Illinois law, a plaintiff must establish that:   (1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended that his conduct should inflict severe emotional distress, or knew that there was a high probability that his conduct would cause severe emotional distress; and (3) the defendant's conduct in fact caused severe emotional distress.  *Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006).   Extreme and outrageous conduct is that which goes "beyond all bounds of decency and is considered intolerable in a civilized community." *Id.*

Plaintiff's IIED claim relies solely on the same facts as his malicious prosecution, an alleged prosecution without probable cause.  (Doc. #43, ¶126-27).  As a result, his IIED claim fails with his malicious prosecution claim.  See *Jiminez v. City of Chicago*, 830 F.Supp.2d 432, 451 (N.D. Ill. 2011) (recognizing the success of plaintiff's IIED claim was contingent on the success of his due process and malicious prosecution claims); *Walden v. City of Chicago*, 755 F.Supp.2d 942, 962 (N.D.Ill. 2010) (recognizing that plaintiff's IIED claim was contingent or "intertwined" with the malicious prosecution claim).  Because defendants are entitled to summary judgment on

plaintiff's malicious prosecution claim, they are entitled to summary judgment on plaintiff's IIED claim as well.

### C. Count VII – Plaintiff Has No State Law Claim for Wilful and Wanton Conduct

In Count VII, plaintiff alleges a cause of action for willful and wanton conduct, independent from any other state law tort. Wilful and wanton conduct, however, is not a separate and independent tort. It is an aggravated form of negligence that attaches to a traditional negligence claim or other recognized tort. *Doe-3 v. McLean County Unit Dist. #5*, 2012 IL 112479, ¶19; *Krywin v. Chicago Transit Auth.*, 238 Ill.2d 215, 235 (2010). In Count VII, plaintiff asserts only a separate claim for willful and wanton misconduct, unconnected to a recognized tort. As a result, defendants are entitled to summary judgment on Count VII of Plaintiff's Second Amended Complaint.

### D. Count VIII – Defendants are Entitled to Summary Judgment on Plaintiff's Civil Conspiracy Claim

For all of the reasons defendants are entitled to summary judgment on plaintiff's federal conspiracy claim, defendants are entitled to summary judgment on Count V.

### E. Defendants are Entitled to Summary Judgment on Counts IX and X

Counts IX (*Respondeat Superior*) and Count X (Indemnification) are derivative claims of plaintiff's other counts. Because these claims fail, defendants are entitled to summary judgment on Counts IX and X.

## CONCLUSION

Defendants should be granted summary judgment. There is no evidence to prove they did anything to violate plaintiff's due process or Fourth Amendment rights or maliciously prosecute him. Defendants worked diligently and did their best to solve a gruesome murder. There is no evidence that they did anything wrong to result in a wrongful conviction or even that plaintiff was

in fact wrongfully convicted.  For all of the foregoing reasons, defendants respectfully request this

court grant summary judgment in their favor.

<br>

By:  /s/ Thomas G. DiCianni
      One of the Attorneys for Defendants
      City of Decatur, Roger Ryan, Brian
      Bell, Roger Morville, Michael
      Applegate, Frank Hubbard, Joe Patton,
      Jeremy Welker, and Steve Chabak

Thomas G. DiCianni / ARDC # 3127041
tdicianni@ancelglink.com
Kathleen M. Kunkle / ARDC # 6281796
kkunkle@ancelglink.com
ANCEL GLINK, P.C.
140 South Dearborn Street, Sixth Floor
Chicago, Illinois  60603
(312) 782-7606
(312) 782-0943 Fax

By:  /s/ Jerrold H. Stocks
One of the Attorneys for Defendant, Estate of
Tim Carlton
Jerrold H. Stocks/ARDC #6201986
jstocks@decatur.legal
Ross J. Munsterman / ARDC #6324391
rmunsterman@decatur.legal
101 S. State Street / Suite 240
Decatur, IL 62523
(217) 429-4453
(217)425-8892 Fax

By:  /s/ John Robinson
One of the Attorneys for Defendants
City of Decatur, Roger Ryan, Brian
Bell, Roger Morville, Michael
Applegate, Frank Hubbard, Joe
Patton, Jeremy Welker, and Steve
Chabak
John Robinson / ARDC # 6186220
jrobinson@decaturil.gov
CITY OF DECATUR
#1 Gary K Anderson Plaza
Decatur, IL 62523
(217) 424-2807
(217) 424-2871 Fax

## CERTIFICATE OF SERVICE

I, Thomas DiCianni, an attorney, certify that on April 16, 2021, I electronically filed the foregoing **JOINT MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Steven Edwards Art  / steve@loevy.com
Jonathan I Loevy  / jon@loevy.com
Rachel Elaine Brady  / brady@loevy.com
Cindy Tsai / Cindy@loevy.com
Imani Franklin / imani@loevy.com
LOEVY & LOEVY
311 North Aberdeen St / 3rd Floor
Chicago, IL 60607

John T Robinson
CITY OF DECATUR
#1 Gary K Anderson Plaza
Decatur, IL 62523
jrobinson@decaturil.gov

Jerrold H. Stocks
Ross J. Munsterman
FEATHERSTUN GAUMER STOCKS FLYNN & ECK
101 S. State Street / Suite 240
Decatur, IL 62523
jstocks@decatur.legal
rmunsterman@decatur.legal

/s/ Thomas G. DiCianni