E-FILED
Wednesday, 23 June, 2021  06:05:42 PM
Clerk, U.S. District Court, ILCD

### IN THE UNITED STATES DISTRICT COURT FOR THE
### CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

CHARLES PALMER,

              Plaintiff,

     v.

CITY OF DECATUR, AMY M. WAKS, as
Special Representative of the ESTATE of
TIM CARLTON, ROGER RYAN, BRIAN
BELL, ROGER MORVILLE, MICHAEL
APPLEGATE, FRANK HUBBARD, JOE
PATTON, JEREMY WELKER, STEVE
CHABAK, and as-yet UNKNOWN
OFFICERS OF THE DECATUR POLICE
DEPARTMENT,

              Defendants.

No. 17-cv-3268

Judge Colin S. Bruce

Magistrate Judge Eric I. Long

### DEFENDANTS'  JOINT LOCAL RULE 7.1(D)(3) REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Filed as additional exhibits in support of Defendants' Motion for Summary Judgment and in Reply to Plaintiff's Additional Statement of Facts are the following Exhibits:

- HH – Affidavit and report of Dr. James Upshaw Downs

- II – Affidavit of Thomas G. DiCianni

- JJ – Deposition Transcript of Mort Smith

- KK – National Sun Graph and Twilight Descriptions

- LL – Deposition of Thomas Fedor

- MM – Lucy Davis Report (Exhibit to Davis Deposition, Exhibit N)

- NN – Deposition of Michael Mowen and Exhibit Pages

- OO – Decatur Newspaper Article

**<u>REPLY TO ADDITIONAL FACTS</u>**

1.      Charles Palmer is innocent of murdering William Helmbacher. Ds' Ex. B at 165:9¬11, 188:4-11, 213:15-19, 269:9-11; Ds' Ex. A, Part 3, at Decatur 6077:2-14; Ex. 33 at Decatur 119; Ex. 35; Ex. 5; Ex. 6; Ex. 115 at Palmer 6765; DSOF94; *People v. Palmer*, 2021 IL 125621; see also ASOF2.

**RESPONSE**:  **Immaterial/Disputed.  Defendants' Motion for Summary Judgment questions whether plaintiff can produce admissible, non-speculative, credible evidence to create a triable fact question on his claim that defendants violated his due process or Fourth Amendment rights, not whether plaintiff is guilty or innocent of the murder of William Helmbacher. *Coleman v. City of Peoria*, 925 F.3d 336, 352 (7th Cir. 2019).   Nevertheless, defendants dispute that plaintiff is innocent.  (Facts[1] #31-32, 50, 85-88)**

2.      Charles Palmer is innocent of burglarizing William Helmbacher. Ds' Ex. A, Part 3, at Decatur 6071:4-6073:5; Ds' Ex. B at 191:10-23; Ex. 33 at Decatur 119; Ex. 35; Ex. 99 at 56:9-20, 59:8-60:13, 62:5-23, 63:18-65:2, 69:5-71:1; Ex. 98 at ¶12; see also ASOF 1.

**RESPONSE**:  **Immaterial/Disputed. Defendants' Motion for Summary Judgment questions whether plaintiff can produce admissible, non-speculative, credible evidence to create a triable fact question on his claim that defendants violated his due process or Fourth Amendment Rights, not whether plaintiff is guilty or innocent of the burglary of William Helmbacher's apartment.  *Coleman v. City of Peoria*, 925 F.3d 336, 352 (7th Cir. 2019). Nevertheless, defendants dispute that plaintiff is innocent of the burglary.  (Facts #23-24, 42-46).**

**August 27, 1998: The Day Helmbacher Was Killed**

---

[1] References to "Facts" come from defendants' Undisputed Material Facts, pages 3 to 18 of the Joint Memorandum of Law in Support of Defendants' Motion for Summary Judgment

3.      William Helmbacher's neighbor saw him alive in his living room at approximately 7:50 p.m. on the night he was killed. Ex. 40 at Palmer 5573.

**RESPONSE**: **Immaterial/Disputed.  The uncorroborated hearsay report of the 12-year old girl living next door to Helmbacher is not probative of the issues raised in defendants' motion.   In addition, it is disputed in that the statement is based solely on inadmissible hearsay.  Plaintiff supports the statement with the bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within the record is not admissible.  For purposes of summary judgment a police report can be admissible to show its effect on police or why police engaged in some investigative activity, but it is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000). *Shores v. Dupps Company*, 2020 WL 6302362 (C.D. Ill 2020).**

4.      Defendants Carlton, Bell, Chabak, Ryan, Patton, Hubbard, and Applegate were aware that a witness saw Helmbacher alive at 7:50 p.m. on the night he was killed. Ex. 40 at Palmer 5573; ASOF 45-51; Resp. to DSOF 13.

**RESPONSE**: **Immaterial/Disputed.  The uncorroborated hearsay report of the 12-year old girl living next door to Helmbacher is not probative of the issues raised in defendants' motion.   In addition, it is disputed in that the statement is based solely on inadmissible hearsay.  Plaintiff supports the statement with the bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within the record is not admissible.  For purposes of summary judgment a police report can be admissible to show its effect on police or why police engaged in some investigative activity, but it is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821**

3

F.3d 823, 830 (7ᵗʰ Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7ᵗʰ Cir. 2000).

*Shores v. Dupps Company*, 2020 WL 6302362 (C.D. Ill 2020).

5.      Helmbacher was employed by a man named Douglas Lee. Lee was a local businessman, politician, and landlord. Ex. 109 at 109:8-18, 111:21-112: 112:9-113:3, 135:10-19. He owned a law firm and owned several properties in town. Ex. 109 at 112:9-113:3, 135:10-19.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

6.      Helmbacher worked for Lee at his law firm and helped him collect rent from the apartment buildings he owned. Ex. 109 at 123:23-124:1, 136:11-137:3, 142:7-9.

**RESPONSE**: **Material/Undisputed.**

7.      Lee owned the building where Helmbacher lived. Ex. 109 at 112:9-113:3.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

8.      In the weeks leading up to Helmbacher's death, Lee and Helmbacher had been in heated disputes about money. Lee thought Helmbacher was stealing the rent he was collecting. Ex. 109 at 136:11-17; 36:18-137:3; 136:18-137:3; 158:4-12; 162:13-20; Ex. 20 at Decatur 15; Ex. 39 at Decatur 168; Resp. to DSOF 12; Ex. 18 at Decatur 192.

**RESPONSE**: **Immaterial/Disputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can**

4

fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)

     9.     Lee was known to berate Helmbacher about business issues. Ex. 14.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)**

     10.     The evening of August 27th, Lee was scheduled to come to Decatur to conduct business. Ex. 44; Ex. 43; Ex. 47 at Decatur 228.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

11.     Helmbacher was scheduled to meet with Lee and Kelly Ciota, who was purchasing an apartment building from Lee. Ciota said he thought it was odd that Lee and Helmbacher did not come to his residence that evening. Ex. 47 at Decatur 228; Ex. 44; Ex. 43.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)**

12.     Lee had confirmed that he would be coming to Decatur on Thursday to meet with Helmbacher and Ciota. A note was found in Helmbacher's apartment that said "Kelly, knock hard I may be in the shower." Ex. 44; Ex. 43; Ex. 47 at Decatur 228.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is**

inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)

13.     Helmbacher told a friend that he was planning to confront Lee on August 27 about their money disputes. Ex. 20 at Decatur 15.

**RESPONSE**: **Immaterial/Disputed.  Report of a 12-year old girl living next door has no effect on any of the issues in this case.  In addition, it is disputed in that the statement is based solely on inadmissible hearsay.  Plaintiff supports it with a police report, which can be admissible for purposes of summary judgment for limited purposes.  It can be admissible for purposes of showing its effect on police, why they engaged in some activity that they engaged in, but it is inadmissible for the truth of the matter asserted.** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago*, **234 F.3d 979, 985 (2000).** *Shores v. Dupps Company*, **2020 WL 6302362 (C.D. Ill 2020).**

**Lee's Activity on August 27, 1998**

14.     Lee arrived in Decatur between 8 and 9:30 on August 27, Ex. 17 at Decatur 183; Ex. 39 at Decatur 167, and went straight to Helmbacher's apartment alone, Ex. 109 at 307:16-308:6; Ex. 17 at Decatur 183; Ex. 39 at Decatur 167.

**RESPONSE**:  Immaterial/Disputed. **Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed because none of the referenced materials support that Lee arrived in Decatur between 8:00 and 9:30.**

15.     Lee then left Helmbacher's apartment and went to the home of their associate Joe Moyer. Ex. 109 at 308:22-310:4.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

16.    Lee and Moyer chatted outside Moyer's apartment for somewhere between 10 minutes and an hour. Ex. 16 at Decatur 160; Ex. 17 at Decatur 183, Ex. 18 at Decatur 189; Ex. 39 at Decatur 167; Ex. 41 at Decatur 180.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.   For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.   *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)**

17.    They went to Helmbacher's apartment and knocked on the door, but got no answer. Ex. 16 at Decatur 160; Ex. 18 at Decatur189.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

18.     Lee and Moyer found Helmbacher's car parked out front. The lights were on and the front door was locked. Ex. 16 at 160. They peered through the small window in the front door and saw a half-eaten hamburger on the table. Ex. 16 at 160.

**RESPONSE**: **Material/Undisputed.**

19.     Helmbacher had a drinking problem, Ex. 28 at Decatur 85, and Moyer mentioned that he thought Helmbacher had passed out from drugs or alcohol. Ex. 109 at 271:21-272:18.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.   For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.   *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).   Moreover, the deposition reference does not support the statement.**

20.     Lee and Moyer left to try and collect rent from other apartment buildings. During those visits, Lee told multiple tenants to no longer give rent money to Helmbacher. Ex. 41 at Decatur 179; Ex. 38 at Decatur 163.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed in that the statement is based solely on inadmissible hearsay.**

**Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago*, **234 F.3d 979 (7th Cir. 2000);** *Shores v. Dupps Co.*, **2020 WL 6302362 (C.D. Ill.).**

21.     One tenant, Tonya Rice, found that Lee was irate and acting "quite strange" when he knocked on her door around 10:30pm that night. Lee threatened her, "I'm going to cut up your shit and throw it in the dumpster." Rice had previously been told by Moyer to no longer give rent money to Helmbacher because he "screwed up the books." Ex. 28.

**RESPONSE**: **Immaterial/Disputed.      Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago*, **234 F.3d 979, 985 (7th Cir. 2000);** *Shores v. Dupps Co.*, **2020 WL 6302362 (C.D. Ill.).**

22.     Around 11:00-11:10 p.m., Lee and Moyer began to worry about Helmbacher, and so they returned to his apartment. Ex. 16 at 160.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

23.     Lee had a key to Helmbacher's apartment, Ex. 109 at 114:9-18, and used his key to unlock the front door. Ex. 19 at Decatur 200; Ex. 41 at Decatur 179; Ex. 18 at Decatur 190.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

24.     Lee and Moyer saw Helmbacher's dead body, severely beaten and covered in blood. Moyer saw Helmbacher's brain matter on the floor and knew he was dead. Moyer did not touch Helmbacher's body. Ex. 18 at Decatur 190-191; Ex. 17 at Decatur 184. Neither stepped more than one or two steps into the apartment. Ex. 16 at 160; Ex. 17 at Decatur 184; Ex. 18 at Decatur 191.

**RESPONSE**: **Material/Undisputed.**

25.     Lee initially pretended not to see the body and called out Helmbacher's name, even though the body was in plain sight just three feet inside the door. Ex. 24 at Decatur 49; Ex. 16 at Decatur 160; Ex. 18 at Decatur 190; Ds' Ex. A, Part 2, Decatur 5908: 15-22.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.   For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is**

inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)

26.    Moyer promptly called the police. Ex. 65 at Decatur 0841.

**RESPONSE**: **Material/Undisputed.**

**The Crime Scene**

27.    The first Decatur Police Department (DPD) officers to arrive at the scene -- Cleary, Allen, Quehl -- arrived at approximately 11:20pm on August 27, 1998. They found Helmbacher's body with his legs crossed and interlocked with a table leg. Authorities interpreted this to indicate a likelihood that the decedent was rolled from his stomach onto his back after being injured. Helmbacher was only wearing pants and one sock. Ex. 19 at Decatur 200; Ex. 96 at Palmer 15510; Ex. 65 at Decatur 841.

**RESPONSE**: **Material/Undisputed.**

28.    No rigor mortis was present in Helmbacher's arm. Ex. 19 at Decatur 200.

**RESPONSE**: **Immaterial/Disputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.    It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.    For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago*, **234 F.3d 979, 985 (7th Cir. 2000);** *Shores v. Dupps Co.*, **2020 WL 6302362 (C.D. Ill.)**

29.     The sides of Helmbacher's torso appeared to show some early development of livor mortis. However, livor mortis was not assessed at the crime scene, and the scene photos do not allow for determining the degree of lividity. Ex. 121 at Filkins 006.

**RESPONSE**: **Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. The statement is disputed in that it is supported only by hearsay.**

30.     Helmbacher had been dead for somewhere between 30 minutes and 2.5 hours. Ex. 121 at Filkins 012.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. The statement is disputed in that time of death was as early as 5:20 p.m. (Defs' Exh HH)**

31.     Helmbacher had been beaten to death with a hammer. Ex. 96 at Palmer 15509, 15516; Ex. 19 at Decatur 200.  The killer hit Helmbacher in the forehead with the hammer, **(Material/Undisputed),** and then hit Helmbacher repeatedly in the back of the head as he lay face down on the floor. Ex. 121 at Filkins 9; Ex. 108 at Moses 11 **Material/Disputed; the evidence does not support that the forehead strike was first (Defendants' Exhibit O, p. 13 of 47, (Doc. #159-19], 6 of 73).**  The killer then rolled his body over, laid his arms at his sides, and crossed his ankles around the table leg. **Material, Undisputed, except disputed that the killer laid Helmbacher's arms at his side and crossed his ankles – the cited references do not support that statement.**  Helmbacher's face and the floor around him were entirely covered in blood. *See generally* Ex. 108; Ex. 121 at Filkins 3, 9.  **(Material/Undisputed)**

**RESPONSE**:  **See above.**

32.     The hammer had blood and hair on the head, **(Material/Undisputed)** and may have had the killer's DNA on the handle **(Immaterial/Disputed. There was no DNA examination of the handle, only fingerprinting and three is no factual support for the statement)** Ex. 81 at Palmer (ISP) 25; Ex. 96 at Palmer 15511, 15516; Ex. 19 at Decatur 200; ECF No. 136.

**RESPONSE**:  **See above.**

33.     The scene depicted a struggle. **Material/disputed.  If this statement connotes a "struggle" in which Helmbacher laid a hand on the killer in any way, it is disputed.  Defs' Exh. D, p. 9 of 47, Doc. # 159-19, p. 12 of 73)**. Several items were out of place: an empty box of nails was overturned on the floor and nails were strewn on the floor, Ex. 96 at Palmer 15509; the right arm of a reclining chair was broken, Ex. 19 at Decatur 201; couch cushions were in disarray, Ex. 41 at Decatur 182; all kitchen cabinet doors were ajar, Ex. 19 at Decatur 200; and a white plastic chair was overturned, Ex. 95 at Palmer 15495. **(Material/Undisputed)**.

**RESPONSE: See above.**

34.     DPD Officer Welker had responded to a report of burglary Helmbacher's apartment the night before the murder. Ex. 89; Ex. 41 at Decatur 182.

**RESPONSE**:  **Material/Undisputed.**

35.     Officer Welker observed that certain items in Helmbacher's apartment were in a different condition than they had been when he was there the night before. Specifically, after the murder, the kitchen cabinets were all ajar and the cushions on both couches were in total disarray. Ex. 41 at Decatur 182. They had not looked like that the night before. Id.

**RESPONSE**:  **Material/Undisputed.**

36.     On a table, officers found two hamburgers: one wrapped inside a McDonalds bag and the other unwrapped with one bite taken out of it. Ex. 19 at Decatur 201.

**RESPONSE**:  **Material/Undisputed.**

37.    Defendant Ryan arrived at the crime scene at 12:15 a.m. and learned that the door had been locked before the arrival of Lee and Moyer. Officers observed no signs of forced entry. Ex. 19 at Decatur 200; Ex. 95 at Palmer 15495; Cleary dep, 64:14-23.

**RESPONSE**:  **Material/Undisputed.**

38.    Having been burglarized the day before, Helmbacher had said he was going to make sure his doors and windows were locked. Ex. 109 at 231:11-21; 132:13-233:2.

**RESPONSE**:  **Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because it mischaracterizes Lee's testimony.  Lee clarified that Helmbacher said he would "try to secure the apartment" but that he was "not afraid to be in Decatur."  (Pltf's Exh. 109, p. 232-233).**

39.    Defendant Ryan did not process the exterior of the windows anywhere in the apartment. Ds' Ex. A, Part 2, Decatur 5907: 16-18.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

40.    Though there was a large amount of blood around the body, there were no bloody footprints or any shoe patterns in the blood. Ds' Ex. A, Part 2, Decatur 5912: 12-22.

**RESPONSE: Material/Undisputed.**

41.    There was a blood spatter on the inside of the front door, suggesting that the door was closed when the attack occurred. Ex. 19 at Decatur 202.

**RESPONSE**:  **Material/Undisputed.**

42.     Defendant Ryan collected three swabs of Helmbacher's blood from the crime scene. Ex. 1; Ex. 19 at Decatur 201.

**RESPONSE:  Material/Undisputed.**

43.     Helmbacher's hands were bagged. Ex. 45.

**RESPONSE**:  **Material/Undisputed.**

44.     Coroner Michael Day reported that there appeared to be defensive wounds on both of Helmbacher's arms, bruises on the left shoulder, and around 10-12 wounds to the back and sides of the head. Ex. 95 at Palmer 15496. The autopsy also revealed that Helmbacher had two bruises on the knuckles of his middle and pointer fingers. Id. at Palmer 15512.

**RESPONSE:  Material/Undisputed.**

**Structure of DPD's Investigative Team**

45.     Detectives in the DPD detective bureau in 1998 would collaborate on homicide cases, and DPD officers working on a case together would have daily meetings, briefings, and shift meetings with the supervisor. Ds' Ex. A, Part 2, at 5931:19-5932:4; Ds' Ex. H at 43:13-44:5.

**RESPONSE**:  **Material/Undisputed.**

46.     The detective sergeant was the command officer in charge of most of the day-to-day interactions with the detectives. Ex. 116 at 34:12-35:22.

**RESPONSE**:  **Material/Undisputed.**

47.     The sergeant called meetings to ensure that officers on the case were up to speed on case leads and other relevant information, and got copies of all reports. Ds' Ex. G at 61:19-21, 111:5-112:22; 150:7-10; Ex. 116 at 62:1-8.

**RESPONSE**:  **Material/Undisputed.**

48.     When officers completed their reports, command officers, like the sergeant, would ask questions and make suggestions. Ex. 66 at 123:18-124:8.

16

**RESPONSE**: **Material/Undisputed.**

49.      Detective Tim Carlton was assigned as the lead detective on the Helmbacher case. Ds' Ex. A, Part 2, at Decatur 5916:3-20; Ds' Ex. G at 84:5-7.

**RESPONSE**: **Material/Undisputed.**

50.      The sergeant supervising the Helmbacher case investigation was Sergeant Chabak. Chabak reviewed detectives' reports and met with Carlton about developments in the Helmbacher investigation. Ds' Ex. H at 52:1-15, 94:1-20; Ex. 116 at 34:12-35:22, 62:1-8.

**RESPONSE**: **Material/Undisputed.**

51.      Chabak considered himself a hands-on supervisor and would work with detectives to assist their investigations. Ds' Ex. H at 112:12-113:1.

**RESPONSE**: **Material/Undisputed.**

**Early Investigation into Doug Lee**

52.      Lee was interviewed twice on the night of the murder: once at the scene, and once by Defendant Carlton at police headquarters. Ex. 39 at Decatur 167-168; Ex. 17 at Decatur 183, 185.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

53.      Reports reflect that Lee explained his version of events as follows: he arrived in Decatur around 9 or 9:30pm; went straight to Helmbacher's apartment and received no answer at the door; left to speak with Moyer; returned with Moyer to Helmbacher's apartment again and knocked but got no answer; collected rent; and then went to Helmbacher's apartment a third time and entered to find him dead. Ex. 17 at Decatur 183-184; see also Ex. 50 at Decatur 279-280.

17

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

54.     When Carlton asked Lee for consent to take his fingerprints, Lee stated that he wished to have his attorney present and would no longer speak with the officers. Ex. 17 at Decatur 185.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

55.     During the interview, Lee was dressed in soiled and very wrinkled clothing that looked to officers as if they'd been at the bottom of a hamper, including an oversized dark-gray knit shirt that buttoned down the front with no collar, and light-colored khaki shorts. Ex. 49 at Decatur 276.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

56.     Lee told Carlton that he suspected Ray Taylor and his cousin, Charles Palmer, had been involved in the murder. Ex. 109 at 287:1-14, 288:1-4.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because Lee was unsure of what he told the police, and did not even know plaintiff's name.  He testified, "and I might be confused, maybe I had it [discussion about suspects] with somebody who I'd had a conversation with somebody that I don't need**

18

to disclose [likely his attorney].  I don't know where that came from. . . ."  Pltf's Exh. 109, at 287, lines 15-20.

