## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

CHARLES PALMER,                         )
                                        )
                    Plaintiff,          )
          v.                            )        Case No. 17-CV-3268
                                        )
CITY OF DECATUR, et al.,                )
                                        )
                    Defendants.         )

## ORDER

Plaintiff, Charles Palmer, filed a Second Amended Complaint (#43) on December 6, 2018, against Defendants alleging violation of his rights under the U.S. Constitution pursuant to 42 U.S.C. § 1983 and various Illinois state law claims due to his conviction for the murder of William Helmbacher, a conviction that was later overturned. Defendants filed a Motion for Summary Judgment (#153) on April 16, 2021, to which Plaintiff filed a Response (#165) on May 14, 2021. Defendants then filed a Reply (#172) on June 23, 2021. For the following reasons, Defendants' Motion for Summary Judgment (#153) is GRANTED in part and DENIED in part.

## BACKGROUND

The following background facts are taken from Defendants' Undisputed Statements of Material Facts, Plaintiff's Additional Facts section in his Response, and the exhibits attached by the parties to their filings. Because the parties' respective facts diverge wildly, producing almost two completely different versions of events and

expert analysis, the court is presenting the facts of the case as posited by Defendants, and as posited by Plaintiff.

*Defendants' Facts*

<u>Parties</u>

Plaintiff was convicted of the murder of William Helmbacher on April 27, 2000. He was released from custody on November 23, 2016.

Defendant Amy Waks was appointed as a special representative of the Estate of Tim Carlton. Carlton was a detective with the Decatur Police Department ("DPD") criminal investigations division ("CID") during the Helmbacher murder investigation. Carlton was lead detective, and this was his first homicide case. Carlton died on February 15, 2018, and as a result his estate was substituted as Defendant.

Defendant Roger Ryan was a detective in the CID and worked on the Helmbacher murder investigation. Ryan began working with the DPD as a police officer in 1980. He worked 19 years in CID and retired from the DPD in 2005.

Defendant Brian Bell joined the DPD as a police officer in 1979. He worked in the CID from 1986 until 1998, investigating over 100 homicides during that time period, including the Helmbacher investigation.

Defendant Roger Morville worked as a patrol officer for the DPD. At times, Morville was also the backup evidence officer to Dan Ashenfelter, and handled the DPD's evidence inventory and storage processes in Ashenfelter's absence. Morville

acted as the evidence officer for part of the time during the Helmbacher murder investigation. He retired in 2007.

Defendant Michael Applegate became a DPD police officer in 1969. He worked in CID as a detective from 1980 until he retired in 2002. Applegate worked on the Helmbacher murder investigation.

Defendant Frank Hubbard was hired as a DPD police officer in 1990. In 1996, he was assigned to the CID as a detective, where he worked until he retired in 2017. Hubbard also worked on the Helmbacher investigation.

Defendant Joseph Patton worked on the Helmbacher investigation as a detective in the CID. Patton started with the DPD in 1991, was assigned to the CID in 1995, and retired in 2019.

Defendant Steve Chabak was a sergeant in the CID at the time of the Helmbacher murder investigation. Chabak started working with the DPD in 1984 as a patrol officer, was assigned to the CID in the early 1990s, and became a sergeant in that division in 1997, before retiring from the DPD in 2012.

<u>Burglary and Murder of William Helmbacher</u>

On August 26, 1998, William Helmbacher reported to the DPD that his apartment, #1 at 351 West Macon Street, Decatur, was burglarized. According to the report, Helmbacher noticed when he came home around 11:15 that night, that his front door was locked, but someone had entered and rummaged through the apartment. He reported missing some bottles of unopened Ice House beer, and a glass mug containing

3

loose change.  The report notes that a west window was closed but unlocked, and that Helmbacher was unsure if he locked the window when he left the apartment.  The report noted no sign of forced entry, and that all other windows were secure.

Gwen Tucker was Helmbacher's next door neighbor in the building at 351 West Macon.  Knowing of the burglary on August 26, she was concerned about Helmbacher.  The following day, she knocked on his door to check on him when she got home from work, which was about 4:30 to 5:30 pm or a little later.  His car was parked outside, and his windows were closed.  Helmbacher usually left his windows open when home.  At approximately 11:00 that night, a 911 call came to the DPD from Joseph Moyer, reporting that he and Douglas Lee, the owner of the building at 351 West Macon, went to the apartment of their friend and colleague, William Helmbacher, and found him dead in his living room.

The DPD immediately began investigating the murder.  CID Lieutenant Todd Walker managed the investigation by keeping a "Lead Sheet" of the activities of the officers who worked on the case.  The Lead Sheet for the Helmbacher murder investigation shows that about 30 DPD officers worked at various times on the investigation.  Practically all of the detectives in CID participated in some way in the murder investigation.

4

Ray Taylor lived in Apartment #5, on the upper level of 351 West Macon. Taylor was interviewed about the burglary and murder in the early days of the investigation. Taylor denied knowledge of either. As shown on the Lead Sheet, during the next several weeks, numerous interviews were conducted and leads investigated.

On September 10, 1998, William McGaughey, a volunteer who helped with gardening at the Millikin Homestead, a historic mansion owned by Millikin University, located six blocks from 351 West Macon, found a plastic garbage bag stuffed into a hedge on the property. The bag contained items reported to have been taken in the burglary of Helmbacher's apartment, including empty Ice House beer bottles, a beer mug, and Helmbacher's business cards. The bag also had a wallet, an item Helmbacher had not reported missing.

The Illinois State Police ("ISP") crime lab processed the bag and its contents for fingerprints. One of the four latent fingerprints on the bag matched Ray Taylor's. Taylor was then taken into custody and interviewed about the burglary and the murder.

At first, he denied any involvement in either. After Taylor was confronted with his fingerprint on the bag from the Millikin Homestead, and after continued interrogation, he admitted he knew Plaintiff committed the burglary, and that Plaintiff confessed to Taylor that he beat Helmbacher, but did not know if Helmbacher was alive or dead. Taylor reported that on the evening of the murder, he went to the building at 501 West Macon to see his friend, John Bradford, who lived there. While there he saw

Plaintiff, who told Taylor he had committed the murder.  Plaintiff was wearing dark shoes which did not fit him.  His heels were sticking out the back of the shoes with the back flattened down.  Taylor asked Plaintiff why he was not wearing the Fila shoes he had on last.  Plaintiff told Taylor he had to get rid of them because they had blood on them.

Taylor was given a polygraph examination by Mark Cheviron, a local polygrapher who performed lie detector testing for the DPD.  During the questioning, Taylor showed deception on questions pertaining to his being involved in the burglary, no deception about his not being involved in the murder, and no deception regarding his having knowledge of who committed the murder.

After the polygraph, interviews of Taylor continued.  Eventually, Taylor admitted involvement in the burglary.  According to Taylor, Plaintiff went in the apartment through a side window and opened the front door.  Taylor entered the apartment and acted as a lookout while Plaintiff gathered goods to steal from the apartment.  Taylor went on to say that they then left Helmbacher's apartment and went up to Taylor's apartment.  Plaintiff kept some change and they both drank some beer taken from the apartment.  Taylor said they put the rest of the items in a plastic garbage bag.  Taylor told the police they left his apartment carrying the bag.  Taylor dumped the bag with the contents into a dumpster at the Decatur Arts House, a few blocks away. Police investigated that location and discovered it did not have a dumpster for garbage removal.

6

Plaintiff had an outstanding warrant for his arrest.  Plaintiff was taken into custody, and brought to DPD headquarters and interrogated.  According to Carlton's report, Plaintiff was wearing a pair of white and black Fila athletic shoes.  Police seized the shoes and showed them to Taylor, who identified them as looking like the shoes Plaintiff was wearing at the time of the murder.  On September 24, 1998, the Fila shoes were sent to the ISP crime laboratory in Springfield, Illinois, with a request that they be examined for blood.  ISP scientist Jennifer Lu (formerly Jennifer Boster and subsequently Jennifer Aper), performed the inspection.  The Fila shoes had some reddish brown spots on the top of them.  She examined the spots, which turned out not to be blood.  The shoes were returned to DPD and placed back in inventory.

On September 26, 1998, Michael Callaway, Plaintiff's friend who lived at 501 West Macon, was interviewed by Carlton.  According to the reports, Callaway told interviewers that Plaintiff came to his home on the night of the murder, changed out of his clothes, washed clothes at Callaway's apartment, and put Callaway's clothes on. Callaway had gone out to buy beer, and when he returned saw that Plaintiff had put on Callaway's clothes.  Callaway was peeved with Plaintiff for putting on Callaway's clothes.  Callaway told police he saw Plaintiff and Taylor talking together at 501 West Macon on the night of the murder.

On October 15, 1998, the DPD sent Plaintiff's Fila shoes back to the ISP crime lab, with direction to "tear them apart" in order to do a more thorough search for blood. On November 16, 1998, Jennifer Lu cut the shoes open at a number of different

locations.  She found three blood spots on the inner material portions of one of the

shoes below mesh material.  One stain was 10 mm x 4 mm, found under black mesh;

one was on an interior thread that was 5 mm long; and one was 1 mm x 1 mm, also

under black mesh material.  The material with blood from the Fila shoes was then sent

to the lab's DNA analysis section, where ISP DNA analyst Dana Pitchford compared

DNA from the blood stains on the Fila shoes to a blood standard of Helmbacher's

blood.  The blood stains on Plaintiff's Fila shoes matched Helmbacher's.

The Macon County State's Attorney's Office approved murder charges against

Plaintiff.  Defendant Carlton obtained an arrest warrant, which was served on Plaintiff

at Hill Correctional Center, where he was being held for an unrelated parole violation.

On February 18, 1999, Carlton testified at a preliminary hearing where the court

found probable cause for the charges.  The Macon County Public Defender was

appointed to represent Plaintiff.  At a fitness hearing on January 12, 2000, during

discussions about Plaintiff's fitness for trial, Plaintiff complained to the court about the

adequacy of the representation he was receiving from the public defenders assigned to

represent him.  On February 9, 2000, Plaintiff's defense attorneys brought a motion to

suppress evidence relating to the Fila shoes, arguing that the seizure of the shoes by the

DPD when Plaintiff was in custody on September 22, 1998, violated the Fourth

Amendment.  The court denied the motion.

Plaintiff's jury trial began in Macon County on April 24, 2000.  Joseph Moyer

testified at the trial about how he and Doug Lee found Helmbacher's body and reported

it to the DPD.  DPD Officer Jeremy Welker testified about being called to respond to the burglary of Helmbacher's apartment on August 26, 1998.

Ray Taylor testified that in August 1998, he lived in the same building as Helmbacher on Macon Street, in Decatur, and charges were pending against him for burglary of Helmbacher's apartment.  Taylor testified no promises had been made to him about his burglary charge, but that the State's Attorney would take his cooperation into consideration.  Taylor testified that the day before the murder, he saw Plaintiff break into Helmbacher's apartment, going in the side window of the building.  Taylor said Plaintiff then asked Taylor to act as a look-out.  Taylor testified he refused and went up to his own apartment instead.  Taylor testified Plaintiff then came up to Taylor's apartment carrying some cards, change in a jar, and about five Ice House beers.  Taylor testified Plaintiff asked Taylor for a garbage bag to put the stolen goods in.  Taylor gave Plaintiff a plastic garbage bag.

Taylor testified he and Plaintiff drank the beer.  Plaintiff then put the jar, what he thought were baseball cards, and the beer carton box in the garbage bag.  They then went down the alley about two blocks away and threw the bag in a dumpster behind the "Gallery" building there.  Taylor did not see Plaintiff again that night.  Taylor identified at trial some of the items he and Plaintiff disposed of in the plastic garbage bag.

Taylor testified that he next saw Plaintiff the following day in front of his house, early in the day.  Taylor testified that the next time he saw Plaintiff was later that night

at his friend John Bradford's house at 501 West Macon Street.  It was in the evening
some time.  Plaintiff was inside the building, in an apartment with the front door open.
Plaintiff called Taylor inside and they sat on the steps near the apartment.  Taylor
testified that Plaintiff was wearing some old shoes, which did not fit him, and his feet
could not fit all the way into them.  Plaintiff was walking on the back side of the shoes.
His heels were hanging out from the back of the shoes.  He was also wearing different
clothes, an older type of clothes from what Taylor had seen earlier that day.

      Taylor testified that he asked Plaintiff about the clothes and shoes, and Plaintiff
said something like "man you know I had to beat that dude to death."  Taylor asked
"what dude?"  Plaintiff said, "the guy that stayed downstairs" from Taylor.  Plaintiff
added that the guy "didn't have but 11 dollars."  Taylor testified that when he asked
Plaintiff what happened to his shoes, Plaintiff responded that there was blood
everywhere, and Taylor testified he assumed that was why Plaintiff was dressed the
way he was.

      Taylor was then shown the Fila shoes taken from Plaintiff.  Taylor commented
that they had been pretty beaten up, and that he thought they were a different color,
like red.  Taylor added "it's been a while, but they might be the ones."  Taylor testified
that he was shown a pair of "tennis shoes" while he was in custody at the police station.
Taylor testified that he told the police those were the ones that Plaintiff had on earlier
the day of the murder.

Taylor admitted that he had denied any knowledge about the burglary or the murder before the day he was arrested and confronted with his fingerprints on the garbage bag.  Taylor testified that some weeks later he saw Plaintiff in downtown Decatur.  Plaintiff came up to him and asked him if the police were still coming to his house to talk to him.  Taylor told Plaintiff he had to go, and did not respond.

Taylor was then cross-examined.  He testified that he did not think the shoes that he saw in court were the same ones Plaintiff had been wearing, but added "I am not for sure about that."  Taylor denied telling Defendant Bell that he actually stepped inside the apartment and acted as a lookout for Plaintiff as he went through Helmbacher's apartment.  Taylor was asked about his not reporting Plaintiff's confession until he was confronted with his fingerprint on the bag.  Taylor answered it was "cause I didn't want to be involved in it."

The State called William McGaughey, who testified about finding the bag at the Millikin Homestead.

The State then called Michael Callaway.  Callaway testified that he knew Plaintiff.  In August 1998 Callaway was living on Macon Street at the corner with College Street.  He testified that, on occasion, Plaintiff stayed with him at that apartment.  Callaway testified that on the night of the murder, Plaintiff came to his apartment.  Callaway left the apartment to get some liquor, was gone about 45 minutes, and when he came back, Plaintiff had changed into one of Callaway's shirts.  The next day, Plaintiff may have been wearing one of Callaway's caps and had Callaway's shirt

on.  Callaway objected.  Callaway told Plaintiff he had to wash his clothes out.
Callaway saw Plaintiff washing clothes in a tub where the two of them would
sometimes wash clothes.  Callaway could not say with any certainty what time Plaintiff
came to his apartment, but admitted that when he was first interviewed by police, he
told them Plaintiff had "got there just before it started to get dark."

Tim Carlton testified about his role in the investigation.  He testified that after
interviewing Ray Taylor about the burglary and murder, and after Plaintiff was taken
into custody, Carlton took Plaintiff's Fila shoes.  Carlton showed them to Taylor, who
was in custody at the police station at that time.  Carlton then placed the shoes into
evidence.  Carlton also testified about his September 26, 1998, interview of Callaway,
and the report he prepared regarding that interview.  The report was used to refresh
Carlton's memory.

On cross-examination, Carlton testified about the two separate times the Fila
shoes were sent to the ISP crime lab, and his request that the shoes be "torn apart" the
second time.  Carlton was cross-examined about the victim's fingernails having been
inventoried, that defensive wounds might indicate somebody had been fighting, and
was asked if it would be important to know if Plaintiff's blood and skin were
underneath Helmbacher's fingernails.

Roger Morville testified about the procedures for inventorying evidence in the
DPD, and his transportation of the shoes back and forth between the DPD and ISP lab in
Springfield.

ISP crime lab employee Mark Mills testified about the garbage bag fingerprint match with Ray Taylor.

Robert Martin testified about drinking beer with Plaintiff and Taylor in front of 351 West Macon on the afternoon of the murder.

Jennifer Lu testified about finding blood on Plaintiff's shoe.  Dana Pitchford testified that it matched Helmbacher's blood.

Travis Hindman, a pathologist, testified about performing the autopsy. Hindman testified that at times he will preserve blood specimens for testing, either by putting wet blood in a bottle, or will place blood on a card which creates a dried blood sample.  Hindman testified that in this case, he created a dried blood sample of Helmbacher's blood, packaged it, and gave it to the DPD police officer who conducted the autopsy.  The blood standard was sent to the lab and not returned to the DPD.

At the close of the State's case, the court denied Plaintiff's motion for directed verdict.

The defense called Defendant Brian Bell to testify about Taylor's statement in which he admitted to a more active participation in the burglary.  Bell testified about Taylor saying that he actually entered the apartment and acted as a lookout while Plaintiff gathered property in the apartment.

The defense called Jeremy Welker, who testified about Taylor's statement on August 28, 1998, in which he denied any knowledge about the murder.  The defense

13

also called Defendant Applegate, who testified that he interviewed Taylor on September 1, 1998, and he denied any knowledge about the murder.

Plaintiff's attorney then wanted a delay in the trial, because Sherry Allen, a person who had seen Taylor carrying a white bag down the street sometime after the burglary, had not responded to a subpoena. The court denied the delay. As a compromise, the court allowed Carlton to testify to Allen's statements about her seeing Taylor carrying the bag down the street.

Plaintiff then testified in his own case in chief. Plaintiff testified that, on the day of the murder, he left Taylor's apartment at about 3:30 or 4:00 pm, and went down to Callaway's house, where he stayed for the rest of the day. Plaintiff admitted to washing out clothes, but contended it was Callaway's clothes he washed, and changed into.

At the end of trial on August 27, 2000, the jury returned a verdict of guilty.

<u>Postconviction Proceedings</u>

Plaintiff's conviction was affirmed on appeal. He then filed a postconviction petition, which was denied, and the denial was affirmed on appeal.

In 2010, Plaintiff filed a petition for DNA testing. On June 13, 2011, the court allowed DNA testing on Helmbacher's fingernail substances. Cellmark Forensics was selected to perform the DNA analysis. On January 22, 2014, Cellmark issued its report, which excluded Plaintiff's DNA from any materials from Helmbacher's fingernails. The ISP had never examined the fingernail material because it was not considered forensically probative. Fingernails are also easily contaminated.

14

According to Crime Scene Forensics expert Thomas L. Martin, in his February 2021 report for Defendants, there is nothing about the physical evidence in this case which suggests that Helmbacher ever struck the assailant, or had any opportunity to put hands on the assailant that would have deposited the assailant's DNA under Helmbacher's fingernails.

Bode Laboratories purchased Cellmark Forensics.  Bode would not recognize Cellmark's results regarding Helmbacher's fingernails because Bode did not use the protocol used by Cellmark.

