## IN THE UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

CHARLES PALMER,

                Plaintiff,

      v.

CITY OF DECATUR, AMY M. WAKS, as
Special Representative of the ESTATE of
TIM CARLTON, ROGER RYAN, BRIAN
BELL, ROGER MORVILLE, MICHAEL
APPLEGATE, FRANK HUBBARD, JOE
PATTON, JEREMY WELKER, STEVE
CHABAK, and as-yet UNKNOWN
OFFICERS OF THE DECATUR POLICE
DEPARTMENT,

No. 17-cv-3268

Judge Colin S. Bruce

Magistrate Judge Eric I. Long

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' JOINT MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERT KENNETH MOSES

## I.      INTRODUCTION

This lawsuit arises out of the reversed conviction of Plaintiff Charles Palmer for the murder of William Helmbacher in 1998. Palmer was arrested and convicted after a jury trial in 2000, and sentenced to life in prison. In 2017, after post-conviction litigation, Palmer was released and the charges against him dismissed, all on the agreement of the Macon County State's Attorney. Plaintiff now alleges in this lawsuit that his constitutional rights were violated, resulting in what he considers to be a wrongful conviction. Plaintiff alleged in the lawsuit that City of Decatur police officers violated his due process rights by fabricating evidence and failing to disclose exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants moved for summary judgment, and after consideration by the Court, several defendants were granted summary

judgment. (Dkt. #210) The only remaining issue is whether any of the remaining Defendants fabricated evidence by planting the victim's blood on Plaintiff's shoe.

Plaintiff has disclosed three experts in support of his case. This Court held *Daubert* hearings from June 6 to June 10, 2022, and on July 1, 2022. This Memorandum pertains to Defendants' motion to bar opinions of Plaintiff's expert Kenneth Moses.

Moses is director of an independent forensics analyzing company in San Francisco called Forensic Identification Services. He describes his work as concerning "physical evidence, which includes material such as fingerprint examinations, firearms, blood, blood analysis – just about everything that can encompass physical evidence. . . ." (Exh. C, p. 5-6). Defendants have moved to exclude the following opinions offered by Mr. Moses:

1. The person who murdered William Helmbacher was invited by Helmbacher into his apartment.

2. Blood and hairs were transferred from the murderer to Helmbacher's fingernails.

3. The Illinois State Police ("ISP") finding blood on Plaintiff's shoe the second time examined was suspicious because:

   a. It would be unusual for a trained crime laboratory analyst to examine the shoes for blood the first time and not find any.

   b. It would be unusual for blood spatter to penetrate the outer layer of Plaintiff's shoe and end up where it was found.

   c. Chemical tests could have been done to determine if the shoes had been washed to remove blood from the outer layers of the shoes.

   d. The blood found on the inner parts of the shoes were transfer stains.

   e. It is possible to transfer blood from one surface to another.

For the reasons discussed in this Memorandum, these opinions of Kenneth Moses should be excluded.

## II.    LEGAL STANDARD

Under Federal Rule of Evidence 702, this Court may allow an expert witness to testify only if the expert's "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 702 requires that any such expert testimony: (1) be based on sufficient facts or data; (2) be the product of reliable principles and methods; and (3) based on the witness application of the principles and methods reliably to the facts of the case. Rule 702. *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993).

As gatekeeper of expert testimony pursuant to *Daubert*, this Court is to determine "whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Winters v. FruCon Inc.*, 498 F.3d 734, 741 (7th Cir. 2007); *Higgins v. Koch Development Corp.*, 794 F.3d 697, 704 (7th Cir. 2015). The Seventh Circuit has delineated the *Daubert* analysis for scientific opinions:

> First, the district court must consider whether the testimony has been subjected to the scientific method; it must rule out subjective belief or unsupported speculation. Second, the district court must determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue.

*Ancho v. Pentek Corp.*, 157 F.3d 512, 515 (7th Cir. 1998).

