## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| **CHARLES PALMER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 17-CV-3268** |
| | ) | |
| **CITY OF DECATUR, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Plaintiff, Charles Palmer, filed a Second Amended Complaint (#43) on December 6, 2018, against Defendants alleging violations of his rights under the U.S. Constitution pursuant to 42 U.S.C. § 1983 and various Illinois state law claims due to his conviction for the murder of William Helmbacher, a conviction that was later overturned. Defendants filed a Motion for Summary Judgment (#153) on April 16, 2021. On September 20, 2021, this court entered an Order (#210) granting in part and denying in part Defendants' Motion for Summary Judgment.

Following evidentiary hearings pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Plaintiff filed the instant Motion to Exclude Opinions and Testimony of Lucy Davis (#264), and Motion to Exclude Opinions and Testimony of Thomas Martin and James Downs (#265). Those Motions are now fully briefed and ready for the court's ruling.

ANALYSIS

The court hereby incorporates the section on relevant *Daubert* and Federal Rule of Evidence 702 case law from its prior Order ruling on Defendants' Motions seeking to exclude opinion testimony of Plaintiff's expert witnesses.

I.      *Lucy Davis*

Plaintiff first moves to strike certain opinions and testimony to be provided by Defendants' expert Lucy Davis.  Plaintiff seeks to bar Davis from testifying about: (1) the efforts that would be required to create a "realistic" lab-quality DNA simulation; (2) the appearance of blood stains on the shoes or the shoes themselves beyond what is specifically documented by the Illinois State Police ("ISP") analyst who observed them; (3) the reliability of Cellmark's DNA testing on the fingernail scrapings, including about control procedures or validation studies; (4) contamination or "drop-in"; and (5) standards or guidelines that she did not rely upon in her report.  Defendants concede that Davis will be precluded from using the guidelines from 2018 and 2020 at trial, and therefore Plaintiff's Motion is GRANTED in that regard.  Consequently, the court will concern itself only with Plaintiff's first four requests to exclude.

<u>Background of Lucy Davis</u>

Lucy Davis is a forensic scientist who also teaches "forensic analysis with a speciality in DNA and biological material."  She has worked as a forensic DNA and quality assurance consultant for LDH Consultants, LLC, for the past 20 years, and has been an adjunct faculty member at the University of Kentucky's Department of Toxicology and Cancer Biology since 2019.

Davis obtained her bachelors of science from the University of Kentucky in 1982. After graduation she received a certification from the American College of Clinical Pathologists so that she could work as a clinical analyst.  In March 2000, the American Society of Crime Laboratory Directors ("ASCLD"), reviewed Davis' college transcripts, work history, lab performance, and knowledge and issued her a waiver for not having a master's degree (she had taken all the requisite courses but had not finished her thesis), allowing her to "be a technical leader in charge of the technical aspects of the laboratory[.]"  Davis has been a member of the ASCLD since 2000.

Davis also received a certification from the American Board of Criminalistics in January 1994.  She joined the group's board at its inception and wrote and evaluated the first examinations for its Molecular Biology Examination Committee. The group acts as a certification program for forensic scientists in different disciplines.  Davis was a fellow in the group when she was actively working in a lab, and remains current on certain annual training and requirements.  Davis also received a certification from the

American Society of Clinical Pathology to be a medical technologist.  Davis has also been qualified as a lead assessor in different organizations that accredit forensic laboratories.

Davis worked from 1982 to 1985 with the University of Kentucky Clinical Chemistry Laboratory as a staff technologist, where she tested patients' blood and urine samples for medical purposes, such as checking glucose levels, sodium levels, etc.

From 1985 to 2002, Davis worked for the Kentucky State Police Forensic Laboratory.  Davis started at the lab as a forensic serologist, where she was trained in body fluid analysis, hair analysis, and crime scene investigations.  In 1988, she became the lab's DNA analyst, eventually becoming DNA section supervisor and technical leader.  Davis personally performed DNA analysis in this role until 1996 or 1997, when she became a general supervisor and CODIS ("Combined DNA Index System") administrator.  She no longer did hands-on work in the lab at this point, but did more administrative work such as managing grants.  However, she still reviewed reports and evaluated the results produced by the analysts.  She was then promoted to quality assurance supervisor, where her role was to "get all the other disciplines in line" and put together the requirements for the Kentucky State Police to apply for accreditation.

In 2002, she left the Kentucky State Police and began consulting, including time at the National Forensic Science Training Center (2002-2004) as a technical consultant training analysts in DNA analysis.  Davis worked for Quality Forensics from 2003 to

2006, as quality assurance director.  From 2005 to 2011 she worked as an instructor and lecturer at the Northeast Regional Forensics Institute's Forensic DNA Academy, again training lab analysts to do DNA analysis.

Davis has been qualified as an expert in the field DNA forensics over 100 times.

### 1. Confusing and distracting opinions about efforts required to create a "realistic" lab-quality DNA simulation

Plaintiff first moves to bar Davis' opinion on the steps required to "create a 'realistic' lab-quality DNA simulation that is guaranteed to produce a DNA profile." Plaintiff argues that Davis' opinion is an attempt to cast Plaintiff's theory of fabrication (that Defendant officers planted Helmbacher's blood in Plaintiff's shoe) as "incredible." Plaintiff argues: (1) that the opinion of what is needed to create an ideal lab sample is irrelevant because Plaintiff does not allege that Defendants created an ideal lab sample when they framed Plaintiff, but rather that the blood Defendants planted was barely sufficient to contain Helmbacher's DNA, and Davis herself admitted that the stain on Plaintiff's shoe could have been created by a high school student with a swab; (2) Davis' opinion on cell membranes bursting in non-isotonic water is a "distraction" because even if the membranes burst, the DNA still exists, and in any event, the record contains no reference to cell membranes so this irrelevant; and (3) Davis' opinion that achieving a lab-quality result would require "practice" and the related suggestion that it would

have been too difficult for an untrained police officer to achieve is irrelevant because Davis has no knowledge that Defendants were aware of, and intended to create, a DNA sample appropriate in a professional lab setting.

Defendants respond that Davis' expert opinion about whether Defendants would have been able to reconstitute dried blood to liquid blood to get a stain that would be sufficient for DNA testing and to produce a full DNA profile is highly relevant to Plaintiff's fabrication theory and thus is admissible.  Defendants argue that the point of Davis' testimony is that it would be difficult for a layperson, such as a police officer with no training this area, to reconstitute a dried blood sample to create a stain that resembles "real life" and produce a sample that would render a full DNA profile through testing.

Plaintiff, in Reply, claims that he is not arguing whether Davis' testimony on the general process of reconstituting blood is relevant, but rather arguing on the more narrow question of what is required to reconstitute a lab-quality sample of blood to achieve a specific result or create a specific number of blood cells.  Plaintiff continues that because there was barely enough DNA between the three stains combined to achieve a testable profile, and a high school student could do it, "Davis' testimony about the skill, practice, and technique needed to create a realistic, lab-quality DNA sample with a full profile simply ... is not relevant and will do nothing other than mislead and confuse the jury."

As an initial matter, Plaintiff wishes the court to bar Davis from referring to the blood stains in the shoes as "realistic," given that, during her testimony, she stated that, when referring to "realistic" stains, she means blood stains that contain a DNA profile, not that they are "visually realistic." The court agrees with Plaintiff and will GRANT the Motion to the extent Davis would testify that the blood stain looked "visually realistic." If Davis testifies about the "realistic" nature of a blood stain, she must clarify for the jury that she is not referring to visually realistic, but rather realistic in the sense of generating a DNA profile.

Plaintiff does not take issue with Davis' qualifications or the reliability of her methodology in forming her opinion on the steps necessary to plant reconstituted blood that would render a full DNA profile through testing, but only with the relevancy of her opinion. Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and is of consequence in determining the action. Fed. R. Evid. 401. The basic standard of relevance under Rule 401 is a "liberal one." *Daubert*, 509 U.S. at 587.