57.     Lee also said that he stopped at a gas station in Plainfield that night around 7:00 p.m., and then drove to Decatur, which took about two or two and a half hours. Ex. 17 at Decatur 183.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

58.     Carlton reported that Lee showed him a receipt from the gas station establishing that he purchased basketballs at the Plainfield gas station, at 7:02 pm that night. Ex. 17 at Decatur 183.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

59.     Lee gave Carlton the receipt. Ex. 109 at 251:2-21; 294:5-295:7; 297:2-7; 298:12-16.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because Lee was uncertain that he gave Carlton the receipt.  (Pltf Exh. 109, p. 251)**

60.     Defendant Carlton did not tag the receipt into evidence or attach it to the report. Ex. 17 at Decatur 183.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago*, **234 F.3d 979, 985 (7th Cir. 2000);** *Shores v. Dupps Co.*, **2020 WL 6302362 (C.D. Ill.).**

61.     Lee had his own apartment unit in Helmbacher's building. Ex. 50.

**RESPONSE**: **Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

62.     Lee checked into a local Holiday Inn that night rather than staying in his own apartment in Helmbacher's building. Ex. 48 at Decatur 243; Ex. 50 at Decatur 280.

**RESPONSE**: **Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

63.     The front desk associate from the Holiday Inn recalled Lee wearing a white polo, blue jean shorts when he checked in, and possibly carrying a black shoulder bag. Ex. 48 at Decatur 243.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).**

64.    Officers did not observe Lee carrying a black duffle bag earlier that day. Ex. 49 at Decatur 276.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).**

65.     The taxi driver who brought Lee to the Holiday Inn described him as wearing a navy blue shirt and glasses. Ex. 48 at Decatur 0244.

**RESPONSE**: **Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).**

**DPD Gathers Evidence about Doug Lee's Motive**

66.     Over the weeks following the murder, officers conducted several interviews with individuals who knew Helmbacher and Lee. On August 28th, Frank Kelly Ciota reported that he was supposed to have a meeting with Lee and Helmbacher the night of the murder, but neither showed up at his house. Ciota said he "believes that Lee was also verbally abusive to William" and described Lee as a "very hot tempered person" who is "easily angered." Ciota also reported that Lee's wife Julie told him not to make payments to Helmbacher anymore and to deposit payments directly to their account. Ex. 47 at Decatur 229.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can**

fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).

67.     DPD learned Lee had paid for much of Helmbacher's law school and one witness believed Helmbacher was working for Lee to pay him back. Lee was upset with how Helmbacher was running the building's rent collection operation. Ex. 42 at Decatur 195.

**RESPONSE**: **Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay.  Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).**

68.     During a second interview on September 9, 1998, Ciota informed Carlton of the following: Ciota was purchasing an apartment building from Lee, and Lee was purchasing a building from someone named Behmlander. On August 26th, Lee told Behmlander that he was struggling financially because Helmbacher was stealing money from him and Lee needed a 6-

month extension on building payments. Behmlander explained that Lee had lately become irregular in making his payments. Ex. 27 at Decatur 69.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden***, 821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago***, 234 F.3d 979, 985 (7th Cir. 2000);** *Shores v. Dupps Co.***, 2020 WL 6302362 (C.D. Ill.).**

69.    On September 1, 1998, Carlton and detective Walker interviewed Jane Redenberg, who had known Lee for 6 years. Ex. 109 at 200:1-15; Ex. 20. Redenberg informed the officers that she spoke with Helmbacher at approximately 4pm on the day he was killed to discuss her traffic case. According to Redenberg, Helmbacher was uptight on the phone and seemed more upset than she had ever encountered him in the three years that she had known him. Ex. 20 at Decatur 15. On that call, Helmbacher confided to Redenberg that he was upset with Lee because he felt he was doing 70% of the work at their law office and only getting 30% of the pay. Redenberg encouraged Helmbacher to confront Lee about the issue. Ex. 20 at Decatur 15. Helmbacher also informed Redenberg that Lee was coming to stay at his apartment the day of the murder. Ex. 20 at Decatur 17.

**RESPONSE**: **Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago*, **234 F.3d 979, 985 (7th Cir. 2000);** *Shores v. Dupps Co.*, **2020 WL 6302362 (C.D. Ill.).**

70.    Redenberg also informed the DPD officers that Lee called her sometime around 7-8 p.m. on August 28, 1998--the day after the murder---and said several things on that call that concerned her, including: 1) that he would not be himself for the next month because Helmbacher had committed suicide; 2) that he had found Helmbacher dead in his back bedroom and that Helmbacher had killed himself with one hammer blow to the head; 3) that actually Helmbacher could have committed suicide or could have been murdered and that he had been found in his front room, not the bedroom; 4) that Lee was alone when he found Helmbacher; and 5) that Helmbacher had not been burglarized. Redenberg was also concerned about Lee's strange behavior over the last month. He had confided in her that he was seeing a psychiatrist. Ex. 20 at Decatur 17.

**RESPONSE: Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can**

fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.). The only admissible evidence on the topic came from Lee's deposition, where he denied most of the details contained in the statement. Pltf's Exh. 109, p. 460-462.

71. On September 1, Kris Lewison, Helmbacher's former housemate, reported that: 1) Helmbacher would often complain about not being paid on time by Lee; 2) Helmbacher lived at the apartment for free in exchange for not receiving a pay raise that he was entitled to; 3) Helmbacher would collect rent money and turn it over to Lee when he would come to town; 4) Lee would visit Helmbacher's apartment at all hours of the day and would use his key to enter instead of knocking; 5) Helmbacher almost always would lock the front door; and 6) Helmbacher always kept a hammer by the front door or the front closet, though he never used the hammer, and kept one or two baseball bats in the house. Ex. 21 at Decatur 23-25.

RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is

inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).

72.     On September 2, 1998, Wonda Davis, who had lived in Helmbacher's building for 4 months reported that Lee would come to Decatur when things were not going well at the apartment building. Ex. 22 at Decatur 33.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).**

73.     Davis informed DPD that on August 26, 1998, Helmbacher and two other white men who identified themselves as maintenance men served her an eviction notice for unpaid rent. She presented a rent receipt showing Helmbacher's signature. Helmbacher did not say anything and appeared to be afraid. Ex. 22 at Decatur 33-34.

**RESPONSE: Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay.**

Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein. *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).

74.     Davis also informed the officer that, on the night of the murder, she arrived home at 10 p.m. and observed Lee knock on her door three times on her door within the hour. She did not answer the door. At approximately 10:45 p.m., she heard Lee and another individual whispering outside her window and saw Lee walk past her bedroom window toward Helmbacher's apartment. A couple minutes later, she heard a thump like the sound of someone falling in Helmbacher's apartment, and said it was definitely not the sound of someone knocking. She heard another thump and what sounded like someone falling down over a table. Ex. 22 at Decatur 35.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible. For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden***, 821 F.3d 823,**

830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)

75.     On September 3, 1998, Carlton re-interviewed Moyer. Moyer explained that he had no idea Lee was coming to his residence that night and found it surprising and strange that Lee would come so late without notice. Ex. 24 at Decatur 48. Moyer also expressed concern that Lee had "set him up as an alibi." Ex. 24 at Decatur 49.

**RESPONSE:   Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.   For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.   *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)**

**Defendants Carlton and Bell Search Lee's Car and Seize a Bloody Towel**

76.     When officers arrived at the scene the night of the murder, Lee's blue Plymouth Reliant K was parked outside in a haphazard manner facing the wrong direction on the curb. The car was secured as part of the crime scene and was impounded to be towed. Ex. 65 at Decatur 842; Ex. 50 at Decatur 280.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

77.    On August 31, 1998, Lt. Walker obtained a search warrant of Lee's apartment in 351 W. Macon, and his car. Ex. 49; Ex. 50. That day, Defendants Carlton and Bell searched Lee's vehicle and seized a pair of brown leather shoes, a balled up set of clothing, and a yellow towel. Ex. 52; Ex. 50 at Decatur 277.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

78.    Spots of blood were found on the towel that Carlton and Bell took from Lee's trunk. Ex. 4 at Palmer (FA) 36-43; Ds' Ex. DD, 143:21-144:17; Ex. 2 at Decatur 7065-7066; Ex. 7 at Palmer 5053; Ex. 114 at Palmer 15304-15306.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  The statement is disputed because none of the cited references establish that blood was found on the towel.  Blood was not identified on the towel until sent to Forensic Analytical Crime Lab (FACL) during this lawsuit.**

79.    The blood on the towel belonged to Lee. Ex. 113 at Palmer 16551.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  The statement is disputed because it is based solely on a hearsay report, made by FACL for purposes of this lawsuit, more than 20 years after the murder investigation.**

80.    Evidence from Lee's car was marked with a biohazard label, which was used for evidence that had bodily fluid on it (including blood), may have come in contact with a biohazard,

or that was a sharp object that could cause injury. Ds' Ex. DD, 83:10-84:12; Ds' Ex. G at 81:10-22; Ex. 114 at Palmer 15302-15305.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

81.      Bell and Carlton did not document that the towel was bloody or that they sealed the package containing items collected from Lee's car with a biohazard sticker.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   Blood was not identified until the towel was analyzed by FACL during this lawsuit, more than 20 years after Bell and Carlton obtained it.**

82.      Bell and Carlton reported in the lead sheet that they wanted the towel checked for blood. Ex. 37 at Leads 152-153. They submitted the bloody towel and other evidence from Lee's car to the Illinois State Police (ISP) crime lab for forensic analysis, but told them not to test it. Ex. 81 at Palmer (ISP) 27; Ex. 84 at Palmer (ISP) 120.

**RESPONSE**: **Immaterial/Disputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.   For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden***, 821 F.3d 823,**

830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)  None of the references even support that Bell or Carlton told the ISP not to test the towel.

83.   The towel had probative value. Ds' Ex. DD, 148:10-149:21; 162:12 -163:5.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  The statement is disputed because the cited reference does not support it.**

**Suppressed Evidence about Doug Lee**

84.   Carlton obtained video footage from the gas station in Plainfield, where Lee said he had stopped on his way to Decatur on August 27. The video had a timestamp within a few minutes on either side of 6:00 p.m. on August 28, the day after Helmbacher was killed. Ex. 25; Ex. 55 at Decatur 615-616.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.)**

85.   Carlton wrote a report stating that the footage depicted Lee at the gas station on the day Helmbacher was killed. Ex. 25; Ex. 55 at Decatur 616.

**RESPONSE**: **Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

86. Carlton wrote a report stating that the timestamp on the video was off by 23 hours. Ex. 25; Ex. 51 at Decatur 281.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

87. The gas station clerk said she remembered one person purchasing basketballs on the day Helmbacher was killed and described white, male, early 40s, glasses, short dark hair, heavy/stocky build, 5'9', dark complexion, possibly Italian, may have worn eyeglasses. She recalled the man wearing short pants and what she thought was a blue striped tank top. Ex. 25; Ex. 51 at 283; Ex. 55 at Decatur 615.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

88. Carlton investigated whether Lee may have changed clothing on August 27, 1998. On September 8, 1998, he spoke with Lee's wife, who said Lee was wearing a navy blue shirt and white shorts that day. Ex. 26.

**RESPONSE**: **Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

89.     Carlton wrote a report that the gas station surveillance video could be useful to determine whether Lee had changed clothes on the night of the murder. Ex. 51 at Decatur 281.

**RESPONSE**: **Immaterial/Undisputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

90.     Carlton noted that because of the quality of the security camera footage, "he was unable to tell what the subject's clothing was at the time." Ex. 25; Ex. 51 at Decatur 283.

**RESPONSE**: **Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reports do not support the statement.  Carlton actually wrote "[t]he clothing in the picture appear to be similar to those that he did have on at the time he reported the murder."  Pltf. Exh. 25.**

91.     Carlton also obtained four photo stills from the surveillance video, which appeared to show a man inside a convenience store. Ex. 25.

**RESPONSE**: **Immaterial/Undisputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

92.     Carlton wrote a report stating that he tagged the video and photo stills into evidence. Ex. 25; Ex. 90.

**RESPONSE**: **Immaterial/Undisputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

93.     Carlton did not tag the video and photo stills into evidence. Ex. 90.

**RESPONSE**: Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay.  Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).  Moreover, the cited reference does not even support the statement.

94.     The video and photo stills were not tagged into evidence until 2012. Ex. 90.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).  Moreover, the cited reference does not even support the statement.**

95. On September 9, 1998, Carlton requested that the FBI produce still images of the gas station surveillance video and enhance them to help determine what type of clothing the subject was wearing. Ex. 87 at Palmer (FBI) 17; Ex. 74.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

96. Carlton wrote a cover letter to the FBI's Engineering Section that Lee was a "very strong suspect" and that "[i]dentifying the clothing Mr. Lee was wearing prior to him reporting the murder, is vital to this case. It could mean the difference between Mr. Lee being charged for this murder or him getting off." Ex. 87 at Palmer (FBI) 17.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

97. The FBI returned the video, two processed, slow-motion videos, and two types of photo prints. Ex. 87 at Palmer (FBI) 1-14.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

98. Carlton acknowledged that the photos provide no helpful information about Doug Lee's clothes. Ex. 37 at Lead 195; see also Ex. 87 at Palmer (FBI) 7-14.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary**

judgment.  The cited reference does not support the statement.  The entry on the Lead Sheet (Pltf's #37) was made by Lt. Todd Walker. Defs' Exh. H, p. 147.

99.     Carlton did not disclose his correspondence with the FBI or the gas station video or prints that the FBI provided. Ex. 63 at 113:4-23; Ex. 70 at 121:10-122:2.

RESPONSE:  Immaterial/Disputed.    Except  for  mere  background,  the  statement  is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited references do not support the statement. Neither former prosecutors had any memory of the matter.  Moreover, the State's Attorneys did receive reports of the contact with the FBI. Defs' Exh. II, p. SDT 839.  Police are only required under *Brady* to provide information about exculpatory material to the prosecutors. The prosecutors were told by report that the gas station video was sent to the FBI lab.  The Lead Sheet shows it was "No help," that is no help in showing if Lee had changed clothes.  In that respect, it would be no help to plaintiff as well.  Moreover, the information referred to was not exculpatory, in that it did not provide significantly clearer images of Lee in the gas station.

100.     Carlton did not disclose his conclusion that he found the video to be of "no help". Ex. 37 at Lead 195; Ex. 122 at 3.

RESPONSE:  Immaterial/Disputed.    Except  for  mere  background,  the  statement  is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.  The entry on the Lead Sheet (Pltf's #37) was made by Lt. Todd Walker. (Facts, #14). Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited references do

37

not support the statement. Neither former prosecutors had any memory of the matter. Moreover, the State's Attorneys did receive reports of the contact with the FBI. (Defs' Exh. H, p. 147). Under *Brady*, police are only required to provide information about exculpatory material to the prosecutors. Moreover, the information referred to was not exculpatory, in that it did not provide significantly clearer images of Lee in the gas station.

101.    Moyer remembers that Lee changed clothes at some point on the night of the murder. Ex. 102 at 152:20-153:10.

**RESPONSE**: **Immaterial/Disputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.    It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.    For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.** *Cairel v. Alderden*, **821 F.3d 823, 830 (7th Cir. 2016);** *Woods v. City of Chicago*, **234 F.3d 979, 985 (7th Cir. 2000);** *Shores v. Dupps Co.*, **2020 WL 6302362 (C.D. Ill.)**

**Initial Interviews of Ray Taylor**

102.    The night of the murder, officer Welker interviewed Taylor. Taylor told him that he had not seen anything unusual that night. Ex. 38 at Decatur 162.

**RESPONSE: Material/Undisputed.**

103.    The night of the murder, Defendant Chabak also interviewed Taylor. Ex. 41 at Decatur 181. Taylor said he did not have information about the homicide. Taylor consented to the

police searching his apartment, and the officers found nothing of evidentiary value. Ex. 41 at Decatur 181.

**RESPONSE: Material/Undisputed.**

104.    On September 1, 1998, Taylor told Defendant Applegate stated that he had no knowledge of who committed the Helmbacher murder and he saw no one around either coming or going that evening. Taylor also explained his whereabouts that night: he left home around 6 or 7 p.m., went to a liquor store, visited with John Bradford for a short period, returned to Main Liquor, returned to Bradford's, and then went to his mother's house. Ex. 53. He did not mention seeing Palmer. Ex. 53. Applegate reported that he also inquired about Taylor's arrest on August 24 for getting into an altercation with Helmbacher and Lee. Ex. 53 at Decatur 309.

**RESPONSE: Material/Undisputed.**

105.    On September 2, Defendant Hubbard asked Taylor to take a polygraph, and Taylor refused. Taylor denied knowledge about the Helmbacher murder. Ex. 56.

**RESPONSE: Material/Undisputed.**

106.    On September 3, Officer Beck went to Taylor's apartment. Ex. 23. Taylor was hostile and refused to let Beck inside. Id. He said he was tired of being harassed by the police. Id.

**RESPONSE: Material/Undisputed.**

107.    Defendant Chabak learned that Taylor had gotten into a verbal confrontation with Helmbacher three days before the murder. Ex 41 at Decatur 81. One witness, Tanya Estes, reported that Taylor (described as the black man who lived on the top floor, west corner of the building) had several arguments with Helmbacher and most recently had come to Helmbacher's apartment with a "small G" [possibly gun] and said, "if he don't give him his rent receipt he's going to be

sorry." On another occasion, Estes had seen Helmbacher come out of his apartment with a baseball bat in his hand. Ex. 40 at Decatur 176.

**RESPONSE**: **Material/Undisputed.**

108.    Taylor was also arrested in April 1998 for having an altercation with Helmbacher and Lee. The police report says that Taylor came to Lee's apartment door one night and said he was going to kill him. When Lee ran downstairs to Helmbacher's unit, Taylor chased him saying "I am going to kill you mother-fucker." Helmbacher and Lee called the police, and Helmbacher informed the officers that "Taylor said that he would kill him." Ex. 94 at Palmer 8904-8906. **(Material/Undisputed)**.  Palmer was not involved in this altercation.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because plaintiff cites no support for it.**

109.    DPD officers were aware of Taylor's death threats toward Helmbacher. Ex. 53 at Decatur 309; Ex. 94 at Palmer 8904-8909; ASOF 45-51; Resp. to DSOF13.

**RESPONSE: Immaterial/Undisputed.   The statement is immaterial in that whether identified DPD officers had knowledge of Taylor's threats has nothing to do with what is at issue in defendants' motion for summary judgment.**

110.    Taylor denied making any threats to kill Lee or Helmbacher. Ex. 53 at Decatur 309; Ex. 99 at 89:2-9; Ex. 94 at Palmer 8903-8909.

**RESPONSE: Material/Undisputed.**

**Discovery of Plastic Bag with Items Reported Stolen and Wallet**

111.    On September 10, 1998, the groundskeeper of Millikin Homestead, William McGaughey, discovered a white plastic garbage bag in a bush by the Millikin flag pole. The bag contained items that Helmbacher reported missing from his apartment on August 26, including

Helmbacher's business cards, a glass beer stein, and the paper carton of a six-pack of beers. It also included a wallet, which Helmbacher had not reported stolen. Ex. 13; Ex. 29 at Decatur at 89.

**RESPONSE:  Material/Undisputed.**

112.    McGaughey had last checked that location on September 3, and the bag had not been there. Ex. 13; Ex. 29 at Decatur at 89.

**RESPONSE:  Material/Undisputed.**

113.    On September 21, 1998, ISP informed Lieutenant Walker of DPD that a suitable latent print on a plastic garbage bag matched Ray Taylor. The remaining suitable latent prints did not match anyone. Ex. 15 at Decatur 103; Ex. 78; Ex. 76.

**RESPONSE:  Material/Undisputed.**

114.    Taylor maintained that he did not carry the trash bag to the Millikin Homestead. Ds' Ex. A, Part 1, Decatur 5853:11-19.  **(Material/Undisputed)**  He testified that he has no idea how the stolen items got in a bag with his print on it. Ex. 99 at 39:13-40:23; Ex. 98 at 2.

**RESPONSE:   Material/Disputed. It is disputed because Taylor gave statements, including sworn testimony at the trial, in which he admitted holding the garbage bag and disposing of the goods taken in the burglary. (Facts, #44-46).  Taylor's testimony at his deposition is incompetent to refute any information he gave the police, or his sworn testimony more than 20 years earlier.  Taylor was confused and lacked any cogent memory of specific details, at his deposition.  The questioning of Taylor at the deposition was designed to confuse and manipulate him, and exploit what little memory he had of the details of events more than 20 years earlier. (Pltf's Exh. 99, p. 140, line 13 p. 141, line 16)  Taylor had no pre-deposition opportunity to review any materials that might refresh his memory, (Pltf's Exh. 99, p. 141, lines 17-25) and lacked any trust in plaintiff's attorneys.  Taylor believed plaintiff's attorneys**

had harassed him and his family, falsified that he had been properly served with a subpoena for the deposition, and created a false affidavit about a conversation he had with plaintiff's investigator. (Pltf's Exh. 99, p. 147, line 6, to p. 150, line 5)  The investigator created the affidavit 15 months after his interview of Taylor, and claimed he took no notes. (Exh. JJ, p. 83)  Taylor testified the investigator was in fact taking notes during the interview. (Exh. JJ, p. 83)  Taylor complained multiple times during the deposition about plaintiff's tactics, as did Taylor's court appointed counsel, even requiring court intervention to complete the deposition.  The only clear, cogent, unequivocal and competent testimony Taylor provided at his deposition was that everything he testified to at plaintiff's criminal trial was true. (Pltf's Exh. 99, p. 146)

**Bell and Carlton Arrest and Interrogate Taylor**

115.    Taylor was arrested and brought in to be interviewed by Defendants Bell and Carlton. Bell and Carlton interrogated Taylor together about the trash bag of stolen contents and why his fingerprint was found on the bag. Ex. 54 at Decatur 438-439; Ex. 15 at Decatur 103.