Defendants' retained forensic science expert Lucy Davis testified that Cellmark's conclusions were sub-threshold, failed to account for drop-in or drop-out of DNA, and were scientifically unreliable.  Davis testified that it would be next to impossible to create wet blood from a dry blood standard, or to transplant DNA rich blood to a surface in uncontrolled conditions.

On October 5, 2016, Plaintiff filed a successive postconviction petition.  In November 2016 the State conceded the petition and agreed to vacate Plaintiff's conviction.  The State then moved to dismiss the charges.

On August 30, 2018, Plaintiff filed a petition for a certificate of innocence based on the Cellmark DNA testing.  The State's Attorney opposed the petition for a certificate of innocence, but took an unusual position.  Instead of contesting the validity of the Cellmark report, or contending that the lack of DNA under Helmbacher's fingernails did not exonerate Plaintiff or demonstrate in any way that he was not guilty

of murder, the State instead took the position that Plaintiff could have been guilty but only as an accomplice who did not wield the actual murder weapon.

The circuit court denied the certificate of innocence, and the appellate court affirmed.  However, on April 15, 2021, the Illinois Supreme Court reversed the appellate court and remanded the matter to the circuit court to issue Plaintiff a certificate of innocence.

*Plaintiff's Facts*

<u>August 27, 1998: The Day Helmbacher Was Killed</u>

According to a DPD report[1] dated August 27, 1998, Helmbacher's neighbor saw him alive in his living room at approximately 7:50 pm on the night he was killed. Defendants Carlton, Bell, Chabak, Ryan, Patton, Hubbard, and Applegate were aware of the DPD report.

Helmbacher was employed by a man named Douglas Lee, who was a local businessman, politician, and landlord.  Lee owned a law firm and several properties in

---

[1]Police reports are "admissible under the business records exception to the hearsay rule if: (1) 'the record was made at or near the time by—or from information transmitted by—someone with knowledge'; (2) 'the record was kept in the ordinary course of a regularly conducted activity of a business, organization, occupation, or calling'; (3) 'making the record was a regular practice of that activity'; (4) 'all these conditions are shown by the testimony of a custodian or another qualified witness'; and (5) 'the opponent does not show that the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness.'" *Minett v. Overwachter*, 433 F.Supp.3d 1084, 1087 (W.D. Wis. 2020), quoting Fed. R. Evid. 803(6).  Further, third party witness statements summarized in a police report that are offered to show what information had been provided to a defendant officer and the effect that this information had on him are admissible.  *Minett*, 433 F.Supp.3d at 1088, citing *Torrey v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019).

town.  Helmbacher worked for Lee at his law firm and helped him collect rent from the apartment buildings he owned.  Lee owned the building where Helmbacher lived.  According to DPD reports, in the weeks leading up to Helmbacher's death, Lee and Helmbacher had been in heated disputes about money.  Lee thought Helmbacher was stealing the rent he was collecting.  According to a September 13, 1998, DPD report, Lee had berated Helmbacher about a business issue.

On the evening of August 27, Lee was scheduled to come to Decatur to conduct business.  A DPD report dated August 28, 1998, indicates that Helmbacher was scheduled to meet with Lee and Kelly Ciota, who was purchasing an apartment building from Lee.  Ciota said he thought it was odd that Lee and Helmbacher did not come to his residence that evening.  The DPD report confirmed that Lee would be coming to Decatur on Thursday to meet with Helmbacher and Ciota.  A note was found in Helmbacher's apartment that said "Kelly, knock hard I may be in the shower."

According to a DPD report, Helmbacher told a friend that he was planning to have a meeting with Lee on August 27 about their money disputes.

Lee's Activity on August 27, 1998

Lee left his home at approximately 7:00 pm and arrived in Decatur two to two and a half hours later.  He went straight to Helmbacher's apartment, alone.  There was no answer when he knocked on the door, so Lee left Helmbacher's apartment and went to the home of their associate Joe Moyer.  According to a DPD report, Lee and Moyer chatted outside Moyer's apartment for somewhere between ten minutes and an hour.

17

They then went to Helmbacher's apartment and knocked on the door but got no answer.  Lee and Moyer found Helmbacher's car parked out front.  The lights were on in the apartment and the front door was locked.  They peered through the small window in the front door and saw a half-eaten hamburger on the table.

According to a DPD report, Helmbacher had a drinking problem, and Moyer mentioned that he thought Helmbacher had passed out from drugs or alcohol.  Per the report, Lee and Moyer left to try and collect rent from other apartment buildings.  During those visits, Lee told multiple tenants to no longer give rent money to Helmbacher.

According to a DPD report, one tenant, Tonya Rice, found that Lee was irate and acting "quite strange" when he knocked on her door around 10:30 pm that night.  Lee threatened her "I'm going to cut up your shit and throw it in the dumpster."  Rice had previously been told by Moyer to no longer give rent money to Helmbacher because he "screwed up the books."

Around 11:00-11:10 pm, Lee and Moyer began to worry about Helmbacher, so they returned to his apartment.  Lee had a key to Helmbacher's apartment, and used his key to unlock the front door.  Lee and Moyer saw Helmbacher's dead body, severely beaten and covered in blood.  Moyer saw Helmbacher's brain matter on the floor and knew he was dead.  Moyer did not touch Helmbacher's body.  Neither stepped more than one or two steps inside the apartment.

18

According to the DPD report, Moyer said that Lee, initially, appeared not to see Helmbacher's body and called out his name.  However, Moyer stated it would have been impossible not to see the body, and "it was like Doug had intentionally overlooked the body."  Moyer promptly called police.

<u>The Crime Scene</u>

The first DPD officers to arrive on scene arrived at 11:20 pm on August 27.  They found Helmbacher's body with his legs crossed and interlocked with a table leg.  Authorities had interpreted this to indicate a likelihood that the decedent was rolled from his stomach onto his back after being injured.  Helmbacher was only wearing pants and one sock.

According to a DPD report, no rigor mortis was present in Helmbacher's arm.  The sides of Helmbacher's torso appeared to show some early development of livor mortis.  However, livor mortis was not assessed at the crime scene, and crime scene photos do not allow for determining the degree of lividity.  According to Plaintiff's expert James Filkins, Helmbacher had been dead somewhere between 30 minutes and two and a half hours, meaning he was killed between 8:30 and 10:30 pm.  Defendants' expert, J.C. Upshaw Downs, places Helmbacher's death around 5:20 pm.

Helmbacher had been beaten to death with a hammer.  According to Filkins and Plaintiff's forensics expert Kenneth Moses, the killer hit Helmbacher in the forehead with the hammer, and then hit Helmbacher repeatedly in the back of the head as he lay face down on the floor.  However, Defendants' forensic crime scene expert Thomas L.

19

Martin found that the evidence did not support the forehead strike being the first blow. The killer then rolled Helmbacher's body over, laid his arms at his sides, and crossed his ankles around the table leg. Helmbacher's face and the floor around him were entirely covered in blood.

The hammer had blood and hair on the head. Several items were out of place: an empty box of nails was overturned on the floor and nails were strewn about on the floor; the right arm of a reclining chair was broken; couch cushions were in disarray; all kitchen cabinet doors were ajar; and a white plastic chair was overturned.

DPD Officer Welker had responded to a report of burglary at Helmbacher's apartment the night before the murder. Welker observed that certain items in Helmbacher's apartment were in a different condition than they had been when he was there the night before. Specifically, after the murder, the kitchen cabinets were all ajar and the cushions on both couches were in total disarray. They had not looked like that the night before.

On a table, officers found two hamburgers: one wrapped inside a McDonald's bag and the other unwrapped with one bite taken out of it.

Defendant Ryan arrived at the crime scene at 12:15 am and learned that the door had been locked before the arrival of Lee and Moyer. Officers observed no signs of forced entry. Having been burglarized the day before, Helmbacher had said he was going to make sure his doors and windows were locked. Lee testified Helmbacher said

he would try and secure the apartment and was not afraid to be in Decatur.  Defendant Ryan did not process the exterior of the windows anywhere in the apartment.

Though there was a large amount of blood around the body, there were no bloody footprints or any shoe patterns in the blood.  There was a blood spatter on the inside of the front door, suggesting that the door was closed when the attack occurred. Ryan collected three swabs of Helmbacher's blood from the crime scene.  Helmbacher's hands were bagged.

Coroner Michael Day reported that there appeared to be defensive wounds on both of Helmbacher's arms, bruises on the left shoulder, and around 10-12 wounds to the back and sides of the head.  The autopsy also revealed that Helmbacher had two bruises on the knuckles of his middle and pointer fingers.

Structure of DPD's Investigative Team

Detectives in the DPD detective bureau in 1998 would collaborate on homicide cases, and DPD officers working a case together would have daily meetings, briefings, and shift meetings with the supervisor.  The detective sergeant was the command officer in charge of most of the day-to-day interactions with the detectives.  The sergeant called meetings to ensure that officers on the case were up to speed on case leads and other relevant information, and got copies of all reports.  When officers completed their reports, command officers, like the sergeant, would ask questions and make suggestions.

Detective Tim Carlton was assigned as the lead detective on the Helmbacher case.  The sergeant supervising the Helmbacher case investigation was Sergeant Chabak.  Chabak reviewed detectives' reports and met with Carlton about developments in the Helmbacher investigation.  Chabak considered himself a hands-on supervisor and would work with detectives to assist their investigations.

Early Investigation Into Doug Lee

Lee was interviewed twice on the night of the murder: once at the scene, and once by Defendant Carlton at police headquarters.  Reports reflect that Lee explained his version of events as follows: he arrived in Decatur around 9:00 or 9:30 pm; went straight to Helmbacher's apartment and received no answer at the door; left to speak with Moyer; returned with Moyer to Helmbacher's apartment again and knocked but got no answer; collected rent; and then went to Helmbacher's apartment a third time and entered to find him dead.

When Carlton asked Lee for consent to take his fingerprints, Lee stated that he wished to have his attorney present and would no longer speak with the officers. During the interview, Lee was dressed in soiled and very wrinkled clothing that looked to officers as if they had been at the bottom of a hamper, including an oversized dark-gray knit shirt that buttoned down the front with no collar, and light-colored khaki shorts.

Lee testified, although he did not remember clearly doing so, that he might have told police that evening that he suspected Plaintiff and his cousin, Ray Taylor, had been involved in the murder.  He also said that he stopped at a gas station in Plainfield that night around 7:00 pm, and then drove to Decatur, which took about two and a half hours.  Carlton reported that Lee showed him a receipt from the gas station establishing that he purchased basketballs at the Plainfield gas station at 7:02 pm that night.  Lee gave Carlton the receipt.  Defendant Carlton did not tag the receipt into evidence or attach it to the report.

Lee had his own apartment unit in Helmbacher's building.  Lee checked into a local Holiday Inn that night rather than staying in his own apartment in Helmbacher's building.  According to a DPD report, the front desk associate from the Holiday Inn recalled Lee wearing a white polo and blue jean shorts when he checked in, and possibly carrying a black shoulder bag.  According to the report, DPD officers did not observe Lee carrying a black duffle bag earlier that day.  Per the report, the taxi driver who brought Lee to the Holiday Inn described him as wearing a navy blue shirt and glasses.

DPD Gathers Evidence About Doug Lee's Motive

The following information on Lee's motive is provided by DPD reports.

Over the weeks following the murder, officers conducted several interviews with individuals who knew Helmbacher and Lee.  On August 28, Ciota reported that he was supposed to have a meeting with Lee and Helmbacher on the night of the murder, but

neither showed up at his house.  Ciota said he "believes that Lee was also verbally abusive to William" and described Lee as a "very hot tempered person" who is "easily angered."  Ciota also reported that Lee's wife Julia told him not to make payments to Helmbacher anymore and to deposit payments directly to their account.

DPD learned Lee had paid for much of Helmbacher's law school and one witness believed Helmbacher was working for Lee to pay him back.  Lee was upset with how Helmbacher was running the building's rent collection operation.

During a second interview on September 9, 1998, Ciota informed Carlton of the following: Ciota was purchasing an apartment building from Lee, and Lee was purchasing a building from someone named "Behmlander."  On August 26, Lee told Behmlander that he was struggling financially because Helmbacher was stealing money from him and Lee needed a six-month extension on building payments.  Behmlander explained that Lee had lately become irregular in making his payments.

On September 1, 1998, Carlton and Welker interviewed Jane Redenberg, who had known Lee for six years.  Redenberg informed the officers that she spoke with Helmbacher at approximately 4:00 pm on the day he was killed to discuss her traffic case.  According to Redenberg, Helmbacher was uptight on the phone and seemed more upset than she had ever encountered him in the three years that she had known him.  On that call, Helmbacher confided to Redenberg that he was upset with Lee because he felt he was doing 70% of the work at their law office and only getting 30% of the pay.  Redenberg encouraged Helmbacher to confront Lee about the issue.

Helmbacher also informed Redenberg that Lee was coming to stay at Helmbacher's apartment the day of the murder.

Redenberg also informed the DPD officers that Lee called her sometime around 7:00-8:00 pm on August 28, 1998, the day after the murder, and said several things on the call that concerned her, including: (1) that he would not be himself for the next month because Helmbacher had committed suicide; (2) that he had found Helmbacher dead in his back bedroom and that Helmbacher had killed himself with one hammer blow to the head; (3) that actually Helmbacher could have committed suicide or could have been murdered and that he had been found in his front room, not his bedroom; (4) that Lee was alone when he found Helmbacher; and (5) that Helmbacher had not been burglarized.  Redenberg was also concerned about Lee's strange behavior over the past month.  In his deposition, Lee disputed some of what Redenberg said in the DPD report.

According to a DPD report, on September 1, 1998, Kris Lewison, Helmbacher's former housemate, reported that: (1) Helmbacher would often complain about not being paid on time by Lee; (2) Helmbacher lived at the apartment for free in exchange for not receiving a pay raise that he was entitled to; (3) Helmbacher would collect rent money and turn it over to Lee when he would come to town; (4) Lee would visit Helmbacher's apartment at all hours of the day and would use his key to enter instead of knocking; (5) Helmbacher almost always would lock the front door; and (6)

Helmbacher always kept a hammer by the front door or the front closet, though he never used the hammer, and kept one or two baseball bats in the house.

On September 2, 1998, Wonda Davis, who had lived in Helmbacher's building for four months, reported that Lee would come to Decatur when things were not going well at the apartment building. According to a DPD report, Davis informed DPD that on August 26, 1998, Helmbacher and two other white men who identified themselves as maintenance men served her an eviction notice for unpaid rent. She presented a rent receipt showing Helmbacher's signature. Helmbacher did not say anything and appeared to be afraid. Davis also informed the officer that, on the night of the murder, she arrived home at 10:00 pm and observed Lee knock on her door three times within the hour. She did not answer the door. At approximately 10:45 pm, she heard Lee and another individual whispering outside her window and saw Lee walk past her bedroom window toward Helmbacher's apartment. A couple of minutes later, she heard a thump like the sound of someone falling in Helmbacher's apartment, and said it was definitely not the sound of someone knocking. She heard another thump and what sounded like someone falling down over a table.

On September 3, 1998, Carlton re-interviewed Moyer. Moyer explained that he had no idea Lee was coming to his residence that night and found it surprising and strange that Lee would come so late without notice. Moyer also expressed concern that Lee had "set him up as an alibi."

<u>Defendants Carlton and Bell Search Lee's Car and Seize a Towel</u>

When officers arrived at the scene the night of the murder, Lee's blue Plymouth Reliant K was parked outside in a haphazard manner facing the wrong direction on the curb.  The car was secured as part of the crime scene and was impounded to be towed.

On August 31, 1998, Lt. Walker obtained a search warrant of Lee's apartment in 351 West Macon, and his car.  That day, Defendants Carlton and Bell searched Lee's vehicle and seized a pair of brown leather shoes, a balled up set of clothing, and a yellow towel.

According to the Forensic Analytical Crime Lab report, commissioned by Plaintiff for this suit in 2020, spots of blood were found on the towel that Carlton and Bell took from Lee's trunk.  According to that report the blood on the towel belonged to Lee.

Evidence from Lee's car was marked with a biohazard label, which was used for evidence that had bodily fluid on it (including blood), may have come in contact with a biohazard, or that was a sharp object that could cause injury.  Bell and Carlton did not document that the towel had spots of blood on it or that they sealed the package containing items collected from Lee's car with a biohazard sticker.  Bell and Carlton reported in the lead sheet that they wanted the towel checked for blood.  They submitted the towel and other evidence from Lee's car to the ISP crime lab for forensic analysis, but it was not tested.  It is disputed whether they told ISP not to test it.

27

If the towel had blood on it, Bell testified that he would have wanted to know whose blood it was to determine if it was potential evidence or not.

<u>Suppressed Evidence About Doug Lee</u>

According to a DPD report, Carlton obtained video footage from a gas station in Plainfield, Illinois, where Lee said he had stopped on his way to Decatur on August 27. The video had a timestamp within a few minutes on either side of 6:00 pm, August 28, the day after Helmbacher was killed.  Carlton wrote a report stating that the footage depicted Lee at the gas station on the day Helmbacher was killed.  Carlton wrote a report stating that the timestamp on the video was off by 23 hours.

The gas station clerk said she remembered one person purchasing basketballs on the day Helmbacher was killed and described a white male, early 40s, glasses, short dark hair, heavy/stocky build, 5'9", dark complexion, possibly Italian, may have worn eyeglasses.  She recalled the man wearing short pants and what she thought was a blue striped tank top.  Carlton investigated whether Lee may have changed clothing on August 27, 1998.  On September 8, 1998, he spoke with Lee's wife, who said Lee was wearing a navy blue shirt and white shorts that day.

Carlton wrote a report that the gas station surveillance video could be useful to determine whether Lee had changed clothes on the night of the murder.  Carlton noted that because of the quality of the security camera footage, it could not be determined if Lee was wearing the same clothes he wore on August 27 to report Helmbacher's death,

but the clothes did appear to be similar.  Carlton also obtained four photo stills from the surveillance video, which appeared to show a man inside a convenience store.

Carlton wrote a report stating that he tagged the video and photo stills into evidence.  The video and photo stills were tagged into evidence in 2012.

On September 9, 1998, Carlton requested that the FBI produce still images of the gas station surveillance video and enhance them to help determine what type of clothing the subject was wearing.  Carlton wrote a cover letter to the FBI's Engineering Section that Lee was a "very strong suspect" and that "[i]dentifying the clothing Mr. Lee was wearing prior to him reporting the murder, is vital to this case.  It could mean the difference between Mr. Lee being charged for this murder or him getting off."

The FBI returned the video, two processed, slow-motion videos, and two types of photo prints.  Carlton acknowledged that the photos provide no helpful information about Lee's clothes.  Prosecutors had no recollection of such information being disclosed to them.