In practical application courts apply a 3-step analysis:  the witness must be qualified as an expert by knowledge, skill, experience, training or education; the expert's reasoning or methodology underlying the testimony must be scientifically reliable; and the testimony must be relevant, that is, it must assist the trier of fact to understand the evidence and determine a fact in issue in the case.  *Ervin v. Johnson & Johnson*, 492 F.3d 901, 904 (7th Cir. 2007); *Hill v. City of Chicago*, 2011 U.S. Dist. LEXIS 71784, *4 (N.D. IL).  The proponent of the expert's testimony bears the burden of establishing that the opinions satisfy the *Daubert* standard.  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

### III.    ARGUMENT

#### A.    Moses' opinion that blood and hair were transferred from the killer to the victim's fingernails is pure speculation

Moses offers an opinion that DNA transferred from the killer to Helmbacher. This opinion fails the *Daubert* test. First, Moses established a threshold basis for the opinion, that Helmbacher's own DNA was not found in matter scraped from under his fingernails.  Moses is wrong about this finding he himself identified as necessary to the completeness of his analysis.  In addition, Moses offers no evidence to support the opinion. Moses' method was nothing more than extrapolation from what could have happened to an opinion that it did happen.

Moses' general methodology in this case is not based on any scientific testing in the Newtonian sense. He relies on "soft science" for the opinion.  He explained that his methodology was to make observations of the crime scene and draw generalized theories about what happened, which then must be confirmed by specific evidence. He agrees that for any "conclusions" [opinions] he develops to rise to the level of science specific evidence must support it. Nevertheless, the opinion he arrives at never moves beyond mere theory. The evidence that Moses needed to make the logical jump from theory to an evidentiary opinion is missing.

By Moses' own admission, his opinion that DNA was transferred from the assailant to Helmbacher's fingernails relied on a conclusion that Helmbacher's own DNA was excluded from the matter scraped from Helmbacher's fingernails. Moses first tried to support his opinion based on physical evidence. However that analysis was undeveloped and inconsistent. During the *Daubert* hearing, Moses laid the following foundation for his opinion.[1]

> Q.    Did you review any documents in this case that indicated that there was blood and hair on the victim's hands and beneath the fingernails?

---

[1] For ease of reading colloquoy from the *Daubert* hearing transcript omits objections and discussion about them.

A.      **Yes.**

Q.      Did you rely on those documents when you were opining that those – that blood and hair may have come from the victim?

I'm sorry, came from – come from the assailant.

A.      **Well, the hair on the victim – the foreign hair on the victim is kind of persuasive.  But the tissue underneath the fingernails is a classic sign of, that a struggle has taken place because you need force to force tissue up under the fingernails.   It's kind of a scratching motion or a warding-off motion, whatever; but it takes some force to put that tissue underneath the nails.  And almost every case I have seen that had tissue under the nails was very, very persuasive that there – it had been the result of a struggle.**

Q.      And did you review any documents that indicated that the tissue underneath the nails had been tested?

A.      **Yes, I did.**

(Exh. C, p.52)

*        *        *

Q.      And did the – did that information about the testing of the tissue inform your opinion that the tissue underneath the nails may have belonged to the assailant?

A.      **Yes.  That was –**

A.      **-- very persuasive to me.**

*        *        *

Q.      Did you look at the Cellmark data, Mr. Moses, when you were crafting this opinion?

A.      **Yes.  I looked at the narrative report.**

Q.      And did you see in the Cellmark data that the tissue did not test – did not match the

victim, Mr. Helmbacher?

A.      **Yes.**

(Exh. C, p. 58, 59)

In an effort on cross-examination to flush out this amorphous testimony, the following colloquy took place:

Q.      So, it's your opinion that the presence of foreign DNA under Mr. Helmbacher's fingernails is sufficient to support a conclusion that blood and hairs were transferred to the victim's hands from the assailant;

is that your position?

**A.      Yes.  And the stronger – a stronger opinion for the tissue than for the hair.**

Q.      All right.  And if I told you Helmbacher's DNA was not excluded from underneath his own fingernails, you would have to completely withdraw and abandon this, this opinion; would you not?

**A.      I would have to review that report.  I understood he was excluded.**

Q.      So, that is crucial – is it not?  -- to your opinion that blood and hairs were transferred from the vic – from the assailant to the victim?  The exclusion of Helmbacher is crucial to that opinion; it is not?