The court agrees with Defendants that Davis' opinion is, on its face, plainly relevant to Plaintiff's fabrication claim. It goes directly to the claim at issue of the ability of Defendants to have accomplished what Plaintiff alleges in his theory of the case. Moreover, Plaintiff has not demonstrated that the certainly highly probative value of Davis' testimony is substantially outweighed by any unfair prejudice due to any confusion the testimony would cause the jury. To that end, Plaintiff's arguments on

relevance and confusion go more towards how much weight the jury should afford

Davis' opinion, contrasted against her own statements that a high school student could

transfer blood with a swab. Thus, they are more appropriate for cross-examination, as

opposed to admissibility under *Daubert* and Rule 702. Plaintiff's Motion is DENIED on

this ground.

> 2.   Opinions on the appearance of blood stains or shoes beyond what is
> specifically documented by the ISP analyst who observed them

Plaintiff next moves to bar Davis from testifying about the appearance of

Plaintiff's shoe or blood stains on the shoe beyond what she read in the ISP lab report.

Specifically, Plaintiff requests the court bar Davis from speculating that the shoes were

washed in 1998 based on anything other than what is in ISP analyst Lu's report because

this is merely a personal opinion which Davis does not support with any degree of

scientific certainty, and she is not an expert on this subject. Plaintiff also argues Davis

employed no reliable methodology to come to her opinion that the shoe may have been

washed, and that it is only based on an observation that the shoes appear clean in a

photograph taken 20 years after they were unsealed and her personal musings about

cleaning shoes based on her experience cleaning her own shoes. Plaintiff also moves to

bar Davis' opinion that the blood stains on the shoes were "diluted," because, although

she bases her opinion on Lu's description of the shoes, Lu never said the stains

appeared "diluted," but rather were only "light" in appearance.

Defendants respond that Davis' opinion in this regard must be taken in the full

context of her testimony on the shoes, which is that her experience of having found

8

blood within items that was not readily apparent on the outside of the item comports with the process of Defendants and the ISP lab in analyzing Plaintiff's shoes. Davis' opinion is that, based on her professional experience and knowledge, it is not uncommon for lab analysts to have to deconstruct an item to find blood within, particularly if the item had been wiped down or if the owner had attempted to clean the item of visible blood on the outside of the item. Further, Defendants argue that Davis' testimony on the "diluted" stain is based on applying her knowledge and "extensive experience" to the statements by Lu in her report.

Plaintiff, in Reply, argues that Defendants' Response is misleading. Davis did not just offer her opinion "as a possible explanation for why there was no blood on the shoes the first time the ISP crime lab analyzed them[,]" as Davis' report clearly opines that the shoes "may have been washed." Concerning dilution, Plaintiff reiterates that Davis' opinion is mere speculation, as she never saw a photo of the original stains and does not know what Lu meant by the stains being "light."

Davis' report states that, based on the ISP lab report when they were first sent in, the shoes appeared "worn and dirty[,]" but Davis notes that while the lab report describes the shoes as dirty, the actual pictures "do not show an extreme amount of dirt on the shoes" and show "little obvious dirt on the top of the shoes." Further, although "the shoes show much wear, the tops appear very clean and white and without obvious dirt stains." The report continues: "It would seem that if these shoes were worn a lot, there would be more dirt on the shoes, unless they were recently cleaned."

Regarding the resubmission of the shoes to ISP lab on October 15, 1998, Davis wrote "Complete examination of items of evidence may at times require deconstruction of the item, especially if there is a possibility that the item has been washed."  Davis continued that "While cleaning an item, especially one with numerous stitching lines, overlay of material, and crevasses, it is easy to clean on the exterior of the item.  But to thoroughly clean the item, additional scrubbing may be required to clean areas not visible when examining just the exterior (i.e., stitching lines, under mesh, crevasses)." During her career, Davis wrote, she has "deconstructed items of evidence, including tennis shoes[,]" and "found blood stains between where the tongue of the shoe is attached to the shoe itself" and has "also found blood stains on cushions when you remove the piping from the covering and underneath carpeting that had been cleaned with a steam cleaner in the padding underneath."

At the *Daubert* hearing, Davis testified that, based on her review of photographs of the shoes taken in 2020, the shoes appear to have been cleaned.  Davis testified that this was her personal opinion.  On cross-examination, Davis again testified that this was her personal opinion, and not one she offered with any degree of scientific certainty. Davis testified that she was not holding herself out as an expert on this issue and she was not offering the opinion that the shoes were washed.  She admitted she based her opinion on pictures of the shoes from 2020, not 1998, and she did not know what the shoes looked like in 1998.  The pictures of the shoes from 1998, Davis testified, were in black and white.  Davis testified that she was unaware that the shoes had not been

sealed the entire time they were in storage after the underlying criminal trial, and she did not know how the shoes were handled or exposed after the trial.  Davis also is not an expert in determining how visible dirt degrades over time.

Regarding possible dilution of the blood stains on the shoe, Davis wrote in her report that "A blood stain that has not been diluted will have a deep red or brown color (depending on how long it has been there).  As you dilute a blood sample, the red color diminishes."  Davis wrote that she has observed numerous stains that she has described as "light" in color, meaning it is not a concentrated stain.  It is not possible to determine how the stains got on the shoes, whether it was from hitting a person with an item that causes bleeding, by drips from a bloody item, or by being in contact or close proximity with liquid blood.  By the description provided by the ISP analysts, Davis wrote, "it is possible to say that the stains on the shoes were diluted. If an item is washed, but not thoroughly scrubbed, a concentrated blood stain present underneath a mesh may be partially removed and become lighter in color."

At the *Daubert* hearing, concerning whether the blood stains were diluted, Davis testified that the "description of them by the ISP analyst did state that there was a red blood stain and then what was there was a lighter blood stain; and so by the description

of those blood stains, in order to be, like, lighter, they would have had to, more than

likely, be diluted in some way, shape, or fashion."  Davis admitted that the ISP analyst

only described one stain as light, but not the other two.

There is certainly no question as to the relevance of Davis' opinion on this point.

Additionally, Plaintiff cannot reasonably challenge Davis' qualifications to offer such an

opinion, in general.  Rather, Plaintiff's argument rests on the methodology (or absence

thereof) employed by Davis to come to this opinion, and the lack of sufficient facts on

which to base the opinion.  However, the court finds that, for much the same reason it

allowed Thomas Fedor's opinion on whether the shoes appeared to be washed, that

Davis' opinion is admissible.

While Davis was offering a personal opinion as opposed to one she offered "with

any degree of scientific certainty," it was an opinion based on her substantial experience

in this area.  An expert can offer a hypothetical explanation for the cause of an event, so

long as it has an analytically sound basis rendering it more than mere speculation.  See

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718-19 (7th Cir. 2000).  The Seventh Circuit "has

'repeatedly' allowed expert testimony based on experience and training without

requiring 'scientific methodologies' or 'peer review.'"  *James Hamlin & Co. PC v.

Czarnecki & Schlenker, LLC*, 567 F.Supp.3d 1040, 1050-51 (E.D. Wis. 2021), quoting *United

States v. Parkhurst*, 865 F.3d 509, 516 (7th Cir. 2017) (cleaned up).  Here, as recounted in

her report, Davis has experience with making "many simulated items of evidence for
training classes [she has] conducted[,]" and has experience with how stains will look on
deconstructed items that have been cleaned.

Moreover, there was sufficient evidence in the record for Davis, based on her
experience, to come to her opinion that the shoes appeared to have been washed and
the stain diluted. Like Plaintiff's experts, Davis was not able to examine the shoes
themselves, and relies on photographs, which experts are allowed to do. See *Bratt v.
Genovese*, 2017 WL 6344449, at *3 (M.D. Fla. Dec. 12, 2017), citing *Duyst v. Rapelje*, 483
Fed. Appx. 36, 48 (6th Cir. May 17, 2012). Davis also relies on the lab report from the
ISP in 1998.