**RESPONSE:  Material/Disputed.  The statement is disputed to the extent that it suggests that Bell and Carlton conducted the entire interview together.  Neither document plaintiff cited supports that conclusion.  The best evidence on whether they interviewed Taylor together or separately is this colloquy during defendant Bell's deposition.**

> Q.    Okay.  Was Detective Carlton present during the interview with Ray Taylor that's memorialized in this report that is Exhibit 10?
>
> **A.    I don't recall if he was present during this interview or not.**
>
> Q.    Was he present during part of the interview?
>
> **A.    I don't recall.**

116.    Defendants Bell and Carlton threatened Taylor and accused him of involvement in the burglary. Ex. 99 at 31:22-32:20, 45:21-46:14; 49:1-7; Ds' Ex. DD at 203:11-15.

**RESPONSE**: **Immaterial/Disputed.   What is meant by "threatened" is unclear.   The references to Taylor's deposition all suffer from the same factual unreliability as stated in response to Statement 114.   The reference to defendant Bell's deposition actually disputes the statement, where Bell sated unequivocally "I made no threats."  Defs' Exh. DD, p. 203, line 10.**

117.    Taylor testified at the criminal trial that the officers who interrogated him (Defendants Bell and Carlton) told him that "the murdered man's wallet was in the bag with [his] prints on it," and Carlton was the one who told him that his prints were on the bag. Ds' Ex. A, Part 1, at Decatur 5847:1-5, Decatur 5853:20-24.

**RESPONSE:  Material/Undisputed, except it must be clarified that "prints on it" refers to the bag, not the wallet.**

118.    Bell and Carlton brought up Charles Palmer's name. Ex. 99 at 24:4-6, 52:24-53:2, 76:22-77:5.

**RESPONSE:   Material/Disputed.  This is a complete, brazen misstatement.  The reference to Taylor's deposition at p. 24 states that Taylor did not bring up plaintiff's name when interviewed by defendant Applegate on September 1, 1998, weeks before the Carlton/Bell interview.  At page 52-53 of the deposition Taylor says he cannot recall if he brought up plaintiff's name when interviewed.  At page 76 Taylor only talks about plaintiff's name in the margin of Taylor's handwritten statement. Taylor resisted what plaintiff was suggesting despite leading and improper questioning.  Taylor clearly testified at the trial that he offered**

43

the information about plaintiff's confession to the police, and confirmed at his deposition that he only told the truth at the trial.

**Defendant Bell's Report of the Ray Taylor Interrogation**

119.    Bell's report of the September 21 interrogation says that he spoke with Taylor "at length" about the fact that his prints were on the bag, and "after a considerable amount of time in which Taylor denied knowledge" of the burglary, Taylor said he would tell "the truth." Ex. 54 at Decatur 438.

**RESPONSE:  Material/Undisputed.**

120.    According to Bell's report, Taylor then said that Palmer burglarized Helmbacher and came to Taylor's apartment asking for a bag. The report says Taylor said Palmer threw away the belongings and threw it in the dumpster, and that Taylor said he had no idea how the bag got to the Millikin Homestead. Ex. 54 at Decatur 438.

**RESPONSE:  Material/Undisputed.**

121.    Bell reported that Taylor also told him that the day after the burglary, while he was at his friend John Bradford's house and around 7:00 p.m., Palmer waived Taylor to come upstairs and said that he had to "beat the dude to death," referring to the "man who lived in the apartment" by Ray, and that there was blood everywhere. Ex. 54 at Decatur 438.

**RESPONSE:  Material/Undisputed, except according to the report Taylor "guessed" it was about 7:00.**

122.    The report states that Palmer said he did not know if the man was alright. Id.

**RESPONSE:  Material/Undisputed.**

123.    Bell wrote that Taylor said Palmer got $11 from the man. Id.

**RESPONSE:  Material/Undisputed.**

44

124.    Bell's report says Taylor said no one else was present during his conversation with Palmer. Ex. 54 at Decatur 438.

**RESPONSE**:  **Material/Undisputed.**

125.    Bell reported that Taylor was taken for a polygraph. Ex. 54 at Decatur 439.

**RESPONSE**:  **Material/Undisputed.**

126.    The polygraph report says that Taylor was deceptive when he said 1) he did not plan to try to lie during the polygraph examination; 2) he had told the complete truth about the matter; and 3) he had not intentionally lied during the polygraph examination. Ds' Ex. Y at Decatur 109.

**RESPONSE**:  **Material/Undisputed.**

127.    Bell wrote that he continued the interrogation after the polygraph. Ex. 54 at Decatur 439.

**RESPONSE**:  **Material/Undisputed.**

128.    Bell's report says Taylor then told him that Palmer asked Taylor to be a look out while he burglarized Helmbacher's apartment. Id.

**RESPONSE**:  **Material/Undisputed.**

129.    Bell reported that Taylor told him Palmer climbed into Helmbacher's window, walked through the apartment and opened the front door, and then Taylor went into the living room and looked out the curtains to see if anyone was coming. Id. at Decatur 439.

**RESPONSE**:  **Material/Undisputed.**

130.    Helmbacher's apartment has vertical blinds. Ex. 16 at Decatur 160.

**RESPONSE**:  **Immaterial/Disputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary**

45

judgment.  It is disputed in that the statement is based solely on inadmissible hearsay. Plaintiff supports the statement with a bare reference to a police report. A police report can fall within the business records exception to hearsay, but hearsay contained within it is not admissible.  For purposes of summary judgment hearsay within a police report can be admissible to show its effect on the police or why police engaged in some activity, but is inadmissible for the truth of the matters asserted therein.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979 (7th Cir. 2000); *Shores v. Dupps Co.*, 2020 WL 6302362 (C.D. Ill.).  Moreover, the hearsay in the report does not even establish the apartment had "vertical blinds."

131.    Defendant Bell's report says nothing about shoes with blood on them. Ex. 54 at Decatur 438-441.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

132.    Bell's report also says that Taylor told him that Palmer told him at a bus stop and said that he could not believe he had "done that for $11." Ex. 54 at Decatur 440.

**RESPONSE: Material/Undisputed.**

133.    Bell also reported showing Taylor a 5-person photo array containing Palmer's photo, and that Taylor picked Palmer. Ex. 54 at Decatur 440-441.

**RESPONSE: Material /Undisputed.**

**Defendant Carlton's Report of the Ray Taylor Interrogation**

134.    Defendant Carlton's report of the Taylor's interrogation says that Taylor told Bell that Palmer told Taylor "I had to beat the dude down," and that Taylor said Palmer was referring to Helmbacher. Ex. 15 at Decatur 103.

**RESPONSE:  Material/Undisputed.**

135.    Carlton's report says that Taylor volunteered that Palmer had burglarized Helmbacher's apartment the night before. He relayed that Palmer had come to his residence carrying several items, including a jar of change and some beer and asked Taylor for a trash bag for the items. Taylor explained that his own fingerprints would be on the bag because he'd handled the bag. Ex. 15 at Decatur 103.

**RESPONSE**:  **Material/Undisputed.**

136.    Carlton wrote that Taylor said Palmer came to Taylor's apartment after the burglary was completed and that Taylor did not know how Palmer entered the Helmbacher's apartment, Ex. 15 at Decatur 103.

**RESPONSE**:  **Material/Undisputed.**

137.    According to Carlton, Taylor informed him and Bell of the following: just before dark on August 27, Palmer flagged down Taylor and announced, "I had to beat the dude. He didn't have but $11.00. There was blood everywhere." Ex. 15 at Decatur 104.

**RESPONSE**:  **Material/Undisputed.**

138.    Carlton wrote that he asked Taylor if he saw blood on his clothing or hands and Taylor said he did not see any. According to the report, Taylor asked Palmer about the Fila shoes he was wearing the night before, and Palmer responded that he had to get rid of the shoes because they'd gotten blood on them. Ex. 15 at Decatur 104. **(Material/Undisputed)**  Carlton's account deviated from Bell's, which made no mention of Fila shoes. Compare Ex. 15 with Ex. 54.

**RESPONSE**:  **Immaterial/Undisputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  The reports clearly establish Bell and Carlton conducted their own separate**

interviews of Taylor, and Carlton asked Taylor to "be more specific" about the events of that night.  Pltf's Exh. 15.

139.    According to Defendant Carlton's report, Taylor stated that Palmer's confession occurred just before dark on August 27, 1998. Ex. 15 at Decatur 103-104.

**RESPONSE: Material/Undisputed, except disputed that Carlton is a defendant in this lawsuit.**

140.    Defendant Carlton's report reflects that Taylor said he told his father, Robert Taylor, that Palmer had confessed committing the murder. Ex. 31 at Decatur 106.

**RESPONSE:  Material/Undisputed, except disputed that Carlton is a defendant in this lawsuit.**

141.    Carlton's report also says that Ray told him he saw Palmer downtown waiting for a bus the week after the murder, and that Taylor said he tried to avoid Palmer but Palmer asked if the police had been back to Taylor's apartment. Ex. 15 at Decatur 104.

**RESPONSE:  Material/Undisputed.**

**Handwritten Statement Attributed to Ray Taylor**

142.    According to Defendants Bell and Carlton, Taylor also wrote a handwritten statement on September 21 that said: "He came to my house and wanted a garbage bag to put items taken in burglary R.T. theft I took the garbage and threw it in the dumpster. The next day I was down the street [illegible/crossed out] R.T. over John Bradford house [illegible/crossed out] R.T. outside then Charles came from upstairs and called me and said he had to beat Bill for $11 dollars and I ask was he O.K. he said he didn't know and said there was blood everywhere and I went back outside with John. That night I found out Bill was killed." "Charles Palmer" is written in the margin at the beginning of the statement next to the word "He." Ex. 30 at Decatur 102.

**RESPONSE:  Material/Undisputed, except that Taylor wrote the statement, except Carlton did not sign the statement, so plaintiff's reference to "according to defendants Bell and Carlton, Taylor also wrote a handwritten statement . . ."  is not supported by the cited reference.**

143.    Taylor confirmed that the signature on the statement is his, but does not remember ever writing that handwritten statement. Ex. 98 at 4-5; Ex. 99 at 73:2-74:7. Taylor does not recall what was written on the page when he signed it and testified that the page was possibly blank. Ex. 99 at 74:11-75:12. **Immaterial/Disputed.  Any testimony by Taylor about the page "possibly" being blank is speculation, and completely inadmissible.  The actual testimony on the topic went as follows:**

And at the bottom of the page [of the handwritten statement] where it says signed?
**A.      Yes.  Signature –**

Q.      Is that your signature?
**A.      It is my signature.**
Q.      So now let's look above that.  There is a bunch of handwritten texts.  Do you see that?
**A.      What about the witness and stuff?**
Q.      Yeah. No. Below that there is a bunch of handwriting.  Do you see the chunk in the middle, looks like it is handwritten?
**A.      What are you looking at?  Next to my name, where I signed my name?**
Q.      Above where you signed your name there is a bunch of kind of blank lines.
**A.      Oh, yeah.**
Q.      And then above that there is a bunch of handwriting.
**A.      Yes.**
Q.      Okay.  You don't recognize that handwriting as your own, do you?
**A.      No.  I don't remember this stuff.**
Q.      My question was whether, was that you don't recognize the handwriting as your own handwriting, right?
**A.      I don't remember it, no. Looks like my signature.**
Q.      The handwriting isn't yours, is it?
MR. DICIANNI:   I object that he answered that twice now.  He doesn't remember.
BY MS. BRADY:
Q.      I am sorry, I just didn't catch your answer about whether the handwriting is yours.
**A.      I don't recall or remember this stuff.**
Q.      Okay. Do you recall placing your signature on this page back in 1998?
**A.      No.**

Q.      And you don't know what was written on the page at the time you placed your
        signature on it, right?
        [OBJECTIONS OMITTED]
BY MS BRADY:
Q.      Do you remember my question?
**A.      I don't recall.  I don't remember this stuff.**

Pltf's Exh. 99, p. 72, line 24, to p. 75, line 17.

The handwriting on the statement appears to match the handwriting in the parts of the page that

Bell filled out, including the "Helmbacher" case name written at the top of both pages. Ex. 30.

**RESPONSE**: **Immaterial/Disputed.  This statement is complete speculation.  In fact, the**

**letters on the writing common to Taylor's signature are obviously the same.**

144.    The report bears only Bell's witness signature, though there are lines for two witness

signatures. Ex. 30.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is**

**immaterial because it is not probative of the issues raised in defendants' motion for summary**

**judgment.**

**Defendants Ryan and Patton Report an Interview of Taylor**

145.    Defendant Ryan wrote a report stating that he and Defendant Patton talked to Taylor

on September 22. Ex. 32.

**RESPONSE:  Material/Undisputed.**

146.    Ryan's reported that Taylor told them that, at or around 7 p.m. on August 27, Taylor

returned from a store with his friend John Bradford. Ryan's report states that Taylor told him

Palmer then came outside of the building, got Taylor's attention, and told him that he had to "beat

old boy," and stole $11 from Helmbacher. Ex. 32. Ryan's report further states that Taylor told them

that he noticed Palmer was not wearing his black and white Filas, but that he was wearing dark

shoes with his heels hanging out the back. Ex. 32. Ryan wrote that Taylor then said that he asked

Palmer where his shoes were and Palmer said he had to get rid of them because they had blood all over them. Ex. 32. The report also says Taylor said he thought Palmer had been wearing dark jeans, but that he did not see any blood on Palmer. Ex. 32.

**RESPONSE:   Material/Undisputed.**

147.    Ryan testified that, during that interview, it is possible he accused Taylor of burglarizing Helmbacher, and he does not recall whether he told Taylor that he could be accused of the murder as well. Ryan explained that "it's possible that if [Taylor] was involved in the burglary, [Ryan] would have told him that he was going to be in trouble for the burglary and/or murder." Ds' Ex. C, 214; 216.

**RESPONSE: Immaterial/Undisputed. Ryan's testimony about what he might have told Taylor is nothing but conjecture.  Taylor never said he was accused by any police officers of the murder.  Nevertheless, even if it happened, a due process claim cannot be made based on police using aggressive interviewing tactics to obtain information from a witness. *Coleman v. City of Peoria*, 925 F.3d. 336, 352 (7th Cir. 2019).**

**Impossible Timeline in Ray Taylor's Story**

148.    Each of the police reports on Taylor's confession story -- written by Defendants Bell, Carlton, and Ryan -- state that Palmer's alleged confession occurred before dark or around 7 p.m. Ex. 54 at Decatur 438; Ex. 15 at Decatur 104; Ex. 32.

**RESPONSE:   Material/Disputed.  In one report Taylor said it occurred a few hours before dark. (cite).**

149.    Apparent sunset in Decatur on August 27, 1998 was at 7:35 p.m. Ex. 112 at Palmer 15517.

**RESPONSE:   Material/Undisputed. After sunset in Decatur, Illinois, on August 27, civil twilight continues until 8:03 p.m.  Civil twilight is defined as the period of time when the sun**

descends below the horizon, but it is still light enough for normal outdoor activity.  Total darkness, (the absence of daylight) can occur 35 to 90 minutes after the end of civil twilight.  (Defs' Exh. KK). The court can take judicial notice of these facts.  Fed.R. Evid. 201(b)(2).

150.    Defendants Carlton, Bell, Ryan, Hubbard, Chabak, Patton, and Applegate were aware that a witness reported that she saw Helmbacher reading a book in his sitting room around 7:50 p.m. on August 27. Ex. 40 at Palmer 5573;5 ASOF 45-51.

**RESPONSE**: **Immaterial/Disputed.  Report of a 12-year old girl living next door has no effect on any of the issues in this case.  In addition, it is disputed in that the statement is based solely on inadmissible hearsay.  Plaintiff supports it with a police report, which can be admissible for purposes of summary judgment for limited purposes.  It can be admissible for purposes of showing its effect on police, why they engaged in some activity that they engaged in, but it is inadmissible for the truth of the matter asserted.  *Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016); *Woods v. City of Chicago*, 234 F.3d 979, 985 (2000).  *Shores v. Dupps Company*, 2020 WL 6302362 (C.D. Ill 2020).**

151.    Bradford said Ray Taylor was at his apartment, where Palmer's confession supposedly occurred, during daylight, and guessed that it was somewhere between 6:00 p.m. and 6:30 p.m. Ex. 53 at Decatur 310.

**RESPONSE:  Material/Undisputed.**

152.    Taylor left Bradford's apartment and he went to his mother's and then grandmother's house. Ex. 53 at Decatur 310.

**RESPONSE:  Material/Undisputed, except it must be clarified that according to the report that's what Taylor said he did.  The statement in the police report is inadmissible for the truth of the matter asserted.**

52

153.    Taylor's grandmother said that it was still light when he got to her house. Ex. 75

**RESPONSE:   Material/Undisputed.**

154.    On September 21, 1998, Defendant Carlton spoke with Taylor's father, who denied that Ray Taylor ever told him anything about Palmer's involvement in the Helmbacher murder. Ex. 31 at Decatur 106.

**RESPONSE:  Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

155.    Taylor testified that he was concerned that DPD suspected him of committing both the burglary and murder. Ex. 99 at 26:24-27:16, 29:15-17, 45:21-46:5, 46:15-47:5, 49:24-50:2. According to Taylor, Defendants Carlton and Bell warned that he would go down for both crimes. Ex. 99 at 50:7-19; Ex. 98 at 2. He testified, "[The officers] was . . . wanting to put the suspect on me because they didn't have no place else to go so they want to point the finger at me. And I said no, no, no, wrong finger to be pointing at . . . ." Ex. 99 at 47:2-5.

**RESPONSE:  Immaterial/Disputed.  It is immaterial for the reasons stated in response to #147.  It is disputed for the reasons stated in response to #114.**

156.    Taylor felt the officers wanted him to supply information about anyone they could pin the murder on and to lie about his involvement. Ex. 99 at 50:20-25, 53:9-15.

**RESPONSE:  Immaterial/Disputed.  It is immaterial for the reasons stated in response to #147.  It is disputed for the reasons stated in response to #114.  Moreover, the testimony cited does not support the statement.  In response to the objectionable question whether the police wanted him to "lie about your involvement in the murder."  Taylor answers "I am sure they**

**did.  That is what detectives do."  That answer is pure speculation, and not even about how**

**Taylor felt at the time of the investigation.  Taylor is then asked:**

> Q.     The police told you that they wanted you to give them evidence to
>        implicate Charles Palmer, didn't they?
> **A.     Did the police tell me that?**
> Q.     Yeah.
> **A.     The police never said that to me.**

Pltf's Exh. 99, p. 53, lines 3-8.

157.    ASA Ahola testified that if he had evidence that undermined Taylor's statement, he

would have disclosed it to the defense attorneys. Ex. 63 at 82:1-6.

**RESPONSE:  Material/Undisputed.**

158.    DPD had information about Charles Palmer that Taylor did not provide them

through these interviews. Ex. 98 at ¶11.

**RESPONSE: Immaterial/Disputed.  It is immaterial because Taylor himself, under oath,**

**denied he was encouraged to implicate plaintiff in the murder.  It is disputed based on the**

**unreliability of the Mort Smith affidavit expressed in response to #114, and because Taylor's**

**alleged statement to Mort Smith is hearsay.**

**Taylor Denies Information in DPD Reports Documenting His Interviews**

159.    Taylor says he knew nothing about the Helmbacher murder until police arrived at

his door. Ex. 98 at 20.

**RESPONSE**:  **Immaterial/Disputed.  It is immaterial because Taylor himself, under oath,**

**denied he was encouraged to implicate plaintiff in the murder.  It is disputed based on the**

**unreliability of the Mort Smith affidavit expressed in response to #114, and because Taylor's**

**alleged statement to Mort Smith is hearsay.**

160.    Taylor testified that he had no knowledge of the burglary, did not see Palmer crawl into Helmbacher's window, and that he truthfully told Defendants Carlton, Bell, Ryan, and that he had no knowledge of the burglary or murder. Taylor testified that he did not participate in the burglary that Palmer never brought stolen items to his apartment, and that he did not help dispose of Helmbacher's stolen items. Ex. 99 at 17:4-10, 96:23-97:7, 102:6-8, 107:9-13.

**RESPONSE**:   **Immaterial/Disputed. It is disputed because Taylor gave statements, including sworn testimony at the trial, in which he admitted holding the bag and disposing of the goods taken in the burglary.  In addition, it is immaterial and disputed because of the reasons stated in response to #114.**

161.    Taylor further testified that he never told Defendants Carlton and Bell that Palmer brought Helmbacher's property to his apartment and never told them anything else about the burglary. Ex. 99 at 56:9-20; Ex. 98 at 12.