According to a DPD report, Moyer remembered that Lee changed his clothes at some point on the night of the murder.

<u>Initial Interviews of Ray Taylor</u>

The night of the murder, Welker interviewed Taylor.  Taylor told him that he had not seen anything unusual that night.  Defendant Chabak also interviewed Taylor that night.  Taylor told Chabak he had no information about the homicide.  Taylor

29

consented to police searching his apartment, and the officers found nothing of evidentiary value.

On September 1, 1998, Taylor told Defendant Applegate that he had no knowledge of who committed the Helmbacher murder and he saw no one around either coming or going that evening.  Taylor also explained his whereabouts that night: he left home around 6:00 or 7:00 pm, went to a liquor store, visited with John Bradford for a short period, returned to the liquor store, returned to Bradford's, and then went to his mother's house.  He did not mention seeing Plaintiff.  Applegate reported that he also inquired about Taylor's arrest on August 24, 1998, for getting into an altercation with Helmbacher and Lee.

On September 2, 1998, Defendant Hubbard asked Taylor to take a polygraph, and Taylor refused, denying knowledge about Helmbacher's murder.  On September 3, Officer Beck went to Taylor's apartment, but Taylor was hostile and refused to let Beck inside.  He said he was tired of being harassed by the police.

Defendant Chabak learned that Taylor had gotten into a verbal confrontation with Helmbacher on August 24, three days before the murder.  One witness, Tanya Estes, reported that Taylor (described as the Black man who lived on the top floor, west corner of the building) had several arguments with Helmbacher and most recently had come to Helmbacher's apartment with a "small G" [presumably a gun] and said "if he don't give him his rent receipt he's going to be sorry."  On another occasion, Estes had seen Helmbacher come out of his apartment with a baseball bat in his hands.

30

Taylor was also arrested in April 1998 for having an altercation with Helmbacher and Lee.  The police report says that Taylor came to Lee's apartment door one night and said he was going to kill him.  When Lee ran downstairs to Helmbacher's unit, Taylor chased him saying "I am going to kill you motherfucker."  Helmbacher and Lee called the police, and Helmbacher informed the officers that "Taylor said he would kill them." DPD officers were aware of Taylor's threats toward Helmbacher, however Taylor denied making those threats.

Discovery of Plastic Bag with Items Reported Stolen and Wallet

On September 10, 1998, the groundskeeper of Millikin Homestead, William McGaughey, discovered a white plastic garbage bag in a bush by the Millikin flag pole. The bag contained items that Helmbacher reported missing from his apartment on August 26, including his business cards, a glass beer stein, and the paper carton of a six-pack of beers.  McGaughey had last checked the location on September 3, and the bag had not been there.

On September 21, 1998, ISP informed Welker that a suitable latent print on the garbage bag matched Ray Taylor.  The remaining suitable latent prints did not match anyone.  Taylor maintained that he did not carry the garbage bag to Millikin Homestead.  He testified at his 2021 deposition that he had no idea how the stolen items got in a bag with his print on it.  This testimony, however, conflicts with his testimony at trial, where he admitted holding the garbage bag and disposing of the goods taken in the burglary.

<u>Bell and Carlton Arrest and Interrogate Taylor</u>

According to a DPD report, Taylor was arrested and brought in to be interviewed by Bell and Carlton.  They interrogated Taylor about the trash bag of stolen contents and why his fingerprint was found on the bag.  Bell and Carlton accused Taylor of involvement in the burglary.  Taylor testified at the criminal trial that the officers who interrogated him told him that "the murdered man's wallet was in the bag with [his] prints on [the bag]," and Carlton was the one who told him that his prints were on the bag.

<u>Bell's Report of the Taylor Interrogation</u>

Bell's report of the September 21, 1998, interrogation says that he spoke with Taylor "at length" about the fact that his prints were on the bag, and "after a considerable amount of time in which Taylor denied knowledge" of the burglary, Taylor said he would tell "the truth."  According to Bell's report, Taylor then said that Plaintiff burglarized Helmbacher and came to Taylor's apartment asking for a bag.  The report says Taylor said Plaintiff threw away the belongings and threw it in a dumpster, and that Taylor said he had no idea how the bag got to the Millikin Homestead.  Bell reported that Taylor also told him that the day after the burglary, while he was at his friend John Bradford's house at around 7:00 pm, Plaintiff waived Taylor to come upstairs and said that he had to "beat the dude to death," referring to the "man who lived in the apartment" by Ray, and that there was blood everywhere.  The report states that Plaintiff did not know if the man was alright.  Bell wrote that Taylor said Plaintiff

got $11 from the man, and no one else was present during his conversation with Plaintiff.

Bell reported that Taylor was taken for a polygraph.  The polygraph report says that Taylor was deceptive when he said: (1) he did not plan to try to lie during the polygraph examination; (2) he had told the complete truth about the matter; and (3) he had not intentionally lied during the polygraph examination.

Bell wrote that he continued the interrogation after the polygraph.  His report says that Taylor then told him that Plaintiff asked Taylor to be a lookout when he burglarized Helmbacher's apartment.  Bell reported Taylor told him Plaintiff climbed into Helmbacher's window, walked through the apartment and opened the front door, and then Taylor went into the living room and looked out the curtains to see if anyone was coming.

Bell's report says nothing about shoes with blood on them.  His report says Taylor told him that Plaintiff told him at a bus stop that he could not believe he had "done that for $11."  Bell also reported showing Taylor a five person photo array containing Plaintiff's photo, and that Taylor picked Plaintiff.

Carlton's Report of the Ray Taylor Interrogation

Carlton's report of Taylor's interrogation says that Taylor told Bell that Plaintiff told Taylor "I had to beat the dude down," and that Taylor said Plaintiff was referring to Helmbacher.  Carlton's report says that Taylor volunteered that Plaintiff had burglarized Helmbacher's apartment the night before.  He relayed that Plaintiff had

come to his residence carrying several items, including a jar of change and some beer and asked Taylor for a trash bag for the items.  Taylor explained that his own fingerprints would be on the bag because he had handled the bag.  Carlton wrote that Taylor said Plaintiff came to Taylor's apartment after the burglary was completed and that Taylor did not know how Plaintiff entered the Helmbacher apartment.

According to Carlton, Taylor informed him and Bell of the following: just before dark on August 27, Plaintiff flagged Taylor down and announced, "I had to beat the dude.  He didn't have but $11.00.  There was blood everywhere."  Carlton wrote that he asked Taylor if he saw blood on his clothing or hands and Taylor said he did not see any.  According to the report, Taylor asked Plaintiff about the Fila shoes he was wearing the night before, and Plaintiff responded that he had to get rid of the shoes because they'd gotten blood on them.  Carlton's account deviated from Bell's, which made no mention of Fila shoes.

According to Carlton's report, Taylor stated that Plaintiff's confession occurred just before dark on August 27, 1998.  Carlton's report reflects that Taylor said he told his father, Robert Taylor, that Plaintiff had confessed to committing the murder.  Carlton's report also says that Taylor told him he saw Plaintiff downtown waiting for a bus the week after the murder, and that Taylor said he tried to avoid Plaintiff but Plaintiff asked if the police had been back to Taylor's apartment.

<u>Handwritten Statement Attributed to Ray Taylor</u>

Taylor also wrote a handwritten statement on September 21, 1998, that said: "He came to my house and wanted a garbage bag to put items taken in ~~burglary~~ <sup>R.T.</sup> theft I took the garbage and threw it in the dumpster.  The next day I was down the street [illegible/crossed out] <sup>R.T.</sup> over John Bradford house [illegible/crossed out] <sup>R.T.</sup> outside then Charles came from upstairs and called me and said he had to beat Bill <sup>for $11 dollars</sup> and I ask was he O.K. he said he didn't know and said there was blood everywhere and I went back outside with John.  That night I found out Bill was killed."  "Charles Palmer" is written in the margin at the beginning of the statement next to the word "He."

Taylor confirmed that the signature on the statement was his, but did not remember ever writing that handwritten statement.  Taylor testified at his 2021 deposition that he did not recall what was written on the page when he signed it and testified that the page was possibly blank.  The report bears only Bell's witness signature, although there were lines for two witness signatures.

<u>Defendants Ryan and Patton Report of an Interview with Taylor</u>

Defendant Ryan wrote a report stating that he and Defendant Patton talked to Taylor on September 22, 1998.  Ryan's report stated that Taylor told them that, at or around 7:00 pm on August 27, Taylor returned from a store with his friend John Bradford.  Ryan's report states that Taylor told him Plaintiff then came outside of the building, got Taylor's attention, and told him that he had to "beat old boy," and stole $11 from Helmbacher.  Ryan's report further states that Taylor told them that he noticed

35

Plaintiff was not wearing his black and white Filas, but that he was wearing dark shoes with his heels hanging out the back.  Ryan wrote that Taylor then said that he asked Plaintiff where his shoes were and Plaintiff said that he had to get rid of them because they had blood all over them.  The report also says Taylor said he thought Plaintiff had been wearing dark jeans, but that he did not see any blood on Plaintiff.

Ryan testified that, during that interview, it is possible he accused Taylor of burglarizing Helmbacher, and he does not recall whether he told Taylor that he could be accused of the murder as well.  Ryan explained that "it's possible that if [Taylor] was involved in the burglary, [Ryan] would have told him that he was going to be in trouble for the burglary and/or murder."

"Impossible" Timeline in Ray Taylor's Story

Each of the police reports on Taylor's confession story- written by Defendants Bell, Carlton, and Ryan- state that Plaintiff's alleged confession occurred before dark or around 7:00 pm.  Apparent sunset in Decatur on August 27, 1998, was at 7:35 pm.

According to a DPD report, Defendants Carlton, Bell, Ryan, Hubbard, Chabak, Patton, and Applegate were aware that a witness, Helmbacher's 12-year old neighbor, reported that she saw Helmbacher reading a book in his sitting room around 7:50 pm on August 27.

Bradford said Taylor was at his apartment, where Plaintiff's confession reportedly occurred, during daylight, and guessed that it was somewhere between 6:00 and 6:30 pm.  Taylor said he left Bradford's apartment and he went to his mother's and

36

then grandmother's house.  Taylor's grandmother said that it was still light when he got

to her house.  On September 21, 1998, Carlton spoke with Taylor's father, who denied

that Taylor ever told him anything about Plaintiff's involvement in the Helmbacher

murder.

Taylor testified that he was concerned that DPD suspected him of committing

both the burglary and murder.  According to Taylor, Carlton and Bell warned him that

he would go down for both crimes.  He testified at his deposition that "[The officers]

was ... wanting to put the suspect on me because they didn't have no place else to go so

they want to point the finger at me.  And I said no, no, no, wrong finger to be pointing

at..."  Taylor testified at his deposition that he felt the officers wanted him to lie about

his involvement.  This is disputed by Defendants.

Assistant State's Attorney Jack Ahola testified that if he had evidence that

undermined Taylor's statement, he would have disclosed it to defense attorneys.

According to the affidavit of Plaintiff's retained private investigator Mort Smith, Taylor

told him that DPD had information about Plaintiff that Taylor did not provide them

through these interviews.

Taylor Denies Information in DPD Reports Documenting His Interviews

According to Mort Smith, Taylor says he knew nothing about the Helmbacher

murder until police arrived at his door.

At his 2021 deposition, Taylor testified that he had no knowledge of the burglary, did not see Plaintiff crawl into Helmbacher's window, and that he truthfully told Carlton, Bell, and Ryan that he had no knowledge of the murder.  Taylor testified that he did not participate in the burglary, that Plaintiff never brought stolen items to his apartment, and that he did not help dispose of Helmbacher's stolen items.  Taylor further testified at his deposition that he never told Carlton and Bell that Plaintiff brought Helmbacher's property to his apartment and never told them anything else about the burglary.

Taylor, again at his 2021 deposition, testified that he never told police that he had any knowledge of who committed the murder.

Taylor essentially contradicted his trial testimony relating to what he told police about Plaintiff's involvement in the murder.  He testified that he believed detectives were trying to get him to say things that were false.  He testified that he had no idea why Plaintiff's name would be written in the margin on his handwritten statement, and that he did not think Plaintiff's name should have been on the statement and that he never saw Plaintiff's name in the margin until his deposition.

Taylor testified that during the investigation, DPD was following him, harassing him, and watching him from their cars.

Bell testified that he does not recall how Plaintiff's name was introduced during Taylor's interrogation.  According to Mort Smith's affidavit, Taylor says he was not interviewed again by police after the polygraph test or the next day.  However, when

38

asked about this at his 2021 deposition, Taylor said he did not know and could not be sure about whether he was interviewed again.  He also denied he ever told his father that Plaintiff had been involved in the murder.  Further, according to Smith, although this is disputed by Taylor's trial testimony, Taylor says that Plaintiff never told him anything about the police or that he could not believe he had "done that for $11" at the bus stop.

Plaintiff Is Arrested and Interrogated

On September 22, 1998, DPD arrested Plaintiff, who was 43-years old and working at an auto detail shop.  Carlton interrogated him.  Plaintiff denied having any knowledge of the burglary or murder.  Carlton wrote a report stating that he and Bell brought Taylor to Plaintiff's interrogation room, and Taylor repeated in front of Plaintiff his story that Plaintiff confessed to the burglary and murder.

Plaintiff testified that Taylor was never brought into an interrogation room with him, and that Taylor did not make any statements in front of him.  Bell does not recall using this interrogation technique in any other instance during his employment with DPD.

During the interrogation, Carlton took Plaintiff's Fila tennis shoes.  According to Carlton's report, he showed the shoes to Taylor, and Taylor said they looked like the same shoes Plaintiff said he had to get rid of because they had blood on them.

Taylor, in his 2021 deposition, testified that he was not asked to identify Plaintiff's shoes at the station and had never seen Plaintiff wearing the Filas before that. However, this is contradicted by Taylor's trial testimony.

On September 22, 1998, Plaintiff's Fila shoes were taken into evidence. Carlton created a property record form on September 23. Carlton told Plaintiff that he saw spots on the shoes that he thought were blood. On September 22, Carlton swore an affidavit for a warrantless arrest of Plaintiff, stating that Taylor's prints were on the bag at Millikin, and that Taylor said he participated in the burglary with Plaintiff. The sworn statement says Taylor stated that Plaintiff entered Helmbacher's apartment through the window and Taylor acted as the lookout. Carlton's sworn statement also says Taylor said that Plaintiff had to beat Helmbacher during a robbery, that Plaintiff said there was blood all over, and that Plaintiff said he had to change his shoes because he had gotten blood on them.

<u>Defendants Investigate Plaintiff</u>

Carlton wrote a report dated September 26, 1998, reflecting that he interviewed Mike Callaway after Plaintiff's arrest. According to the report, Callaway said Plaintiff had stayed at Callaway's residence on the night of Helmbacher's murder. According to the report, Callaway stated that Plaintiff did not mention anything about a murder to him that night and Callaway had not noticed blood on Plaintiff. According to the report, Callaway said during that interview that Plaintiff put on Callaway's shirt,

40

Callaway told him to wash his own clothes and wear them instead, and then Plaintiff washed his clothes that day or the next.

Defendants Stop Investigating Lee

No one from DPD contacted Lee or his attorney again after September 21, 1998. On September 24, 1998, Ryan informed ISP crime lab analyst Jennifer Lu that she should not examine the items found in Lee's car because Lee was "not a suspect anymore." Ryan did not write a report memorializing this conversation.

It was the practice in the DPD at that time that it was not appropriate to exclude someone as a suspect if there were still leads to follow up on, even if there was evidence inculpating someone else.  Assistant State's Attorney Ahola has some independent recollection of his work on the Helmbacher case, yet does not recall ever being informed that Doug Lee had been a suspect in the Helmbacher murder.

First Test of Shoes Reveals No Blood

On September 25, 1998, ISP analyst Jennifer Lu performed the "examination for blood" that Carlton requested.  She examined the black and white Fila shoes and found them worn and dirty.  Lu also did not recall anything about the shoes that made it appear that they had been washed.  However, she thinks they probably were washed at some point due to the presence of blood in the underneath layers.

Lu also testified that nothing about the appearance of the blood spots supported the idea that the shoes were cleaned on the outside.  The Fila had not been washed between the time of the murder on August 27 and when Carlton confiscated the shoes

41

on September 22.  However, Lu did also testify that, when asked for her explanation as to why she did not see blood on the outside of the shoe when she examined it, "It was probably washed off."

Lu performed the standard exam used when a police agency requests that an item be tested for blood.  If there were blood on the shoe, the most likely spot it would have been was the tongue.  Lu conducted a visual examination with a bright light of the interior and exterior of the shoe for anything that could be a blood-like stain, including taping both shoes for "hairs, fibers and debris."  Analyst Lu described her process as follows: "exam w/bright light, RBS, noted;" "cut away small portion of 'tongue' to examine inside padding"; and "shoe laces removed for examination."  She also examined the interior of the shoes.

Lu's examination was thorough, and she did not believe she missed something when examining the shoe this first time.  It was not a cursory exam.  She saw two brown-red spots on the shoes that she determined were not blood, based on biological testing, and Defendants were informed of this.  She found no evidence of blood on the Fila shoes the first time.  After examining the shoes, she placed them back in the original bag, sealed it with blue evidence tape and placed it into the evidence vault for the evidence technician to return to the DPD.

On September 29, 1998, Lu issued a formal report that no blood was indicated on the shoes.  Lu sensed that DPD officers working on the Helmbacher case were disappointed that she did not find blood on the shoe during her first analysis.  Her

practice was to analyze one item at a time, package it and seal it, and then completely decontaminate her work area to ensure that there was no item-to-item contamination. She testified that the Fila shoes could not have come into contact with Helmbacher's blood while in ISP custody.

<u>Macon County State's Attorney's Office Declines to Charge Plaintiff</u>

Between September 22 and October 6, 1998, Carlton had conversations with the Macon County prosecutor about whether to charge Plaintiff, given standard communication practices between detectives and the prosecution during an investigation. Carlton presented the evidence DPD had compiled to establish probable cause to charge. This included: (1) Taylor's written statement; (2) Taylor and Plaintiff's statements to each other; (3) Taylor's statements to Carlton, Bell, Welker, Chabak, Applegate, Hubbard, and Ryan, DPD Officer Beck, and Robert Martin.

According to Scott Reuter, who was an Assistant State's Attorney in Macon County at the time, the prosecutor declined to charge Plaintiff because the evidence Carlton had presented was not sufficient, and charges were withheld "pending further investigation."

The prosecutor would have told Carlton what additional evidence he needed in order for the State's Attorney's Office to be able to issue charges. The Macon County prosecutor memorialized its decision not to charge in a No Charge sheet. The No Charge sheet lists as evidence against Plaintiff only Taylor's written statement; Taylor and Plaintiff's statements to each other; and Taylor's statements to the DPD officers.