**A.      Yes.  I would say so.**

Q.      All right.  And, sir, this is a blockbuster issue in this case.  Are you willing today to tell us and tell the Court that if, in fact, Mr. Helmbacher's DNA was not excluded from the fingernail substance that you would abandon the opinion that blood and hairs were transferred to the victim's hands and fingernails from the assailant?

**A.      I'd like to have an opportunity to review that report before making that statement.**

Q.      Well, I'm, asking you to assume that the Helmbacher DNA was not excluded from underneath the fingernails.  I'm asking you to assume that.  And, certainly, you may go back and look at the report.

        But if that report above shows you what I'm saying, that Helmbacher's DNA was not excluded from the fingernails, you would have to abandon and withdraw your opinion that blood and hairs were transferred to the victim's hands and beneath his fingernails from the assailant, --

*        *        *

Q.      -- correct?

6

\*      \*      \*

**A.**    **So, if I found – from what I understood, there was an exclusion with the hair and the tissue.  If part of that – if there is a mixture involved and one was, could not exclude the victim but the other would, this is where I'm hesitating.**

**These reports are quite complex and I'm not a serologist.  So if, in fact, as you say, the hair was not excluded, the fiber – the tissue was not excluded, no parts of anything under his nails were excluded – then I would definitely have to rethink this.**

**But I don't recall it saying that; and I, to my memory, there were some exclusions of DNA on these samples.**

Q.      Well, there were a lot of mixed conclusions which we've been talking about for a few days from these examinations.

You're aware of that; are you not?

**A.**    **I'm not aware of what went on before today.**

Q.      All right.  So as you, as you sit here on this very important issue, you are not willing to say that if Helmbacher's excluded – or Helmbacher is not excluded from the fingernails that you're withdrawing this opinion on blood and hair transfer?

\*      \*      \*

**WITNESS MOSES:  So at this point, I guess you're – is this a hypothetical?  Or is this saying if that is, in fact, the case that the hair was not excluded and the tissues were not excluded?**

**That's where I'm a little confused on this.**

BY MR. DICIANNI:

Q.      Treat it as a hypothetical if you wish.

**A.**    **Yeah.  If, if they were both – if the victim could not be excluded from that evidence, I would have to agree that that's – the evidence loses its, loses most of its punch.**

(Exh. C, p. 89, 93)

The evidence that Moses reviewed, the Cellmark report, shows that Helmbacher's DNA was not excluded from scrapings from Helmbacher's fingernails. (See Plaintiff's Exhibit 36 to *Daubert* transcript.) Moses effort to draw upon physical evidence to support his DNA transfer opinion failed its own criteria. Plaintiff cannot establish that Moses applied a reliable methodology.[2] The completeness of Moses' opinion on the transfer of DNA, the bridging of the analytical gap, is lacking.

Moreover, Moses cannot make the soft-science connection between his theory and the opinion he wants to draw from it. All Moses relies on to opine that the conflict between the killer and Helmbacher resulted in DNA transfer to Helmbacher's fingernails is that there were defensive wounds. Those wounds, however, were in the form of bruising to Helmbacher's forearms and one blow to one hand. (Plaintiff's Exhibits 16, 34, 37.)  They do not reflect the "scratching motion or warding-off motion" Moses described that causes the transfer. Helmbacher obviously fended off blows from the hammer, but Moses himself cannot say to any degree of reliability that Helmbacher ever got his hand on the assailant's body such that the transfer of DNA would have taken place.

During the *Daubert* hearing, the following colloquy occurred:

Q:     Well, you can't even say though, Mr. Moses, that Helmbacher ever grabbed the assailant's arm or head or any other part of his body.  You can't say that?

**A:     No, I cannot.**

Q:     Alright. You say perhaps.  Perhaps means maybe, correct?

**A:     Yes. As I mentioned, I did not examine the hair**.

Q:     Alright. So you're not rendering an opinion that Mr. Helmbacher at any time actually grabbed the assailant's arm or head or any other part of his body.