This evidence is enough to provide a sufficient connection between Davis' actual
professional experience, as described in her report, and her expert opinion, so as to
make Davis' proffered opinion on this point admissible. Davis' offering of her opinion
without a degree of "scientific certainty," the reliance on photographs of the shoes
taken 20 plus years after the fact, and the other two blood stains not appearing to be
"diluted," is more appropriate subject matter for cross-examination. Plaintiff's Motion
is therefore DENIED in this respect.

3.    Davis' opinion on the reliability of Cellmark's DNA testing on the
      fingernail scrapings, including about control procedures or validation studies

Plaintiff next argues that Davis' testimony regarding the reliability of Cellmark's
DNA testing on fingernail scrapings should be barred because those opinions are not
based on reliable methodology, contradict generally accepted guidelines in the field,

13

and will confuse the jury.  Specifically, Plaintiff seeks to bar Davis' opinions on: (1) Cellmark's decision not to use "negative controls" in the post-amplification purification ("PAP") process; and (2) Cellmark's validation studies.

    a.    **Factual Background**

        Plaintiff provided the following factual background behind Davis' opinions on Cellmark's reliability, to which Defendants did not object.  Cellmark's analysis of the DNA scrapings from Helmbacher's fingernails revealed a mixture of two individuals' DNA.  The mixture contained alleles 14 and 16.  Allele 14 likely came from the victim, Helmbacher, and allele 16, the allele that eventually exonerated Plaintiff, likely came from the killer.  Cellmark found Plaintiff to be excluded from the mixture.  Davis takes issue with Cellmark's conclusion that there was an allele 16 in the DNA profile at all.

        Given the low level of DNA in the scrapings, Cellmark enhanced the fingernail DNA three times, as is standard practice.  The first two rounds of enhancement were standard "DNA amplification," in which Cellmark amplified the original sample.  The second amplification revealed alleles 11, 14, and 16.  The appearance of 16 during this second round of amplification is what excluded Plaintiff.  Plaintiff analogized the process to a "bowl of different kinds of fish."  In the first amplification, Cellmark took a fish net and scooped up a bunch of fish, containing some allele 11 and allele 14 fish.  In the second amplification, Cellmark took another scoop of fish from the original bowl, this time containing allele 11, 14, *and* 16 fish.  Though there were a "substantial" number of 16 fish in that scoop, there were not quite enough to satisfy the analytical threshold to

receive an official 16 label, so Cellmark performed another standard analysis step by "cleaning up the scoop."

To do this, Cellmark performed the PAP process, which removes primers and excess junk from the sample to make the actual DNA more prevalent. After the PAP, alleles 11, 14, and 16 were still present, and Plaintiff was still excluded. This was the evidence relied on in the Illinois courts throughout the postconviction and certificate of innocence proceedings.

> **b.** **Bar Davis from opining about Cellmark's decision not to use "negative controls" in the PAP**

Plaintiff notes that Davis attempts to cast doubt on allele 16 by criticizing Cellmark's application of the PAP procedure and suggesting that the 16 was actually the result of contamination because Cellmark did not follow Federal Bureau of Investigation ("FBI") Quality Assurance Standards 9.5.2 and 9.5.3 when performing the PAP and that Cellmark did not use a negative control procedure to ensure the same was not contaminated. Davis opines that no one can be sure that the sample was not contaminated.

Plaintiff argues that Davis' opinion on the PAP is irrelevant and confusing to the jury because what happened in the PAP has no bearing in this case, as Plaintiff had already been excluded during the second round of enhancement, before the PAP occurred. Plaintiff further argues that Cellmark followed all industry standards and relevant guidelines with respect to its PAP testing. Plaintiff notes that Davis, citing to 9.5.2 and 9.5.3, suggests that Cellmark should have, but failed to, "reamplify the agent

blank" during the PAP.  However, per Plaintiff, Cellmark did not have to do so because the second amplification conditions were the same conditions for the first amplification, which Davis acknowledged at her deposition and *Daubert* hearing testimony.  Plaintiff argues that, for Davis to opine otherwise, based on an incomplete excerpt of the FBI standards and her own personal preference "to impose on Cellmark a higher standard than was required, is improper, misleading at best (deceptive, at worst), and not generally accepted in the field."

Defendants respond that Davis' opinion is not that the DNA results did not actually exclude Plaintiff, but that the results should have been "inconclusive" because the data was too low for interpretation.  Davis' opinion and testimony is based on data from Cellmark that shows that for allele 16, after the first amplification, no peak was present, after the second amplification a peak was present but below the threshold, and after the PAP the peak was above threshold.  Davis analyzed the results of a specific analysis and found the result should have been inconclusive, rather than excluding Plaintiff.

Defendants argue that Davis' opinion on Cellmark failing to use a negative control sample throughout its analysis is based on Davis' extensive knowledge and experience in interpreting and enforcing FBI Quality Assurance Standards.  Davis' opinion is that one cannot say with any degree of scientific certainty that the presence of allele 16 was not the result of contamination.  At her *Daubert* hearing, Davis testified that, had Cellmark concluded the process after the second amplification, she would

have no issue with the analysis.  However, Cellmark did not stop the process and continued with the PAP.  Cellmark amplified the first time, using a reagent blank and negative control.  Cellmark amplified the sample a second time, using a negative control, but no reagent blank.  For the PAP, Cellmark used a reagent blank, but because they did not use one for the second amplification they thus failed to use a negative control.  Because Cellmark never took the negative control through the second amplification, "there was really technically no negative sample that went through that second amplification that was subjected to the PAP."

Under the FBI standards, labs are required to utilize a reagent blank through all conditions and all processes for the sample being interpreted.  Cellmark, by continuing with the PAP, failed to account for continued controls, which rendered the results not reproducible or reliable.

Plaintiff replies that Davis admitted in her testimony that Cellmark followed the "letter of the law" with its control procedures, even on the PAP, and thus "Davis' preference that Cellmark perform additional control procedures *beyond* those required by quality assurance standards is just that: a preference that is not supported by the scientific community."  (Emphasis in original).

In support of his argument that Davis' opinion should be barred, Plaintiff cites to the district court decision in *Andersen v. City of Chicago*, 467 F.Supp.3d 598 (N.D. Ill. 2020). In that case, the defense expert concluded that the DNA results from Cellmark that excluded the plaintiffs as contributors to certain DNA should have actually been deemed "inconclusive." *Andersen*, 467 F.Supp.3d at 600-01. The expert found that the conditions under which the knife was stored and handled, the possibility of multiple contributors and degradation, and the small quantities of DNA available for testing are issues that independently and cumulatively support the test results from these samples being deemed "inconclusive" in regard to whose DNA may or may not have been associated with them at the time that they were collected as part of an investigation into the murder of the victim. *Andersen*, 467 F.Supp.3d at 601.

The district court found that, while the expert was eminently qualified, his methodology was flawed. The expert stated that "there is no generally accepted means of attaching a reliable statistical weight to a mixed DNA sample with an unknown number of contributors where allelic drop-out may have occurred[,]" and opined that a partial profile, which has evidence of stochastic effects, "should not be used to exclude or include anyone as a contributor." *Andersen*, 467 F.Supp.3d at 601. Because the DNA profiles Cellmark derived from the samples taken from the evidence resulted in partial profiles, they should have been deemed "inconclusive" and none should have been used to either include or exclude the plaintiffs. *Andersen*, 467 F.Supp.3d at 601.

The court found this methodology lacking because, "[r]ather than discussing specific errors or specific differences in how a given profile should be interpreted, Dr. Krane, in his report, merely applied his categorical approach to each profile and stated that because it could be a mixture of more contributors than posited, it should be deemed inconclusive." *Andersen*, 467 F.Supp.3d at 601.  The court found the expert's opinion to be "in stark contrast to what is being done in the field of forensic DNA testing[,]" as "accredited labs, including Cellmark, interpret partial profiles and draw conclusions from them[,]" and "every forensic DNA laboratory constantly encounters and then interprets, partial profiles." *Andersen*, 467 F.Supp.3d at 601 (cleaned up).  The expert even "admitted that he is not aware of any lab that subscribes to his 'blanket' approach to decline to interpret a partial profile[,]" and, "[a]dditionally, the 2017 Interpretation Guidelines published by the Scientific Working Group on DNA Analysis Methods ('SWGDAM'), which is 'a group of scientists representing federal, state, and local forensic DNA laboratories in the United States and Canada,' anticipate that laboratories will analyze partial profiles." *Andersen*, 467 F.Supp.3d at 601.