**RESPONSE**:   **Immaterial/Disputed.  It is disputed because Taylor gave statements including sworn testimony at the trial, in which he admitted holding the bag and disposing of the goods taken in the burglary.  In addition, it is immaterial and disputed based on all the reasons sated in response to #114.**

162.    Taylor testified that he never told police that he had any knowledge who committed the murder. Ex. 99 at 33:3-17, 69:10-23.

**RESPONSE**:  **Immaterial/Disputed.   For all of the reasons to question the materiality of Taylor's deposition testimony expressed in response to #144 and elsewhere, the statement is immaterial.  It is disputed because the cited references do not support the statement.  In fact, the statement is alarmingly false and misleading.  The testimony from p. 33 went as follows:**

Q.      Yeah. Okay. So within the week or so following the Helmbacher homicide, you talked to police officers at least five times based on the reports that we have looked at. And you never told them anything about the murder, right?

**A.      I didn't have no reason for them to be coming and talking to me to talk about the murder.  Only thing –**

Q.      And you –

**A.      Go ahead.**

Q.      You told them you did not know anything about the murder right?

**A.      Yeah.**

Q.      And you told them truthful information, right?

**A.      All the things I tell you is truthful.**

Q.      And you have never at any point reached out to anybody from the police department to give them more information, did you?

**A.      No.**

Q.      And you never mentioned Charles Palmer's name to any officers up to this point, right?

**A.      No. Why would I?**

The testimony does not support that Taylor "never" told police he had no knowledge who committed the murder, only that when questioned during the first days of the investigation, Taylor did not admit he knew who killed Helmbacher.  On page 69 of the deposition, the following colloquy is reported:

Q.      Okay.  The next page, so now I am on Page 3 of this exhibit which is Bates labelled Decatur 440.  The first full paragraph says I asked Ray if there were any other times that he and Charles talked about this homicide.

Ray stated that a couple of weeks ago they were downtown at the bus stop.  He stated that he was talking to Charles and Charles stated that he could not believe he had done that for $11.  Do you see that?

**A.      No.  But I am just listening to you.  That is not true.  It is not true.**

Q.      It is not true that conversation happened at the bus stop/

**A.      Never happened.**

Q.      Okay.  And you never told police that it happened, did you?

**A.      Never happened.**

Q.      Sorry, Say that again?

**A.      No.  it never happened.**

Q.      And you never told the police that it did happen, right?

**This testimony does not support that Taylor "never" told the police he had no knowledge of who killed Helmbacher. Moreover, although Taylor was confused about this conversation happening at a bus stop, he confirmed at his deposition that it happened. Taylor testified later in the deposition as follows:**

So you talked about a time when you ran into Charlie and this was
after the murder and he asked you are the police still coming to talk
to you all the time.  Do you remember when you told Mrs. Brady
about that?

A.   **I remember that.**

Q.   That was in Downtown Decatur right?

A.   **Yeah, downtown. Yeah, that is when the city, the transit used to meet down
there instead of the library.**

Q.   So you had that conversation with him.  You guys were on the, almost on
different sides of the street.  Then you got on a bus, right?

A.   **No.  We didn't get on a bus.  He was across the street and I was on the other
side.  He walked across the street and he asked me, he said, he said did the
detectives and stuff still coming to the house. And I am like yeah.  And he
walked on down and I went on down that way.**

Q.   You said you were at a transit?

A.   **Yeah. A transit where they used to meet right there on Williams Street right
there by where the old crossing jewelry store used to be, that corner right
there.  It used to be right there, but it not no more though.  They moved
down by the library.**

Pltf's Exh. 99, p. 156, lines 1-25.  The statement is also entirely disputed by Taylor's unequivocal

affirmation of his trial testimony as completely true.

163.    Taylor testified that he never told Defendants Carlton, Bell, Ryan, or Patton, or any

other officer, that: Palmer had burglarized Helmbacher, Ex. 99 at 59:8-60:13; Palmer asked him

to look out during the burglary, id. at 62:5-23; Palmer climbed in Helmbacher's window and let

him in Helmbacher's front door, id. at 63:18-65:2; or that Palmer told him at a bus stop that he

could not believe he had "done that for $11," id. at 69:5-71:1; see also Ex. 98 at 15.

**RESPONSE**:  **Immaterial/Disputed. The statement is immaterial based on the reasons stated**

**in response to # 114.  The statement is disputed in that Taylor first says he does not recall**

**making these statements, which does not establish that he did not provide this information**

**to the police.  More significantly, Taylor confirmed the truth of his trial testimony in which**

**he testified that he gave the police the information that plaintiff committed the burglary.**

164.    Taylor testified that Defendants Bell and Ryan tried to get him to lie about the burglary and homicide, and he informed the police that the details about the burglary and the homicide that they were trying to get him to say were false. Ex. 99 at 50:20-25, 71:20-72:5.

**RESPONSE**:  **Immaterial/Disputed. It is immaterial because the statement has no probative value. The statement is disputed because the cited references to Taylor's deposition do not support it.  It is also disputed because the details in Taylor's statement implicating plaintiff could not have been fed.   Only two details were revealed in Taylor's statement, that Helmbacher was beaten, and he was robbed.   That Helmbacher was beaten to death was widely known.  Defendants' Exh. OO.  And police ever discovered anything about $11.00 taken from Helmbacher, so that detail could not have been fed.**

165.    Taylor testified that he has no idea why Palmer's name would be written in the margin on his handwritten statement. Ex. 99 at 24:4-6, 52:24-53:2, 76:22-77:5. **(Material/Undisputed)** Taylor testified that he doesn't think Palmer's name should have been on the statement and that he never saw Palmer's name in the margin until his deposition. Ex. 99 at 76:22-77:5.

**RESPONSE**:  **Immaterial/Undisputed.  It is immaterial because there is no explanation for why Taylor did not think plaintiff's name should be there.   Moreover, plaintiff is being misleading if suggesting that Taylor did not see it when he wrote the statement in 1998. Taylor is clearly referring to not seeing plaintiff's name there while looking at the statement at his deposition.   Moreover, plaintiff's suggestion is misleading because the statement is consistent with his trial testimony, which Taylor unequivocally confirmed during the deposition.**

166.   Taylor testified that during the investigation, DPD was following Taylor, harassing him, and watching him from their cars. Ex. 99 27:22-28:16, 28:20-29:8.

**RESPONSE**: **Immaterial/Undisputed.   The statement is immaterial based on the reasons stated in response to #147.**

167.   Taylor testified that he never brought up Palmer's name during the interrogation on September 21. Ex. 99 at 24:4-6, 52:24-53:2, 76:22-77:5.

**RESPONSE**: **Immaterial/Disputed.   The statement is immaterial because it is incorrect and disputed because, once again, it is not supported by the cited references.**

168.   Bell testified that he does not recall how Palmer's name was introduced into Taylor's interrogation. Ds' Ex. DD at 210:17-211:6.

**RESPONSE: Immaterial/Undisputed.   The statement is immaterial because it proves nothing.  It is Bell merely saying he lacks any memory of the matter.**

169.   Taylor says he was not interviewed again after the polygraph test or the next day. Ex. 98 at 9, 10.

**RESPONSE:  Material/Disputed.  It is disputed based on the reasons expressed in response to #158.  In addition, it is disputed because Taylor testified he could not remember if he gave any additional information to the police after the polygraph.  Pltf's Exh. #99, p. 53, line 22 p.54, line 4.**

170.   Taylor denies that he ever told his father that Palmer had been involved in the murder. Ex. 98 at  17; Ex. 99 at 70:6-24.

**RESPONSE:  Immaterial/Disputed.  Immaterial and disputed for all of the reasons stated in response to #s 114 and #158.**

171.    Taylor says that Palmer never said anything to him about the police or that he could not believe he had "done that for $11" at the bus stop. Ex. 98 at 15.

**RESPONSE:  Immaterial/Disputed.  It is immaterial because Taylor himself, under oath, denied he was encouraged to implicate plaintiff in the murder.  It is disputed based on the unreliability of the Mort Smith affidavit expressed in response to #114, and because Taylor's alleged statement to Mort Smith is hearsay.**

**Palmer is Arrested and Interrogated**

172.    On September 22, 1998, officers arrested Palmer, who was 43-years old and working at an auto detail shop, without a warrant, and Defendant Carlton interrogated him. Ex. 33; Ex. 117; Ds' Ex. B at 67:6-20.

**RESPONSE:   Material/Disputed. It is disputed because there was a warrant outstanding for plaintiff's arrest on a different matter.  (Pltf's Exh. 54, p. Dec. 441)**

173.    Palmer truthfully denied having any knowledge of the burglary or the murder. Ex. 33; ASOF1; ASOF2.

**RESPONSE:  Immaterial/Disputed.  It is immaterial because plaintiff's denials are not probative of any issues in the case.  It is disputed based on Facts, #50 and #71.**

174.    Defendant Carlton wrote a report stating that he and Defendant Bell brought Taylor to Palmer's interrogation room, and Taylor repeated in front of Palmer his story that Palmer confessed to the burglary and murder. Ex. 33 at Decatur 119.

**RESPONSE:  Material/Undisputed.**

175.    Taylor was never brought into an interrogation with Palmer, and he did not make any statements in front of Palmer. Ds' Ex. B at 313:16-24.

**RESPONSE:  Material/Disputed.  It is disputed based on Facts, #64.**

176.   Defendant Bell does not recall using this interrogation technique in any other instance during his employment at DPD. Ds' Ex. DD, 67-68.

**RESPONSE:  Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

177.   During the interrogation, Carlton took Palmer's Fila tennis shoes. According to Carlton's report, he showed the shoes to Taylor, and Taylor said they looked like the same shoes Palmer said he had to get rid of because they had blood on them. Ex. 33 at Decatur 119.

**RESPONSE:  Material/Undisputed.**

178.   Taylor testified that he was not asked to identify Palmer's shoes at the station and had never seen Palmer wearing the Filas before that. Ex. 99 at 83:24-84:16, 137:6-138:2; Ex. 98 at 13.

**RESPONSE:  Immaterial/Disputed.  It is immaterial because of the lack of reliability and credibility of the cited reference material.  It is disputed based on Facts #53, which recites Taylor's trial testimony on the topic.**

179.   On September 22, 1998, Palmer's Fila shoes were taken into evidence. Ex. 33 at Decatur 119.

**RESPONSE:  Material/Undisputed.**

180.   Carlton created a property record form on September 23rd. Ex. 97 at Decatur 7120.

**RESPONSE:  Material/Undisputed.**

181.   Carlton told Palmer that Carlton saw spots on the shoes that he thought were blood. Ex. 35 at Decatur 136.

**RESPONSE:  Material/Undisputed.**

182.    On September 22nd Carlton swore an affidavit for a warrantless arrest of Palmer, stating that Taylor's prints were on the bag at Millikin, and that Taylor said he participated in the burglary with Palmer. The sworn statement says Taylor stated that Palmer entered Helmbacher's apartment through the window and Taylor acted as the lookout. Ex. 9 at Palmer 6563.

**RESPONSE:  Material/Undisputed.**

183.    Carlton's sworn statement also says Taylor said that he had to beat William during a robbery, that Palmer said there was blood all over, and that Palmer said he had to change his shoes because he had gotten blood on them. Ex. 9 at Palmer 6563.

**RESPONSE:  Material/Undisputed.**

**Defendants Investigate Palmer**

184.    Defendant Carlton wrote a report, dated September 26, 1998, reflecting that he interviewed Mike Callaway after Palmer's arrest. According to the report, Callaway said Palmer had stayed at Callaway's residence on the night of Helmbacher's murder. According to Carlton's report, Callaway stated that Palmer did not mention anything about a murder to him that night and Callaway had not noticed blood on Palmer. Ex. 34 at Decatur 126-127.

**RESPONSE:  Material/Undisputed.**

185.    According to Defendant Carlton's report, Callaway said during that interview that Palmer put on Callaway's shirt, Callaway told him to wash his own clothes and wear them instead, and then Palmer washed his clothes that day or the next. Ex. 34.

**RESPONSE:  Material/Undisputed.**

**Defendants Stop Investigating Lee**

186.    No one from DPD contacted Lee or his attorney again after September 21, 1998. Ex. 109 at 486:15-19, 487:9-19.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

187. On September 24, 1998, Defendant Ryan informed ISP crime lab analyst Jennifer Lu not to examine the items found in Lee's car because Lee was "not a suspect anymore." Ex. 84 at Palmer 120; Ex. 61, 64:8-18. Ryan did not write a report memorializing this conversation.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

188. It was the practice in the Decatur Police Department at that time that it was not appropriate to exclude someone as a suspect if there were still leads to follow up on, even if there was evidence inculpating someone else. Ds' Ex. C at 202:16-24; Ds' Ex. G at 77:5-10; Ex. 102 at 175:14-177:7. No Defendant wrote a report explaining why Lee was no longer a suspect. affidavit.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed because the cited references do not support the statements.**

189. ASA Ahola has some independent recollection of his work on the Helmbacher case yet does not recall ever being informed that Doug Lee had been a suspect in the Helmbacher murder. Ex. 63 at 67:5-7; 109:14-16.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

**First Test of Shoes Reveals No Blood**

190.   On September 25, 1998, ISP analyst Jennifer Lu (formerly Jennifer Broster and subsequently Jennifer Aper) performed the "examination for blood" that Carlton requested. Ex. 82. She examined the black and white Fila shoes and found them worn and dirty. Ex. 61, 90:18-20; Ds' Ex. A at Part 2, Decatur 6011:6-12.

**RESPONSE:  Material/Undisputed.**

Lu also does not recall anything about the shoes that made it appear that they had been washed. Ex. 61 at 93:14-94:4; 94:16-20; 94:21-95:1.

**RESPONSE:  Immaterial/Disputed.  It is immaterial because how shoes would appear washed three weeks later is a mystery.  Lu (Aper) did believe the shoes were washed.  (Pltf's Exh. 61, p. 90, line 18 to p. 92 line 6).**

191.   Lu also testified that nothing about the appearance of the blood spots supports the idea that the shoes were cleaned on the outside. Ex. 61 at 231:12-16.

**RESPONSE:** Immaterial/Undisputed.  It is immaterial because cleaning the outside of the shoe would not necessarily affect the appearance of the blood spots trapped between material.

The Fila shoes had never been washed between the time of the murder on August 27 and when Carlton confiscated the shoes on September 22nd. Ds' Ex. B at 193:9-10; Ex. 101 at Fedor 10.

**RESPONSE:  Material/Disputed.  The totality of the evidence supports that the shoes were washed, and refutes plaintiff's denial that they were washed.  Lu (Aper) believed the shoes were washed.  Pltf's Exh. 61, p. 90, line 18 to p. 92, line 6.  (*Id.*)  Plaintiff wearing shoes that didn't fit, and his response to Taylor's asking about what happened to the athletic shoes he was wearing (Facts, #s 49-50), support that the shoes were washed, as does Calloway catching plaintiff washing items in a tub and changing into Calloway's clothes (Facts, #61-620).  ISP analyst Dana Pitchford believed the outside of the shoes had been cleaned (Defs' Exh. L, p.**

**139, line 2 to p. 140, line 16; p. 142, lines 6-24), as does forensic scientist Lucy Davis, because the color of the blood stains appeared diluted (Defs' Exh. N, p. 138, line 23 to p. 139, line 24), and from review of photographs the shoes were worn, but not as dirty as would be expected based on how worn they were (Defs' Exh. N, p. 74, line 11, to p. 75, line 15).**

192.    Lu performed the standard exam for when a police agency requests that an item be tested for blood. Ex. 61 at 26:9-29:7.

**RESPONSE:  Material/Undisputed.**

193.    If there were blood on the shoe, the most likely spot it would have been was the tongue. Ex. A, Part 2, at Decatur 6023:8-14; Ds' Ex. N at 126:7-13.

**RESPONSE**:  **Material/Undisputed, if blood on the tongue were not wiped or washed off.**

194.    Lu conducted a visual examination with a bright light of the interior and exterior of the shoe for anything that could be a blood-like stain, including taping both shoes for "hairs, fibers and debris." Ex. 81 at Palmer (ISP) 27; Ds' Ex. A, Part 2, at Decatur 6023:1-3. Analyst Lu described her process as follows: "exam w/ bright light, RBS noted;" "cut away small portion of 'tongue' to examine inside padding; and "shoe laces removed for examination." Ex. 84 at Palmer (ISP) 128. She also examined the interior of the shoes. Ds' Ex. A, Part 2, at Decatur 6023:18-21. Ds' Ex. A, Part 2, at Decatur 6023:18-21; Ex. 61, 26:9-27-3; 28:18-29:7; Ex. 101 at Fedor 5.

**RESPONSE:  Material/Undisputed.**

195.    Lu's examination was thorough, and she did not believe she missed something when examining the shoe this first time. Ex. 61, 31:8-19 at 104:2-12. It was not a cursory exam. Ex. 59 at 38:19-42:16.

**RESPONSE:  Material/Disputed.  The examination was cursory to the extent that it was a visual examination of the visible surfaces of the shoes.  It did not explore blood that seeped into deeper shoe material that could not be washed out.**

196.    Lu saw two brown-red spots on the shoes that she determined were not blood, based on biological testing, and Defendants were informed of this. Ds' Ex. A at Part 2, Decatur 147:17-Decatur 148:2; Ex. 84 at Palmer (ISP) 128.

**RESPONSE:  Material/Undisputed.**

197.    Lu found no evidence of blood on the Fila shoes. Ds' Ex. A at Part 2, Decatur 148:1-2.

**RESPONSE:  Material/Disputed.   Defs' Exh. K, p. 113, lines 21-24.**

198.    After examining the shoes, Lu placed them back in the original bag, sealed it with blue evidence tape and placed it into the evidence vault for the evidence technician to return to DPD. Ds' Ex. A, Part 2, Decatur 6011:16-23.

**RESPONSE:  Material/Undisputed.**

199.    On September 29, 1998, Lu issued a formal report that no blood was indicated on the shoes. Ex. 81 at Palmer (ISP) 73.

**RESPONSE:  Material/Undisputed.**

200.    Lu had not talked to anyone at DPD about the negative finding before September 29. See generally Ex. 84.

**RESPONSE**:  **Material/Disputed.  It is disputed because the document cited in support does not establish the extent of communications between Lu (Aper) and the DPD.**

201.    Lu sensed that the DPD officers working on the Helmbacher case were disappointed that she did not find blood on the shoe during her first analysis. Ex. 61, 103:18-21.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

202.   Lu's practice was to analyze one item at a time, package and seal it, and then completely decontaminate her work area to ensure that there was no item-to-item contamination. Ex. 61, 151-152:14.

**RESPONSE**:  **Material/Undisputed.**

203.   Lu testified that the Fila shoes could not have come into contact with Helmbacher's blood while in ISP's custody. Ex. 61 at 151:15-152:14.

**RESPONSE**: **Material/Undisputed.**

**MCSAO Declines to Charge Palmer**

204.   Between September 22 and October 6, Defendant Carlton had conversations with the Macon County prosecutor about whether to charge Palmer, given standard communication practices between detectives and the prosecution during an investigation. Ex. 70 at 74:14-76:22; Ex. 63 at 36:12-38:19, 54:6-16, 73:8-76:10, 79:9-81:4.

**RESPONSE:  Material/Undisputed.**

205.   Carlton presented the evidence DPD had compiled to establish probable cause to charge. This included 1) Taylor's written statement; 2) Taylor's and Palmer's statements to each other; and 3) Taylor's statements to Defendants Carlton, Bell, Walker, Chabak, Applegate, Hubbard, and Ryan, DPD Officer Beck, and Robert Martin. Ex. 92 at Palmer 6546-6547; Ex. 9 at Palmer 6563-6565; Ex. 70 at 74:14-76:22, 96:21-97:6; Ex. 63 at 36:12-38:19.

**RESPONSE:  Material/Undisputed.**

206.    The Macon County prosecutor declined to charge Palmer because the evidence Carlton had presented did not establish probable cause. Ex. 92 at Palmer 6546-6547; Ex. 9 at Palmer 6563-65; Ex. 70 at 96:21-97:6

**RESPONSE:  Material/Disputed. None of the cited material establishes what the statement claims.  The statement cites the deposition testimony of Scott Reuter, who had no role in the charging decision.  (Pltf's Exh. 70, p. 85, line 21 to p. 86, line 10).  The First Assistant State's Attorney, Jack Ahola, made that decision, and the initial decision not to approve charges was based on the standard of proof beyond a reasonable doubt, not probable cause.  Ahola testified that Ray Taylor's testimony alone would have established probable cause, but might not have been enough for proof beyond a reasonable doubt.  (Pltf's Exh. 63, p. 131, line 19, to p. 132, line 10).  Charges were withheld "pending further investigation," not because of insufficient evidence.  Pltf's Exh. 63, p. 146, line 22, to p. 147, line 6).**

207.    The prosecutor would have told Carlton what additional evidence he needed in order for the MSCAO to be able to issue charges. Ex. 63 at 55:2-22, 73:8-76:10, 79:9-81:4.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

208.    The Macon County prosecutor memorialized its decision not to charge in a No Charge sheet. Ex. 92.

**RESPONSE:  Material/Undisputed.**

209.    The No Charge sheet lists as evidence against Palmer only Taylor's written statement; Taylor's and Palmer's statements to each other; Taylor's statements to Defendants

Carlton, Bell, Walker, Chabak, Applegate, Hubbard, and Ryan, DPD Officer Beck, and Robert Martin. Ex. 92.