The No Charge sheet reflects that further investigation was needed to issue charges, and that the prosecutor was not awaiting any forensic testing.  This communication should have been in the form of an attached memo, in the file.

### Shoes and Blood are Opened at the Station and Removed from the Chain of Custody

The packages containing shoes and blood swabs were returned to DPD on October 1, 1998.  According to an evidence form, Defendant DPD Officer Roger Morville checked the Filas out of the evidence vault on October 5, 1998.  There is no report explaining why Morville checked the Filas out of evidence on October 5.  However, at his deposition, Morville testified that he made a mistake of writing "05" on the evidence form instead of "15" and that he actually checked them out October 15.  Morville did not take the Filas to the ISP crime lab until October 15.  There are no reports documenting what happened to the shoes or where they were between October 5, when the form says Morville checked them out, and October 15, when he took them to the crime lab.

Morville understood that DPD officers were supposed to initial evidence tape when they alter, touch, or seal an item of evidence.  He initialed the tape on the evidence bag containing the shoes on October 1, 1998.  He initialed the tape on the package containing Helmbacher's blood swabs on October 1.  The package containing Helmbacher's blood has blue and white evidence tape, clear tape, and two sets of staple holes.  Morville's initials are on the blue and white evidence tape.  There is no record

memorializing why Morville resealed the package and initialed the new tape on October 1.

Morville served as DPD's evidence officer from around September 3 through October 15, 1998.  Officers could request that the evidence officer retrieve evidence from the vault for their use.  If officers retrieved evidence from the vault, the officer was supposed to record it on the evidence tag.  Morville's desk was located inside the vault and contained a spare set of keys.  Ryan testified that he can recall going to the evidence officer's desk and seeing him away from the desk.  Morville testified that he would not have known if someone had taken the evidence key from his desk or opened the evidence locker without his knowledge while he was off duty.  Morville also testified that he has no particular memory of whether someone may have removed evidence related to the Helmbacher case without creating an evidence receipt or whether someone planted blood evidence in this case.

There were no surveillance cameras in the evidence locker area.  Morville's shift was from 7:00 am to 3:00 pm on weekdays and no evidence officer was present after 3:00 pm or on the weekend.  DPD officers knew there was no one guarding the evidence room from 3:00 pm to 7:00 am the next day.  There is no written record memorializing why the Fila shoes were removed from evidence on October 5, 1998.

Plaintiff's experts Fedor and Moses state that it would have been possible for Defendants Morville, Carlton, Chabak, or Ryan to use Helmbacher's blood and a sharp-tipped instrument (such as a toothpick) to penetrate the porous mesh layer on the

45

outside of the Fila shoes to place Helmbacher's blood on the shoe, especially since there is no reason that evidence should be out of the chain of custody for days before going for forensic analysis.  Defendant Ryan, who was DPD's key officer for processing crime scenes and collecting evidence, explained that he was able to rehydrate coagulated blood by mixing it with distilled water and moving it to another object.

The detective command, Chabak, or lead detective, Carlton, were in charge of deciding which evidence to send for testing and what type of evidence would be done on a piece of evidence.  Given Ryan's expertise and status as key officer for processing evidence, he would often consult with the lead detective about what kind of testing to do on specific evidence.

<u>Shoes Are Returned to Crime Lab for Second Test</u>

On October 15, 1998, Carlton instructed the ISP crime lab to examine the shoes a second time by tearing them apart.  No Defendant made a report explaining the reasons the shoes were re-sent, and no Defendant reported or testified that the shoes had to be retested because of washing.  Carlton wrote to ISP "[t]he Fila tennis shoes were reported by a witness to of [sic] had blood on them from William Helmbacher.  I need them taken apart and every fiber checked for William Helmbacher's blood."

Lu was concerned about the DPD's instructions because it was contrary to ISP's standard procedure to tear a shoe apart in search of blood, given that it was time consuming, difficult, and often dangerous.  Lu testified that it was typically not necessary to tear apart a shoe because "most of the time if there's going to be blood on a

shoe, you're going to see it on the external surfaces." Standard procedure was to examine the outside with a bright light, look inside the shoe, and tear the shoe laces apart, which she did. Lu was also concerned because if she destroyed the shoes, they potentially could not be tested for other types of evidence, such as footprint evaluations.

The retesting of an item of physical evidence for blood already determined not to be present was virtually unprecedented for Lu. Lu never had another case other than the Helmbacher investigation where she examined a piece of evidence for biology, found no blood indicated, and then was asked to look again and found blood a second time. This is the only case in which Lu ever found blood on a second examination after not having found blood the first time. However, Defendants' forensic expert Lucy Davis testified that she had been asked ten times to retest an item and, on two of those occasions, found blood where the previous time she had not.

ISP was thorough and reliable in its testing, and ISP and DPD both trusted that ISP's testing protocol, which was employed in the Helmbacher case, turned up evidence the first time. It was not DPD's standard practice to send evidence back for retesting, and multiple Defendant officers could not remember ever resending ISP negative evidence to be tested again for the same form of DNA, other than in the Helmbacher case.

ASA Ahola similarly testified that he could not remember any shoes being taken apart like Plaintiff's in any of his other cases.  Ahola further testified that if he had evidence that undermined the DNA findings, he would have disclosed it to the defense attorneys.

Nevertheless, on November 16, 1998, Lu examined the shoes a second time by tearing them apart, as instructed.  She (1) removed the black trim; (2) separated the outside leather and black mesh; (3) separated the inside lining; and (4) examined the shoes with a bright light.  The extent to which she tore the shoe apart to identify blood was not typical.

Defendants' DNA expert testified that she had never seen a shoe torn apart to this degree.  According to forensic specialists, if they had been told the shoes had been covered in blood, it would be expected to find blood without tearing the shoes apart.  Lu detected three red blood stains (labeled Qa, Qb, and Qc) on the outside right side of one shoe.  No blood was found on the other shoe.  Qa was approximately 10 millimeters by 4 millimeters on the shoe's right front side "under black mesh."  Qb was a very light red blood stain observed on "string (threading)" extending about 5 millimeters in length on the shoe's right mid-side.  Qc was a discrete pinpoint droplet, approximately 1 millimeter by 1 millimeter, and was observed under black mesh near Qb.

The black mesh is a porous material.  No trace of blood was found other than in those three spots on one shoe.  According to Plaintiff's forensic expert Fedor, there were no signs of diluted blood in crevices and cracks of either shoe, where it would likely be

48

even if the shoes had been washed.  The blood stains Lu found on the shoe were not the vibrant red, dark stains that you typically see.  They were a lighter reddish brown stain and they were "very small."  Lu's biology test confirmed that the stains were human blood.

A second ISP analyst, Dana Pitchford, conducted a DNA test of the blood on the shoe.  The stains were small and faint, and Pitchford had to combine stains to generate a usable DNA profile.  Pitchford was able to confirm that the blood stains matched the DNA of Helmbacher.  Pitchford informed Carlton of the DNA result on January 27, 1999.

Defendants Plant Blood on Palmer's Fila

According to Plaintiff's expert Moses, if a shoe is exposed to blood during a beating like the one in the Helmbacher case and blood was deposited on the shoe, a trained analyst would find it during a standard examination.  Per Moses, there are three ways blood could have gotten on the shoe at the crime scene: spatter, cast-off droplets, or transfer.  Moses, however, found that while transplantation of blood to a shoe is possible, "[t]here is no evidence that permits me to opine with certainty that it happened in this case."

Defendants Decline to Test Other Probative Forensic Evidence

DPD requested that ISP test some other items of evidence.  Carlton informed ISP that he needed testing on the blood and hair from Helmbacher's right hand and left fingernail scrapings, in which Lu had found a blood-like substance.  ISP did not conduct

49

DNA testing on the fingernail scrapings or hair.  The nail scrapings examined by Lu did not find DNA from skin.  However, Cellmark's later testing may have found such DNA, using "touch" DNA analysis not used at the ISP lab in 1998.

Carlton learned that there was a blood-like substance in the left fingernail scraping, but testified that he did not have them sent back to the lab for further analysis after they were returned to DPD from ISP without analysis.  Carlton thought, in a general sense, blood evidence found at a crime scene would be more likely to provide probative information than shoes collected three or four weeks later.  Lu testified that she relied on information from the police departments to determine what items of evidence to test.  Lu and Pitchford also did not test the blood swabs from Helmbacher's apartment or blood-like stains on the hammer or ball cap found in the apartment.  Lu informed DPD that they should advise if any items not tested would significantly aid the case.

Per Plaintiff's expert Fedor, DPD officers did not advise ISP that the untested fingernail scrapings or handbag contents needed to be tested.  DPD did not inform the ISP analysts that Helmbacher "had the ability to scratch or fight with [his attacker] to receive bloodstains under his fingernails."

ASA Ahola testified that he would have wanted the fingernail scrapings analyzed for DNA because the results could have been exculpatory.  Around September 24 or 25, Lu examined the handbags and identified hairs.  She did not forward the hairs for microscopy examination because she never received a hair standard from Plaintiff.

50

Defendants posit that that is because Lu and Pitchford testified the hairs were not tested because they have a very low level of probative value.

Plaintiff's prints were never found at the crime scene. Defendants Carlton, Chabak, Bell, Ryan, Hubbard, Applegate, and Patton knew Plaintiff's prints did not match any of the latent prints developed at the scene, yet none wrote a report memorializing this.

<u>Plaintiff is Charged with Capital Murder</u>

On January 29, 1999, Carlton informed Plaintiff that the shoes were tested and had come back with blood matching the DNA of Helmbacher. Plaintiff shook his head no and maintained that Helmbacher's blood could not have been found on his shoes because he had not murdered him. Plaintiff continued saying "I didn't do it."

Carlton wrote a closing report stating that the Helmbacher murder was being closed with the arrest of Plaintiff for first degree murder. The report stated that there was "nothing incriminating" found in Lee's car and that the security tape showed Lee had not changed clothes. Carlton's report says a witness saw Helmbacher alive around 7:00 pm.

This memo was provided to the prosecution. ASA Ahola relied on information provided by the police department when making decisions regarding whether to charge a suspect. Ahola assumed the police had eliminated all other suspects before bringing someone to him for charges.

Plaintiff was charged with first degree murder and burglary, and an arrest warrant was issued for him on January 28, 1999.  The complaint for arrest warrant described three categories of evidence as forming the basis for Carlton's belief that Plaintiff committed the murder: Ray Taylor's story; the Filas that were taken from Plaintiff and shown to Taylor; and the blood on the Fila shoe.  According to Ahola, none of those pieces of evidence alone was enough to support probable cause, until the DNA from the shoe came back.

Information showing that Helmbacher's blood was planted on Plaintiff's shoe would have impacted Ahola's decision to charge Plaintiff.  If Ahola had known that the Fila shoes had been unsealed while in DPD custody, he would have disclosed that information to the defense.  The Macon County prosecutors on Plaintiff's case did not recall being informed of the following: that a DPD officer said he obtained a video of Lee at a gas station that the officer claimed showed Lee had not changed his clothes the night of the murder, but which did not show that Lee had not changed clothes; that officers collected a towel with blood on it from the trunk of Lee's car pursuant to a search warrant or that items of evidence from Lee's car were labeled with a biohazard sticker; that officers told Taylor to include Plaintiff's name in the statement or to implicate Plaintiff; or that there was a financial conflict between Lee and Helmbacher, among other evidence.  Prosecutors would have disclosed to the defense any of the above listed information had they known it.

Pretrial Hearings

At the preliminary hearing on February 18, 1999, Carlton discussed only two categories of evidence: the blood found on Plaintiff's shoe and Taylor's story about Plaintiff's supposed confession.  No other evidence was discussed.  Carlton also testified that the shoes were sent to the crime lab and blood was found, and that they were sent back to the lab and the blood was matched to Helmbacher.  Based on those two pieces of evidence, the court concluded that there was probable cause to believe Plaintiff committed the offense.

Carlton testified at a suppression hearing that the shoes were sent to the lab and came back about five months later with the results that Helmbacher's blood was on them.  Carlton did not testify at the preliminary hearing or suppression hearings that the shoes were examined once, tested negative for blood, and returned to DPD.

Trial

Plaintiff faced the death penalty.

At the criminal trial, Taylor testified that he was outside Helmbacher's apartment with Plaintiff on August 26, 1998, and that Plaintiff climbed in the window and came out the front door, and asked him to act as a lookout during the burglary. Taylor testified at trial that he stood there and then went up to his apartment, and that a short time later Plaintiff appeared in his apartment with an armload of Helmbacher's stolen belongings.  According to Taylor, Plaintiff asked for a garbage bag, and Taylor got out his garbage can, which had a white plastic bag in it.  He said Plaintiff went

through the stolen items and threw some of them away.  The two of them then took the bag to the dumpster a few blocks away.

Taylor further testified that the next day he saw Plaintiff in front of his apartment, and then saw him again a couple hours before dark outside Bradford's apartment.  According to Taylor's testimony, when he saw Plaintiff the second time, Plaintiff was wearing different clothes and shoes than he had been wearing earlier in the day, and Plaintiff told him that he had beat "the dude to death."

Taylor testified three times that the shoes ISP tested were not the ones Plaintiff wore on August 26 or 27, 1998, before Helmbacher's death.  The State also presented evidence at trial that Helmbacher's blood was found on Plaintiff's shoe.  Carlton testified that, in his understanding, the first time the shoes were sent to the lab, the ISP lab tested only the two visible red spots on the outside of the shoe.  Carlton also testified that the testing he had wanted ISP to do the first time was not done, and that he returned them to the lab because ISP had not done proper testing the first time.

The jury deliberated for 14 hours and sent four notes to the judge, one asking to see the shoes, and one indicating that they were deadlocked.  The judge told them he would not accept a hung jury, and eventually the jury returned a verdict of acquittal on the burglary and guilty on the murder.  On May 8, 2000, Plaintiff was sentenced to life in prison.

<u>Taylor's Burglary Charges Dropped</u>

Six weeks after Taylor's testimony, on June 5, 2000, the burglary charges against Taylor were dropped. Ahola testified that "all sorts of things" could have been given to Taylor in exchange for truthful testimony. While law enforcement could not offer deals on the State's Attorney's Office's behalf, officers would regularly tell witnesses that they would inform the State's Attorney's Office about the witnesses cooperation. ASA Ahola testified that it would be reasonable to assume that there was nothing aside from Taylor's testimony in Plaintiff's trial that could have formed the basis to dismiss the charges against Taylor.

<u>Postconviction DNA Testing Shows Plaintiff's Innocence</u>

The court held a hearing on the 2010 petition, and concluded that Helmbacher exhibited defensive wounds which suggested he had fought with the assailant, and thus the scrapings from Helmbacher's fingernails would be materially relevant. The forensic testing on Helmbacher's nail scrapings was conducted by highly qualified analysts at a reputable, accredited lab.

In 2014 and 2015, Cellmark Forensics lab developed DNA profiles from the scrapings taken from Helmbacher's fingernails. Cellmark found a mixture of DNA belonging to Helmbacher and another male. In Cellmark's analysis, conducted in 2014, Plaintiff was unequivocally excluded as a contributor to the DNA under Helmbacher's nails. Barbara McCarty, Cellmark's senior forensic DNA analyst at the time, said that

the sample would undergo a second independent analysis to confirm the results of the first analysis.

On January 22, 2014, Barbara Leal and Huma Nasir of Cellmark issued a lab examination report that concluded that the right-hand nail scrapings indicated a mixture of DNA of two males. Plaintiff and Taylor were both excluded as contributors, and Helmbacher was not excluded. The non-Helmbacher DNA necessarily came from another male. Bode, the company which subsequently purchased Cellmark, performed later mitochondrial DNA testing on the hairs found in Helmbacher's hands. This DNA testing established that one of the hairs did not belong to Helmbacher, and it could not have come from Plaintiff.

<u>Palmer is Exonerated</u>

Following Plaintiff's exoneration, DPD reopened its investigation into the unsolved Helmbacher murder. As of 2018, DPD was still investigating Doug Lee as a potential suspect for the murder of Helmbacher, but has no more evidence to implicate him in 2018 than it did in 1998.

In 2018, Bode performed DNA testing on the same fingernail scrapings and hairs from Helmbacher's hands. Lee's DNA sample, CCC1727-0253-R-1, was compared to the Cellmark sample, FR12-0088-01.01, which was the fingernail scrapings. Bode compared the Lee sample to the fingernail DNA and stated: "the partial Y-STR profile received for sample FR12-0088-01.01 is consistent with a mixture of at least two

individuals.  Due to the possibility of allele drop out, no conclusions can be made on this mixture."

<u>The Lead Sheet</u>

The Lead Sheet, which documents investigative developments, but which was not shared with the prosecutor, includes the following information:

Lead 134 (assigned to Ryan) is to compare prints of Lee with prints from the scene.  It's listed as completed 9/1.  "No comparison" done.

Lead 141 (assigned to Carlton) is to conduct the search of Lee's vehicle.  Carlton does not mention here that there was blood on the towel he collected in his police report.

Leads 152 and 153 (assigned to Ryan) is to send items C-71506 (Lee's shirt, pants, socks, towel) and C-71505 (Lee's shoes) to the ISP to "examine evidence ... for blood."

Lead 171 (assigned to no one) is to check the ISP lab results for the above items. It is never completed.  It is listed on the lead sheet 9/2.

Lead 189 (assigned to Felton) is to interview "T. Estes," Helmbacher's neighbor. It was Estes' daughter who saw Helmbacher alive at 7:50 pm on the night he was killed. The entry is not marked as completed.

Lead 200 is Morville sending the bag to the ISP on September 17, 1998, the same day he sent Taylor's prints to ISP.

Lead 266, which is listed on 9/16, says "Re-Compare Ray Taylor's prints/ISP lab evidence."  It is listed as "completed" on 9/17.  The disposition is "ID Made."

There is no entry on the lead sheet documenting that Carlton sent the shoes back to the ISP for the second examination.  The only entry on the lead sheet between when ISP reported the negative finding on the shoes and when Carlton sent them back is that DPD took blood samples from Ray Taylor and test results on those samples.

<u>DPD Policies and Practices</u>

Plaintiff issued a Federal Rule of Civil Procedure 30(b)(6) notice seeking discovery on his theories under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).  Any written policies that went into effect after 1998-99 and were not replacing a previous policy were new policies, not effective at the time of the Helmbacher investigation, although they might have existed as "practices."

DPD had no written policy in 1998 or 1999 outlining the obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose exculpatory evidence, including alternate suspects.  The policy was that all evidence was turned over to the State's Attorney's Office.  Former Decatur Police Chief Michael L. Mowen could not recall if officers were given written training materials on their obligations to disclose exculpatory evidence.  However, DPD written policy required officers to thoroughly familiarize themselves with the rules, regulations, orders, and policies of the DPD and to "abide and conform to the same."  Each officer was to have a working knowledge of all laws and ordinances.