---

[2] Moses also speaks repeatedly of hairs, along with blood and tissue, transferred to Helmbacher's fingernails.  Hair, however, was only found in bags in which Helmbacher's hands were wrapped when transferred from the crime scene.  Hair was never even identified as being in Helmbacher's hands, let alone under his fingernails.

You're not – you don't have that opinion, correct?

A:     **I think there was contact as a mentioned from the evidence of defensive wounds that there was a struggle. But I can't say that he closed his hands upon some of the assailant's hair. No. Of course, I cannot say that**.

Q:     Or any part of his body, not just his hair, right?

A:     **Or any part of his body.**

Q:     Based on the information you have, just to clarify, you cannot arrive at an opinion that Mr. Helmbacher at any time grabbed onto or laid his hands on the body of the assailant, correct?

A:     **That's correct. In this case, an opinion infers a conclusion. We're not dealing with scientific conclusions here as much as putting up a theory of what had occurred based on some of the evidence around. A theory is not a proof. A theory is something based on various data points, in which case there was hair found; there was the defensive wounds. So this is a theory of how those, how that went down.**

Q:     All right.

A:     **It was not a scientific study with – that led to a scientific conclusion.**

(Exh. C, p. 94-96)

Later, a follow-up question was asked for clarification:

Q:     And I believe that you have just told me you do not have enough data to arrive at a scientific opinion that Helmbacher ever laid his hands on the assailant's body, correct?

A:     **That's correct.**

(Exh. C, p. 96, lines 21-25).

The opinion/conclusion that Moses wishes to draw about the transfer of DNA is nothing but speculation. He arrives at a theory, based on general circumstances surrounding the crime, that there was a beating with a hammer, and defensive wounds. Whether Helmbacher ever got his hands on the killer, such that DNA would transfer to his fingernails, is nothing but speculation. This opinion should be excluded.

**B.     Moses' opinion that the murderer was invited into Helmbacher's apartment Fails the Daubert Standard**

To opine that the murderer was invited into Helmbacher's apartment Moses reviewed photographs and video of the crime scene. He noted no sign of forced entry either on the front door or the apartment windows; lights were on in three rooms; there appeared to be social activity, in that Helmbacher was partially undressed, the hamburger had one bite eaten from it; and the beating itself appeared to have an emotional impact. He also believes that Helmbacher may not have been eating the hamburger because the autopsy did not show hamburger in his stomach contents.

Moses' opinions about the relationship between the killer and the victim do not rise to the level of an admissible opinion in this case. Moses applies the methodology of a crime scene investigator who is the first step in evaluating each unique crime scene.  Moses explains that the initial observations by the crime scene investigator are important to the investigation, in that they may provide leads on possible suspects. (Exh. C., p. 100-01). However, they take place in the earliest stages of the investigation and serve only an investigative purpose. Moses candidly agreed that the early observations made at a crime scene which are not based on hard science are meant only for guidance of the investigation.  (Exh. C., p. 105-06).  Moses explained that those initial observations may create theories, but they are not conclusions. As such, though very important to an investigation, and significant to where the investigation may eventually go, they do not qualify as opinions in and of themselves about what took place.  Moses observations may produce impressions useful to an investigator who takes over the investigation when the crime scene analysis ends, but they are not helpful to a jury.

Moses understood fully the point being made here. During his examination, the following colloquy occurred:

Q:     I'm asking about theories that you came up with that you feel comfortable offering because you think they're scientifically valid, or whatever word you want to use for

10

it – specialized knowledge, valid – but you're comfortable with offering them as actual evidence in the case. Not just an idea. Not just a theory. Actual evidence in the case. That's my point.

\*      \*      \*

A:    **The observations that were made at the scene were not meant as scientific proofs or fact as much as guidance as you mentioned earlier for the investigation to proceed.**

Q:    I see. Yeah.

A:    **If, in fact, they then at a later time are – evidence comes about that, that illustrates that this is indeed the correct MO, I imagine it could be used in court based on the same observations you made at the scene. But, again, it may change as the case develops, as I mentioned.**

Q:    Thank you. And that's my precise point. Your opinion that the assailant in this case was invited in and there was some social interaction, that may be relevant as useful to an investigation; but it does not rise to the level of evidence, does it?