The court also noted that the sources the expert cited did not support his position.  *Andersen*, 467 F.Supp.3d at 602-03.  The court found that the expert's "blanket methodology is unsupported by his cited sources and is not generally accepted within his field[,]" and, while, as the expert suggested, he may be "at the forefront of a position that will one day become widely held[,] [t]oday, however, is not that day, at least not for the purposes of *Daubert* and Rule 702." *Andersen*, 467 F.Supp.3d at 603. The court

concluded that the expert's opinion that the partial profiles derived in that case should be deemed inconclusive did not meet the requirements for reliability and must be excluded. *Andersen*, 467 F.Supp.3d at 603.

The court further noted that some of the underlying propositions the expert relied on were generally accepted and had been published widely, specifically that interpretation of partial profiles with an unknown number of contributors can present risk and uncertainty. *Andersen*, 467 F.Supp.3d at 603. The court continued that the caution advised by the expert had "to do with making inclusions, although the parties did not address this rather crucial point[,]" and that here the court was dealing with exclusions[,]" and "[t]herefore, to allow discussion of the uncertainty in the area would be prejudicial." *Andersen*, 467 F.Supp.3d at 603-04. The court found that a "jury may become confused and extrapolate the uncertainty to exclusions even though unwarranted[,]" and that "[d]iscussion of the uncertainty, therefore, would be more prejudicial than probative, even if it is reliable and relevant." *Andersen*, 467 F.Supp.3d at 604, citing Fed. R. Evid. 403.

The court finds Davis' opinion to be distinguishable from the expert opinion confronting the court in *Andersen*. The expert in *Andersen* had no support in the relevant scientific community for his opinion, and it was based on a statistical "blanket" "categorical approach" that no lab in the country subscribed to and that did not discuss specific errors or specific differences in how a given profile should be interpreted in the

20

case at bar.  See *Andersen*, 467 F.Supp.3d at 601.  By contrast, Davis' opinion on the

negative controls is based on the FBI Quality Assurance Standards and her years of

experience in DNA laboratories.

Plaintiff and Plaintiff's expert Fedor disagree with Davis' interpretation and

application of the FBI Quality Assurance Standards in this case, but this does not mean

that Davis applied a methodology that was not sound and reliable.  If Plaintiff believes

that Davis' methods and conclusions are questionable, "vigorous cross-examination"

and "presentation of contrary evidence" via a "battle of the experts" are the appropriate

means to show as much.  See *Andersen v. City of Chicago*, 467 F.Supp.3d 619, 628 (N.D. Ill.

2020), citing *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013).

Moreover, Plaintiff argues that Davis' opinion goes *beyond* what is normally required in

the scientific community, and is a more stringent standard than necessary.  This does

not make Davis' methodology unsound, but rather goes to the opinion's weight rather

than admissibility.  See *Andersen*, 467 F.Supp.3d at 629.

The court further finds that Davis' opinion on this matter would not so confuse

or mislead the jury that such prejudice would substantially outweigh the probative

value under Rule 403.  If Plaintiff wishes to put before the jury the proposition that

Davis' discussion of control procedures during the third round of enhancement is of no

import because the allele excluding Plaintiff was revealed during the second round of

enhancement, they may do so through cross-examination or the presentation of

contrary evidence via Fedor's testimony.  Plaintiff's Motion is DENIED on this ground.

21

c.      **Bar Davis from opining about Cellmark's validation studies**

Plaintiff next argues that Davis should not be permitted to discuss Cellmark's

validation studies because the opinion ignores commonly accepted industry practices.

Plaintiff states that validation studies are sample tests that labs perform when they start

using new procedures to show accrediting bodies they can perform the procedures

correctly and achieve expected results.  Plaintiff argues it is industry standard to

validate new analytical methods only, and that Davis identifies no industry norm

establishing that a lab should validate every specific potential application of a particular

procedure.  Cellmark evaluated the reliability of PAP in five separate studies from 2004

to 2011, whenever it changed methods, conditions, or utensils.

Plaintiff argues that Davis' quibble with Cellmark comes down to one issue: that

Cellmark did not give her any documentation showing it had revalidated the PAP

process using the Y-filer and Identifiler test kits on low level mixtures.  Plaintiff argues

that Defendants did not subpoena Cellmark for any validation-related documents, or

otherwise seek them during formal discovery, but "merely asked Cellmark for

validations it had available[.]"  Thus, Davis' opinions are based on an incomplete set of

information and speculation about the significance of documents that were never

produced.

Plaintiff also argues that Davis' opinion is misleading and confusing and ignores

common guidelines in the field.  Davis' opinion is based on discretionary procedures,

and her opinion that Cellmark had not done a specific enough validation study is no

reason to discount the DNA results, as the validation testing Davis suggests was not

required by the approving bodies in the field.  This opinion will only confuse the jury.

Moreover, Plaintiff notes that Davis admitted at her deposition that, under her

interpretation of the validation requirements, every single one of Cellmark's results

from PAP procedures on low level mixtures, numbering into the hundreds or

thousands, would be rendered invalid, further undermining her methodology.

Defendants respond that, from the studies produced by Cellmark in response to

Defendants' email request, Cellmark never performed a validation study of the PAP

process using a mixed DNA sample nor the Y-filer chemistry with multiple

amplifications.  Defendants argue that there is no evidence that Cellmark actually

performed the "missing" validations and just could not locate the paperwork

documenting them, and, if this proposition was true, Cellmark would be in danger of

losing its accreditation, as it runs afoul of FBI Quality Assurance Standard 8.2.1 that

states that all "validation studies shall be documented."  Defendants argue that Davis'

opinion on the lack of validation studies is relevant, as it goes directly to the heart of

whether Cellmark's results were scientifically valid and whether the conclusion

Cellmark reached was reliable.

In Reply, Plaintiff argues that Davis' opinion that Cellmark should have done

more studies than they did is not the industry standard.  Plaintiff also notes that

Defendants did not respond to his argument that Davis' opinion would render

hundreds or thousands of Cellmark's results invalid, thus calling into question the

soundness of Davis' methodology.  Finally, Plaintiff argues that Defendants never used

a discovery tool to find out whether Cellmark performed the additional validation

studies, as they merely asked Cellmark, which had changed ownership and locations, to

"dig around for" what it was able to find.  Cellmark was under no legal obligation to

locate or produce anything, so Davis does not know whether additional studies exist,

and her opinion is based on an incomplete set of data.

The court agrees with Plaintiff that Davis' opinion on this point should be

excluded.  Defendants' argument is premised on the assertion that Cellmark did not

perform additional validation studies beyond those they emailed to Davis "as a favor."

However, Davis' testimony reveals that Defendants and Davis "asked for" the

validation studies, but did not receive them.  Davis testified that Cellmark, due to the

change in company ownership and location, had to "do some digging" to find the five

studies that were sent.  However, Davis does not know for sure that Cellmark did *not*

do the validation studies she believes were essential.  It also appears from the record

that no actual discovery request was made for those studies, just a request in an

informal manner, which placed Cellmark under no legal obligation to produce the

material.  The court must agree with Plaintiff that Davis' opinion that the additional

validation studies do not exist is based on an incomplete set of data, and thus

Defendants have not met their burden to prove that their expert relied on reliable data,

rendering the opinion inadmissible.  See *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d

771, 782 (7th Cir. 2017).  Plaintiff's Motion is GRANTED on this ground.