**RESPONSE:  Material/Undisputed.**

210.    The No Charge sheet reflects that further investigation was needed to issue charges **(Material/Undisputed),** and that the prosecutor was not awaiting any forensic testing and did not need a court order for blood, hair, or saliva. Ex. 92 at Palmer 6546-6547.

**RESPONSE:    Immaterial/Disputed.    Except for mere background,  the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.    It is disputed because the form does not say that the "prosecution was not awaiting any forensic testing and did not need a court order for blood, hair or saliva."**

211.    This communication should have been in the form of an attached memo, in the file. Ex. 63 at 73:8-12.   If such a memo exists, it was not produced during discovery.

**RESPONSE**: **Immaterial/Disputed.    Except for mere background,  the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.**

212.    The ASA who issued the No Charge sheet testified that there was not probable cause to charge Palmer until the shoes came back with Helmbacher's DNA on them. Ex. 63 at 87:23-89:2.

**RESPONSE:  Material/Disputed.  None of the cited material establishes what the statement claims.  The statement cites the deposition testimony of Scott Reuter, who had no role in the charging decision.  (Pltf's Exh. 70, p. 85, line 21 to p. 86, line 10).  First Assistant State's Attorney Jack Ahola, made that decision, and the initial decision not to approve charges was based on the standard of proof beyond a reasonable doubt, not probable cause.  Ahola**

testified that Ray Taylor's testimony alone would have established probable cause, but might not have been enough for proof beyond a reasonable doubt.  (Pltf's Exh. 63, p. 131, line 19, to p. 132, line 10).  Charges were withheld "pending further investigation," not because of insufficient evidence.  Pltf's Exh. 63, p. 146, line 22, to p. 147, line 6).

**Shoes and Blood are Opened at the Station and Removed from Chain of Custody**

213.   The packages containing Helmbacher's shoes and blood swabs were returned to DPD on October 1. Ex. 79 at Palmer (ISP) 81.

**RESPONSE:  Material/Undisputed.**

214.   Morville checked the Filas out of the evidence vault on October 5. Ex. 97 at Decatur 7121.

**RESPONSE**:  **Material/Disputed.  Morville did not check the Fila shoes out of evidence on October 5, 1998.  Defs' Exh. A, Dec. Dec5943.  Morville explained at his deposition that the entry was a mistake, that he wrote "05" instead of "15."  Defs' Exh. D, p. 406.  Morville's explanation is not in any way refuted merely by plaintiff's citation to the form without some credible corroboration.**

215.   There is no report explaining why Morville checked the Filas out of evidence on October 5. See Ex. 118-120; Ex. 122 at 2.

**RESPONSE:  Immaterial/Undisputed.  The statement is immaterial because Morville did not check the shoes out of evidence on October 5, so there would not be such a report.  Defs' Exh. D, p. 406; Defs' Exh. A, Dec5943.**

216.   Morville did not take the Filas to the ISP crime lab until October 15. Ex. 83 at Palmer 84.

**RESPONSE:  Material/Undisputed.**

217.    There are no reports documenting what happened to the shoes or where they were between October 5 when Morville checked them out and October 15 when Morville took them to the crime lab. See Ex. 118-120; Ex. 122 at 2.

**RESPONSE**:  **Immaterial/Disputed.  The statement is immaterial because Morville did not check the shoes out of evidence on October 5, so there would not be such a report.  Defs' Exh. D, p. 406; Defs' Exh. A, Dec5943.**

218.    Morville understood that DPD officers were supposed to initial evidence tape when they alter, touch, or seal an item of evidence. Ds' Ex. D at 166:12-167:4; 380:17-24

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  Morville himself did not inspect the evidence sealed in a bag.  He only initialed a tab on the bag when he moved evidence back and forth from the lab.  (Defs' Exh. A, Dec 5940)**

219.    Defendant Morville initialed the tape on the evidence bag containing the shoes on October 1. Ex. 11.

**RESPONSE:  Immaterial/Undisputed, except the photograph does not establish the contents of the bag as containing shoes.**

220.    Defendant Morville initialed the tape on the package containing Helmbacher's blood swabs on October 1. Ex. 8 at Palmer 5113; Ex. 111 at Harvey 19; D's Ex. A, Part 2, at Decatur 5940:5-6.

**RESPONSE:  Material/Undisputed.**

221.    The package containing Helmbacher's blood has blue and white evidence tape, clear tape, and two sets of staple holes. Ex. 8 at Palmer 5113-5114. Morville's initials are on the blue and white evidence tape. Id.

**RESPONSE:  Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed because it cannot be determined exactly where the initial appear from the photograph.**

222.    The package containing the blood swabs were not opened at the ISP. Ex. 81 at Palmer (ISP) 125.

**RESPONSE:  Material/Disputed.  Certainly the blood swabs had to be opened at the ISP lab in order to make the comparison between Helmbacher's blood on plaintiff's shoe and the standard.  Facts #32.**

223.    There is no record memorializing why Morville resealed the package and initialed the new tape on October 1. See Ex. 118-120; Ex. 122 at 2.

**RESPONSE:  Immaterial/Undisputed.  It is immaterial because Morville did not reseal the package.  Plaintiff misunderstands that Morville initialed the package when moving it in or out of the DPD, as did the ISP staff, as shown on the face of the packages.  See Response to #218.**

224.    Defendant Roger Morville served as the evidence officer from around September 3, 1998 through October 15, 1998. Ds' Ex. D at 147:22-149:16.

**RESPONSE:  Material/Undisputed.**

225.    Officers could request that the evidence officer retrieve evidence from the vault for their use. Ds' Ex. D at 157:13-158:9.

**RESPONSE:  Material/Undisputed.**

226.    If officers retrieved evidence from the vault, the officer was supposed to record it on the evidence tag. Ds' Ex. D at 157:13-22, 163:9-13, 336:5-11

**RESPONSE:  Material/Undisputed.**

227.    Morville's desk was located inside the vault and contained a spare set of keys. Ds' Ex. D at 389:23-393:3.

**RESPONSE:  Material/Undisputed.**

228.    Ryan testified that he can recall going to the evidence officer's desk and seeing him away from the desk. Ds' Ex. C at 95:3-8.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

229.    Morville testified that he would not have known if someone had taken the evidence key from his desk or opened the evidence locker without his knowledge while he was off duty. Def's Ex. D at 137:13-138:13; 151:3-6.

**RESPONSE**: **Immaterial/Undisputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

230.    Morville also testified that he has no particular memory of whether someone may have removed evidence related to the Helmbacher case without creating an evidence receipt or whether someone planted blood evidence in this case. Ds' Ex. D at 62:3-16; 64:13-21.

**RESPONSE**:  **Immaterial/Undisputed.  Not having a memory of something Morville would have no way of knowing has no probative value to any issue in this case.**

231.    There were no surveillance cameras in the evidence locker area. Ds' Ex. D at 116:9-12.

**RESPONSE**: **Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

232.    Morville's shift was 7 a.m. to 3 p.m. on weekdays and no evidence officer was present after 3 p.m. or on the weekend. Ds' Ex. D at 113:19-116:18, 144:4-8.

**RESPONSE**: **Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

233.    DPD officers knew that there was no one guarding the evidence room from 3pm until 7am the next day. Ds' Ex. D at 131:12-18

**RESPONSE**: **Immaterial/Undisputed. It is immaterial because officers would have no way to get into the evidence room when the officer was out.**

234.    There is no written record memorializing why the Fila shoes were removed from evidence on October 5. Ex. 118-120; Ex. 122 at 2.

**RESPONSE**: **Immaterial/Undisputed. The shoes were not removed from evidence on October 5, so of course there is no such record.**

235.    Expert testimony establishes that it would have been possible for Defendants Morville, Carlton, Chabak, or Ryan to use Helmbacher's blood and a sharp-tipped instrument (e.g., a toothpick) to penetrate the porous mesh layer on the outside of the FILA shoes to place Helmbacher's blood on the shoe, Ex. 101 at Fedor 10, 26; Ex. 108 at Moses 19, especially since

there is no reason that evidence should be out of the chain of custody for days before going for forensic analysis. Ex. 111 at Harvey 19.

**RESPONSE: Immaterial/Disputed.  These so-called experts have no expertise in such a matter, and are merely speculating about the ability of any defendant to place blood on plaintiff's shoe, and there is no credible evidence the shoes were ever out of the chain of custody.  Fedor has no expertise in blood pattern analysis.  Defendants' Exh. LL, p. 42.**

236.    Defendant Ryan -- who was DPD's key officer for processing crime scenes and collecting evidence -- explained that, anytime he had access to dried blood, he was able to rehydrate the dried blood by mixing it with distilled water and move it to another object. Ds' Ex. C, 119:1224; 120:6-8; see also Ex. 101 at Fedor 11.

**RESPONSE: Immaterial/Disputed.  Ryan discussed making a blood standard from blood that has coagulated on some surface in order to get it onto filter paper used to make the standard.  He never discussed reliquifying blood that was already dried onto filter paper.  Making DNA rich blood from a dried blood standard is not possible.  Defs' Exh. N, p. 120.**

237.    The detective command (Defendant Chabak) or lead detective (Defendant Carlton) were in charge of deciding which evidence to send for testing and what type of testing would be done on a piece of evidence. Ds' Ex. C, 129:8-120:3; Ds' Ex. C, 167:11-18; Ds' Ex. F, 154:20155:2,156:1-8

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. All evidence was sent to the ISP lab, and the lab had protocols that required lab personnel to triage testing based on determinations of the probative value of the testing. Defs' Exh. L, p. 168, line 13 to p. 169, line 7.**

238.    Given Defendant Ryan's expertise and status as key officer for processing evidence, he would often consult the lead detective about what kind of testing to do on specific evidence. D's Ex. C at 130:1-3.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

### Shoes Are Returned to Crime Lab for Unprecedented Second Test

239.    On October 15, Carlton instructed the ISP crime lab to examine the shoes a second time by tearing them apart. Ex. 83. **(Material/Undisputed)** No Defendant made a report explaining the reasons the shoes were resent, and no Defendants reported or testified that the shoes had to be retested because of washing. Ex. 122 at 2.

**RESPONSE: Immaterial/Undisputed.  It is immaterial because there would be no need for such a specific report.  The shoes were not retested because of "washing."  The shoes were retested because there could be (and was) blood located in areas of the shoes that were not examined the first time.**

240.    Carlton wrote to ISP: "[t]he Fila tennis shoes were reported by a witness to of [sic] had blood on them from William Helmbacher. I need them taken apart and every fiber checked for William Helmbacher's blood." Ex. 83.

**RESPONSE:  Material/Undisputed.**

241.    Lu was concerned about DPDs' instructions because it was contrary to ISP's standard procedure to tear a shoe apart in search of blood, given that it was time consuming, difficult, and often dangerous. Ex. 61 at 27:3-21; Ex. 59 at 44:20-24.

**RESPONSE:  Material/Undisputed.**

242.    Lu testified that it was typically not necessary to tear apart a shoe because "most of the time if there's going to be blood on a shoe, you're going to see it on the external surfaces." Ex. 61 at 27:15-21.

**RESPONSE:  Material/Undisputed.**

243.    Standard procedure was to examine the outside with a bright light, look inside the shoe, and tear the shoe laces apart, which she did. Ds' Ex. A, Part 2, at Decatur 6024:23-24; Decatur 6026:19-22; Ex. 59 at 44:20-24.

**RESPONSE:  Material/Undisputed.**

244.    Lu was also concerned because if she destroyed the shoes, they potentially could not be tested for other types of evidence, such as footprint evaluations. Ex. 61 at 54:8-55:18.

**RESPONSE:  Material/Undisputed.**

245.    The retesting of an item of physical evidence for blood already determined not to be present was virtually unprecedented. Ds' Ex. N at 124:9-21; Ex. 101 at Fedor 9; Ex. 61 at 33:10-34:15; Ex. 59 at 114:9-117:10. Lu never had another case other than the Helmbacher investigation where she examined a piece of evidence for biology, found no blood indicated, and then was asked to look again and found blood the second time. Ex. 61 at 33:10-34:15.

**RESPONSE:  Material/Disputed. The cited material does not support the statement.  Lucy Davis testified she did it ten times and found blood twice after deconstruction, which is 20% of the times in her experience.  Defs' Exh. N, p. 124, lines 17-21.  That is far from "virtually unprecedented."  Lu (Aper) had an instance where she found no blood on a shirt, then found blood on retesting.  Pltf's Exh. 61, p. 33, line 21 – p. 34, line 8.  Pitchford did retest a pair of boots at the DPD's request, cutting them up to look for blood after having found nothing the**

**first time.  No blood was found the second time.  Pltf's Exh. 59, p. 114, line 14 to p. 115, line 5.**

246.    This is the only case in which Lu ever found blood on a second examination after not having found blood the first time. Ex. 61 at 31:20-32:2.

**RESPONSE**:  **Material/Disputed.  The statement is not correct.  Pltf's Exh. 61, p. 33, line 21 to p. 34, line 8.**

247.    ISP was thorough and reliable in its testing, and ISP and DPD both trusted that ISP's testing protocol -- which was employed in the Helmbacher case -- turned up evidence the first time. Ex. 59 at 45:16-21; D's Ex. H at 216:12-15; D's Ex. G at 160:23-161:5.

**RESPONSE**:  **Immaterial/Undisputed.   It is immaterial because the facts of this case indicated a deeper review of the shoes than the ISP lab normally did was necessary.**

248.    It was not DPDs' standard practice to send evidence back for re-testing, and multiple defendant officers could not remember ever re-sending ISP negative evidence to be tested again for the same form of DNA, other than in the Helmbacher case. D's Ex. G at 104:8-22; D's Ex. E, Part 1, at 189:24-190:8; D's Ex. H at 213:14-22; D's Ex. F at 104:15-22; D's Ex. C at 133:1624; Ds' Ex. DD, 102:12-20.

**RESPONSE**:  **Immaterial/Undisputed.   It is immaterial because the facts of this case indicated a deeper review of the shoes than the ISP lab normally did was necessary.**

249.    ASA Ahola similarly testified that he could not remember any shoes being taken apart like Palmer's in any of his other cases. Ex. 63 at 84:21-24, 85:1.

**RESPONSE**:  **Immaterial/Undisputed.  It is immaterial because Ahola did not deny having such a case before, only that he could not remember one, because he "had so many."  *Id*. at p. 84, line 6.  He "would have to look through all" his cases.  *Id*. at lines 23-24.**

250.    Ahola further testified that if he had evidence that undermined the DNA findings, he would have disclosed it to the defense attorneys. Ex. 63 at 82:1-6.

**RESPONSE:  Material/Undisputed.**

251.    Nevertheless, on November 16, 1998, Lu examined the shoes a second time by tearing them apart, as instructed. She 1) removed the black trim, 2) separated the outside leather and black mesh, 3) separated the inside lining, and 4) examined the shoes with a bright light. Ex. 3; Ex. 84 at Palmer (ISP) 131-136; D's Ex. A, Part 2, Decatur 6016:3-6017:3, 6018:6-9, 6026:23-6027:4.

**RESPONSE:  Material/Undisputed.**

252.    The extent to which Lu tore the shoe apart was highly irregular. Ex. 101 at Fedor 9; Ds' Ex. N at 127:22-128:1; Ex. 61 at 27:4-7.

**RESPONSE**:  **Immaterial/Disputed.  It is immaterial because Lu did what she had to do to thoroughly examine the interior material of the shoes.  The cited reference does not characterize Lu's actions as "highly irregular."**

253.    Defendants' DNA expert testified that she had never seen a shoe torn apart to this degree. Ds' Ex. N at 127:22-128:1; Ex. 3 at Palmer (FA) 7.

**RESPONSE**:  **Immaterial/Undisputed.  It is immaterial because Lu did what she had to do to thoroughly examine the interior material of the shoes.**

254.    According to forensic specialists, if the shoes had been covered in blood, it would be expected to find blood without tearing the shoes apart. Ex. 59 at 53:11-20, 55:17-24; Ex. 101 at Fedor 5.

**RESPONSE: Immaterial/Disputed.  It is immaterial, and disputed, because Pitchford responded to a hypothetical question not based on the facts of this case.  Nothing about the**

circumstances gave Pitchford any reason to believe that the blood was planted on plaintiff's shoe.  In fact, Pitchford specifically concluded the blood was not planted and became lodged inside inner materials of plaintiff's shoe.  Pltf's Exh. 59, p. 139, line 2, p. 141, line 17; p. 144, line 16 – 24; p. 162, line 14-22).

255.    Lu detected 3 red blood stains (labeled Qa, Qb, Qc) on the outside right side of one shoe. No blood was found on the other shoe. Ex. 84 at Palmer (ISP) 131, 134.

**RESPONSE:  Material/Undisputed.**

256.    Qa, was approximately 10 millimeters by 4 millimeters on the shoe's right front side "under black mesh". Ex. 84 at Palmer (ISP) 134.

**RESPONSE:  Material/Undisputed.**

257.    Qb, was a very light RBS was observed on "string (threading)" extending about 5 millimeters in length on the shoe's right mid-side. Ex. 84 at Palmer (ISP) 134.

**RESPONSE:  Material/Undisputed.**

258.    Qc was a discrete pinpoint droplet, approximately one millimeter by one millimeter, and was observed under black mesh near Qb. Ex. 84 at Palmer 844; Ex. 10 at Palmer 13185.

**RESPONSE:  Material/Undisputed, except to the characterization as a "discrete pinpoint droplet," which does not accurately describe the spot.**

259.    The black mesh is a porous, see-through material. Ex. 3 at Palmer (FA) 18.

**RESPONSE:  Material/Disputed.  The mask may be porous, but based on the photos it certainly is not "see-through."  Defs' Exh. K, p. 57.**

260.    No trace of blood was found other than in those three spots on one shoe. Ex. 101 at Fedor 10; Ex. 85 at 131-136.

**RESPONSE:  Material/Undisputed.**

261.    There were no signs of diluted blood in crevices and cracks of either shoe, where it would likely be even if the shoes had been washed. Ex. 101 at Fedor 10.

**RESPONSE: Immaterial/Disputed. Fedor offered this unsupported opinion with no consideration of any studies, and no scientific expertise in the blood analysis. Defs' Exh. LL, p. 79, line 19, - p. 80, line 4, and with no expertise or training in blood spatter or blood pattern analysis, p. 42, lines 15-20.**

262.    The blood stains Lu found on the shoe "weren't the vibrant red, dark stains that you typically see. They were a lighter reddish brown stain and they were very small." Ex. 61 at 55:22-56:3

**RESPONSE**:  **Material/Undisputed.**

263.    Lu's biology test confirmed that the stains were human blood. Ex. 10 at Decatur 13185:9-24; Ex. 85 at Palmer (ISP) 177.

**RESPONSE:  Material/Undisputed.**

264.    A second ISP analyst, Dana Pitchford, conducted a DNA test of the blood on the shoe. Ex. 80.

**RESPONSE:  Material/Undisputed.**

265.    The stains were small and faint, and Pitchford had to combine stains to generate a usable DNA profile. Ex. 80 at Palmer (ISP) 149.

**RESPONSE:  Material/Undisputed.**

266.    Pitchford was able to confirm that the blood stains matched the DNA of Helmbacher. Ex. 72 at Palmer (ISP) 78-79.

**RESPONSE: Material/Undisputed.**

267.    Pitchford informed Carlton of the DNA result on January 27, 1999. Ds' Ex. A, Part 1, at Decatur 5745:11-20; Ex. 80 at Palmer (ISP) 146 ; Ex. 88.

**RESPONSE:  Material/Undisputed.**

**Defendants Plant Blood on Palmer's Fila**

268.    The blood was found in a place where it would have been seen during ISP analyst Lu's first examination of the shoes. ASOF 259; Ex. 84 at Palmer 844; Ex. 108 at Moses 18.

**RESPONSE: Material/Disputed.  See response to ASOF 259.   The other cited material does not support the statement.  Plaintiff's Exh. 84 does not contain a page Palmer 844, and Pltf's Exh. 108 at Moses 18 does not support the statement.  Also, Lu (Aper) denied she could see the blood stains without separating layers of fabric.  Defs' Exh. K, p. 215, line 13-p. 216, line 12.**

269.    Furthermore, if a shoe is exposed to blood during a beating like the one in the Helmbacher case and blood was deposited on the shoe, a trained analyst would find it during a standard examination. Ex. 108 at Moses 18.

**RESPONSE: Material/Disputed.   See Response to ASOF 268.**

270.    There are three ways blood could have gotten on the shoe at the crime scene: spatter, cast-off droplets, or transfer. Ex. 108 at Moses 11.

**RESPONSE: Material/Disputed.  The blood could have been deposited on the shoes by spatters, drip stains, or small collected pools of blood.  Plaintiff's expert's speculation that the blood was a transfer stain deposited by an object is a baseless assumption, which he qualifies himself saying "there is no evidence that permits me to opine with certainty that it [blood was planted] happened in this case."  Pltf's Exh. 108, at Moses 0919; Defs' Exh. O, p. 44 of 47 – 45 of 47.**

271.     Qc was a "pinpoint droplet," which was too discrete to be the result of crime-scene transfer, and could not have been caused by blood flying from spatter or cast-off droplets through the air and through a mesh layer on the shoe, because spatter of that kind could not retain a pinpoint form on a subterranean surface of the shoe. Ex. 108 at Moses 18.