Morville, who was in charge of managing the custody of all evidence in DPD's possession around the time of the Helmbacher investigation, was not familiar with an obligation to share information with the prosecution or the criminal defendant or his attorney.  He received no training on the subject and, to his knowledge, DPD did not require him to turn over evidence to the prosecution.  It was not the practice for prosecutors or criminal defense attorneys to come to DPD headquarters and examine reports or evidence.

Plaintiff's police practices expert discussed that it was a departure from normal police practices in 1998 for officers to lack training in evidence disclosure.  DPD had no written policy requiring officers to document investigative developments in a homicide investigation.  DPD required that all materials pertinent and material to a case be kept in the investigative file, yet had no written policy governing what information must be included in a report on a homicide investigation.  DPD had no written policy governing note-taking during an investigation, or the preservation of notes.

Individual Defendants testified that they could not recall specific training regarding documenting investigative information and disclosing it to prosecutors.  However, they were all aware of the obligation to give all information to prosecutors.

Any evidence that Plaintiff's defense counsel did not receive was the result of nondisclosure by the DPD, rather than by the Macon County State's Attorney's Office.  The State's Attorney's Office had an "open file" policy regarding criminal defendants' access to documents and trained its attorneys that everything the prosecutors got

should be turned over to the defense, no matter what it was.  Defendants claim that this obligation fell on Plaintiff's criminal defense counsel.

Any police report provided to the State's Attorney's Office would be provided to the defense, and the defense would receive any additional materials as they came in.

The prosecutors on Helmbacher's case did not withhold any exculpatory information from the defense.  According to DPD standard practice as of 1998, officers were supposed to collect all crime scene evidence that might be pertinent to an investigation.

DPD had no written policy dictating which pieces of physical evidence to collect from a crime scene and left that to the discretion of officers.  DPD policies left it to the discretion of the investigating detective what items of evidence should be tested at the lab.  DPD's practice regarding the storage of evidence was as follows: officers would place evidence in a bag, secure it with evidence tape, and write their initials on it.  If there was no evidence officer on duty, officers would place the bagged evidence in an empty storage locker and deposit the key in the drop box.  Officers could keep the key and have access to the evidence again.  Once the key was returned, the evidence officer would then empty the lockers and place the evidence into the vault.

DPD's evidence storage policy required officers to write a report when they checked evidence into and out of the vault, and were supposed to record chain of custody on the evidence card affixed to the evidence.  Defendant Bell's report on September 1, 1998, says that keys were checked in and out of the vault on that date, but

the evidence tag does not reflect that.  According to DPD standard practice, the evidence officer should check an item out of evidence immediately before taking it to the crime lab.  DPD had no written policy on how soon evidence needed to be taken to the crime lab after being checked out of the vault.

DPD policy required detectives to collect any liquid blood from a crime scene into a test tube, using a pipette, and store it in the refrigerator.  In this case, however, the blood was coagulated.  DPD did not have any protocol related to the storage of liquid blood other than to keep it in a refrigerator near the evidence lockers.

DPD had no written policy governing the conduct of interrogations or interviews, although Defendants contend this was covered by the general policies.

*Second Amended Complaint*

Plaintiff filed his Second Amended Complaint (#43) on December 6, 2018.  In the Amended Complaint, Plaintiff raises ten counts.  Count I alleges a violation of Plaintiff's due process rights under the U.S. Constitution's Fourteenth Amendment, pursuant to 42 U.S.C. § 1983.  Plaintiff alleges Defendants, acting individually or in a conspiracy, deprived him of his right to a fair trial, in that Defendants withheld exculpatory evidence from Plaintiff, as well as knowingly fabricated false evidence, thereby misleading and misdirecting the criminal prosecution of Plaintiff.  In Count I, Plaintiff also alleges a *Monell* claim against the City of Decatur.

Count II alleges unlawful detention in violation of the Fourth Amendment to the U.S. Constitution, in that Plaintiff was detained and imprisoned before trial without probable cause.

Count III alleges failure to intervene under § 1983, in that one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had opportunity to do so.

Count IV alleges a conspiracy to deprive Plaintiff of his constitutional rights pursuant to § 1983 by Defendant Officers, "acting in concert with other co-conspirators, known and unknown," who reached an agreement "among themselves to fabricate evidence and/or detain Plaintiff for the Helmbacher homicide, regardless of Plaintiff's guilt or innocence, and thereby deprive him of his constitutional rights."

Counts V through X allege Illinois state law claims, respectively: malicious prosecution (Count V), intentional infliction of emotional distress (Count VI), wanton and willful conduct (Count VII), civil conspiracy (Count VIII), respondeat superior (Count IX), and indemnification (Count X).

ANALYSIS

Defendants have moved for summary judgment on Plaintiff's federal claims (Counts I through IV), arguing that there is no evidence to support Plaintiff's claims that they fabricated evidence against him or suppressed exculpatory evidence. Defendants further argue that there is no evidence to suggest they did anything to cause Plaintiff's unlawful detention.  Defendants also claim they are entitled to qualified

immunity.  Defendants further argue they are entitled to summary judgment on

Plaintiff's state law claims (Counts V through X).

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In

ruling on a motion for summary judgment, a district court "has one task and one task

only: to decide, based on the evidence of record, whether there is any material dispute

of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir.

1994).  In making this determination, the court must construe the evidence in the light

most favorable to the nonmoving party and draw all reasonable inferences in favor of

that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986); *Singer v.

Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the

nonmoving party does not extend to drawing inferences which are only supported by

speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not

accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion."

*Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. Ill.

2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations

contained in the pleadings.  *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must

present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.*, 387

F.3d 921, 924 (7th Cir. 2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

*Count I: Due Process Right to a Fair Trial*

Defendants argue that summary judgment should be granted in their favor on Plaintiff's due process claims because: (a) Plaintiff has produced no evidence that Defendants coerced a statement they knew to be false from Ray Taylor; (b) Plaintiff has produced no evidence that Defendants planted Helmbacher's blood in the Fila shoes; and (c) Plaintiff has not demonstrated a genuine issue of material fact exists as to a claim under *Brady v. Maryland.*

A.  Whether Defendants Coerced a Statement Implicating Plaintiff That They Knew to Be False from Ray Taylor

Defendants first argue that Plaintiff cannot show that police coerced a statement from Taylor that they knew to be false. Specifically, Defendants argue that there is no evidence any of them improperly coerced Taylor's statement, knew it was false, or that the incriminating information itself *was* false. Defendants argue that Taylor's statement

64

was corroborated in multiple ways, and that any recalcitrance Taylor showed as a

witness is easily explainable.  Defendants further argue that the use of Taylor's

statement at trial did not violate Plaintiff's fair trial rights, as Taylor was fully cross-

examined in front of the jury on his credibility.

In his Response, Plaintiff argues that Defendants fabricated a statement for

Taylor to provide that they knew was false.  In support of his argument, Plaintiff cites to

the following facts: (1) Taylor had no knowledge of the crime; (2) Defendants reported a

fabricated account of what Taylor told them; (3) Defendants suggested Plaintiff's name

to Taylor; (4) Defendants fed Taylor facts of the crime; (5) Defendants used aggressive

tactics to force Taylor to adopt their false story; (6) Defendants fabricated additional

facts about interactions with Taylor and Plaintiff to "corroborate" their false account; (7)

Defendants fabricated a handwritten statement attributed to Taylor; (8) inconsistencies

in Defendants' own reports suggest they fabricated Taylor's story; (9) Defendants knew

Taylor's story was false; and (10) Taylor repeated the false story at trial to avoid

burglary charges.

Law enforcement officers may not knowingly use false evidence, including false

testimony, to obtain a tainted conviction, as doing so violates a defendant's right to a

fair trial guaranteed by the Fourteenth Amendment's Due Process Clause.  *Coleman v.*

*City of Peoria, Illinois*, 925 F.3d 336, 344 (7th Cir. 2019).  This is a high bar to clear,

however, as a plaintiff must prove not only that the statement was false, but that the

defendant officer "manufactured" it.  *Coleman*, 925 F.3d at 344.  That requires proof that

a defendant caused a witness to provide him with a statement that the defendant officer

knew - with certainty - was false.  *Coleman*, 925 F.3d at 344.  Evidence that merely

impeaches an aspect of the witness' statement or suggests that the officer had reason to

doubt the witness' statement is insufficient.  *Coleman*, 925 F.3d at 345.

The court will address the points raised by Plaintiff, one by one, in support of

Plaintiff's claim that Defendant officers fabricated a statement for Ray Taylor to provide

them that they knew was false.  First, Plaintiff points to Taylor having "no knowledge

of the Helmbacher murder" before police arrived at the door.  However, Taylor's claims

that he had no knowledge about the murder, and burglary, are of little value in

demonstrating any fabrication on the part of Defendant officers.  It is not unreasonable

that Taylor would deny knowledge or involvement in crimes until confronted with

evidence of those crimes, as happened here with Taylor's latent print on the garbage

bag containing stolen items from Helmbacher's apartment.  Further, the officers did not

"know" that Taylor had no knowledge of who was involved in the murder while

interviewing him.  They knew that, initially at least, Taylor was *denying* that he knew,

but the officers suspected he knew, and further interrogation of Taylor appeared to

justify their suspicions.  Finally, with regard to Taylor's 2021 deposition testimony,

wherein he denies many of the things he told the police about the burglary and murder

back in 1998-2000, the deposition testimony is all over the place, and Taylor claims "not

to remember" telling the police many of the things he swore to and testified to in court.

Still, in that same deposition, despite repeated prompting from Plaintiff's counsel,

Taylor denied police fed him Plaintiff's name or brought it up to Taylor (see Plaintiff's Ex. 99 at pp. 52-53). While Taylor's 2021 deposition and initial denials of knowledge about the murder might impact Taylor's credibility as a witness, they do not provide any evidence, beyond speculation and conjecture, that police manufactured or fabricated Taylor's testimony, or that they knew Taylor's testimony to be false.

Next, Plaintiff argues that Defendants reported a fabricated account of what Taylor told them. Plaintiff points to the 2021 deposition, where Taylor denied ever telling police about the burglary and murder, and testified that he did not recall all the things contained in his signed statement to police. Plaintiff specifically notes Taylor testified that he never told police he had discussed the murder with Plaintiff later at a bus stop, and that this story was "fabricated entirely by Defendants[.]" As stated above, Taylor's failure to recall, more than 20 years later, the statements he made to police and testified to at trial, is not evidence that Defendant officers manufactured or fabricated his testimony. Further, as it pertains to the later conversation with Plaintiff at the bus stop, Taylor testified at his deposition that he had a conversation with Plaintiff about the detectives coming to Taylor's house downtown "where the transit used to meet." It should also be noted that much of Taylor's deposition testimony concerns him not remembering or having any recall, which is not the same as the police fabricating testimony to feed to Taylor that they knew was false. Further, despite Taylor at times in his 2021 deposition contradicting what he said 20 years earlier, in that same deposition

he confirmed that "all" of what he testified to in front of the jury at Plaintiff's 2000 trial was the "truth."

Plaintiff next argues that Defendants suggested Plaintiff's name to Taylor. However, the evidence of record does not bear this out. There is testimony from Bell and Taylor that they do not recall how Plaintiff's name was introduced into Taylor's interrogation, but this, again, does not demonstrate that Defendant officers fabricated a statement from Taylor implicating Plaintiff that they knew to be false. It means that two people, 20 years later, cannot recall how Plaintiff's name was introduced into an interrogation.

Plaintiff argues that Defendant officers "fed" Taylor facts of the crime because Taylor testified he had no knowledge of the crime before interacting with Bell and Carlton. For many of the reasons cited above, Taylor's testimony in this regard is not persuasive evidence of fabrication on the part of Defendants. Further, there is no evidence that Defendants were aware of certain facts that Taylor testified to, such as Plaintiff getting $11 off of Helmbacher during the murder. Also, as noted by Defendants via a newspaper article published just days after Helmbacher's murder (Defendants' Exhibit OO to Reply (#172-8)), it was well-known that Helmbacher was beaten to death, so there would be no need to "feed" this fact to Taylor in mid-September 1998.

Next, Plaintiff argues that Defendants used aggressive tactics to "force" Taylor to adopt their "false story."  Plaintiff cites, specifically, to Defendants accusing Taylor of having a threatening confrontation with Helmbacher just days before the murder, telling Taylor that Helmbacher's wallet and other belongings taken during the August 26 burglary had been found in a bag with Taylor's fingerprint on it, threatening to charge Taylor with Helmbacher's murder and that he would go down for murder and burglary unless he gave information implicating someone else, and demanding that Taylor should "lie" about his involvement.

This likewise fails to demonstrate fabrication on the part of the police.  Apart from the claim that Defendants demanded Taylor "lie" about his involvement, the remaining cited examples are simply aggressive policework and traditional interrogation techniques, and there is nothing unconstitutional about confronting a witness or suspect with direct questions or statements concerning the police's theory of the case supported by information supplied by others or information discovered during the course of an investigation.  See *Coleman*, 925 F.3d at 346.  There is also no evidence Defendants told Plaintiff to "lie" during his testimony or statement.  Taylor testified at his deposition that he "felt" Defendants wanted him to do so, but Taylor's subjective feelings, 20 years later, amount to nothing more than speculation, which is insufficient at summary judgment and, in any event, is contradicted by his other deposition testimony that he told the truth in front of the jury.

Plaintiff argues that Defendants fabricated additional facts about interactions with Taylor and Plaintiff to corroborate their "false account."  Plaintiff specifically points to the different police reports prepared by Defendants Carlton, Bell, Ryan, and Patton, and inconsistencies between those reports and Taylor's deposition.  Plaintiff cites: Carlton's September 21 report that Taylor said during initial interviews that Plaintiff had been wearing Fila shoes on the night of the murder, and his report of September 22 stating that he confiscated those shoes following Plaintiff's arrest and showed them to Taylor, at which point Taylor identified them. However, Carlton's September 21 report is the only police report of that interrogation mentioning the Fila shoes, as Bell's report does not.

Second, Defendant Carlton reported that, on September 22, 1998, Taylor repeated the story about Plaintiff confessing to him, this time at the DPD station in front of Plaintiff himself, but Plaintiff testified this encounter never took place.  However, Plaintiff's testimony does not, again, demonstrate evidence of fabrication on the part of Defendant officers sufficient to create a genuine issue of material fact.  Likewise to Plaintiff's citation of Taylor's contradicting Patton and Ryan's reports on whether he was interviewed on September 22, and Bell's report about whether Taylor was interviewed after the polygraph.  These minor contradictions do not provide plausible,

70

non-speculative evidence of fabrication of statements known to be false on the part of

Defendant officers.[2]

Plaintiff also points to several inconsistencies between the different reports

prepared by Defendant officers in this case.  However, the minor inconsistencies in

reports do not evince fabrication of Taylor's statement on the part of Defendant officers.

Indeed, as noted by Defendants, if the reports of Defendant officers were completely

consistent down the line, Plaintiff could argue that this was also evidence of conscious

coordination between Defendants to frame Plaintiff.  They represent the present and

immediate recollection of the officers at the time as to what was said or what happened,

but, again, do not provide evidence of *fabrication* on the officers' part.

Plaintiff next argues that Defendants fabricated a handwritten statement

attributable to Taylor.  Plaintiff points to Taylor's 2021 deposition testimony wherein he

stated he did not recall writing the statement, did not recognize the handwriting on the

statement other than his signature, and said he did not recall anything being on the

page when he signed and it could have been blank.  Plaintiff also points to Plaintiff's

name being written in the left-hand margin "after the fact" and Taylor's testimony that

he never saw Plaintiff's name in the margin until after his deposition.  This argument

does not support fabrication.  The bulk of Plaintiff's argument in this regard is based on

_____

[2]Different individuals investigating the same crime may find different small
details important or not important, and may or may not note that in their reports.  The
difference in reports on these small details is not evidence of a grand conspiracy to
fabricate evidence.

the fact that, more than 20 years later, Taylor cannot recall much of anything about the written statement, but such inconclusive evidence cannot, by itself, create a genuine issue of material fact.  See *Mucha v. Village of Oak Brook*, 650 F.3d 1053, 1056 (7th Cir. 2011) ("While Mucha testified that he could not recall when or whether he told Sheahan about the background check, Sheahan testified under oath that he did not learn of the background check until July 31, 2006. Because Mucha's testimony is inconclusive, it cannot by itself create a genuine factual dispute.").

Plaintiff next argues that Defendants Carlton, Bell, Ryan, and Patton knew that Taylor's statement implicating Plaintiff was false.  Plaintiff cites to Taylor's statement that Plaintiff confessed "around dark" or around 7:00 pm, even though Defendants knew that Helmbacher's 12-year old neighbor had seen him alive, reading in his apartment at 7:50 pm.  Plaintiff also notes that Taylor's account also contradicted or could not explain other important factors about the crime scene, such as how Plaintiff could have left the door locked after the murder or how there were no bloody shoe prints.  Plaintiff also cites to Taylor saying he told his father about Plaintiff committing the murder, but his father later saying Taylor told him no such thing, Taylor's troubles with the polygraph, and State prosecutors' initial determination that Taylor was not credible.

As admitted by Plaintiff, Taylor's inconsistencies go to his credibility.  The fact that his statement did not reference every specific possibility with regard to the crime scene does not indicate Defendant officers themselves fabricated a statement from

72

Taylor they knew to be false.  The remaining points go directly to Taylor's credibility, an issue with many witnesses at criminal trials, and was litigated by and addressed by defense counsel during Plaintiff's trial.  What it does not do is clear the high bar to prove not only that Taylor's statement was false, but that Defendant officers "manufactured" it.  See *Coleman*, 925 F.3d at 344.

Finally, Plaintiff claims that Taylor only repeated his false story implicating Plaintiff at Plaintiff's trial to avoid burglary charges.  Even were the court to accept such an argument, it would not indicate that Defendant officers knew Taylor's statement was false, or that they themselves manufactured the statement.

In sum, Plaintiff bases much of his argument for fabrication on the 2021 deposition testimony of Taylor.  However, that testimony is often equivocal and inconclusive, in that Taylor has no recollection of statements and events more than 20 years prior.  Even so, Taylor's denials of recollection, and sometimes contradictions of earlier statements, are completely undercut by his assertion, in that same 2021 deposition, that everything he told the jury at Plaintiff's 2000 trial was true.  In the end, combining Taylor's 2021 deposition testimony with DPD report inconsistencies, along with discrepancies between what Taylor told Defendant officers and what was in the police reports, Plaintiff still falls short of demonstrating that a genuine issue of material fact exists as to whether the high bar of proving Defendant officers knowingly manufactured a false statement from Taylor has been met.  See *Coleman*, 925 F.3d at 344.  Plaintiff's argument relies on disparate facts that, when pieced together, amount to

nothing more than speculation that Defendant officers fabricated a false statement, and need several extremely large logical leaps to reach that conclusion. Plaintiff's inferences are only supported by speculation or conjecture, see *Singer*, 593 F.3d at 533, and not the definite, competent evidence needed to survive summary judgment. See *Butts*, 387 F.3d at 924.