\*      \*      \*

A:    **Well, I think if, like I said, if the initial observations at a later date are supported by other facts in the case, it probably would rise to evidence. If your initial observations or alternatives available – one alternative was accurate, it would probably count as being brought up as evidence in that case. But as it was offered as my original impressions, it was simply as guidance for the investigators.**

(Exh. C, p. 105-06).

Defendants do not quarrel with the fact that the observations Moses would make at the scene are important to an investigation, and may or may not later be verified or refuted during the ensuing investigation. However, for purposes of actually providing an opinion in a case which constitutes evidence, Moses himself agrees that they do not reach that level. The analytical gap between the theory Moses offers and a reliable opinion is not bridged.

Moses agrees that his opinion may or may not be correct, which is not fatal under *Daubert*. Nevertheless what is at issue in a *Daubert* hearing is methodology, and what Moses applied is that of a crime scene investigator who cannot draw concrete conclusions based on hard science, such

as blood spatter, bullet trajectory, ballistics, or fingerprints, but a bare theory based on supposition. The soft science he applies in this case is relevant only to the criminal investigation, not to a determination the jury must make.

Moreover, the evidence that Moses relies on is equally susceptible to a contrary conclusion. There was no sign of a forced entry on the night of the murder, but there was no sign of a forced entry during the burglary the day before when Helmbacher wasn't home. No one invited the burglar in the day before. So there was a way to enter without using visible force. Helmbacher's front door may just have been open and the killer walked in, or knocked and the door was opened, or he came in through a window like he did for the burglary a day earlier.

In addition, lights could be on in three rooms whether Helmbacher invited the killer in or not. Moreover, the conclusion as to social activity is pure speculation. That Helmbacher is partially undressed does not lend itself to social interaction. What it looks like is Helmbacher picked up two hamburgers on his way home from work, and was undressing from his work clothes as he took a bite of the hamburger, and was surprised by the killer. Multiple strikes with a hammer with many blows being fended off only means the killer kept hitting until Helmbacher was no longer able to fend off blows. It doesn't necessarily resemble an emotional overkilling, and Moses would have to defer to a pathologist to confirm this opinion. (Exh. C, p. 269). Addressing contrary considerations is a necessary part of the Rule 702 analysis. Fed.R.Evid. 702, Committee Comments to 2000 Amendments, citing *Claar v. Burlington N.R.R.*, 29 F.3d 499 (9th Cir. 1994); *Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996)

Importantly, when it comes to methodology, Moses did not do what even a valid investigation would require – testing the initial theory with other developments in the investigation. (Exh.C., p. 115) Moses himself admitted that this is a crucial part of even the

investigative value of the initial theory, let alone its evidentiary value. (Exh. C. p. 103) Subsequent investigation refuted any conclusion that there was a relationship between the killer and Helmbacher. (Exh. C, p. 106-07)  Ray Taylor provided evidence that the burglary and the murder were committed not by someone who had a social relationship with Helmbacher, but a stranger, at least in the social relationship sense.  Moses' opinion fails to advance from the observation or theory stage to a reliable evidence based and supported opinion.  Moses' opinion should be excluded.

### C. Moses' opinion that the ISP finding blood on the second examination was "suspicious" is unfounded and irrelevant

Initially, an opinion that some conduct is "suspicious" is vague and unhelpful to a jury. "Suspicious" is judgment laden in a way that is unhelpful to the jury in deciding any issue in the case. Moses' opinion is nothing but a bottom line extrapolation based on lack of expert evidence to support it.

Moses finds it unusual that blood wasn't found the first time, but he only bases that view on experience that tells him how crime laboratories normally conduct an initial review (Exh. C. p. 261). Blood wasn't found the first time because the ISP lab did not look where the blood was located, inside Plaintiff's shoe, underneath outer material. Only tearing them apart could find it. Moses admits blood could have been washed off the outer layer, in which case the ISP would not have found it the first time. (Exh. C, p. 261)  He has no basis for the conclusion that finding blood the first time was unusual. It wasn't based in any way from the facts in this case, only from what Moses expects from a "competent" lab.