24

4.      Davis' opinion about contamination or "drop in"

Plaintiff next argues that Davis "should be barred from speculating about 'contamination' or 'drop-in.'"  Plaintiff argues that Davis' opinion that Cellmark's DNA results could have been contaminated should be barred because she admits that she has no foundation for this conclusion in that "she cannot say one way or another whether there was contamination or drop-in in any of the amplification processes."  Thus, Plaintiff argues, Davis admitted she was speculating.  In addition, Plaintiff notes that Davis testified that there was no sign of contamination in the second amplification and that there was a negative control procedure during the second amplification that showed there was no contamination in the negative control sample, which means that "we can be confident that there's no contamination of the sample itself."

Defendants respond that Davis' opinion is not that the presence of allele 16 is actually the result of contamination, but rather that one cannot say with any degree of scientific certainty that the presence of allele 16 was *not* the result of contamination because Cellmark failed to utilize negative controls throughout their analysis, contrary to FBI Quality Assurance Standards requirements.

Regarding Davis not being able to say "one way or another whether there was contamination or drop-in," Defendants argue that Fedor also testified at his *Daubert* hearing that allele 16 was "certainly one of the two," either a drop-in or drop-out. Defendants argue there is no dispute that the data unequivocally shows that allele 16

was not present after the first amplification, was present but below threshold after the second amplification, and was present and above threshold after the PAP and thus must either be a drop-in or drop-out.

In Reply, Plaintiff argues, with respect to drop-in, that Davis herself admitted she does not know whether allele 16 dropped into the later amplification, or out of the earlier amplification, and thus is speculating about whether it was drop-out or drop-in.

At the *Daubert* hearing, Davis was asked if she believed that allele 16 was a drop-in, to which she responded that she believed it "most likely" was a drop-in because it was not reproducible.  This is consistent with her report, in which she states it "should be noted that the 16 is not present in the 01.01.1 EPG (red arrow), and it appears in the second amplification 01.01.1ra.  This is an indication of drop-in since the allele is not seen in the replicate amplifications."

Davis then testified "I, I -- it could be contamination.  I don't really feel like it's contamination.  It could be drop-out on the first amplification.  It could also be that.  But the bottom line is, is it's not reproducible.  It's there one time; it's gone the next.  I do not know why it's either there or why it's either gone.  But since it's not reproducible, I can't see scientific reproducibility and reliability.  So however you want to name it or call it: drop-in, drop-out, whatever."

On cross-examination, Davis was asked "you cannot say with any degree of scientific certainty that the 16 was the result of contamination or drop-in, right?" to which she responded "No."  Davis then stated "I mean, I, I can say -- you're taking an

extreme statement.  I cannot say with any scientific certainty, that is not an absolute.

My statement is, is that this allele is not reproducible in the two different amplifications.

Where it came from, whether or not it is an allelic drop-in, whether or not it's an allelic

drop-out, whether or not it's contamination, or whether or not it's just a random spike

that came up, I don't know."  But, Davis testified, the result was not reproducible.

   Davis further testified that one explanation for the presence of the 16 in the

second round of amplification was that it was a drop-in.  She was then asked "you don't

affirmatively opine that the 16 was a drop-in; you just don't know how it got there,

right?"  Davis responded "It can be -- right.  It could be a drop-in.  It could be a

drop-out.  There could be contamination.  I do not know."  Davis then confirmed that

there was no sign of contamination in the second round of amplification.  When asked if

it was common for alleles to drop out of the first amplification, she testified "Drop-out

is an aspect of stochastic effect.  Right."  Counsel then asked "So the fact that the 16

doesn't appear in that first round, we just don't know what to make of it; is that fair?"

Davis responded "We don't know what was going on.  That's why it's inconclusive."

   Fedor, during his *Daubert* hearing, was asked "so the 16 was either a drop-out of

the first round or a drop-in of the second round?" and responded "Yeah.  It's certainly

one of the two."  Fedor opines that it is more likely the 16 was a drop-out, because

drop-outs are more common, as they are statistically the more likely to occur of the two.

The court finds that Davis' testimony on this point is admissible. Davis cannot opine with scientific certainty whether it was a drop-in or drop-out, but she believes it is probable, or more likely, that the allele was a drop-in. On the other hand, Fedor also testified that allele 16 was a drop-out or drop-in, but believes it more likely that it was a drop-out. Both Davis and Fedor are testifying to hypotheticals based on a probability or possibility, which is admissible so long as the hypotheticals have "analytically sound bases," rendering them "more than mere 'speculation' by the expert." See *Smith*, 215 F.3d at 719. Both experts have an analytically sound basis for their hypotheticals: Davis' is based on the fact it was not reproducible and Fedor's basis is because a drop-out is more statistically common. Davis also ties her theory that it was possible it was a drop-in, or contamination, to Cellmark's lack of proper controls on the amplification process. This analytical basis, based on the Davis' extensive experience and training and her review of the record in this case, is sufficient to render her opinion more than mere speculation and therefore admissible.

This is not to say, of course, that Davis' analytical basis is necessarily strong, but merely that it is sufficient. Davis herself equivocated during her testimony, and emphasized the inconclusive nature of her opinion, that she could not say either way, for sure, what caused allele 16 to show up in the second amplification. The court has no doubt that Plaintiff will thoroughly cross-examine Davis on this matter at trial. The court's gatekeeping function is to determine whether the methods used by an expert in

reaching a conclusion are sound, not to judge whether the conclusion is correct. See *Andersen*, 467 F.Supp.3d at 628. That will be for the trier of fact. Plaintiff's Motion is DENIED on this ground.

<u>Conclusion</u>

Plaintiff's Motion to Exclude Opinions and Testimony of Lucy Davis (#264) is GRANTED in part and DENIED in part as described above.

II.    *Thomas Martin*

Plaintiff moves to strike certain opinions and testimony to be provided by Defendants' expert Thomas Martin, as well as allegedly cumulative opinions of Defendants' expert James Downs. Plaintiff moves to strike the following opinions and testimony: (1) that Helmbacher did not struggle; (2) that Helmbacher was surprised by his killer; and (3) certain duplicative opinions of Martin and fellow defense expert James Downs.

As a preliminary matter, in Defendants' Response, Defendants note that Plaintiff, in his Motion, "says 'in support of their defense that Plaintiff is guilty of killing Helmbacher, Defendants have disclosed two experts…"  Defendants then state that a "correction to that statement is that the defense is not that Plaintiff is guilty of killing Helmbacher. The defense is that Defendants did not fabricate evidence that led to the conviction of Plaintiff for the murder of Helmbacher."  In response to this statement, Plaintiff, in his Reply, argues that this is a "judicial admission" that significantly narrows the scope of the evidence that will be relevant, and thus limits the relevance of

Martin and Downs' opinions.  Plaintiff then moves to exclude a slew of Martin's opinions that cast doubt on Plaintiff's innocence.  Plaintiff does, in a footnote, indicate that he will still argue and offer evidence on his innocence related to his damages claim and constitutional and Illinois state claims for trial.

The court will not strike Martin's opinions that may cast doubt on Plaintiff's innocence.  It is not entirely clear what Defendants meant by their statement in the Response.  Indeed, it may merely be Defendants asserting, as they have in their own Motions to Exclude Expert Testimony, that the only narrow issue for trial is whether Defendants fabricated evidence by planting blood in Plaintiff's shoe, as opposed to Plaintiff's assertion that issues related to the deficiency of the investigation are also relevant issues at trial.

To the extent that the deficiencies in the investigation are relevant issues for trial,[1] Defendants should be allowed to put on a defense to those claims, and such a defense would likely include evidence from the murder investigation that led Defendants to pursue Plaintiff as a suspect.  Evidence implicating Plaintiff would also be relevant to a defense that Defendants conspired to frame Plaintiff, indicating Defendants reasonably and legitimately believed Plaintiff to be a viable suspect.  This is distinguishable from Defendants pursuing a theory of defense that Plaintiff *actually* committed the murder, but rather is a theory that Plaintiff was a viable suspect, and

---

[1]The court, as stated in its prior *Daubert* Order, anticipates this issue being raised in a future pretrial motion in limine.

that Defendants did not conspire to frame him.  Therefore, the court will not strike as irrelevant Martin's opinions in this regard.