**RESPONSE: Material/Disputed.   The blood could have been deposited on the shoes by spatters, drip stains, or small collected pools of blood.   Plaintiff's expert's speculation that the blood was a transfer stain deposited by an object is a baseless assumption, which he qualifies himself saying "there is no evidence that permits me to opine with certainty that it [blood was planted] happened in this case."   Pltf's Exh. 108, at Moses 0919; Defs' Exh. O, p. 44 of 47 – 45 of 47.**

**Defendants Decline to Test Other Probative Forensic Evidence**

272.     DPD requested that ISP test some other items of evidence. Carlton informed ISP that he needed testing on the blood and hair from Helmbacher's right hand and left fingernail scrapings, in which Lu had found a blood-like substance. Ex. 83; Ex. 61 at 75:3-10; Ex. 84 at Palmer (ISP) 127.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

273.     ISP did not conduct DNA testing on the fingernail scrapings or hair. Ex. 84 at Palmer (ISP) 127; Ex. 85.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

274.     The nail scrapings contained DNA from skin. Ex. 61 at 73:11-75:10.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited material does not support the statement.  Lu (Aper) testified she did not find skin under the fingernails.  Later DNA testing by Cellmark may have found skin cells under the fingernails, but that type of "touch" DNA analysis was not done at the ISP lab in 1998.  Defs' Exh. K, p. 75, line 11-p.76, line 3.**

275.    Carlton learned that there was blood-like substance in the left fingernail scraping, but testified that he did not have them sent back to the lab for further analysis after they were returned to DPD from ISP without analysis. Ds' Ex. A, Part 2, at Decatur 5934:2-8.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

276.    Carlton thought blood evidence found at the crime scene would be more likely to provide probative information than shoes collected three or four weeks later. Ds' Ex. A, Part 2, at 5937:4-11.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because Carlton's testimony is mischaracterized.  The question is whether, in a general sense, "forensic evidence" at a crime scene would be "more likely" to assist an investigation than a pair of shoes found weeks later.  It is a general opinion on evidence gathering.  It is not a statement about the actual evidence gathering in the Helmbacher murder investigation.**

277. Lu testified that she relied on information from the police departments to determine what items of evidence to test. Ex. 61 at 23:21-24.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed because it mischaracterizes Lu's description of the ISP lab practices. Certainly the lab needed to know the facts of a case. But the ISP had its own protocols to make testing decisions, and had to make its own decisions of what tests would have the most probative value. Defs' Exh. K, p. 232, line 7 – p. 233, line 20.**

278. Lu and Pitchford also did not test the blood swabs from Helmbacher's apartment or blood-like stains on the hammer or ball cap found in the apartment. Ex. 59 at 33:15-34:2; Ex. 84 at Palmer (ISP) 121-123.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

279. Lu informed DPD that they should advise if any items not tested would significantly aid the case. Ex. 85 at Palmer (ISP) 177.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed because the cited reference does not support the statement.**

280. DPD officers did not advise ISP that the untested fingernail scrapings or hand-bag contents needed to be tested. Ex. 101 at Fedor 6.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.**

281.   DPD did not inform the ISP analysts that Helmbacher had defensive wounds and that the attacker's DNA profile could be under Helmbacher's fingernails. Ex. 10 at Palmer 13194:36.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.**

282.   ASA Ahola testified that he would have wanted the fingernail scrapings analyzed for DNA because the results could have been exculpatory. Ex. 63 at 124:17-25:5

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.**

283.   Around September 24th or 25th, Lu examined the hand bags and identified hairs. Ex. 61 at 72:16-21. Lu did not forward the hairs for microscopy examination because she never received a hair standard from Palmer. Ex. 61 at 72:7-10, 74:5-14, 148:1-5.

**RESPONSE:  Immaterial/Disputed.  It is immaterial and disputed because Lu and Pitchford both testified that hairs were not tested because they have a very low level of probative value. Pltf's Exh. 61, at 143, line 19- p. 145, line 4; p. 147, line 22-p. 148, line 5; Defs' Exh. L, p. 76 lines 15-20, p. 181, line 12-23.**

284.   Palmer's prints were never found at the crime scene. Ex. 86.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  Fingerprints are a chance impression.  Lack of fingerprints at a crime scene has no probative value.**

285.    Defendants Carlton, Chabak, Bell, Ryan, Hubbard, Applegate, and Patton knew Palmer's prints did not match any of the latent prints developed at the scene, Ex. 86; ASOF 45-51, yet none wrote a report memorializing this. Ex. 118-120; Ex. 122 at 2.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  Fingerprints are a chance impression.  Lack of fingerprints at a crime scene has no probative value.**

### Palmer is Charged with Capital Murder

286.    On January 29, 1999, Carlton informed Palmer that the shoes were tested and had come back with blood matching the DNA of Helmbacher. Ds' Ex. A, Part 1, at Decatur 5745:21-23. Palmer shook his head no and maintained that Helmbacher's blood could not have been found on his shoes because he had not murdered him. Palmer continued truthfully saying "I didn't do it." Ex. 35; ASOF 1.

**RESPONSE:  Immaterial/Undisputed, except for the claim of "truthfully."  Facts, #50, 71.**

287.    Carlton wrote a closing report stating that the Helmbacher murder was being closed with the arrest of Palmer for First Degree Murder. Ex. 36.

**RESPONSE:  Material/Undisputed.**

288.    Carlton's closing report stated that there was "nothing incriminating" found in Lee's car and that the security tape showed Lee had not changed clothes. Ex. 36 at Decatur 142; Ex. 51; Ex. 36 at Decatur 142; ASOF 77-79, 82.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

289.    Carlton's report says that a witness saw Helmbacher alive at 7:00 p.m. Ex. 36 at Decatur 141.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  The statement fails to point out that the report says the witness saw Helmbacher "around" 7:00.**

290.    This memo was provided to the prosecution. Ex. 63 at 44:13-45:2; 46:3-24; 51:4-9.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

291.    ASA Ahola relied on information provided by the police department when making decisions whether to charge a suspect. Ex. 70 at 74:14-76:22; Ex. 63 at 36:12-16.

**RESPONSE: Material/Undisputed.**

292.    Ahola assumed that the police had eliminated all other suspects before bringing someone to him for charges. Ex. 63 at 110:2-6.

**RESPONSE: Immaterial/Undisputed.  It is immaterial because everything the DPD did in connection with investigating or knew about other suspects was disclosed in police reporting.**

293.    Palmer was charged with first-degree murder and burglary, and an arrest warrant was issued for Palmer on January 28, 1999. Ex. 93.

**RESPONSE: Material/Undisputed.**

294.    The complaint for arrest warrant described three categories of evidence as forming the basis for Carlton's belief that Palmer committed the murder: Ray Taylor's story; the Filas that were taken from Palmer and shown to Taylor; and the blood on the Fila shoe. Ex. 93.

**RESPONSE: Material/Undisputed.**

295.    None of those pieces of evidence alone was enough to support probable cause. Ex. 63 at 87:23-88:19; Ex. 102 at 138:13-23.

**RESPONSE: Material/Disputed.  Pltf's Exh. #63, line 19 – p. 64, line 5.**

296.    Information showing that Helmbacher's blood was planted on Palmer's shoe would have impacted Ahola's decision to charge Palmer. Ex. 63 at 90:8-15.

**RESPONSE: Material/Undisputed.**

297.    If Ahola had known that the Fila shoes had been unsealed while in DPD custody, he would have disclosed that information to the defense. Ex. 63 at 122: 22-24, 123:1-12.

**RESPONSE: Immaterial/Undisputed.  It is immaterial because the shoes were not unsealed while in DPD custody.**

298.    MCSAO prosecutors on this case do not recall being informed of the following: that a DPD officer said he obtained a video of Lee at a gas station that the officer claimed showed Lee had not changed his clothes the night of the murder but which did not show that Lee had not changed clothes, Ex. 63 at , 113:4-12; Ex. 70 at 121:10-122:2, 122:3-11; that officers collected a bloody towel from the trunk of Lee's car pursuant to a search warrant or that items of evidence from Lee's car were labeled with a biohazard sticker, Ex. 63 at 114:1-10; Ex. 68 at 98:20-101:3; Ex. 70 at 122:12-124:6; that officers told Taylor to include Palmer's name in the statement or to implicate Palmer, Ex. 68 at 89:19-90:12; or that there was a financial conflict between Lee and

Helmbacher, Ex. 68 at 92:1-93:11; Ex. 63 at 111:8-20; Ex. 70 at 119:6-120:2; among other evidence.

**RESPONSE: Immaterial/Disputed. It is immaterial because what prosecutors remember more than 20 years later proves nothing relevant to the case. All of the above information was disclosed in police reports.**

299.    Prosecutors would have disclosed to the defense any of the information listed in ASOF 298, had they known it.

**RESPONSE: Material/Undisputed, and presumably the prosecutors did disclose it because they had all that information, which was contained in police reports given to the prosecutors.**

**Pretrial Hearings**

300.    At the preliminary hearing on February 18, 1999, Carlton discussed only two categories of evidence: the blood found on Palmer's shoe and Taylor's story about Palmer's supposed confession. No other evidence was discussed. Ds' Ex. A, Part 1, at Decatur 5712-5726.

**RESPONSE: Material/Undisputed.**

301.    At a preliminary hearing, Carlton also testified that the shoes were sent to the crime lab and blood was found, and that they were sent back to the lab and the blood was matched to Helmbacher. Ds' Ex. A, Part 1, at Decatur 5720:3-5721:3.

**RESPONSE: Immaterial/Disputed.    Plaintiff's statement mischaracterizes Carlton's testimony as though he was giving a precise chronological account of the ISP testing events. Blood was found on the shoes and they underwent DNA testing. Carlton's testimony cannot realistically be construed as misrepresenting that blood was found the first time, which is what plaintiff intends.**

302.    Based on those two pieces of evidence, the court concluded that there was probable cause to believe that Palmer committed the offense. Ds' Ex. A, Part 1, at Decatur 5725:2-12.

**RESPONSE**: **Material/Undisputed.**

303.    Carlton testified at the suppression hearing that the shoes were sent to the lab and came back five months later with the results that Helmbacher's blood was on them. Ds' Ex. A, Part 1, at Decatur 5745:4-14.

**RESPONSE: Material/Undisputed, except Carlton testified it was "about" five months later.**

304.    Carlton did not testify at the preliminary hearing or suppression hearings that the shoes were examined once, tested negative for blood, and returned to DPD. Ds' Ex. A, Part 1, at Decatur 5712-5726, 5745:4-14.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is also immaterial because the shoes did not get "tested negative for blood." There was no testing of the shoes when first at the crime lab, only an exterior examination.**

305.    Carlton never took any steps during the preliminary or suppression hearings to correct or clarify his incorrect testimony. Ds' Ex. A, Part 1, at Decatur 5712-5726, 5733-5767.

**RESPONSE:  Immaterial/Disputed.  Carlton did not give incorrect testimony.**

**Trial**

306.    Palmer faced the death penalty. Ex. 73.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

307.    At the criminal trial, Taylor testified that he was outside Helmbacher's apartment with Palmer on August 26, 1998, and that Palmer climbed in the window and came out the front door, and asked him to act as a lookout during the burglary. Taylor testified at trial that he stood there and then went up to his apartment, and that a short time later Palmer appeared in his

apartment with an armload of Helmbacher's stolen belongings. According to Taylor, Palmer asked for a garbage bag, and Taylor got out his garbage can, which had a white plastic bag in it. He said Palmer went through the stolen items and threw some of them away. The two of them then took the bag to the dumpster a few blocks away. Ds' Ex. A, Part 1, at Decatur 5822:5-5830:11.

**RESPONSE: Material/Undisputed.**

308.     Taylor further testified that the next day, he saw Palmer in front of his apartment, and then saw him again a couple hours before dark outside Bradford's apartment. According to Taylor's testimony, when he saw Palmer the second time, Palmer was wearing different clothes and shoes than he had been wearing earlier in the day, and Palmer told him that he had beat "the dude to death." Ds' Ex. A, Part 1, at Decatur 5831:23-5832:6, 5832:22-5833:6, 5848:13-20.

**RESPONSE: Material/Undisputed.**

309.     Taylor testified three times that the shoes ISP tested were not the ones Mr. Palmer wore on August 26 or 27, 1998 before Helmbacher's death. Ds' Ex. A, Part 1, at Decatur 5834:20-5835, 5845:2-9, 5858:21-5859:12.

**RESPONSE: Material/Disputed.  Facts, #52-53, 56.**

310.     The State also presented evidence at trial that Helmbacher's blood was found on Palmer's shoe. Ds' Ex. A, Part 3, at Decatur 6041:7-9, 6128:7-13, 6151:12-16.

**RESPONSE: Material/Undisputed.**

311.     Carlton testified that the first time the shoes were sent to the lab, ISP lab tested only the two visible red spots on the outside of the shoe, and nothing more. Id. at Decatur 5931:4-15.

**RESPONSE: Immaterial/Disputed.  Carlton testified about his understanding of what the ISP lab did.  Lu (Aper) testified in detail that the lab tested more than two brownish spots on the outside exterior of the shoes, which were negative.  Facts, #28**

312.    Carlton also testified that the testing he had wanted ISP to do the first time was not done, and that he returned them to the lab because ISP had not done proper testing the first time. Ds' Ex. A, Part 2, at Decatur 5928:22-5929:13, 5931:4-15.

**RESPONSE:  Immaterial/Disputed.  Carlton's testimony was about what the DPD wanted done. It was not a commentary on whether the ISP did anything improper.**

313.    The jury deliberated for 14 hours and sent four notes to the judge, one asking to see the shoes, and one indicating that they were deadlocked. The judge told them he would not accept a hung jury, and eventually the jury returned a verdict of acquittal on the burglary and guilty on the murder. Ds' Ex. A, Part 3, Decatur 6166-6176.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

314.    Palmer was acquitted of burglary. D's Ex. A, Part 3, at Decatur 6181:20-23.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

315.    On May 8, 2000, Palmer was sentenced to life in prison. Ex. 73 at Palmer 2247.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

**Taylor's Burglary Charges Dropped**

316.    Six weeks after Taylor's testimony, on June 5, 2000, the burglary charges against Taylor were dropped. Ex. 91 at Palmer 5326.

**RESPONSE**: **Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

317.    Ahola testified that "all sort of things" could have been given to Taylor in exchange for truthful testimony. Ex. 63 at 94:4-19.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

318.    While law enforcement could not offer deals on the SAO's behalf, officers would regularly tell witnesses that they would inform the State's Attorney's Office about the witness's cooperation. Ex. 68 at 59:14-50:11; Ex. 70 at 87:23-91:3.

**RESPONSE: Immaterial/Disputed.  It is immaterial because it discusses a general practice followed by the prosecutors.  It says nothing about anything the DPD did in this case.  It is disputed because the cited references do not support the statement.   Waggoner's testimony described a practice she followed in drug prosecutions.  Pltf's Exh. 68, p. 60, line 1-11.  Reuter only discusses the various prosecutor's offices approaches.**

319.    ASA Ahola testified that it would be reasonable to assume that there was nothing aside from Taylor's testimony in Palmer that could have formed the basis to dismiss charges against Taylor. Ex. 63 at 95:19-24, 96:1-3.

**RESPONSE: Material/Undisputed.**

**Post-Conviction DNA Testing Shows Palmer's Innocence**

320.    The court held a hearing on the 2010 petition, and concluded that the victim exhibited defensive wounds which suggested he had fought with the assailant, the scrapings from Helmbacher's fingernails would be materially relevant. Ds' Ex. M, at 2-3.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

321.   The forensic testing on Helmbacher's nail scrapings was conducted by highly qualified analysts at a reputable, accredited lab. Ex. 5; Ex. 6; D' Ex. N. at 177:3-13; Ex. 106 at 10:2-5; Ex. 104, 16:1-8.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

322.   In 2014 and 2015, Cellmark Forensics laboratory developed DNA profiles from the scrapings taken from Helmbacher's fingernails. Cellmark found a mixture of DNA belonging to Helmbacher and another male. Ex. 6.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

323.   Palmer was unequivocally excluded as a contributor to the DNA under Helmbacher's nails. Ex. 6; Resp. to DSOF 86.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  Facts, #85-87.**

324.   The DNA sample underwent a second independent analysis to confirm the results of the first. Ex. 106 at 41:9-42:16.

**RESPONSE: Immaterial/Disputed.** **Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed because the statement completely misleads the court about the Cellmark results. The second amplification did not confirm the first test results. The #16 allele in the Cellmark results is what was believed to have excluded plaintiff from the fingernail DNA, because plaintiff's DNA does not share that allele. The first reading from the Cellmark test did not show #16 allele at all, so it did not exclude plaintiff. Cellmark then amplified it again, and a #16 came up the second time as a tiny peak, highly sub-threshold. The threshold is the level a DNA reading must reach to be considered scientifically reliable. Reamplification is tricky. As samples get reamplified, the risk of distortion becomes great. The second amplification testing results fell far short of that level of reliability. Moreover, Cellmark did not employ a negative control measure required for reamplification, which is designed to reduce the risk of distortion such as drop-in, where DNA which doesn't actually belong to the sample, shows up. Cellmark's testing was scientifically unreliable and Bod, which purchased Cellmark, refused to endorse the Cellmark results. Plaintiff's statement is completely wrong, and very misleading. Defs' Exh. MM (Exhibit 1 to Lucy Davis' deposition) ( Defs' Exh. N), p. 11-20; Appendix p. 2.**

325. On January 22, 2014, Barbara Leal and Huma Nasir of Cellmark Forensics issued a lab examination report that concluded that the right-hand nail scrapings indicated a mixture of DNA of two males. Palmer and Taylor were both excluded as contributors, and Helmbacher was not excluded. The non-Helmbacher DNA necessarily came from some other male. Ex. 6 at Palmer 3743-3744; Ex. 106 at 38:5-39:3; Ex. 106 at 101:4-10; Ex. 104 at 33:24-35:24; Ex. 101 at Fedor 12.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed based on reasons stated in response to #324.**

326.    Bode Cellmark later performed mitochondrial DNA testing on the hairs found in Helmbacher's hands. This DNA testing established that one of the hairs did not belong to Helmbacher, and it could not have come from Palmer. Ex. 5.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

**Palmer Is Exonerated**

327.    Following Palmer's exoneration, DPD reopened its investigation into the unsolved Helmbacher murder. Ex. 102 at 35:12-36:1; Ex. 115.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

328.    As of 2018, DPD was still investigating Doug Lee as a potential suspect for the murder of Helmbacher. Ex. 102 at 150:4-7; 150:23-151:4.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed because the DPD had no more to implicate Lee as of 2018 than it did in 1998. *Id.* at 171, lines 14-17.**

329.    In 2018, Bode Cellmark performed DNA testing on the same fingernail scrapings and hairs from Helmbacher's hands. The lab was unable to exclude Lee as a possible contributor to the DNA found under Helmbacher's fingernails. Ex. 12 at Palmer 3268.

97

**RESPONSE**: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.  In fact, it disputes the statement.  Lee's DNA sample, CCC1727-0253-R-1, was compared to the Cellmark sample, FR12-0088-01.01, which was the fingernail scrapings.  Bode compared the Lee sample to the fingernail DNA, and stated:  "the partial Y-STR profile received for sample FR12-0088-01.01.1 is consistent with a mixture of at least two individuals.  Due to the possibility of allele drop out, no conclusions can be made on this mixture."  Using the valid testing methods Cellmark failed to use in excluding plaintiff, Bode determined no conclusions were possible.

330.   In 2020, an independent crime lab engaged in this civil lawsuit, discovered a mixture of DNA profiles on the handle of the murder weapon. ECF No. 136 at 2. Plaintiff requested that DPD send the profiles to CODIS, which could potentially identify the contributor to the DNA on the handle. ECF Nos. 136. Defendants refused to send the profiles to CODIS. ECF No. 139.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed because such a submission would not identify a relevant contributor.  The hammer handle profile was a complex mixture, with greater than 5 alleles identified at multiple loci.  This means that the profile mixture was generated by more than one person.  Because of the severity of the mixture, the profile did not meet the formula prescribed by the FBI's INDS Operational Procedures Manual.  Generally, to conduct a search via CODIS, CODIS requires a single source profile of up to 2 alleles on 1 loci (which would be generated by a single source or one person / contributor).  Because of the severity**

of the mixture of the profile from the hammer handle, a submission to CODIS (assuming it would have even been accepted), would have resulted in hundreds of thousands of results which would have no probative value. Moreover, defendants concluded that a CODIS submission for civil lawsuit purposes would be improper and violate the FBI's regulations for CODIS submissions. This court agreed with defendants after litigation on plaintiff's motion to compel the submission. Doc. #146, affirmed Doc. #150.

**The Lead Sheet**

331.    The Lead Sheet, which documents investigative developments, but which was not shared with the prosecutor, Ex. 37, Ex. 122 at 1, includes the following information:

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

332.    Lead 134 (assigned to Ryan) is to compare prints of Lee with prints from the scene. It's listed as completed 9/1. "No comparison" done. Ex. 37.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

333.    Lead 141 (assigned to Carlton) is to conduct the search of Lee's vehicle. Carlton does not mention here that there was blood on the towel he collected in his police report. Ex. 37.