 B. Whether Plaintiff Has Produced Evidence That Defendants Planted the Blood Found On the Fila Shoes By the ISP Crime Lab

 Defendants next argue that Plaintiff's claims of blood being planted could not have deprived Plaintiff of a fair trial. Defendants argue that the integrity of the Fila shoes was central to Plaintiff's defense at trial, and was hotly contested during that trial. Defendants also argue that their request for a second examination of the shoes was eminently reasonable, as were DPD's interactions with the ISP crime lab. Defendants further argue that the actual mechanics of fabricating the evidence, requiring them to plant Helmbacher's blood in the mesh of the Fila shoes, is absurd and near impossible, mandating that Plaintiff "produce significant and positive evidence of such proof."

 Plaintiff responds that any one of the following categories alone justifies denying summary judgment on the blood evidence fabrication claim: (1) blood only appeared the second time the shoes were tested; (2) the blood appeared after prosecutors declined to charge; (3) Defendants had the opportunity to plant the blood; (4) Defendants had the means to plant the blood; (5) Defendants did not have any reason to test the shoes again; (6) testing the shoes again violated policy and was highly irregular; (7) the

blood's presentation is consistent only with it being planted; (8) Carlton repeatedly lied under oath to cover up the plant; (9) Defendants fabricated a story about Taylor identifying the shoes; (10) Plaintiff's Fila shoes were not at the crime scene; and (11) expert testimony supports that the blood was planted.

First, Plaintiff argues that the blood only appeared the second time the shoes were tested. Plaintiff argues that, between the first thorough examination by ISP Crime Lab analyst Jennifer Lu on September 25, 1998, and the second analysis on November 16, 1998, blood "suddenly" appeared on one shoe, in a location where it would have been discovered if it had been present during the first round of testing. However, as noted by Defendants, this speculation was dispelled by Lu herself at her deposition, where she testified that she could *not* see under the mesh on the Fila shoe and that the blood stains she found on the second examination were under the mesh that she could not see through, and thus would not have been found on the first examination (#154-15, Ex. K, p. 57, lines 9-11).

Next, Plaintiff argues that the blood appeared only after prosecutors declined to charge. This, however, is not evidence, either circumstantial or direct. This is argument based upon speculation or conjecture.

Next, Plaintiff argues that Defendants had the opportunity to plant blood because the Fila shoes and Helmbacher's blood were stored together at DPD and were removed from evidence and their containers opened for no reason. Plaintiff notes that between October 1 and 15, Defendants Morville, Carlton, Chabak, and Ryan had access

to Helmbacher's blood and the shoes at DPD, and the shoes were checked out of custody on October 5 and were missing for 10 days.  In response, Defendants cite Morville's testimony that the October 5 date on the Fila shoe checkout was a scrivener's error, and he meant to write October 15.  Morville also testified that his initials appeared on the evidence bags because his practice was to initial evidence packages each time he moved them to and from the ISP lab.

Despite Morville's later assertion that the October "05" date was a scrivener's error, a trier of fact, viewing the evidence in the light most favorable to Plaintiff, could disregard Morville's testimony and conclude that the shoes were indeed checked out on October 5, and not sent to the ISP for ten days.  Further, a trier of fact could draw the inference that, during that unaccounted for ten day period, something was done to the shoes to influence the lab testing ISP would conduct.  The court finds this cited evidence by Plaintiff could support Plaintiff's fabrication claim.

Plaintiff argues that Defendants did not report any reason or explanation to test the shoes a second time, simply returning them to the ISP to be torn apart to search for Helmbacher's blood.  Further, nothing had happened during the course of the investigation in the time between the first and second tests to justify the second test, and all of Defendants' explanations were invented post hoc.

Plaintiff's statement in this regard is more argument than evidence.  In any event, the ISP Evidence Receipt has a handwritten statement from Carlton regarding the Fila shoes being sent back for re-examination, wherein Carlton states "[t]he Fila

76

tennis shoes were reported by a witness to of had blood on them from William Helmbacher.  I need them taken apart and every fiber checked for William Helmbacher's blood."  Thus, Defendants did put forth some basis for the retest.  The police believed the shoes still contained Helmbacher's blood, even though they were not found to bear any on the first examination.

Plaintiff next argues that testing the shoes again violated policy and was highly irregular.  As noted by Defendants, Plaintiff has not cited what "policy" testing the shoes a second time violated.  While testimony established that the second examination was irregular and unusual, testimony also established that it was not unheard of.  Both Lu and Pitchford testified that they had retested certain items in the past.  Still, there is testimony that this was unusual and irregular, and viewing this evidence in the light most favorable to Plaintiff, a trier of fact could find it supports a fabrication claim.

Next, Plaintiff argues that "the blood's presentation is consistent only with it being planted."  Plaintiff notes that the crime scene was extremely bloody, and the shoes, which were leather, mesh and foam had no blood on the left shoe and no blood anywhere on the right shoe's surface.  Nor was any blood soaked into any mesh or foam parts of the shoe, including the tongue.  Plaintiff also argues that the blood found in the mesh, which was in droplet form, could not have flown through the air, penetrated the mesh layer, and landed in droplet form on a subsurface layer.  Instead, it gives the appearance of having been placed through the mesh with a sharp instrument.  Plaintiff also argues that there was no evidence the shoes were washed.

First, with regard to the shoes being washed, Lu, the ISP analyst who actually examined the shoes, while not recalling anything about the shoes that made it appear that they had been washed, did testify that she thinks they probably were washed at some point due to the presence of blood in the underneath layers.  Still, this testimony, taken in the light most favorable to Plaintiff, could support a finding that the shoes were not washed.

Second, Plaintiff's expert Moses stated in his report at page 17 (#157-112, p. 17): "From the reports that I reviewed, I cannot determine with certainty whether the three stains originated from the assault or whether they were purposely applied sometime after the assault.  I find the wording and the timing of the re-testing request was unusual and suspect."  Moses further stated he found it unusual for the ISP analysts to have examined the shoes in the manner they did and not find any traces of blood on the surface of the shoe that had been exposed to blood stains "in an attack such as in this case."  Moses also opined that "[i]t would have been highly unusual for blood spatter to have penetrated the outer mesh layer of the shoes which itself was covered with a strip of material with the shoe logo."  Moses also states that a stain labeled "Qa" "suggests that it may have been a transfer stain meaning it had been deposited after having been touched by a bloody object rather than from spatter during the attack.  No photos were taken of the stains, so it is difficult to make a definitive evaluation of the nature or origin of any of the three stains."

Moses went on to conclude that, while it is possible for an individual to move blood from a source to another surface by touching a fine-tipped item to wetted blood and then touching it to a shoe, pressing it through the outer layer of mesh, "[t]here is no evidence that permits me to opine with certainty that it happened in this case." The court finds Moses' expert testimony is not dispositive for either side. While it does not prove that the blood was transferred, it also does not foreclose that theory.

Next, Plaintiff argues that Carlton lied "repeatedly" under oath "to cover up the plant[,]" pointing to Carlton's testimony at one pretrial hearing that the Fila shoes were sent to ISP just once, and at another hearing that the ISP found human blood on the shoes the first time, and on the second trip the blood was matched to Helmbacher.

The court agrees with Plaintiff that Carlton's testimony in this regard is troubling. Taken in the light most favorable to Plaintiff, a trier of fact could conclude that Carlton was misstating the evidence and being deceptive about what happened involving the shoes and covering up the fact that no human blood was found the first time.

Plaintiff next argues that Defendants fabricated a story about Taylor identifying the shoes when Plaintiff was arrested. Carlton reported that he showed Taylor the Fila shoes at the DPD station and Taylor identified them as the shoes that Plaintiff was wearing when he supposedly confessed the murder to Taylor. Yet, Taylor said he never made such an identification and never identified the Fila shoes as ones Plaintiff had

79

worn, and at trial repeated that he had not seen Plaintiff wearing the shoes around the time of Helmbacher's murder.

The evidentiary value of Taylor's statements on this point is minimal.  At trial, Taylor's testimony was equivocal.  He testified that while he did not think the shoes at trial were the same ones Plaintiff was wearing at the time of his confession, he could not be sure.  He also, when first shown the shoes at trial, testified that the shoes, which had been "torn apart" by Lu at the ISP, looked "like tennis shoes that a moth ate up[,]" and were in pretty beat up condition.  Taylor testified that he thought the shoes he saw Plaintiff in that night were a different color than the ones at trial, but then testified that "[w]ell, you know, it's been a while, but they might be the ones."  He then, in answer to the question "[y]ou can't say for sure?" testified "No. Not looking at them like that."

Plaintiff next argues that his Fila shoes were not at the crime scene as a matter of fact because he is innocent.  This is argument, however, not evidence.

Finally, Plaintiff argues that his experts' testimony supports that blood was planted.  The court has already recounted Moses' expert findings, and Plaintiff's expert Fedor stated that "an object such as a toothpick stained with liquid blood could possibly be used to penetrate the interstitial space between any strands of the black mesh to any underlying surface without damaging the mesh itself or the underlying surface, and without necessarily contaminating the mesh's exterior surface, and thereby deposit blood on the mesh's underlying surface."  Still, Defendants also note that, in his

deposition, Fedor admitted that he had no training in interpreting blood spatter analysis and was not an expert in the area.

In sum, and taking the evidence in the light most favorable to Plaintiff and drawing all inferences therefrom, which the court must do at this stage of the proceedings, the court finds that Plaintiff has demonstrated a genuine issue of material fact exists as to whether the blood evidence found in the Fila shoes was fabricated. Plaintiff's experts hold that it is possible to recoagulate blood and plant it on a surface like the Fila shoes, in the manner posited by Plaintiff in this case. Defendant Ryan, who was DPD's key officer for processing crime scenes and collecting evidence, explained that he was able to rehydrate coagulated blood by mixing it with distilled water and moving it to another object. Plaintiff's experts cannot say definitively that that occurred in this case, but do state that it is possible based on the facts presented. Further, Defendants had the opportunity to do so, as the shoes were checked out of evidence on October 5, 1998, and were not sent to the ISP lab for retesting until ten days later, leaving a ten day window where the custody of the shoes cannot be fully accounted for, unless they were in the custody of Defendants. Lu did not find any blood on the surface of the shoes during the first examination, even though the crime scene was quite bloody, and Helmbacher's blood was later found under the Fila shoes' porous mesh at the second examination. While Lu testified she believed the shoes probably were washed, she had no evidence, and recalled no indication during her examination, that anyone had washed the shoes.

Carlton's testimony at the preliminary hearing, wherein he stated the shoes were sent to ISP just once, and the suppression hearing, wherein he testified that the ISP found human blood on the shoes the first time, and on the second trip to the lab the blood was matched to Helmbacher, could lead a trier of fact to conclude that Carlton was misstating the evidence and being deceptive about what happened involving the shoes and covering up the fact that no human blood was found the first time.  As noted by Plaintiff, making false statements under oath can be indicative of consciousness of guilt.  See *United States v. Perkins*, 937 F.2d 1397, 1402 (9th Cir. 1991) (false statements may be circumstantial evidence of consciousness of guilt).

Taking all the evidence in the light most favorable to Plaintiff, the court concludes that Plaintiff has demonstrated a genuine issue of material fact as it relates to his claim that Defendants violated his due process rights by fabricating the Fila shoes blood evidence, and thus summary judgment is denied on this ground.

Defendants implicated here are Carlton (the court will refer to Carlton as Defendant for simplicity's sake, even though Waks is the actual Defendant as representative of Carlton's Estate), Morville, and, as will be explained in the conspiracy section below, Ryan.  However, judgment is granted in favor of all other named Defendants on this count.

82

C.      Whether Plaintiff Has Demonstrated a Genuine Issue of Material Fact

Exists as to a Claim Under *Brady*

Plaintiff, in his Response, argues that Defendants suppressed the following

evidence: (1) evidence of their fabrications of planting Helmbacher's blood and Taylor's

false statements; (2) Taylor impeachment evidence, such as: (a) Taylor's September 21,

1998, statement to Carlton and Bell during the interrogation that he had no knowledge

of the burglary and murder, and that they, not Taylor, first raised Plaintiff's name

during the interrogation; (b) the tactics Defendant Officers used to pressure Taylor to

implicate Plaintiff; (c) the fact that Taylor never confronted Plaintiff with his story at the

DPD on September 22, 1998, despite reports stating otherwise; and (d) that Taylor had

not actually been shown Plaintiff's shoes on September 22, 1998, and that Taylor had

not identified them as shoes worn by Plaintiff close in time to the crime, contrary to

their report that he had identified the Fila shoes; and (3) evidence pointing to Doug Lee

as the actual murderer, such as: (a) the bloody towel belonging to Lee; (b) Carlton's

report stating Lee was a "very strong suspect"; (c) evidence of whether Lee changed

clothes the night of the murder and Carlton's false report stating the gas station video

showed Lee had not changed clothes; (d) Ryan's instruction to the ISP lab not to test

Lee's clothing because he'd been deemed "not a suspect anymore"; (e) Carlton

preventing ISP from testing the fingernail scrapings by not informing the ISP analyst

that this testing was important to the investigation; and (f) that all the latent prints

taken at the scene excluded Plaintiff.

Plaintiff alleges a constitutional violation of due process for failure to turn over exculpatory/impeaching evidence to him as constitutionally required—a so-called *Brady* violation. *Brady v. Maryland*, 373 U.S. 83 (1963). "While most commonly viewed as a prosecutor's duty to disclose to the defense, the duty extends to the police and requires that they similarly turn over exculpatory/impeaching evidence to the prosecutor, thereby triggering the prosecutor's disclosure obligation." *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008). "A *Brady* violation can be broken down into three basic elements: (1) the evidence at issue is favorable to the accused, either being exculpatory or impeaching; (2) the evidence must have been suppressed by the government, either willfully or inadvertently; and (3) there is a reasonable probability that prejudice ensued —in other words, 'materiality.'" *Carvajal*, 542 F.3d at 566-67. Under *Brady*, "[e]vidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence; evidence is 'material' 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Carvajal*, 542 F.3d at 567, quoting *Strickler v. Greene*, 527 U.S. 263, 280 (1999).

First, with regard to Defendants withholding evidence that they fabricated Taylor's statement implicating Plaintiff in the murder, judgment must be granted in Defendants' favor on that claim. The court has determined above that Plaintiff has

84

failed to present competent, definite evidence that Defendants engaged in any fabrication in this case of Taylor's statement.

Second, Plaintiff argues that Defendants suppressed that they planted blood on Plaintiff's shoe, "going so far as to lie under oath to cover it up." Defendants argue that summary judgment should be granted on the blood-planting claim because: (1) "there is no real evidence to support the far fetched allegation that blood was planted on Plaintiff's shoes" and (2) even if there was, the blood-planting could not constitute *Brady* material because the evidence has not been suppressed if it was otherwise available to Plaintiff through the use of due diligence, and, if Plaintiff had nothing to do with the murder, as he argues, he would have known that there was no way for Helmbacher's blood to get on his shoes *other* than being planted.

Defendants' first argument fails for the reasons articulated in the preceding section.

Defendants' second argument is not as clear cut. Under the Seventh Circuit rule articulated in *Gauger v. Hendle*, 349 F.3d 354 (7th Cir. 2003), "evidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant." *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017). The Seventh Circuit has applied the *Gauger* rule to preclude *Brady* claims against officers who failed to disclose the coercive circumstances surrounding the statements of prosecution witnesses when the criminal defendant already knew of those circumstances, and has also applied it in a

85

case involving officers who falsely reported a relationship between the criminal defendant and a third party. *Avery*, 847 F.3d at 443.

However, the Seventh Circuit declined to apply it in the *Avery* case itself. There, the court noted that Avery's *Brady* claims were premised on the detectives' failure to disclose the details of the pressure and inducements they brought to bear to extract false statements from the various witnesses, and that the district court thought the *Brady* obligation "dropped out" because Avery already "knew what he said (or didn't say) to the jailhouse informants." *Avery*, 847 F.3d at 443. The Seventh Circuit found that to be "beside the point[,]" holding that "the material question is whether Avery was aware of *the impeachment evidence*." *Avery*, 847 F.3d at 443 (emphasis in original).

In the cases that applied *Gauger* to bar *Brady* claims, the criminal defendants were already aware of the impeaching facts—namely, that the testimony in question was coerced, and in another case the criminal defendant was just complaining that the officer did not admit to falsifying his report. *Avery*, 847 F.3d at 443. By contrast, in *Avery*, Avery knew that the informants' statements were false, but he did not know about the pressure tactics and inducements the detectives used to obtain them, and he did not know that one informant had in fact recanted his statement just before trial but was told that he "had to" testify. *Avery*, 847 F.3d at 443-44. "In other words, he did not have the evidence that could help him *prove* that the informants' statements were false." *Avery*, 847 F.3d at 444.

86

Setting aside *Gauger* and *Avery*, Plaintiff's *Brady* claim here suffers from a lack of specificity.  In Plaintiff's Response on this issue at page 111, Plaintiff does not say specifically what evidence related to the blood-plant fabrication was unknown to Plaintiff.  All Plaintiff states is: "They suppressed that they planted blood on Palmer's shoe, going so far as to lie under oath to cover it up."  At the time Carlton testified at the preliminary and suppression hearings, had it been disclosed to the prosecution, and thus to Plaintiff, that no blood was found on the shoes the first time?  Plaintiff does not say, although he has had ample opportunity to do so.  Nor does Plaintiff specifically state that the document indicating Morville checked the shoes out of evidence on October "05" as opposed to October 15 was not disclosed to the prosecution before trial.  Plaintiff, at page 18 of his Response, in the "Summary of the Facts" section, states that Morville "suppressed that he took the shoes out of evidence at least 10 days before sending them back to the crime lab[,]" but the cited record evidence does not demonstrate that this fact was not disclosed to the State's Attorney's Office before trial.[3]  Despite this issue being squarely before the court at the time Plaintiff drafted his Response to Defendants' summary judgment motion, Plaintiff does not specifically articulate the argument in the body of the Response.

---

[3]It should be noted that, at page 4 in the court's Order (#164) of May 11, 2021, in ruling on Plaintiff's request to file an oversize brief, the court stated, with respect to this "Summary of the Facts" section, that "[t]he court will not consider the factual summary at the beginning of the Response in any way to be substantive argument."