Moses bases the opinion on a claim that it would be unusual for blood spatter to penetrate the outer layer of the shoe. He did not inspect the shoe or conduct any study to support that conclusion, he only looked at photographs. (Exh, C, p. 159) Moses himself admitted that the type

of material involved here is conducive to being penetrated by a substance such as blood. (Exh. C, p. 168-169). Moses goes on to conclude that a chemical test could have been done to see if the shoes were washed. Nevertheless, such tests would have been done by the crime lab, and that the crime lab didn't do it is not a suspicion that should be attributed to Defendants.

Moses fully admits that he cannot say that the blood on the shoes was a transfer stain. His own professional standards would not allow him to come to that conclusion, and he has withdrawn it. (Exh, C., p. 139) As a result, any such opinion now must be barred in total.

Finally, the last basis Moses offers is the general opinion that it is possible to transfer blood from one surface to another. That is not an opinion that is helpful to a jury. In fact, any juror who has ever bled knows that when they touch it, they can get the blood on something else. Moses attempted to fine tune the opinion to talk about a toothpick that could fit through the shoe mesh, but he is clearly speculating.  He did not examine the shoe and cannot evaluate its dimensions or ability for blood to be transferred into it.  (Exh, C, p. 192, 254-56) There is no basis for any such opinion, either as a stand alone view or in support of a "suspicion".

## IV.    CONCLUSION

For all the foregoing reasons, Defendants respectfully request this Court grant their motion to exclude the opinions of Kenneth Moses.

By:   /s/ *Thomas G. DiCianni*
       One of the Attorneys for Defendants
       City of Decatur, Roger Ryan, and Roger
       Morville

14

Thomas G. DiCianni / ARDC # 3127041
tdicianni@ancelglink.com
Kathleen M. Kunkle / ARDC # 6281796
kkunkle@ancelglink.com
ANCEL GLINK, P.C.
140 South Dearborn Street, Sixth Floor
Chicago, Illinois  60603
(312) 782-7606
(312) 782-0943 Fax


  By:   /s/ Jerrold H. Stocks
One of the Attorneys for Defendant, Estate of
Tim Carlton
Jerrold H. Stocks/ARDC #6201986
jstocks@decatur.legal
Ross J. Munsterman / ARDC #6324391
rmunsterman@decatur.legal
101 S. State Street / Suite 240
Decatur, IL 62523
(217) 429-4453
(217)425-8892 Fax

By:   /s/ Kathleen Wrigley Pletsch
One of the Attorneys for Defendants
City of Decatur, Roger Ryan, and
Roger Morville
kwrigley@decatureil.gov
CITY OF DECATUR
#1 Gary K Anderson Plaza
Decatur, IL 62523
(217) 424-2807
(217) 424-2871 Fax

## <u>CERTIFICATE OF SERVICE</u>

I, Thomas DiCianni, an attorney, certify that on March 21, 2023, I electronically filed the

foregoing **Memorandum of Law in Support of Defendants' Joint Motion to Exclude Opinions**

**and Testimony of Plaintiff's Expert Kenneth Moses** with the Clerk of the Court using the

CM/ECF system which will send notification of such filing to:

Steven Edwards Art  / steve@loevy.com
Jonathan I Loevy  / jon@loevy.com
Rachel Elaine Brady  / brady@loevy.com
Renee Spence / spence@loevy.com
Samantha Hamilton / samhamilton@loevy.com
LOEVY & LOEVY
311 North Aberdeen St / 3rd Floor
Chicago, IL 60607

Kathleen W. Pletsch
Assistant Corporation Counsel
CITY OF DECATUR
#1 Gary K Anderson Plaza
Decatur, IL 62523
kwrigley@decaturil.gov

Jerrold H. Stocks
Ross J. Munsterman
101 S. State Street / Suite 240
Decatur, IL 62523
jstocks@decatur.legal
rmunsterman@decatur.legal

/s/ *Thomas G. DiCianni*

4877-6567-8168, v. 1