<u>Background of Thomas Martin</u>

Martin is currently a forensic consultant and since 2010 has been the proprietor of Crime Scene Forensics, LLC.  In this position, he provides case consultancy, reviews different types of cases, and renders opinions on those cases.  He also provides training in the areas of crime scene and death scene investigation, shooting incident reconstruction, and blood stain pattern analysis.

Martin started his career with the New York State Police in 1988, attending the academy and then serving as a patrol trooper until 1992.  In 1990 he became a "field crime scene technician," where he was trained in entry level crime scene analysis, such as larcenies, burglaries, and robberies.  He was initially trained in collecting fingerprints, photography, and then more advanced evidence collection.  In 1992 he was reassigned to the full-time crime scene response unit, where he regularly provided crime scene investigation services to smaller police agencies that did not have such capabilities.  He was in this position for the remainder of his career.

Martin started as an investigator and then in 1996 was promoted to senior investigator.  For the last 14 years of his career he was a supervisor of the unit.  In this unit Martin would respond to major crimes, and would handle basic scene documentation utilizing photography, note-taking, measurements, diagrams, and sketching.  The unit would handle all aspects of evidence collection at the scene and

evidence that might come in subsequently associated with that scene.  The unit also maintained a regional fingerprint laboratory with all certified latent print examiners. Martin was trained in the basic components of scene investigation, and in further specialized fields as well, including shooting incident reconstruction and blood stain pattern analysis.

Martin testified that crime scene reconstruction is documenting the scene via photography, note-taking, sketches, and measurements.  The investigators would always diagram the scene out so they knew how one thing related to the other, depicting spatial or proportional relationships.  Then the investigators would collect evidence, document what was there "in kind of the same type of a method" time after time, and then put things "together to try and generate -- reconstruct what happened, try to determine what happened at the scene based on the evidence at the scene and based on your training and experience."  The investigators would "both develop theories and then support other theories that were there."  Martin testified that "one of the basics of physical evidence is more or less to support or refute other information that comes in[,]" because "[i]t gives validity or takes validity away from other things when you can actually see it."

Martin went through extensive training, both through his 22 years with the New York State Police "and then continued with seminars and classes, everything else after that." Martin regularly worked homicide cases in this position, estimating that he

investigated hundreds of homicides in his time with the New York State Police.  Martin also detailed his extensive training in crime scene analysis, such as photographing and blood stain pattern analysis.

Martin retired in 2010 and set up his own company.  Martin is on the road many weeks of the year running training courses and seminars for law enforcement, as well as consulting.  The subject matter is crime scene investigation, primarily death and homicide investigation.

Martin consults on anywhere from 10 to 50 cases a year, and has testified in court "hundreds of times" over the last 34 years (including his time in law enforcement).  He estimated that he has testified in court 40 to 100 times in his consulting career.

    1.    <u>Martin's opinion that Helmbacher did not struggle</u>

Plaintiff moves to bar Martin's opinion that there is no evidence that Helmbacher's murder included a "prolonged combative event or struggle" because it is based on: (1) an unreliable methodology; (2) speculation that falls outside Martin's scope of expertise; and (3) an unusual definition of the word "struggle" which renders his opinion confusing and misleading.

    **a.    Whether the methodology was unreliable**

Plaintiff first argues that Martin's methodology in arriving at his opinion was unreliable because he ignored photographic and video evidence that was contrary to his opinion that no prolonged combative event or struggle occurred.  Plaintiff notes that Martin cited the fact that furniture was not knocked over and did not have blood on it,

but photographs from the scene showed that a disturbed couch, knocked-over, blood-smeared chair lay inches from Helmbacher's head.  Plaintiff argues that Martin ignored or minimized the import of this evidence, claiming, based on pure speculation, that the chair was knocked over when the hammer was swung by the killer, although he had no idea when the hammer was introduced in the attack.  Plaintiff further notes that Martin bases his opinion on his claim that there was no evidence showing Helmbacher fought with his attacker or defended himself, ignoring the autopsy photographs showing defensive wounds and bruising on Helmbacher's knuckles.  Plaintiff argues that Martin's opinion is based on "selective focus on confirmatory evidence and the speculative discounting of the remaining physical evidence[,]" which directly contravenes the generally accepted methodology of considering the documentary evidence as a whole and using the holistic approach to develop theories.

Defendants respond that Plaintiff misunderstands Martin's opinion, and that Plaintiff's claims of unreliable methodology rely on quibbles with the evidence that have nothing to do with the soundness of the methodology.  Rather, Defendants argue that Plaintiff attacks Martin's conclusions.  Defendants argue the relevance of Martin's opinion is that there is no evidence that Helmbacher ever got his hands on his attacker, such that a DNA transfer would have occurred.  Defendants argue that, rather than ignoring the couch, Martin considered the couch in his opinion but found it consistent as there was no other sign of struggle in the area.  Regarding the turned-over chair with blood on it and knocked-over can of nails, Defendants argue that those items were in

34

the vicinity of the attack, so of course they would be disrupted and have blood on them.
Defendants acknowledge Martin does not know precisely when the hammer was first
swung, but clearly it was swung at some point.  Finally, regarding the defensive
wounds, Defendants argue those wounds were the kind of wounds one would get
when shielding themselves from an attack, and are thus consistent with Martin's
opinion that no prolonged combat or struggle occurred.

At his *Daubert* hearing, Martin testified about the methodology he employs when
analyzing a crime scene, whether it be a scene where he can be physically present or
reviewing photographs and reports from a case file.  Martin bases his opinions on what
evidence he sees at the scene, whether in person or, as in this case, photographs and
video.  Martin assesses what is there, putting the physical evidence into the context of
how the scene is configured, and draws information from that evidence as to what was
the last apparent activity at the scene, building off his years of experience and
information gleaned from prior crime scene investigations.  Such a methodology is
sound, and indeed, is similar to the methodology employed by Plaintiff's expert David
Harvey in analyzing crime scenes.  The question is whether Martin actually employed
that methodology in this case.

In his report, Martin states his opinion on this point as follows: There is no sign
of a "struggle" or other prolonged combative event at the scene of William
Helmbacher's murder.  Helmbacher was assaulted in the immediate area in which the
blood stains are located.

35

The basis for Martin's opinion, as documented in his report, is as follows: The photos of Helmbacher's apartment depict a residence that is generally unkempt and in need of cleaning and upgrades.  With that being said, the overall condition of the apartment does not demonstrate a prolonged combative event or struggle.  None of the items observed on the tables have been knocked over onto the floor.  None of the items observed on the kitchen counters have been knocked over onto the floor.  There is no notable damage to the surrounding walls.  The blood observed in the scene photos is noted to be limited to the area immediately surrounding Helmbacher.  Blood spatters are observed on the floor and on the bottom portions of the plastic chair that is observed lying on its back side immediately above Helmbacher's head.

There are no readily apparent blood stains observed on the surrounding upper walls or furniture.  There are no blood transfer stains on the surrounding walls that would indicate a direct contact between a blood source (Helmbacher) and the surrounding walls.  There are no cast off spatters observed on the surrounding walls or furniture that would suggest Helmbacher's injured/bleeding arm was moving around in order to defend himself from the next hammer strike.

The overall condition of the scene and the lack of blood stains outside the immediate area surrounding William Helmbacher suggest that the assault on Helmbacher was confined to the immediate area in which Helmbacher and the blood stains are observed.  There are no signs of a prolonged combative event between Helmbacher and his assailant that extended to any other area of the apartment.

36

Plaintiff argues that this opinion is a flawed product of unreliable methodology because Martin did not consider *all* of the evidence at the scene, namely the turned-over blood-smeared chair, scattered nails and broom, couch in disarray, and defensive wounds such as bruised knuckles.

However Martin, as revealed in the *Daubert* testimony, did consider that evidence, but found that, when compared against other evidence, the evidence still supported his opinion that there was no prolonged combat or struggle.  To wit, Martin testified that the attack was a concise one that occurred in a particular, confined area of the apartment, and the fact that the overturned chair with blood spatter and nails were in that area, along with the blood spatter being at a very low level, supports his theory of the one-sided attack.  Martin noted that the chair was a small plastic one with no weight to it and thus easy to knock over, and testified that the blood on the "chair with the spatter on it is consistent with blood moving from Mr. Helmbacher's head onto that leg of the chair, as you pointed out.  So the chair is in the area where the hammer would have been swung."