**RESPONSE: Immaterial/Undisputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. There was no evidence at that time that there was blood on the towel.**

334.    Leads 152 & 153 (assigned to Ryan) is to send items C-71506 (Lee shirt, pants, socks, towel) and C-71505 (Lee shoes) to the ISP to "examine evidence . . . for blood." Ex. 37.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

335.   Lead 171 (assigned to no one) is to check the ISP lab results for the above items. It is never completed. It is listed on the lead sheet 9/2. Ex. 37.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed because the cited reference does not support the statement.**

336.   Lead 189 (assigned to Felton) is to interview T. Estes (Helmbacher's neighbor whose daughter saw him alive at 7:50 p.m. on the night he was killed, see Ex. 40 at Palmer 5573). It was never completed. Ex. 37.

**RESPONSE: Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed because the cited reference does not support the statement.**

337.   Lead 200 is Morville sending the bag to ISP on September 17--the same day as he sent Taylor's prints to ISP. Ex. 76; Ex. 37.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

338.   Lead 266, which is listed on 9/16, says "Re-Compare Ray Taylor's prints/ISP lab evidence." It is listed as "completed" on 9/17. The disposition is "ID Made." ISP did not identify Taylor's print until September 21. Ex. 78; Ex. 37.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.   It is disputed because the cited reference does not support the statement.**

339.   There is no entry on the lead sheet documenting that Carlton sent the shoes back to the ISP lab to be torn apart. Ex. 37.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

340.   The only entry on the lead sheet between when ISP reported the negative finding on the shoes and when Carlton sent them back is that DPD took blood samples from Ray Taylor and test results on those samples. Ex. 37 at Leads 297-298; Ex. 81 at Palmer (ISP) 75.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

**DPD Policies and Practices**

341.   Plaintiff issued a 30(b)(6) notice seeking discovery on his *Monell* theories. Ex. 67.

**RESPONSE: Material/Undisputed.**

342.   Any written policies that went into effect after 19981-1999 and were not replacing a previous policy were new policies, not effective at the time of the Helmbacher investigation. Ex. 66 at 74:22-75:12

**RESPONSE: Material/Disputed.   The testimony establishes the opposite of what the statement contends.   Some policies dated after 1999 could have been restatements or refinements of policies or of practices that preceded them.**

343.    To the extent DPD had any written policies in 1998, DPD had no formal testing on policies or procedures and no signature requirement asking officers to attest to having read the policies or procedures. Ex. 66 at 86:17-21; Ex. 66 at 86:22-87:1; Ex. 67.

**RESPONSE: Immaterial/Disputed.  The statement is immaterial because testing and attestation to policies is irrelevant to plaintiff's *Monell* claim.  The policy form of a *Monell* claim requires that a policy be the cause, that is, the driving force, behind a constitutional violation.  *Bd. Of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 399 (1997).  The statement is disputed because the cited reference does not support it.  Former police chief Mowen could not recall how officers were tested on or attested to the policy manual.  Nevertheless, a DPD written policy required an officer "to thoroughly familiarize himself with the rules, regulations, orders and policies of the department and to abide and conform to same.  Each officer must have a working knowledge of all laws and ordinances."  Defs' Exh. NN, p. 52 of 293  (Exh. 4 of Mowen deposition)**

344.    DPD had no written policy in 1998 or 1999 outlining the obligation under *Brady v. Maryland* to disclose exculpatory evidence, including alternate suspects. Ex. 66 at 49:12-51:20, 52:3-8, 112:13-19.

**RESPONSE: Immaterial/Undisputed.  It is immaterial because the DPD had a clear practice that all evidence must be documented and disclosed to the State's Attorney.  (*Id*. at 53, line 3-17; 123, line 7.-p.124, line 11).**

345.    The only policy DPD had on the disclosure of evidence was *Brady v. Maryland* itself. Ex. 66 at 51:2-10.

**RESPONSE**: **Immaterial/Disputed.  It is immaterial because the DPD had a clear practice that all evidence must be documented and disclosed to the State's Attorney.  (*Id*. at 53, line 3-17; 123, line 7.-p.124, line 11).**

346.    Officers were not given written training materials on their obligations to disclose exculpatory evidence. Ex. 66 at 55:14-17.

**RESPONSE**: **Immaterial/Disputed.   The statement is immaterial because testing and attestation to policies is irrelevant to plaintiff's *Monell* claim.  The policy form of a *Monell* claim requires that a policy be the cause, that is, the driving force, behind a constitutional violation.  *Bd. Of Cnty. Comm'rs. v. Brown*, 520 U.S. 397, 399 (1997).  The statement is disputed because the cited reference does not support it.  Former Police Chief Mowen could not recall how officers were tested on or attested to the policy manual.  Nevertheless, a DPD written policy required an officer "to thoroughly familiarize himself with the rules, regulations, orders and policies of the department and to abide and conform to same.  Each officer must have a working knowledge of all laws and ordinances."  Defs' Exh. NN, Exh. 4, p. 52 of 293.**

347.    Morville, who was in charge of managing the custody of all evidence in DPD's possession around the time of the Helmbacher investigation, was never familiar with an obligation to share information with the prosecution or the criminal defendant or his attorney. He received no training on the subject, and to his knowledge, DPD did not require him to turn over evidence to the prosecution. Ds' Ex. D, 180:20-181:15; 181:16-23.; 182:1-12; 183:22-185:9.

**RESPONSE**: **Immaterial/Undisputed.  It is immaterial because Morville was mostly a patrol officer, who did not make disclosures to prosecutors.  Detectives worked directly with the prosecutors.  If Morville made an arrest while on patrol, he did a report, and if a prosecution**

followed, there's no indication the prosecutor did not get the report, so someone in the DPD followed the standard practice of getting materials to prosecutors.  Moreover, the DPD had a written policy, establishing it was "the responsibility of the criminal investigations commander to ensure the integrity, control and dissemination of all reports maintained under his control.  Exh. NN, p. 224, VIII.A.4.

348.     It was not the practice for prosecutors or criminal defense attorneys to come to DPD headquarters and examine reports or evidence. Ex. 63 at 22:1-23:22; Ex. 70 at 59:17-60:23, 60:24-61:19, 61:20-62:19; Ex. 68 at 32:6-33:10, 42:2-43:3, 46:4-12, 51:17-52:18, 52:19-53:18; Ex. 66 at 70:7-21.

RESPONSE: Immaterial/Undisputed.  It is immaterial because there is no evidence any defense attorney or prosecutor could not go to the police station (which at the time was in the same building as the State's Attorney's office) to review evidence.

349.     Palmer's expert police practices expert discussed that it was a departure from normal police practices in 1998 for officers to lack training in evidence disclosure. Ex. 111 at Harvey 33.

RESPONSE: Immaterial/Undisputed.  It is immaterial because Harvey had no basis for that testimony, and in any event it is irrelevant to plaintiff's *Monell* claim.

350.     DPD had no written policy requiring officers to document investigative developments in a homicide investigation. Ex. 111 at Harvey 25-26; Ex. 66 at 65:6-20, 71:20-72; Ex. 67.

RESPONSE: Immaterial/Disputed.  There was no written policy expressed as it is in the statement, and as the question was posed.  But there certainly were policies covering the topic and which dispute the substance of the statement.  For example, DPD had the following

**written polices:  a) police must be truthful in their written reports, Exh. NN, Ex. 4 p. 49; b)**
**General Order 95-90 covered all aspects of field and follow-up report writing.** *Id.***, p. 158-67;**
**c) G.O. 95-99 covered all aspects of managing case investigations,** *Id.***, p. 183-187; d) General**
**Order I-9 covered all aspects of criminal investigations.** *Id.***, at 194-196; e) G.O. 5-2 covered**
**all aspects of records creation and management.** *Id* **at 222-227.**

351.    DPD required that all materials pertinent and material to a case be kept in the
investigative file, Ex. 66 at 68:5-8, yet had no written policy governing what information must be
included in a report in a homicide investigation. Ex. 66 at 71:20-72:3.

**RESPONSE**:  **Immaterial/Disputed. It is immaterial because the DPD officers' training and**
**experience taught them what goes into a homicide investigation report, and no** *Monell* **claim**
**can be based on the lack of written requirements on such detail.  It is disputed based on the**
**policies disclosed in response to #350.**

352.    DPD had no written policy governing note-taking during an investigation or the
preservation of notes. Ex. 66 at 65:6-20, 71:20-72:8; Ex. 67.

**RESPONSE**:  **Immaterial/Disputed.  It is immaterial because the DPD officers' training and**
**experience taught them what goes into a homicide investigation report, and no** *Monell* **claim**
**can be based on the lack of written requirements on such detail.  It is disputed based on the**
**policies disclosed in response to #350.**

353.    Though Defendants' supervisor Chabak had the responsibility to oversee and ensure
the disclosure of evidence in homicide investigations, he did not conduct that oversight. Ds' Ex. H
at 121:13-124:8.

**RESPONSE**: **Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.**

354.    Individual Defendants testified about the lack of training regarding documenting investigative information and disclosing it to prosecutors. Ds' Ex. D at 181:16-23, 182:1-12; Ds' Ex. C at 74:5-24; Ds' Ex. F at 162:16-20.

**RESPONSE**: **Immaterial/Disputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited reference does not support the statement.**

355.    Any evidence that Palmer's defense counsel did not receive was the result of nondisclosure by DPD, rather than by MCSAO. MCSAO had an open-file policy regarding defendants' access to documents and trained its attorneys that everything the prosecutors got should be turned over to the defense, no matter what it was. Ex. 68 26:20-28:3; Ex. 70 at 36:15-37:15; Ex. 70 at 56:18-57:3.

**RESPONSE**: **Immaterial/Disputed.   It is immaterial because there is no evidence that plaintiff's defense attorneys did not obtain information required by due process.  It is disputed because if plaintiff's defense attorneys did not receive certain information, such as DNA from evidence never processed, that was their doing, not any defendants.**

356.    Any police reports provided to the prosecutors' office would then be provided to the defense, and the defense would receive any additional materials as they came in. Ex. 63 at 20:17-24, 21:1-2; 25:1-7.

**RESPONSE**: **Material/Undisputed.**

106

357.    The prosecutors on the Helmbacher case did not withhold any exculpatory information from the defense. Ex. 68 at 153:20-154:7; Ex. 63 at 139:19-22; Ex. 70 at 158:7-13.

**RESPONSE**:  **Material/Undisputed.**

358.    According to standard DPD practice as of 1998, officers were supposed to collect all crime scene evidence that might be pertinent to an investigation. DPD had no written policy dictating which pieces of physical evidence to collect from a crime scene and left that to the discretion of officers. Ex. 66 at 91:1-13.

**RESPONSE**: **Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed based on the response to # 350.**

359.    DPD policies left it to the discretion of the investigating detective what items of evidence should be tested at the lab. Ex. 66 at 91:14-20.

**RESPONSE: Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  The ISP had its own protocols on what was tested at its lab.  Defs' Exh. L, p. 168, lines 13-22; p. 170, line 9, to p. 172, line 23.**

360.    DPD's practice regarding the storage of evidence was as follows: officers would place evidence in a bag, secure it with evidence tape, and write their initials on it, Ds' Ex. G at 98:24-99:10.

**RESPONSE:  Material/Undisputed.**

361.    If there was no evidence officer on duty, officers would place the bagged evidence in an empty storage locker and deposit the key in a drop box. Ds' Ex. D at 116:19-117:15. Officers could keep the key and have access to the evidence again. Ds' Ex. G at 91:15-12.  Once the key

was returned, the evidence officer would then empty the lockers and place evidence into the vault. Ds' Ex. D at 376:22-379:1.

**RESPONSE**: **Immaterial/Disputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  The statement that the officers could keep the key to have access to the evidence is misleading.  Patton testified that if an officer's shift ends while he is still in the process of completing whatever has to be done with the evidence before it's inventoried, then the officers might secure the evidence overnight and keep the key until the next shift.  But the evidence would not be bagged and tagged yet.  It would be in the same condition as when the officer brings it into the station.  The evidenced would not be inventoried at that time.**

362.    DPD's evidence storage policy required officers to write a report when they checked evidence into and out of the vault, and were supposed to record chain of custody on the evidence card affixed to the evidence. Ex. 67 at 215-216.

**RESPONSE:  Material/Undisputed.**

363.    It was not the practice to follow this policy. For instance, Defendant Bell's report on September 1, 1998 says that keys were checked in and out of the vault on that date, but the evidence tag does not reflect that. Compare Ex. 57 at Decatur 6 with Ex. 58 at Decatur 7014.

**RESPONSE: Immaterial/Disputed.    Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the cited material does not support the statement.  This single document does not establish a practice of not following the policy.**

364.    According to standard DPD practice, the evidence officer should check an item out of evidence immediately before taking it to the crime lab. Ex. 66 at 97:24-98:4.

**RESPONSE: Material/Undisputed.**

365. DPD had no written policy on how soon evidence needed to be taken to the crime lab after being checked out of the vault. Ex. 66 at 99:1-4.

**RESPONSE: Immaterial/Undisputed.  It is immaterial because the standard practice was that the evidence officer took the materials to take to the lab out of evidence the morning that he went.  He would start his shift at 7:00 a.m., empty out the locker of the materials, then take them to the ISP lab in Springfield.  Defs' Exh. D, p. 147, lines 1-16.**

366. DPD policy required detectives to collect any liquid blood from a crime scene into a test tube, using a pipette, and store it in the refrigerator. Ex. 66 at 91:24-16.

**RESPONSE: Immaterial/Disputed.  Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.  It is disputed because the policy required blood still in a live state to be gathered in a test tube.  In this case, blood was coagulated, so blood swabs had to be made.  Defs' Exh. C, p. 118-119.  Helmbacher's blood standard for DNA comparison was made by the pathologist during the autopsy by drying liquid blood onto filter paper.  Facts #72.**

367. DPD did not have any protocol related to the storage of liquid blood other than to keep it in a refrigerator near the evidence lockers. Ex. 66 at 92:17-93:8, 95:8-11.

**RESPONSE: Immaterial/Undisputed.   Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment.**

368. DPD had no written policy governing the conduct of interrogations or interviews. Ex. 66 at 56:20-22.

**RESPONSE: Immaterial/Disputed. Except for mere background, the statement is immaterial because it is not probative of the issues raised in defendants' motion for summary judgment. It is disputed based on all the reasons stated in response to #350.**

# ARGUMENT

## INTRODUCTION

In their Motion for Summary Judgment, defendants demonstrate they are entitled to summary judgment and challenge plaintiff under *Celotex Corp*. to produce evidence to support a trial on his far-fetched claims that defendants denied him a fair trial, that he was incarcerated without probable cause and that his state law claims are triable.  Plaintiff's response, Doc. #165 ("Response"), attempts a desperate effort to do so, but fails.  Plaintiff offers nothing more as proof than inadmissible hearsay, speculation, innuendo, and the piling of inference on inference to stretch for conclusions unsupported by the underlying facts.  The melodrama plaintiff spins in his Response may work for a Netflix drama, but it has no place in pushing a case toward a massive at least six week trial against seven police officers, and the estate of one,  all who retired from the Decatur Police Department ("DPD") years ago with stellar reputations and fine records.

Plaintiff floods the Court with 368 Additional Facts, but volume should not be confused with merit. A vast majority of the allegations are immaterial and unsupported by evidence, or simply conjecture.  Repeatedly the allegation of an Additional Fact was unsupported by the material cited.  Plaintiff's strategy appears to be to overwhelm the Court with allegations to obscure his lack of real evidence to support his claims.  The tactic should not succeed.

Plaintiff's Response suffers from some general infirmities that infect his entire case.  The Response relies heavily on hearsay to weave the story plaintiff proposes, often from police reports for their contents to prove the matters therein. Defendants point out in their Reply where plaintiff's allegations in the Additional Facts fail based on lack of support with admissible evidence.

Plaintiff's Response spends an enormous amount of its ink on criticisms of how the DPD conducted its investigation of the Helmbacher murder. Yet, investigative shortcomings and flaws,

even if true, cannot form the basis of a constitutional claim. *Alexander v. City of South Bend*, 433 F.3d 550, 555 (7th Cir. 2006).  Plaintiff blames defendants for work not done at the ISP lab, even though defendants have no constitutional obligation to process latent evidence.  *Camm v. Faith*, 937 F.3d 1096, 1109-1110) (7th Cir. 2019); *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011).  Plaintiff also pushes heavily that defendants had a constitutional duty to create exculpatory evidence, which they do not.  *Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015); *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir. 2003).

Plaintiff takes the greatest factual  liberties with his rendition of Ray Taylor's deposition testimony, which he must, because Taylor alone destroys plaintiff's lawsuit.  During his deposition Taylor was verbally beaten, berated, lead into confusion and, mostly, lacked memory of 20 year-old events.  Nevertheless, through it all, Taylor reaffirmed his statements and trial testimony implicating plaintiff in Helmbacher's murder.

Plaintiff argues in his Response that defendants did not address all of the claims he makes, and should have divined, apparently through questions asked witnesses in discovery, the moving target he would raise to oppose summary judgment. Plaintiff even claims waiver.  A complaint however, must provide adequate notice of what a  plaintiff claims the defendant did to cause his injury, and a   plaintiff cannot amend his pleadings in his response to a motion for summary judgment.  *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).  Any arguments plaintiff raises to defeat summary judgment, not sufficiently plead to provide notice to defendants as to the nature of them, are waived.  For purposes of completeness, defendants will reply to plaintiff's additional claims, but in doing so do not relinquish their waiver arguments.

I.    **DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL CLAIMS**

At the outset plaintiff argues defendants did not do enough to trigger his *Celotex* burden. Defendants showed how the evidence that convicted plaintiff was developed and presented at his trial.  All of the facts and the legal arguments that followed sufficiently established that plaintiff was not convicted by fabricated evidence or the suppression of exculpatory evidence, and if plaintiff could prove otherwise, he had to show it to defeat summary judgment.  Plaintiff apparently contends it was defendants' burden to prove a negative, that they did not fabricate or suppress evidence, contesting that defendants' summary judgment presentation does just that.  In *Celotex*, however, the Court expressly rejected what plaintiff contends.  The Court observed that "[we] find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponents claim."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). (Emphasis in original).  Plaintiff cites *Carmichael v. Village of Palatine*, 605 F. 3d 451 (7th Cir. 2010), which offers no support for his argument.

### A. The Individual Defendants are Entitled to Summary Judgment on Plaintiff's Due Process Claim in Count I of the Second Amended Complaint.

Plaintiff argues defendants impose an improperly heightened level of proof for his claims. Defendants do not argue, however, for anything more than the law requires.  Defendants only submit that plaintiff must prove his allegations with actual credible evidence, not wild speculations and fancy (*Steinhaver v. Degolieiz*, 359 F.3d 481, 485 (7th Cir. 2004)), because speculation cannot defeat summary judgment.  Neither does evidence that becomes probative only when inferences are piled on other inferences, all attenuated from the fact the inference chain might allow.  *Carvajal v. Dominguez*, 542 F.3d 561, 568 (7th Cir. 2008).  *Coleman v. City of Peoria*, 925 F.3d. 336 (7th Cir. 2019), is essentially the same case as this one.  The plaintiff there alleged that the defendants elicited a false statement from a witness implicating the plaintiff, which led to his conviction, eventually reversed.  The plaintiff in that case weaved together the same type of unconnected facts

113

and attenuated inferences plaintiff offers in this case.   The Court rejected the plaintiff's

construction, because "inferences that are supported by only speculation or conjecture will not

defeat a summary judgment motion." *Id*. at 345.  *See also*, *King v. Hendricks Cnty. Comm'rs*, 943

F.3d 981, 985 (7th Cir. 2020).

(i)   Plaintiff Cannot Present a Fact Question On His Fabrication Claim That Any
Defendant Planted Blood on His Shoe

Plaintiff argues in his Response that he can make a triable case that Carlton, Morville,

Ryan, and Chabak somehow injected blood onto the interior materials of one of his Fila shoes.

Each defendant denied doing anything of the sort, in their pleadings and depositions (and Carlton

at the trial), and to rebut them plaintiff tries to present a suspicious set of factual claims. The

problem is those claims do not create a logical bridge to rebut defendants' denials.  Plaintiff calls

it circumstantial evidence, but circumstantial evidence differs from conjecture.

Plaintiff contends that defendants' demonstration of how hard plaintiff's criminal defense

counsel pressed the blood planting theory at his trial is irrelevant to their due process argument

here.  Plaintiff's position is shortsighted.  Due process required that plaintiff receive a fair trial.

That his experienced and competent defense counsel could not sell it to the jury, even against the

State's reasonable doubt burden, says a great deal about the merits of the claim here.  In addition,

witness credibility on such a claim matters.  The jury saw Morville, Ryan, and Carlton testify

(Sergeant Chabak did not testify at the trial), and did not accept that they planted the blood.  The

jury believed Carlton when he denied blood was planted on plaintiff's shoe.  Unfortunately, if this

case were tried a jury would not have that same ability to judge Carlton's credibility.  These factors

are not irrelevant to the Court's consideration of plaintiff's far-fetched claims.

It is also relevant that nothing that resulted from the post-conviction proceedings leading

to plaintiff's conviction getting vacated endorsed the blood planting claim, or even questioned

114

defendants' denials of it.  In the face of these strong considerations, which at the outset cast serious doubt on the blood planting claim, the facts plaintiff presents in response pale in comparison.