Again, Plaintiff has left the court to guess what specific evidence supporting Plaintiff's fabrication claim was suppressed by Defendants.  Plaintiff's inferences are only speculation or conjecture, see *Singer*, 593 F.3d at 533, and not the definite, competent evidence needed to survive summary judgment.  See *Butts*, 387 F.3d at 924.  Plaintiff had the opportunity to substantiate this *Brady* claim, but has failed, or declined, to do so. Nor is it the court's burden to search the record to find competent evidence to support Plaintiff's claim.

Next, the alleged suppression with regard to the Taylor impeachment evidence does not demonstrate a genuine issue of material fact of a *Brady* violation.  For Taylor's September 21, 1998, statement to Carlton and Bell during the interrogation that he had no knowledge of the burglary and murder, and that they, not Taylor, first raised Plaintiff's name during the interrogation, the court finds no *Brady* violation occurred.  Regarding the September 21, statement, the materiality is questionable, as it was disclosed that Taylor initially denied having anything to do with the burglary or knowledge of the murder, although he later admitted his involvement and knowledge and testified to such at trial.  Further, the cited Additional Fact #160 cites to Taylor's 2021 deposition, long after the investigation and original trial had concluded.  The court has also, above, noted the dubious evidentiary value of the deposition, as Taylor appeared to be able to recall little of what was said or occurred in 1998 to 2000.  Likewise, regarding the issue of who brought Plaintiff's name up first during Taylor's interview with police, the sole evidentiary basis for this is Taylor's 2021 deposition,

88

where he says he cannot recall bringing up Plaintiff's name during the interview, but also testified that everything he told the jury at Plaintiff's murder trial was the truth. The court finds there is no competent, definite evidence in the record that Defendants suppressed the above information, and that it was material.

Next, concerning the Fila shoes, this suffers from the same deficiency as above, being based on Taylor's 2021 deposition testimony. Further, as recounted above, the matter of identifying the Fila shoes was thoroughly litigated at trial, when Taylor was not sure if the shoes were the same he had previously seen worn by Plaintiff. The jury was allowed to assess Taylor's credibility on this matter, for better and for worse.

Continuing, the court finds that there was no *Brady* violation with regard to Defendants' tactics surrounding the production of Taylor's statement. Taylor's 2021 deposition testimony in this regard is, again, unclear and equivocal. He testified that everything he testified to at Plaintiff's trial was the truth. He does not describe exactly how police threatened or harassed him, or how the police following him during the course of the investigation resulted in any false or coerced testimony. He never directly stated that police told him or ordered him to lie about Plaintiff's involvement, but he seemed to "feel" that the police wanted him to. When directly asked whether the police wanted him to give them evidence to implicate Plaintiff, Taylor answered, "The police never said that to me."

The court finds Plaintiff's comparison to the Seventh Circuit's decision upholding a police coercion/pressure argument in *Avery v. City of Milwaukee*, 847 F.3d 433 (7th Cir. 2017), to be unavailing. In that case, unlike this one, the police defendants did not contest the plaintiff's version of the facts, and the coercion and pressure employed by the police on the jailhouse informant witnesses involved coaching and pressuring multiple witnesses over several years in numerous meetings and phone calls, directly ordering the witnesses to implicate the plaintiff and supplying witnesses with details of the crime in return for leniency. *Avery*, 847 F.3d at 436-37. This stands in marked contrast to the vague, contradictory, hedging, and speculative testimony provided by Taylor in his 2021 deposition about police coercion/pressure on him to implicate Plaintiff. The court would also note that, in *Avery*, the jury had found that the police manufactured the plaintiff's confession, violating the plaintiff's due process rights, and the Seventh Circuit upheld this verdict, unlike the instant case, where the court has already found no competent, definite evidence exists that Defendant officers fabricated Taylor's statements against Plaintiff. See *Avery*, 847 F.3d at 441-43. Summary judgment is granted in Defendants' favor on this aspect of Plaintiff's *Brady* claim.

Last, the court finds Plaintiff's *Brady* claim concerning suppression of evidence related to Doug Lee to be similarly unsuccessful. Suppressing or withholding evidence of a viable alternate suspect in a case can constitute a *Brady* violation. *Beaman v. Freesmeyer*, 776 F.3d 500, 507-08 (7th Cir. 2015). Here, Plaintiff specifically cites to Defendants' suppression of: (1) the towel and clothes recovered from Lee's car which

90

they requested the ISP not to test; (2) a report Carlton wrote implicating Lee as a "very strong suspect"; (3) a surveillance video from the night of the murder indicating that it was possible that Lee had changed clothes; and (4) the fact that Carlton prevented the fingernail scrapings from being tested by ISP by not informing the ISP analyst that this testing was important to the investigation and also suppressed that all latent prints taken at the scene excluded Plaintiff.

First, regarding the fingernail scrapings not being tested and the latent prints not being tested, Defendants had no duty, under *Brady*, to process latent evidence in order to create exculpatory evidence for Plaintiff. "Latent exculpatory evidence is evidence that requires processing or supplementation to be recognized as exculpatory[,]" such that the exculpatory character of the evidence is unknown and unknowable until the evidence itself is processed and the exculpatory nature of it becomes apparent. *United States v. Gray*, 648 F.3d 562, 567 (7th Cir. 2011). The government is under no duty to direct a defendant to exculpatory evidence, of which it is unaware, within a larger mass of disclosed evidence. *Gray*, 648 F.3d at 567.

The court finds the report Carlton wrote implicating Lee as a "very strong suspect" early on in the case to be immaterial. It is doubtful that disclosure of this report would have made it a reasonable probability that the result of the proceeding would have been different. See *Carvajal*, 542 F.3d at 567. As will be discussed below regarding the surveillance video from the gas station, the prosecution was well aware

that the DPD was investigating Lee as a prime suspect in the early days of the

Helmbacher murder investigation.

Regarding the surveillance video from the gas station, documents provided by

Defendants in their Reply at Exhibit II (#172-2) demonstrate that information about the

surveillance video of Lee from the gas station on the night of Helmbacher's murder was

disclosed to the prosecution.  The affidavit of Thomas G. DiCianni, one of Defendants'

counsel, indicates that his office sent a subpoena to the Macon County State's

Attorney's Office for its entire file and documents relating to the Helmbacher murder

case, and received 4,222 pages in response.  Those documents included a September 4,

1998, report from Carlton describing how he received in the mail from a Sgt. Grekow of

the Plainfield Police Department a video tape showing Douglas Lee making a purchase

at a Thornton's gas station, and that the video and photographs from the video were of

poor quality, so it could not be determined whether Lee was wearing the same clothes

as when he came to police headquarters to report Helmbacher's murder.  Carlton noted

the clothing did appear to be similar to what Lee had on when he came in to report the

murder, however.

Also included is a September 9, 1998, report from Carlton of his interview with

FBI lab chief Del Lindon, wherein Carlton reports that Lindon informed him the FBI

could enhance the video and send him photos of those frames, as well as a VHS tape of

the video.

First, there is no evidence that the photographs and video in question would have been exculpatory for Plaintiff, in that they would have somehow implicated Lee in the murder.  By all indications, Carlton was not able to determine whether Lee was wearing the same clothes in the gas station as he wore later that night when reporting the murder, although Carlton believed them to be the same.  Moreover, the above reveals that Carlton did not attempt to conceal the evidence, as the prosecution was made aware of the existence of the surveillance video and photos, in their original and enhanced form, based on the explicit police reports in the prosecution's case file documenting Carlton's communication with the FBI.[4]  See *Cairel v. Alderden*, 821 F.3d 823, 832 (7th Cir. 2016) ("While prosecutor Ciaccia said at her deposition that she did not remember if she was told about Moore and the alibi he offered, there is no dispute that the police reports were sent to the prosecution and contained detailed descriptions of the alibi and the investigation at the repossession center.  These undisputed facts show that exculpatory evidence was not concealed by the detectives as required to establish a civil *Brady* claim against them.").

---

[4]Prosecutor Ahola did not recall Lee being a suspect, but also testified that he did not independently recall the contents of the prosecutor's file.  A "witness's inability to recall a fact cannot be used to create a genuine dispute about it; no recollection yields no competent evidence."  *Rivera v. Guevara*, 319 F.Supp.2d 1004, 1044 (N.D. Ill. 2018) (citation omitted).  And, based on Defendants' Reply as recounted above, the case file clearly had information in it that indicated the police at one point considered Lee a suspect.

Finally, concerning the towel recovered from Lee's trunk, the court finds no *Brady* violation. First, as noted by Defendants, the blood on the towel was not processed by Defendants until 2012, and remained latent, instead of patent, evidence before, during, and after Plaintiff's trial. It was not processed because, apparently, Lee was no longer a suspect at the relevant time. There is no obligation to disclose latent evidence that is discoverable only through further testing, such as the blood belonging to Lee on the towel. See *Gray*, 648 F.3d at 567.

Further, it is by no means certain that the blood on the towel belonging to Lee qualifies as exculpatory evidence. Lee's blood[5] was found on a towel belonging to Lee in the trunk of a car belonging to Lee. There were probably plenty of items belonging to Lee in his trunk that had his own DNA on them, including blood. Had the blood belonged to Helmbacher, as the blood found in the Fila shoes did, it would have clearly been exculpatory for Plaintiff. However, as the blood belonged to Lee himself and was found on his own towel in his own car, the court cannot say that the evidence here is either favorable to Plaintiff or material, in that, had it been disclosed, there is a reasonable probability the result of Plaintiff's trial would have been different. See *Beaman*, 776 F.3d at 506.

---

[5]Plaintiff consistently refers to the towel as a "bloody towel," conjuring images of a blood-soaked and stained cloth. However, based on the evidence of record, the towel can be more accurately described as a towel with a very few, rather small spots of blood on it.

At trial, the State produced evidence showing Plaintiff had burgled Helmbacher's apartment the day before, had confessed to Taylor that he had killed Helmbacher, and that Helmbacher's blood was found inside a pair of Fila shoes that belonged to Plaintiff.  Taking all of the alleged withheld "additional evidence" under *Brady* cumulatively, in the context of the entire record, the court cannot say that the absence of this evidence deprived Plaintiff of a fair trial, in that the jury's verdict was not worthy of confidence.  See *Anderson v. City of Rockford*, 932 F.3d 494, 505 (7th Cir. 2019).

The court would also note, perhaps more importantly, that much of the evidence Plaintiff cites as "exculpatory" is only *theoretically* exculpatory, as in it "might" have helped Plaintiff under some possible theory. This does not satisfy the materiality standard under *Brady.*  See *United States v. Hamilton*, 107 F.3d 499, 509 (7th Cir. 1997), quoting *United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The materiality standard is not met by '[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial....'").

Further, the "additional evidence" Plaintiff argues was improperly withheld in violation of *Brady*, as argued in pages 113 to 114 of his Response, was not mentioned as being withheld, or described at all, in Plaintiff's Second Amended Complaint, the operative pleading in this case.  In addition, in Plaintiff's Response to Defendant Decatur's First Set of Interrogatories (attached as Exhibit CC to Defendants' Motion for Summary Judgment (#154-33)), at pages 9 to 10, Plaintiff was asked by Defendants to

"[i]dentify and describe the 'exculpatory evidence' withheld from the Plaintiff that

mislead and misdirected the criminal prosecution of Plaintiff as alleged in Paragraph

100 of the [original] Complaint [(#1)], and identify each person with knowledge of this

information and each document which relates to this information."

In response, Plaintiff objected to the interrogatory as overly broad and premature

because discovery had not yet commenced.  Plaintiff cited to the extensive allegations in

the Complaint regarding exculpatory evidence Defendants had failed to disclose and

then stated:

> Defendant officers suppressed this information relating to the blood they
> planted on shoes they say belonged to Mr. Palmer, and information
> relating to the coercion of Ray Taylor's false identification of Mr. Palmer.
> Individuals who may have knowledge relevant to the fact that
> exculpatory and impeaching evidence was withheld may include
> Plaintiff's criminal defense attorneys.
>
> Plaintiff's investigation into this matter continues and he reserves the
> right to supplement or modify this answer as new information comes to
> light.

Per Defendants, and unrebutted by Plaintiff, Plaintiff has failed to supplement or

modify this answer to the interrogatories, and has not filed an amended complaint

alleging the "additional evidence" was withheld in violation of *Brady*.  Rather, the only

allegations of withheld exculpatory material in this case are, and remain, evidence

related to Defendants' fabrications of the blood in the Fila shoes and Ray Taylor's

coerced/manufactured testimony.  This is evidenced by Defendants' Motion for

Summary Judgment addressing those points.  Thus, Plaintiff raised, for the first time in

his Response to the summary judgment motion, these new claims of withheld exculpatory evidence relating to Doug Lee.

The Seventh Circuit has held that a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment. *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017), citing *Whitaker v. Milwaukee County, Wisconsin*, 772 F.3d 802, 808 (7th Cir. 2014). Specifically, the court held that parties cannot add entirely new factual bases not previously presented, and stressed that it was factual allegations, not legal theories, that must be pled in a complaint. *Colbert*, 851 F.3d at 656. Plaintiff did not adequately plead his claims regarding the additional evidence regarding Lee being withheld in violation of *Brady*, and introducing them in his Response to Defendants' motion for summary judgment was not sufficient to survive that motion. See *Colbert*, 851 F.3d at 657.

For the above reasons, summary judgment is granted in favor of Defendants on Plaintiff's *Brady* claims in Count I of the Second Amended Complaint.

*Count II: Unlawful Detention Under § 1983*

Defendants next argue that there was probable cause to detain Plaintiff based on Taylor's statements and the Fila shoes. Plaintiff responds that both of those pieces of evidence were fabricated, and thus cannot support probable cause. Even if they could, Plaintiff argues, fact disputes about whether they have any probative value preclude summary judgment. Moreover, Defendants' argument that they had probable cause is

undermined because they suppressed evidence showing there was no probable cause to suspect Plaintiff, and they failed to pursue an alternative perpetrator, Doug Lee.

To bring a claim for violation of the Fourth Amendment for unlawful detention, courts have set forth the following elements: the defendants (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor. *Williams v. City of Chicago*, 315 F.Supp.2d 1060, 1070 (N.D. Ill. 2018). "Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon County, Illinois*, 705 F.3d 706, 714 (7th Cir. 2013).

Here, the court has determined that Plaintiff has provided no evidence sufficient to create a genuine issue of material fact in support of his claims that Defendants fabricated Taylor's statement, but has found that a genuine issue of material fact exists as to whether Defendants planted the blood on the Fila shoes. The court has also determined that Defendants did not withhold material, exculpatory evidence in violation of *Brady*. However, based on the court's finding with respect to the blood plant evidence, the court finds Plaintiff has demonstrated a genuine issue of material fact with regard to whether probable cause justified Plaintiff's arrest and pretrial detention.

Evidence in the record indicates that the State's Attorney's Office in Macon County declined to charge Plaintiff based on Taylor's statements alone, as shown by the testimony of Assistant State's Attorney Reuter and the No Charge sheet. ASA Ahola testified that none of those pieces of evidence involving Taylor, alone, was enough to support probable cause, until the DNA from the shoe came back. It was only after the second ISP lab test results returned, identifying Helmbacher's blood on Plaintiff's Fila shoes, that the prosecution believed there was enough evidence for probable cause to charge Plaintiff with Helmbacher's murder. Indeed, this evidence was a crucial part of the State's presentation against Plaintiff at his probable cause hearing on February 18, 1999, wherein Carlton testified incorrectly about the ISP lab testing timeline and the court found probable cause that Plaintiff was involved in Helmbacher's murder. Based on the foregoing, the court finds Plaintiff has demonstrated a genuine issue of material fact with regard to whether Plaintiff was unlawfully detained pretrial in violation of the Fourth Amendment. Again, for the same reasons articulated in Count I on the due process claim, this count can go forward against Defendants Carlton, Morville, and Ryan, but summary judgment is granted on this count as to the other individual Defendants.

*Count IV: Conspiracy to Deprive Plaintiff of His Constitutional Rights and Illinois State Law Conspiracy*

"To prevail on a conspiracy claim, 'the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2)

overt acts in furtherance actually deprived him of those rights.'" *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018), quoting *Beaman*, 776 F.3d at 510. Put differently, a plaintiff must show an underlying constitutional violation and demonstrate that the defendants agreed to inflict the constitutional harm. *Daugherty*, 906 F.3d at 612. "'Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative.'" *Daugherty*, 906 F.3d at 612, quoting *Beaman*, 776 F.3d at 511.

The court has found that a genuine issue of material fact exists as to whether Defendants Carlton and Morville fabricated the blood evidence that led to Plaintiff's arrest and conviction in this case. Thus, the evidence supports an inference that Morville and Carlton, at the least, had an agreement, because if a jury found that the two of them fabricated the blood evidence, that finding would necessarily imply they had an agreement to do so; it is highly improbable that two officers would independently decide to fabricate blood evidence against a suspect without consulting each other first. See *Walker v. White*, 2021 WL 1058096, at *15 (N.D. Ill. Mar. 19, 2021). The court, in an abundance of caution and taking all evidence in the light most favorable to Plaintiff and drawing all inferences in his favor, finds that the evidence may support an inference that Defendant Ryan was involved in the conspiracy as well, as he was DPD's key officer for processing crime scenes and collecting evidence, he stated that he was able to rehydrate coagulated blood by mixing it with distilled water and moving it to another object, and he collected Helmbacher's blood from the crime

100

scene.  However, Plaintiff has not demonstrated that the other named individual Defendants were involved in the possible fabrication of the blood evidence.

This could become an issue for Plaintiff at trial with regard to the conspiracy claims.  As the court has stated, a jury could find Carlton and Morville liable for conspiracy, and possibly Ryan.  However, if competent evidence, apart from speculation or conjecture, is not presented at trial implicating Ryan in the conspiracy, only Carlton and Morville will be remaining in the conspiracy claim, and they are the same two officers facing substantive claims of evidence fabrication and unlawful pretrial detention.  Thus, the conspiracy theory would add nothing to the case, as it would not "rope in another [D]efendant or cover additional conduct, and [Plaintiff] may only recover once for the same injury."  *Walker*, 2021 WL 1058096, at *16, citing *Boothe v. Sherman*, 66 F.Supp.3d 1069, 1077 (N.D. Ill. 2014).  The court will allow the conspiracy claim to go forward, and Plaintiff may propose jury instructions in that regard.  However, if Plaintiff cannot demonstrate competent evidence implicating Ryan in the conspiracy, the jury will not be asked to find liability on a separate § 1983 conspiracy because it would be redundant and unnecessarily complicate this case.  See *Walker*, 2021 WL 1058096, at *16.