In contrast to that one small area of the apartment where Helmbacher was believed to have been killed and his body was found, Martin noted that the rest of the apartment was relatively undisturbed.  There was a table lamp set on the floor just above where the chair had fallen over that was undisturbed.  There were no blood stains on the ceilings, other walls, or other furniture in the apartment.  Martin cited multiple items on the table in front of the couch that were not disturbed, as well as soda

37

cans in the kitchen.  As to the defensive wounds, Martin opined that these wounds did not indicate prolonged, extensive combat, as the wounds were mostly on the back of Helmbacher's arms, indicating Helmbacher was in a natural defensive/covering-up/guarding posture, as opposed to a combative one.  For the bruised knuckles, Martin believed the mark on the knuckles consistent with the circular head of the hammer that the attacker used.  All of this, Martin opines, supports his opinion that the attack was a one-sided one in a confined space, as opposed to knockdown, drag-out fight that went all throughout the apartment.

Martin is allowed to form an opinion based on a reliable methodology with a sound analytical basis, from evidence in the record, evaluating and interpreting that evidence based on his years of experience and expertise in the field.  Here, his methodology was sound and based on his interpretation of the photographic and video evidence from the crime scene.  The soundness of the factual underpinnings of Martin's analysis and the correctness of his conclusions based on that analysis are factual matters to be determined by the trier of fact.  See *Smith*, 215 F.3d at 718.  He can look at the photographic evidence and come away from it with a different interpretation than Plaintiff or Plaintiff's expert.  The fact that Martin disagrees with Plaintiff and Plaintiff's expert's interpretation of the evidence does not make Martin's opinion inadmissible. Martin is Defendants' expert, and need not consider Plaintiff's version or interpretation

of contested facts and may base his opinion on assumptions that are necessarily at odds with Plaintiff's view of the evidence.  See *Hill v. City of Chicago*, 2017 WL 2436316, at *13 (N.D. Ill. June 5, 2017).

The court also rejects Plaintiff's cursory argument that Martin's opinion on this point would be confusing or misleading.  Plaintiff's Motion is DENIED on this basis.

### b.    Martin's opinion that Helmbacher was immediately incapacitated by the initial hammer blow

Plaintiff next argues that the court should strike, as part of the basis for his opinion that Helmbacher did not struggle with his attacker, Martin's theory that Helmbacher was immediately incapacitated and rendered incapable of defending himself by the initial hammer blow.  Plaintiff argues that Martin testified he has no idea when the hammer was introduced into the fight, Martin is not a forensic pathologist, and Martin has no medical background.

Defendants do not respond to this argument in any meaningful way.  Martin is not a forensic pathologist or medical expert.  It would be outside his area of expertise to opine on whether the first blow from the hammer immediately incapacitated Helmbacher, just as the court found Moses was not a pathologist when considering his "emotional killing" theory.  Martin did indeed testify that he does not know exactly when the hammer was introduced in the attack on Helmbacher.  Thus, to the extent that Martin would base his theory, in part, on an opinion that the first hammer blow

39

rendered Helmbacher "immediately" incapable of defending himself, Plaintiff's Motion is GRANTED. Martin can still offer his opinion that this was a one-sided struggle based upon the reasons articulated in the above subsection.

      c.        **Martin's use of "struggle"**

Plaintiff next argues that Martin's opinion is based on a "unusual definition of the word 'struggle' which renders his opinion confusing and misleading." Specifically, Plaintiff states that Martin defines "struggle" idiosyncratically to mean that the combatants are evenly matched and move from room to room in a knockdown, drag-out fight that leaves holes in the wall and surrounding furniture upended. Martin testified there was no "struggle" here because it was a very one-sided assault confined to a particular area. Plaintiff argues that this conflicts with the dictionary definition, or "natural use," of struggle, which is a "strenuous" or "violent" effort in opposition, or a tussle. Plaintiff argues that when that definition is applied, it is clear a struggle occurred when Helmbacher was killed.

The court has considered the parties' briefs on this point. "Struggle" has no fixed, specific definition. Even Plaintiff's own preferred definition could apply to Martin's opinion as to what occurred, as Martin does not believe there was a "strenuous" or "violent" effort in opposition by Helmbacher, just a violent, one-sided attack as Helmbacher crouched in a defensive posture. Martin can use his definition of "struggle" to describe what he believes occurred, or did not occur, on the night of

40

Helmbacher's murder.  Plaintiff can cross-examine him on the meaning of the term so as to clear up any confusion Plaintiff believes this may cause the jury.  Plaintiff's Motion is DENIED on this ground.

    2.    <u>Martin's opinion on whether Helmbacher was was surprised by his killer</u>

Plaintiff next argues that Martin should be barred from speculating about the events leading up to the murder, specifically whether Helmbacher was "surprised" by his attacker.  Plaintiff asserts that Martin's "surprise theory" rests on two assumptions: (1) that Helmbacher's back was to the door when the attacker entered; and (2) that Helmbacher was alone in his apartment right before the murder.

Regarding the first assumption, Plaintiff argues that Martin's reliance on the placement of the brown recliner chair, where Helmbacher would have his back to the door, makes no sense because it is just as logical that Helmbacher would be sitting in the white chair next to the table on which the hamburger was resting.  Concerning the placement of Helmbacher's shoes by the brown recliner, Plaintiff notes that Martin does not even know that the shoes belonged to Helmbacher, does not know when the shoes were placed by the recliner, and that the positioning of the shoes was inconsistent with someone sitting in the brown recliner and removing them.  Plaintiff also argues that Martin's supposition that Helmbacher bit into the unwrapped hamburger has no evidentiary support, because there is no evidence that Helmbacher was the one eating the hamburger.

On the second assumption, Plaintiff argues that Martin has no knowledge of Helmbacher's habits when entertaining guests, so his belief that the fact Helmbacher was found with one sock indicates he was alone is speculation.  Moreover, Martin's surprise theory is also based on his assumption that Helmbacher had his back to the door when the attacker entered and then, without any struggle, was immediately felled by his attacker and killed.  Plaintiff argues that Martin had no information as to when Helmbacher was murdered or when the hammer was introduced.  Finally, Plaintiff argues that the jury does not need an expert to look at the state of Helmbacher's apartment and draw the conclusion of whether or not there had been a struggle.

Defendants respond that Martin based his opinion as to where Helmbacher sat just before the attack on the totality of the evidence.  Defendants argue that, regarding the placement of the shoe, there is no law of physics that when someone kicks off their shoes they always land so they point in the opposite direction from the position they are facing.  Defendants argue, regarding the hamburger, that Helmbacher lived in the apartment, presumably ate his meals there, lived alone, and the evidence suggested he was sitting in a chair someone would sit in while eating the hamburger.  Defendants argue that it would be unusual for someone to entertain guests while wearing one sock.

In his report, Martin states that the scene evidence supports Helmbacher being surprised by his attacker.

The basis for his opinion is as follows: There is a chair next to the table on which the hamburger is located.  A pair of tennis shoes is observed on the floor immediately in

front of the chair.  The tennis shoes are in a position that would be consistent with Helmbacher sitting in that chair and removing his shoes.  Helmbacher is observed wearing a pair of pants, no shirt and just one sock.  Normally when one removes socks they are removed in succession, rather than walking around with one sock on and one sock off. The combination of the location/position of the tennis shoes to the chair, and the fact that Helmbacher is found wearing only one sock, would be consistent with him changing out of his work clothes, removing his shoes and socks while seated in the chair, and being surprised before he could remove his second sock.

Helmbacher's state of dress is far from a normal state of dress if one were entertaining company or socializing with someone.  The idea that Helmbacher was entertaining company or socializing with another person at the time of his murder is not supported by the scene evidence.  The scene evidence supports Helmbacher being surprised by his attacker as he was changing his clothes/removing his socks.