Plaintiff presents nothing but the following conjecture to attempt to create a triable fact issue:  a) Plaintiff contends if not planted the blood would have been found the first time.  Jennifer Aper (Lu), the only one who would know, dispelled this speculation.   Defs' Exh. K, P. 57, lines 9-11. b) Plaintiff contends the blood had to be planted because defendants had "opportunity." What plaintiff uses to support opportunity is total speculation and requires too many attenuated inferences to allow the ultimate conclusion that the blood was planted.  Plaintiff first alleges that an evidence tag which Morville marked shows the evidence was out of inventory for 10 days. Morville explained, however, that he mistakenly marked 10-5-98, instead of 10-15-98, on the tag. Reply to ASOF 214.  Plaintiff's Julian to Gregorian calendar switch could be accepted by European kings, but not by a jury, at least not reasonably. To jump from a mistaken record entry to the criminal act of planting blood on plaintiff's shoe is an excessive leap. It would require inferences that Morville, a patrol officer not even part of the investigative team, did not make a mistake, and lied under oath at the trial and his deposition; that his supervisors would not have caught the infraction if it actually occurred; that when property officer Ashenfelter returned, the very day the shoes went to the lab a second time, he wouldn't have questioned why the evidence was out of inventory for 10 days; that Morville was willing to conspire with others outside his unit in such a heinous act, and then create a record of it by showing it on the evidence tag; and why is there no other entry on the tag to show an event on 10-15-98, when the shoes went to the ISP lab.  If the mistaken entry provided anything suspicious, the State's Attorney or plaintiff's criminal defense attorneys would have questioned it.  Plaintiff also supports "opportunity" arguing Morville opened evidence bags, because his initials appeared on them.  Plaintiff ignores Morville's trial testimony

that his practice was to initial the evidence packages each time he moved them to and from the ISP lab.  (Reply to ASOF 218). c) <u>Plaintiff contends the blood was planted because there was no reason for a second examination</u>.  This contention is only argument, not supported by fact, and ignores that the police believed, based on information from Taylor and Calloway, that it was possible blood might be deeper in the shoe material and not seen by the ISP's limited first examination.  See Reply to ASOF 215, 223, 239-240, 339-340.  d) <u>Plaintiff contends the blood was planted because testing the shoes a second time violated policy and practice</u>.  Plaintiff has not identified any such policy, and reexaminations occurred at other times and were not irregular.  See Reply to ASOF 245-249, 252-254.  e) <u>Plaintiff contends the blood spots are consistent with being planted.</u>  This contention is pure speculation.  See Reply to ASOF #s 190-191, 239, 268-271.  f) <u>Plaintiff contends Carlton testified falsely.</u>  This claim is contrived.  Plaintiff mischaracterizes Carlton's summary review of the case at the preliminary hearing.  See Reply to ASOF 300-305.  g) <u>Plaintiff claims the blood was planted because he is innocent.</u>  This claim is specious. The mere reversal of a conviction or a failed prosecution does not guarantee a trial on claims of police misconduct.  *Coleman*, at 352. ("Erroneous convictions are unquestionably human tragedies.  Yet a vacated criminal conviction does not automatically establish that an individual's constitutional rights were violated, that police officers and prosecutors are necessarily liable under §1983").  This is particularly true here, where plaintiff was released merely on the prosecutor's unwillingness to contest plaintiff's post-conviction petition (Facts, ¶90), and the evidence presented in support of it did not prove plaintiff's innocence (Facts, ¶84-88).  Even the Certificate of Innocence plaintiff was issued was based on a technical legal ground rather than true innocence.  *People v. Palmer*, 2021 IL 125621 ¶73.  h) <u>Plaintiff contends Taylor's testimony supports the blood planting claim</u>.  This claim misrepresents the evidence.  Reply to ASOF 309.  i) <u>Plaintiff contends expert testimony supports that the blood</u>

<u>was planted.</u>  There is nothing scientifically reliable about what plaintiff contends is expert support for his argument.  Fedors had no experience in identifying blood patterns or traces, and no scientific support for his opinion. Reply to ASOF 261.   Moses clearly speculates, and admits he is speculating and cannot say with any scientific certainty the blood was planted. Reply to ASOF 270.

The presentation plaintiff attempts here was soundly rejected in *King v. Hendricks Cnty. Comm'rs*., 954 F.3d 381 (7th Cir. 2020), where the defendant police officers shot and killed the plaintiff's decedent when he threatened them with a knife.  The plaintiff contended a fact issue existed on whether the defendants planted the knife at the scene.  The Seventh Circuit, in affirming summary judgment for the defendants, found the network of circumstantial evidence the plaintiff offered to create a triable dispute that the knife was planted, no weaker than what plaintiff offers here, was too speculative.

(ii)    Plaintiff Cannot Present a Fact Question On His Claim That  Defendants Fabricated Taylor's Testimony Implicating Plaintiff

Plaintiff concedes that he has to clear the "high bar" of proving defendants manufactured Taylor's testimony by coercing him into implicating plaintiff, knowing Taylor's testimony was false. *Coleman*, at 344.  His evidence on this claim, however, fails as badly as his blood planting theory.  Taylor testified at the trial essentially to what he admitted to police 1½ years earlier.  Then 20 years later, under very difficult conditions, Taylor reaffirmed that what he testified to at the trial, particularly that plaintiff admitted to committing the crime, was true.   In light of Taylor's blockbuster deposition testimony, plaintiff's assertion of proof to the contrary fails significantly.

Plaintiff offers the following: a)  <u>Plaintiff contends Taylor's testimony was manufactured because he denied involvement in the burglary.</u>  The premise itself is wrong.  Taylor did not deny involvement in the burglary at trial.  (Facts, #44 and 45)  That the DPD recorded Taylor's deeper

117

involvement in the burglary itself disputes that Taylor's account of the events was manufactured. If any defendant was going to manufacture Taylor's admission, he would not give plaintiff more ammunition to impeach Taylor at trial.  If writing the script, the police would want Taylor as innocent as possible. b) <u>Plaintiff contends Taylor's testimony was manufactured because he denied the bus stop meeting with plaintiff.</u>  Taylor never denied the important downtown meeting.  He was thrown off topic at his deposition by its affiliation with a bus stop,  but stripping away that confusion, Taylor unequivocally confirmed the meeting, both at the trial and at his deposition. Taylor testified at his deposition that he in fact saw plaintiff a week or so after the murder, only it wasn't at a bus stop, it was downtown "where the transit used to be."  Reply to ASOF 162.  Plaintiff himself admitted talking to Taylor in downtown Decatur after the murder.  Defs' Exh. B, p. 167.

c) <u>Plaintiff contends defendants fed Taylor details of the crime.</u>  This contention defeats itself. Taylor's statement to the DPD contained no detail that could have been fed.  The statement contained only two details about the murder:  that Helmbacher was beaten to death, and he had $11.00 taken from him by the killer.  Taylor certainly did not need to be fed that Helmbacher was beaten to death.  It was widely known. Defendants' Exh. OO.  And there is no evidence the police ever knew about $11.00 being taken.  d) <u>Plaintiff contends DPD fed plaintiff's name to Taylor</u> This baseless claim comes right out of some police misconduct conspiracy theory handbook, but it does not work here.  First, Taylor had no need to be fed anything about plaintiff.  They were first cousins, both in blood and crime.  Plaintiff has not, and cannot, produce one iota of evidence that any defendant fed plaintiff's name to Taylor.   Taylor himself denied it.  Reply, ASOF 156.  e) <u>Plaintiff contends defendants manufactured Taylor's testimony by aggressive tactics.</u> This argument is groundless, factually and legally.  There is no evidence any defendant threatened to charge Taylor with the murder.  Certainly the police confronted Taylor several times to get an

118

interview, wanted him to take a polygraph, and believed he knew more than he admitted. He was a suspect, and the police wanting to get more from him would be expected. f) Plaintiff contends defendant fabricated Taylor's handwritten statement. As with so many of plaintiff's contentions, there is no evidence to support it. Taylor never repudiated the handwritten statement. When shown the statement at his deposition, all Taylor could say was the signature on it was his, but he had no memory of anything else about it. Reply to ASOF 142-144. Taylor's not having a memory of the statement does not create even an inference that he did not make the statement, particularly 20 plus years later. *Mucha v. Village of Oakbrook*, 650 F.3d 1053, 1056 (7th Cir. 2011). g) Plaintiff contends police reports show Taylor's statement was manufactured   Plaintiff points to trifling differences in police reports that he argues lead only to a conclusion that the statement was manufactured. This is an amazing leap of logic. Any differences in the reports plaintiff points out are easily explainable because each officer prepared reports involving the work he did, without having to repeat what another officer wrote. If the reports were completely consistent, plaintiff would argue they were obviously compared and contrived.

There is an overall problem with plaintiff's position. He tries to weave together arguments that show heavy handedness with Taylor by the police, with the assumption that any such activity must produce a false statement. *Coleman* prohibits such an inference. *Coleman* at 346. One other factor completely militates against plaintiff's manufactured evidence argument. Taylor has never recanted. Even under the compulsion of a tough deposition, taken by thorough and highly competent counsel, and under the duress of a harsh cross-examination, Taylor never recanted. Out of that ball of confusion one fact emerges unscathed - Taylor completely confirmed  that all statements and testimony he gave implicating plaintiff were completely true. That, in itself, rebuts plaintiff's manufactured evidence argument.

119

(iii)    Plaintiff Cannot Present A Fact Question on His *Brady* Suppression Due Process Claim

Plaintiff's *Brady* claims also fail, mostly because they rely on a misapprehension that police must create exculpatory evidence. Plaintiff argues that *Avery v. City of Milwaukee,* 847 F.3d 433 (7th Cir. 2017), disputes that no *Brady* argument could be made for the blood planting claim. But *Avery* has no application here. The plaintiff in *Avery* was convicted as a result of testimony from three jailhouse informants coerced into testifying falsely.  The plaintiff in *Avery,* however, did not know that the informants' statements were coerced.  Here, plaintiff would know the blood was planted if it were.   *United States v. Lee*, 399 F. 3d 864, 865 (7th Cir. 2005) (no *Brady* claim for prosecution not disclosing a gun planted in the plaintiff's pants, because the plaintiff knew what was in his pants).  Plaintiff's *Brady* claim regarding the alleged manufacture of Taylor's testimony implicating plaintiff equally fails.  As demonstrated above, the argument that police manufactured Taylor's testimony fails, so for that reason alone the alleged *Brady* claim fails.

Plaintiff also raises additional evidence he now claims was suppressed.  He never alleged it in his Second Amended Complaint, nor in his interrogatory answers when asked specific questions about what was suppressed. Defs' Exh. CC, p. 9-10.  Plaintiff never amended the complaint to clarify, or supplement his interrogatory answers.  Now he even claims defendants waived their right to contest liability on those supplemental arguments.  On the contrary, plaintiff has waived the supplemental *Brady* claims.

Moreover, the claims fail on the merits. The supplemental claims are succinctly captured in plaintiff's counsel's affidavit, regarding what was not in the materials they subpoenaed from the Macon County State's Attorney.  Pl. Exh. 122.  Most of it pertains to Douglas Lee's status as a suspect, then not a suspect, then a suspect again, then not a suspect again.  These are classic examples of a mistaken belief that the police must create exculpatory evidence.  One clear example

is the letter to the FBI requesting enhancement of security photos of Lee at a gas station in Plainfield.  There was no suppression because the State's Attorney was apprised of the FBI consultation.  Defs' Exh. II.  *Brady* does not require the police to deliver the actual physical evidence to the State's Attorney, only to disclose it.  *United States v. Bruil*, 1992 U.S. Dist. LEXIS 15162 *5.  Moreover, every indication is that the result was not helpful in implicating Lee, so it was not exculpatory for plaintiff. Defs' Exh. U, entry #195.

Plaintiff argues someone suppressed exculpatory evidence about Lee's towel, but the search warrant for Lee's car and the towel were disclosed.  That Lee's blood was on the towel was not known until submitted to the forensic lab in this litigation.  Defendants had no *Brady* obligation to process latent evidence  to see if it was exculpatory.  *United States v. Gray*, 648 F. 3d 562, 567 (7th Cir. 2011).

### B.  Plaintiff's Unlawful Detention Claim is Defeated by Probable Cause

*Coleman* forecloses plaintiff's argument that his claim of innocence guarantees him a trial on the detention.  *Coleman* forecloses that argument. Even Taylor's testimony alone established probable cause.  Taylor, of course, has confirmed what he told the police and what he testified to at the trial.  As a result, there is no dispute about Taylor's rendition of what happened. That lack of a dispute removes the case from jury consideration, and turns it into a legal question this Court can decide. Plaintiff's attacks on Taylor's credibility do not erase probable cause.  *Young v. City of Chicago*, 987 F. 3d 641, 644 (7th Cir. 2021);  *Askew v. City of Chicago*, 440 F. 3d 894, 896 (7th Cir. 2006).

### C.  Plaintiff's Failure to Intervene and Conspiracy Claims Fail

As the underlying claims of unconstitutional conduct fall, so do the conspiracy and failure to intervene claims.  Nevertheless, all plaintiff can point to is that defendants all worked together on the Helmbacher murder investigation.  That police officers work together, however, is

insufficient to establish even an inference of a conspiracy. *McCann v. Mangiardi*, 337 F. 3d 782, 790 (7th Cir. 2003). Plaintiff concedes the intracorporate conspiracy defense. All plaintiff can say is that the Seventh Circuit has recognized conspiracies among police officers even working for the same agency. In those cases, however, the Seventh Circuit did not reject the intracorporate conspiracy defense, it was never raised. A case stands only for what is decided in it. *Webster v. Fall*, 266 U.S. 507, 511 (1925).

### D.  The Individual Defendants Are Entitled To Qualified Immunity.

The individual defendants raise qualified immunity. That plaintiff's claims were so nebulous, particularly regarding the allegation that Ray Taylor's testimony was manufactured, makes forming the correct legal question difficult. On the question of blood planting, plaintiff argues it has been clearly established for decades that fabricating evidence violates due process. However, *Brown v. Mississippi,* 297 U.S. 278 (1936), and *Miller v. Pate,* 386 U.S. 1 (1967), both dealt with *habeus corpus* proceedings. They did not address claims for damages under §1983. Plaintiff's discussion of *Buckley v. Fitzsimmons,* 529 U.S. 259 (1993), is a complete non-sequitur. *Buckley* addressed whether prosecutors have absolute prosecutorial immunity for an allegation of evidence fabrication. The Court never addressed the clarity of the law. The Court actually held that only qualified immunity would be available to a prosecutor for such a claim, leaving open that issue.

So if *Miller* and *Brown* clearly established the due process right plaintiff contends, something muddled along the way, at least in the Seventh Circuit. By 2015, *Saunders-El*, seventeen years after the events that took place in this case, decided that clarification was necessary. *Fields v. Wharrie,* 740 F.3d 1107 (7th Cir. 2014), harkened back to *Whitlock,* decided in 2012, as clarifying the standard. The detour may have been caused by a notion that state law

sufficed as a remedy, *e.g., Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001), but whatever the reason the law went sideways and became unclear, defendants have qualified immunity.

Plaintiff argues that defendants admitting what any right-thinking person would admit, that fabricating evidence is wrong, decides the question against qualified immunity. Plaintiff misunderstands defendants' argument. Qualified immunity is not a test of moral right or wrong, it is whether the right at issue is clearly established based on constitutional law. Certainly fabricating evidence is morally wrong, egregious, and criminal (if proven, unlike here). The question for qualified immunity, however, is based on the complexities of constitutional law. On that basis, defendants acting in 1998 have qualified immunity on plaintiff's due process claim.

Defendants also have qualified immunity on plaintiff's Fourth Amendment claim. Defendants develop in their Motion that Taylor's testimony alone established probable cause, which defeats a wrongful detention claim under *Manuel*. All plaintiff did to contest it was misstate that the State's Attorney denied Taylor's testimony provided probable cause. In fact, First Assistant State's Attorney Ahola testified to the contrary. Reply to ASOF 206.

Plaintiff makes a frivolous argument that defendants waived qualified immunity on the *Manuel* claim. Plaintiff once again trips over his *Celotex* obligation. For probable cause qualified immunity introduces the concept of "arguable probable cause," meaning that unless it is clear there was no probable cause, in any close case, defendants have qualified immunity. Defendants first prong argument satisfied their *Celotex* burden on the second prong.

### E.  The City of Decatur is Entitled to Summary Judgment on Plaintiff's *Monell* claim[2]

In his response plaintiff completely rewrites his complaint, abandoning the three theories he plead, presenting wholly new *Monell* arguments. Plaintiff has waived these new arguments.

---

[2] A scrivener's error in Defendants' Joint Memorandum stated this heading as raising qualified immunity. The mistake is corrected here. The substance of the City's argument is unaffected by the error.

Nevertheless, as with earlier parts of this Reply, defendants answer these new arguments intending no abandonment of the waiver.

The City had the standard 1998 police policies in place during the Helmbacher case. Reply to ASOF 343-347, 350, 359. Plaintiff presses a *Monell* claim based on a lack of specific language in the City's policies prohibiting what plaintiff contends were the constitutional violations caused by the individual actors. But that is not the correct standard to apply here. The City had no history of such violations, so no such specifically targeted policies were needed. This case does not fall into the single incident policy cases where a policy claim can be made without a history of constitutional problems that a specific targeted action was needed to correct.

Plaintiff's cited cases are inapposite. *Glisson v. Indiana Dept. of Corrections*, 849 F.3d 372 (7th Cir. 2017), fits the single incident *Monell* case. *Glissen* addressed a complicated enterprise involving the coordination of medical care among a prisoner's multiple treaters. A state health care directive for jails was ignored by the medical department at the facility where the prisoner was housed, which would have prevented the lack of care that led to the prisoner's death while incarcerated. The state direction on coordination of care substituted for a history of incidents which demonstrate the need for training or policies essential to a *Monell* claim. The plaintiff in *Glisson* had a *Monell* claim based on a conscious decision by the facility not to follow a directive designed to prevent a known problem. Plaintiff cites *JKL v. Polk County*, 960 F.3d 367 (7th Cir. 2020), and *Fields v. City of Chicago*, 981 F. 3d 534 (7th Cir. 2020), but neither case applies either. *JKL* involved repeated sexual assaults of a prisoner. Prior complaints weren't addressed, and the history of sexual assaults itself demonstrated the need for a policy on point. *Fields* involved a systemic failure to produce police street files, which was alleged to have caused a constitutional violation. *Id*. at 562. None of the cited cases involved plaintiff's single incident theory.

Analogous to this case is *Connick v. Thompson,* 563 U.S. 51 (2011), where the Supreme Court held a prosecutor's office was not liable under *Monell* for failure to enact a policy on *Brady* compliance.  The Court found that without a history of *Brady* violations, the lack of a policy or training was not actionable under *Monell*.  *Id*. at 63.  The DPD practice here was that all gets produced to the State's Attorney.  No fuller *Brady* policy could be more effective, particularly with no history of problems.

## II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S STATE LAW CLAIMS

Plaintiff's Response to defendants' motion on plaintiff's state law claims is perfunctory: a) On his malicious prosecution claim, plaintiff argues that fabricated evidence cannot establish probable cause.  True, but as defendants show, plaintiff cannot prove evidence was fabricated.  b) Plaintiff argues the indicative of innocence element is proven by the certificate of innocence the Supreme Court awarded, and cites *Patrick v. City of Chicago*, 974 F. 3d 824 (7th Cir. 2020).  The Court in *Patrick* only found that, based on the facts in that case, the certificate was admissible at trial, not that it proved the element.  The facts here, as set forth in defendants' Motion, show the certificate lacks any probative value.  c) Plaintiff argues IIED is established.  However, that claim falls with his malicious prosecution claim.  d) Plaintiff concedes no willful and wanton misconduct claim. e) Plaintiff provides no showing of a state law conspiracy or that the state law intracorporate conspiracy doctrine does not apply.

## **CONCLUSION**

For all of the foregoing reasons, defendants respectfully request the Court grant summary

judgment in their favor and against the plaintiff.

ANCEL GLINK, P.C.


By:  /s/ Thomas G. DiCianni
       One of the Attorneys for Defendants

Thomas G. DiCianni / ARDC # 03127041
tdicianni@ancelglink.com
ANCEL GLINK, P.C.
140 South Dearborn Street, Sixth Floor
Chicago, Illinois  60603
(312) 782-7606
(312) 782-0943 Fax

### CERTIFICATE OF SERVICE

I, Thomas DiCianni, an attorney, certify that on June 23, 2021, I electronically filed the foregoing **DEFENDANTS'  REPLY TO PLAINTIFF'S RESPONSE TO MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to:

Steven Edwards Art  / steve@loevy.com
Jonathan I. Loevy  / jon@loevy.com
Rachel Elaine Brady  / brady@loevy.com
Cindy Tsai / Cindy@loevy.com
Imani Franklin / imani@loevy.com
LOEVY & LOEVY
311 North Aberdeen St / 3rd Floor
Chicago, IL 60607

John T. Robinson
CITY OF DECATUR
#1 Gary K Anderson Plaza
Decatur, IL 62523
jrobinson@decaturil.gov

Jerrold H. Stocks
Ross J. Munsterman
101 S. State Street / Suite 240
Decatur, IL 62523
jstocks@decatur.legal
rmunsterman@decatur.legal

/s/ Thomas G. DiCianni