Defendants also argue that the intracorporate conspiracy doctrine would apply to bar Plaintiff's conspiracy claims.  However, this court agrees with the district courts in this circuit that have found that the doctrine does not apply to § 1983 conspiracy claims against police officer defendants where those defendants have been accused of

acting outside the scope of their employment by fabricating evidence against a criminal

defendant.  See *Pena v. Ortiz*, — F.Supp.3d —, 2021 WL 722853, at *4 (N.D. Ill. Feb. 23,

2021); *Liggins v. City of Chicago*, 2021 WL 2894167, at *5 (N.D. Ill. July 9, 2021).

Summary judgment is denied on this claim for Defendants Carlton, Ryan, and

Morville, but granted as to the other named individual Defendants.

*Count III: Failure to Intervene*

Plaintiff's Count III failure to intervene claim alleges that Defendants, during the

constitutional violations described in Counts I and II, "stood by without intervening to

prevent the violation of Plaintiff's constitutional rights, even though they had the

opportunity to do so."

"An officer who is present and fails to intervene to prevent other law

enforcement officers from infringing the constitutional rights of citizens is liable under

§ 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that

a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been

committed by a law enforcement official; and the officer had a realistic opportunity to

intervene to prevent the harm from occurring."  *Yang v. Hardin*, 37 F.3d 282, 285 (7th

Cir. 1994); *Gill v. City of Milwaukee*, 850 F.3d 335, 342 (7th Cir. 2017).

Here, the court has found that the actions of Morville and Carlton, combined

with Plaintiff's experts' testimony, and the testimony from the ISP lab workers, create a

genuine issue of material fact with regard to whether the blood evidence on the Fila

shoes was fabricated.  Therefore, as with the conspiracy claims, a jury could find that

Carlton, Morville, and, possibly, Ryan knew about their fellow officers' plan to fabricate the blood evidence and could have possibly stopped it.  See *Walker*, 2021 WL 1058096, at *17.  The remaining named individual Defendants, however, are entitled to judgment as a matter of law, because Plaintiff points to no evidence that they knew about the scheme.  See *Walker*, 2021 1058096, at *17.

*Qualified Immunity*

Defendants argue that qualified immunity applies to bar Plaintiff's claims on the due process fabrication of evidence, unlawful pretrial detention, conspiracy, and failure to intervene claims.  "To defeat a defense of qualified immunity, the plaintiff must show two elements: first, that the facts show 'a violation of a constitutional right,' and second, that the 'constitutional right was clearly established at the time of the alleged violation.'" *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019), quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017).  The court has already determined that Plaintiff has demonstrated a genuine issue of material fact with regard to constitutional violations on Plaintiff's due process fabrication of evidence, unlawful pretrial detention, conspiracy, and failure to intervene claims.  Thus, in order for qualified immunity to apply, the constitutional rights violated by Defendants must not have been clearly established at the time of the violations.

For Plaintiff to meet his burden in this regard, he must show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a

103

reasonable person necessarily would have recognized it as a violation of the law.  See *Leiser*, 933 F.3d at 701.  This requirement does not mean Plaintiff has to find a case "on all fours" with the facts here, but he does need to show some settled authority that would have shown a reasonable officer in Defendants' position that their actions violated the Constitution.  See *Leiser*, 933 F.3d at 702.

"'To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right' meaning that 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Leiser*, 933 F.3d at 702, quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (cleaned up).  "That is, the right must be clearly established to a degree of specificity such that a reasonable government official would be able to identify the violation with a specific set of facts." *Leiser*, 933 F.3d at 702.

First, concerning Plaintiff's due process claim alleging fabrication of evidence, the Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Bruggemann*, 682 F.3d 567, 580 (7th Cir. 2012).  This right was clearly established long before 1998.  See *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988) (wherein the Seventh Circuit, in 1988, upheld a jury's imposition of damages against a variety of defendants, including police officers and a crime lab technician, who "were determined to put away George Jones regardless of the evidence."); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("For it

was established law by 1985 (indeed long before), when the fabrication is alleged to

have occurred, that a government lawyer's fabricating evidence against a criminal

defendant was a violation of due process."); *Myvett v. City of Chicago Police Detective*

*Edward Heerdt*, 232 F.Supp.3d 1005, 1024 (N.D. Ill. 2017).  Qualified immunity does not

apply to bar Plaintiff's fabrication of evidence due process claim.

   Next, regarding Plaintiff's Fourth Amendment unlawful detention claim, the

court has already noted that it was well-established by 1998 that fabricating evidence

against a criminal defendant violated his constitutional rights under due process, and a

reasonable law enforcement officer would have known as well by 1998 that using false

evidence as a substitute for probable cause to detain or prosecute someone violated that

individual's constitutional rights.  See *Serrano v. Guevara*, 2020 WL 3000284, at *23 (N.D.

Ill. June 4, 2020).  Qualified immunity does not apply to bar Plaintiff's Fourth

Amendment claim.

   With regard to Plaintiff's § 1983 conspiracy claim, the Seventh Circuit has long

recognized that conspiracy to violate constitutional rights provides a pathway to

recovery under § 1983.  *Harris v. City of Chicago*, 2020 WL 7059445, at *4 (N.D. Ill. Dec. 2,

2020), citing *Jones*, 856 F.2d at 992 (upholding a jury verdict against individual police

officers under § 1983 for voluntary participation in a conspiracy to deprive a plaintiff's

constitutional rights).  Thus, based on *Jones*, it was clearly established before 1998 that a

conspiracy among police officers to fabricate evidence against a criminal defendant to

deprive him of his liberty violated that defendant's constitutional rights.  Further, for

the reasons articulated in the prior section on Plaintiff's Count IV conspiracy claim,

Defendants are not entitled to qualified immunity on the conspiracy claim based on the

intracorporate conspiracy doctrine.  See *Harris*, 2020 WL 7059445, at *4-5.

Qualified immunity on Plaintiff's failure to intervene claim is also not available.

As noted above, it was clearly established by 1998 that police could not fabricate

evidence against a criminal defendant to detain and prosecute that defendant without

violating the defendant's constitutional rights.  It was also clearly established by 1998

that an officer had a duty to intervene to prevent another officer from violating the

constitutional rights of a criminal defendant.  See *Heidelberg v. Manias*, 503 F.Supp.3d

758, 790-91 (C.D. Ill. 2020).

Defendants are not entitled to qualified immunity on Plaintiff's surviving federal

claims.

*Count I: Monell Claims*

In Count I of the Second Amended Complaint, Plaintiff made the following

*Monell* claims: (1) the misconduct described (fabricated evidence, withholding

exculpatory evidence, etc.) was the result of the custom and practice of the DPD to

employ profoundly flawed investigative techniques and witness identification

procedures that violated Plaintiff's rights; (2) these practices were so widespread as to

constitute de facto policy in DPD and could exist and thrive due to the deliberate

indifference of municipal policymakers with authority over the policies; (3) the customs

and policies causing the violations flourished because the City of Decatur declined to

implement sufficient training or any legitimate mechanism for oversight or punishment, in that they failed to supervise, control, investigate, and discipline officers engaging in investigative misconduct due to a "code of silence" in the DPD; and (4) officers who manufactured criminal cases against individuals such as Plaintiff knew they enjoyed de facto immunity and would be rewarded for closing cases no matter what the cost.

Defendants moved for summary judgment on the *Monell* claims arguing that Plaintiff: (1) can identify no express policy; (2) Plaintiff has no constitutional right to an "unflawed investigation"; (3) there is no evidence of a "code of silence"; and (4) there is no evidence of rewards for closing cases.

Plaintiff responds that Defendants, in their motion, failed to address his two *Monell* liability theories: (1) the City did have an "express policy" in that it had a policy of inaction, in that it omitted any instruction on *Brady* or the obligation to disclose evidence to prosecutors, any policy requiring officers to document investigative developments, and any policy governing what investigative materials should be kept; and (2) a failure to train theory, in that the City's failure to train police officers on homicide investigations and evidence disclosure led to the *Brady* violations in this case.

Defendants reply that Plaintiff has waived these arguments, because they amount to a complete rewriting of the *Monell* theories advanced in the Second Amended Complaint. Defendants further argue that, even if not waived, these theories are only viable if the municipality has a history of such violations, and Plaintiff has not demonstrated that the City has that history, pointing only to the instant case.

107

First, the court notes that Plaintiff's *Monell* claims, as repackaged and argued in Plaintiff's Response at pages 119 through 122, are all premised on alleged *Brady* violations, on which the court has granted summary judgment.  Further, based on Plaintiff's Second Amended Complaint, he seeks only monetary damages in the form of compensatory and punitive damages for all of his claims, including his *Monell* claims in Count I.  "If a § 1983 plaintiff seeks only monetary relief, and if a municipal defendant is willing (or required) to indemnify individual defendants for compensatory damages as well as an award of attorney's fees and costs, a *Monell* claim against the municipality will offer a prevailing plaintiff no additional remedy (aside, perhaps, from nominal damages)."  *Swanigan v. City of Chicago*, 775 F.3d 952, 962 (7th Cir. 2015).  The Seventh Circuit has held that "[i]n such cases there is no need for the parties to spend time and money litigating a *Monell* claim[,]" and "[i]f the plaintiff fails to prove a violation of his constitutional rights in his claim against the individual defendants, there will be no viable *Monell* claim based on the same allegations."  *Swanigan*, 775 F.3d at 962; see also *Gibson v. City of Chicago*, 2021 WL 2127182, at *1 (N.D. Ill. Apr. 6, 2021).

The court has held that Plaintiff has failed to demonstrate that a genuine question of material fact exists as to Plaintiff's *Brady* claims against the individual Defendants, and thus his *Monell* claim, which is explicitly tied to the *Brady* claims for which Plaintiff seeks no additional remedy, is not viable.  See *Swanigan*, 775 F.3d at 962.  Summary judgment is thus granted for Defendants on Plaintiff's *Monell* claim.

*State Law Claims*

<u>Malicious Prosecution</u>

 To state a claim for malicious prosecution under Illinois law, a plaintiff must allege that: (1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury. *Martinez v. City of Chicago*, 900 F.3d 838, 849 (7th Cir. 2018).

Defendants argue that summary judgment should be granted in their favor on this claim because Plaintiff cannot show a lack of probable cause to detain and prosecute him, and Plaintiff cannot show that the proceedings were terminated in his favor.  The court has already determined that Plaintiff has demonstrated a genuine issue of material fact as to whether there was probable cause to subject him to judicial proceedings with respect to his Fourth Amendment claim; thus, he has satisfied this element of his state law malicious prosecution claim.  See *Lovelace v. Gibson*, 2020 WL 6049901, at *33 (C.D. Ill. Oct. 13, 2020).

The court also finds that Plaintiff has demonstrated a genuine issue of material fact that the proceedings were terminated in his favor.  Here, Plaintiff filed a successive postconviction petition that sought a new criminal trial based on new forensic evidence, and the Illinois circuit court vacated his conviction and sentence after the State conceded that the new evidence warranted a new trial.  *People v. Palmer*, — N.E.3d —, 2021 WL 1416564, at *5 (Ill. Apr. 15, 2021).  On November 23, 2016, the State moved to

dismiss the charges against petitioner without prejudice, explaining that Plaintiff was excluded as a contributor to the DNA recovered under Helmbacher's fingernails and that "the victim's cause of death was a violent bludgeoning by a hammer, resulting in defensive wounds to the victim, which is indicative of a physical struggle with the perpetrator." *Palmer*, — N.E.3d —, 2021 WL 1416564, at *5.  After finishing a follow-up investigation and consultation with the DPD, the State concluded that "there is insufficient evidence to prove [Plaintiff's] case beyond a reasonable doubt."  *Palmer*, — N.E.3d —, 2021 WL 1416564, at *5.

Based on the foregoing, a reasonable juror could conclude that the dismissal of the criminal charge against Plaintiff was the result of the circuit court decision to vacate his conviction and sentence following the production of new DNA evidence that the State conceded undermined the conviction and warranted a new trial, and that the dismissal of charges was *not* brought about by an agreement or compromise with Plaintiff, misconduct on the part of Plaintiff for the purpose of preventing trial, mercy requested or accepted by Plaintiff, the institution of new criminal proceedings against Plaintiff, or the impossibility or impracticability of bringing him to trial.  See *Starks v. City of Waukegan*, 946 F.Supp.2d 780, 794 (N.D. Ill. 2013).  Plaintiff was also issued a certificate of innocence based on a decision by the Illinois Supreme Court, which is directly relevant evidence in support of his argument that the criminal proceedings terminated in his favor.  See *Patrick v. City of Chicago*, 974 F.3d 824, 832-33 (7th Cir. 2020).

Thus, the court finds that Plaintiff has demonstrated a genuine issue of material fact with respect to this claim and summary judgment must be denied.

<u>Intentional Infliction of Emotional Distress</u>

Under Illinois law, in order to survive summary judgment on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff "must prove that: '(1) the defendant's conduct was extreme and outrageous; (2) the defendant intended that his conduct would cause severe emotional distress, or knew that there was at least a high probability that the conduct would inflict severe emotional distress; and (3) the conduct did in fact cause severe emotional distress.'" *Lovelace*, 2020 WL 6049901, at *32, quoting *Boston v. U.S. Steel Corp.*, 816 F.3d 455, 467 (7th Cir. 2016).

Here, Defendants argue only that Plaintiff's IIED claim rises and falls on the success of his malicious prosecution claim. The court has found that Plaintiff's malicious prosecution and due process claims (related to fabrication of the blood evidence) survive summary judgment; thus, Plaintiff's IIED claim premised on the same survives summary judgment. See *Jimenez v. City of Chicago*, 830 F.Supp.2d 432, 451 (N.D. Ill. 2013) ("Defendants argue that the contingent claims of failure to intervene, conspiracy, intentional infliction of emotional distress, and respondeat superior all fail because Jimenez's due process and malicious prosecution claims fail. Because the Court has declined summary judgment on the majority of the due process and malicious prosecution claims, the Court similarly denies summary judgment on the contingent claims.").

111

Illinois State Conspiracy

The elements of Illinois state law conspiracy are similar to federal law conspiracy, in that the plaintiff must prove, with direct or circumstantial evidence, that two or more people agreed to participate in an unlawful act, and that one of the parties performed a tortious act in furtherance of the agreement that caused an injury. *White*, 2021 WL 1058096, at *16. Like its federal counterpart, state law conspiracy in Illinois is not a separate tort, but rather is a means of establishing vicarious liability among coconspirators for an underlying tort. *White*, 2021 WL 1058096, at *16.

Defendants argue that they are entitled to summary judgment on Plaintiff's Illinois conspiracy claim for the same reasons as on Plaintiff's federal conspiracy claims. However, for the same reasons as articulated by the court with regard to Plaintiff's federal conspiracy claim, summary judgment is denied on this ground. Summary judgment is also denied for the same reasons as to the application of the intracorporate conspiracy doctrine, as Defendants' actions in fabricating the blood evidence against Plaintiff could be found to go beyond Defendants' official duties. See *Pena*, — F.Supp.3d —, 2021 WL 722853, at *4.

The facts sustaining the surviving state law claims of malicious prosecution, IIED, and conspiracy are the same sustaining the surviving federal claims, and implicate the same Defendants: Carlton, Morville, and Ryan. No definite, competent evidence has been presented against the other individual Defendants on the state law claims, so judgment is granted in favor of those Defendants on the state law claims.

112

<u>Wanton and Willful Conduct</u>

Defendants argue that summary judgment must be granted on Plaintiff's wanton and willful conduct claim in Count VII of the Second Amended Complaint.  Defendants argue that wanton and willful conduct is not a standalone tort in Illinois, and must be attached to a traditional negligence claim or other recognized tort to be viable.  See *Rhyan v. City of Waukegan*, 819 F.Supp.2d 755, 758-59 (N.D. Ill. 2011) (granting summary judgment on a standalone claim of wanton and willful conduct, noting "[t]he Illinois Supreme Court has indicated there is no such independent tort" and that the plaintiff "does not point to any precedent recognizing an independent tort based solely on willful and wanton conduct or point to evidence that supports her allegations of such conduct.").  Plaintiff has failed to respond to this argument. Failure to respond to an opposing party's argument implies concession of that argument.  *Cintora v. Downey*, 2010 WL 786014, at *4 (C.D. Ill. Mar. 4, 2010); *Golomb v. Indiana University Health Care Associates, Inc.*, 2020 WL 6946467, at *1 (S.D. Ind. Nov. 24, 2020), citing *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010).  Summary judgment is granted on Count VII, Plaintiff's standalone wanton and willful conduct claim.

<u>Respondeat Superior and Indemnification</u>

Because Plaintiff's respondeat superior and indemnification claims are derivative of Plaintiff's other claims, many of which survive, summary judgment is denied on those counts.

Summary judgment is DENIED as to Plaintiff's state law claims except Plaintiff's wanton and willful conduct claim in Count VII, on which summary judgment is granted in favor of Defendants.

*Summary of Claims and Defendants Remaining*

Summary judgment is DENIED as to Plaintiff's blood planting evidence fabrication claim in Count I of the Second Amended Complaint. Summary judgment is also DENIED as to Plaintiff's unlawful detention claim in Count II, failure to intervene claim in Count III, federal conspiracy claim in Count IV, state malicious prosecution claim in Count V, intentional infliction of emotional distress claim in Count VI, state civil conspiracy claim in Count VIII, and state law respondeat superior and indemnification claims in Counts IX and X. The summary judgment motion is GRANTED as to Count I regarding the evidence fabrication claim relating to Taylor's statements and the *Brady* and *Monell* claims, in their entirety. Summary judgment is also GRANTED as to the willful and wanton conduct claim in Count VII.

Defendants Carlton (Waks), Morville, and Ryan remain as Defendants on the surviving claims in Counts I, II, III, IV, V, VI, and VIII. Defendant City of Decatur remains as Defendant on Counts IX and X. All other individual Defendants are DISMISSED.

IT IS THEREFORE ORDERED:

(1)   Defendants' Motion for Summary Judgment (#153) is GRANTED in part and DENIED in part, in the manner described above.

114

(2)     All currently pending Motions in Limine (#175-208) are hereby DENIED

        as MOOT.  The parties may refile their Motions in Limine to reflect the

        court's decision in this Order.  Further, the parties are directed to file one

        motion each, which will contain all their individual Motions in Limine, as

        opposed to individual motions that clutter the docket.  I.e., (#175-192) will

        be contained in one motion filed by Defendants, and (#193-208) will be in

        one motion filed by Plaintiff.

(3)     This matter is set for a telephone status conference on Friday, October 1,

        2021, at 11:00 am, to set scheduling for pretrial motions and final pretrial

        and jury trial dates in this case.  The call-in number is 571-353-2300, then

        enter 827466136#.

        ENTERED this _____ day of _____, 2021.

                        s/ COLIN S. BRUCE
                        U.S. DISTRICT  JUDGE