The hamburger on the table with a single bite taken from it is in a location that would be consistent with Helmbacher placing the bag and hamburger on the table as he sat in the chair to remove his shoes and socks.  If Helmbacher were seated in the chair, it would place his back toward the front door.  If Helmbacher were surprised from behind while he was removing his socks, it would provide a reasonable explanation as to why he had one sock on and one sock off.

43

An outer screen door is present over the front door to Helmbacher's apartment. Helmbacher's former roommate, Kristafer Lewison, stated to police that Helmbacher normally kept a hammer just inside his front door.

The Autopsy/Coroner's report states that: "Masking tape surrounding the shaft of the hammer bears the name 'Helmbacher' and a telephone number. This would appear to be the decedents hammer."

If Helmbacher had arrived home, placed the hamburgers on the table and was changing out of his work clothes, it would present a scenario in which the offender could walk into Helmbacher's apartment, pick up the hammer that was normally kept by the front door on the way in, and strike Helmbacher from behind.

Martin testified at the *Daubert* hearing that his surprise theory relied on scene evidence, particular Helmbacher having one sock on and one sock off, where the shoes and chair were, and Helmbacher having taken a bite of the hamburger. Martin explicitly testified that he was not delving into Helmbacher's mental state, what his post-work routine was, or whether he knew the attacker. Martin testified that, the way the scene is laid out, the brown chair is pulled up to the table with the hamburger and the shoes are in front of the chair, "giving the appearance that that's his last apparent activity, sitting in the chair, with the hamburger, taking his socks off."

This court's decision on this particular opinion is a close call. However, as with other close calls in these *Daubert* Motions, such as Moses' opinion on whether

44

Helmbacher knew his killer and Harvey's opinion on whether investigators should have concluded that Helmbacher had a relationship with his attacker, the court errs on the side of finding the opinion admissible.

The court finds that Martin's opinion in this regard is based on a reliable methodology, his crime scene investigation experience of examining the physical evidence from the scene (in this case from video and photographs), and that he formed a theory based on what occurred from that evidence. The question, then, is whether Martin's theory is based on sufficient facts. "Experts must base their opinions on specific facts." *Krause v. County of Mohave*, 459 F.Supp.3d 1258, 1267 (D. Ariz. 2020), citing *Guidroz-Brault v. Missouri Pacific R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001). "When an expert fails to do so, or bases opinions on 'subjective belief or unsupported speculation,' *Daubert*, 509 U.S. at 590, the expert's testimony should be excluded." *Krause*, 459 F.Supp.3d at 1267, citing *Guidroz-Brault*, 254 F.3d at 829-832 (cleaned up). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995), quoting *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

Here, the court finds that Martin's theory that Helmbacher was surprised by his killer is supported by sufficient facts to validate it in the eyes of the law. He based it on his years of experience and training in evaluating crime scenes, and where he believes

Helmbacher sat due to the positioning of furniture and the bitten-into hamburger, the placement of the shoes, and the fact Helmbacher was wearing one sock.  Martin based his opinion on his review of photographs and video from the crime scene and his experience in other crime scene investigations.  An expert may base his opinion on photographs or video of the scene.  From the evidence, Martin deduced his theory that Helmbacher was sitting with his back to the door in the process of eating dinner, and thus was surprised by his attacker.  These facts, though slight, are sufficient to allow an experienced crime scene investigator like Martin to make an inference as to the state of the scene just before the murder occurred.

Plaintiff also argues that Martin's opinion is inadmissible because he did not consider other, alternative explanations for who bit into the burger, which chair Helmbacher could have sat in, where Helmbacher took his sock off, the positioning of the shoes, and what Helmbacher's habits were for entertaining guests.  However, Martin is Defendants' expert, and need not consider Plaintiff's version of contested facts and may base his opinion on assumptions that are necessarily at odds with Plaintiff's view of the evidence.  See *Hill*, 2017 WL 2436316, at *13.  Plaintiff can present at trial evidence contradicting the facts underlying Martin's expert opinion, and the jury may resolve any such factual conflicts.  See *Hill*, 2017 WL 2436316, at *13.

Contradictory facts or interpretations of the evidence from the scene like those advanced by Plaintiff, such as who bit into the hamburger, what chair was the most logical one to sit in, where Helmbacher was when he took off his shoes, and what the

one sock indicates about Helmbacher's entertaining habits, may undermine Martin's theory.  However those arguments go to the weight of Martin's testimony and may well be used effectively by Plaintiff on cross-examination at trial, but those facts cannot be considered "indisputable record facts" that contradict Martin's opinion such that it would be unreasonable.  See *Rebel Oil*, 51 F.3d at 1436.

Defendants also raise a cursory Rule 702 argument, that the jury does not need Martin to look at the state of Helmbacher's apartment and draw the conclusion about whether there had been a struggle, but do not develop or support it.  In any event, this particular opinion is about whether Helmbacher was surprised by his attacker, and Martin's theory is based on his years of expertise and experience in analyzing crime scenes and his interpretation of photographic and video evidence from the scene, something outside the purview of the average layperson.  Martin's opinion that Helmbacher was surprised by his attacker will be allowed.  Plaintiff's Motion is DENIED on this ground.

### 3.    Duplicative Opinions of Martin and Downs

Plaintiff last argues that certain opinions of Martin and fellow defense expert James Downs should be barred as duplicative of one another.  Plaintiff argues that allowing Martin and Downs to offer the same opinions to the jury would result in unfair prejudice to Plaintiff, as the jury may be inclined to more heavily weight the double opinions based merely on repetitive presentation.

47

Defendants respond that there is no set rule that only one expert can talk about a particular issue, and the court has discretion to allow what "one may argue are cumulative opinions."  Defendants also argue that Martin and Downs do not give cumulative opinions because, while they may overlap in some ways, they each provide a different perspective and level of expertise.  Martin is a crime scene investigator, Downs a forensic pathologist.  Defendants argue that if the court does find any opinions duplicative, they need not be stricken at this point, and Defendants could, instead, be required to choose which one to present at trial.

Rule 403 allows a court to exclude relevant evidence if its probative value is substantially outweighed by a danger of needlessly presented cumulative evidence. Fed. R. Evid. 403; *Brown v. United States*, 2021 WL 4480985, at *13 (C.D. Ill. Sept. 29, 2021).  However, in the Northern District of Illinois, at least, while it is generally the practice of courts "to prohibit a party from offering multiple experts to express the same opinions on a subject, there is no general practice or rule that prohibits a party from identifying under Fed. R. Civ. P. 26(a)(2) more than one testifying expert on a subject and reserving for later the decision as to which one to use at trial."  *AVNET, Inc. v. MOTIO, Inc.*, 2016 WL 3365430, at *1 (N.D. Ill. June 15, 2016).

The court believes the Northern District practice is a prudent one that serves judicial economy and prevents the needless waste of judicial resources.  Therefore, the court RESERVES ruling on this portion of Plaintiff's Motion.  The parties are directed to confer, at some point before the filing of pretrial Motions in Limine, on the subject of the

allegedly duplicative opinions of Martin and Downs.  Following that conference, Plaintiff may renew his request to bar those duplicative opinions in no resolution is reached.

The parties are encouraged to reach a reasonable accommodation on this issue. Plaintiff should seek to bar only those opinions that are truly duplicative, considering the respective areas of expertise of Martin and Downs.  Defendants, if confronted with duplicative testimony, should decide which expert to use at trial to present that opinion.

Conclusion

Plaintiff's Motion to Exclude Testimony of Thomas Martin and James Downs (#265) is GRANTED in part and DENIED in part as described above.

IT IS THEREFORE ORDERED:

Plaintiff's Motions to Exclude the Testimony of Lucy Davis (#264) and Thomas Martin and James Downs (#265) are both GRANTED in part and DENIED in part, for the reasons, and to the extent, stated herein.

ENTERED this 9th day of May, 2024.

s/ COLIN S. BRUCE
U.S. DISTRICT  JUDGE