# EXHIBIT 4

**In The Matter Of:**

*PALMER v.*
*CITY OF DECATUR, et al.*

---

*RAY TAYLOR*
*February 23, 2021*

---

*Area Wide Reporting and Video Conferencing*
*www.areawide.net*
*scheduling@areawide.net*
*301 W. White Street*
*Champaign, IL  61820*

Original File 0223tayr.txt
Min-U-Script® with Word Index

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE CENTRAL DISTRICT OF ILLINOIS
2                    URBANA DIVISION

3

4    CHARLES PALMER,                )
                                    )
5         Plaintiff,                )
                                    )
6     vs.                           )   No. 3:17-cv-03268
                                    )
7    CITY OF DECATUR, et al.,       )
                                    )
8         Defendants.               )

9

10

11

            VIDEOTAPED DEPOSITION OF RAY TAYLOR
12                  Via Videoconference
                   February 23, 2021
13                     1:00 p.m.

14

15

16

17

18

19         Becky L. Jessup:  CSR # 084-004343

20      Area Wide Reporting and Video Conferencing
                 301 West White Street
21             Champaign, Illinois  61820
                   (800) 747-6789
22

23

24

25

1                             INDEX

2
     APPEARANCES:
3
     For the Plaintiff (via videoconference):
4
                 Rachel Brady
5                LOEVY & LOEVY
                 Attorneys at Law
6                311 N. Aberborn Street, 3rd Floor
                 Chicago, Illinois  60607
7
     For the Decatur Defendants:
8
                 Thomas DiCianni
9                ANCEL GLINK
                 Attorneys at Law
10               140 South Dearborn Street
                 Chicago, Illinois  60603
11               tdicianni@ancelglink.com

12               John T. Robinson
                 Attorney at Law
13               One Gary K. Anderson Plaza
                 Decatur, Illinois  62523
14
     For the Tim Carlton Estate:
15
                 Jerrold Stocks
16               FEATHERSTUN, GAUMER, STOCKS, FLYNN & ECK
                 Attorneys at Law
17               101 S. State Street, Suite 240
                 Decatur, Illinois  62525
18
     For Ray Taylor:
19
                 Michael Zopf
20               Attorney at Law
                 701 Devonshire, C49
21               Champaign, Illinois  61820
                 mzopf@zopflaw.com
22
     The Videographer:
23
                 Wayne Rutherford
24               515 W. Eldorado Street
                 Decatur, Illinois  62522
25

**Area Wide Reporting and Video Conferencing**
**1-800-747-6789**

EXAMINATION BY:

Ms. Brady . . . . . Page 5
Mr. DiCianni . . . . . Page 140
Mr. Stocks . . . . . Page 157
Mr. DiCianni . . . . . Page 163
Ms. Brady . . . . . Page 166


EXHIBITS:

A . . . . . . . . Page 17
B . . . . . . . . Page 21
C . . . . . . . . Page 22
D . . . . . . . . Page 24
E . . . . . . . . Page 26
F . . . . . . . . Page 54
G . . . . . . . . Page 58
H . . . . . . . . Page 72
I . . . . . . . . Page 77
J . . . . . . . . Page 82
K . . . . . . . . Page 83
L . . . . . . . . Page 86
P . . . . . . . . Page 125
U . . . . . . . . Page 9
V . . . . . . . . Page 10

1                          STIPULATION

2

3          IT IS HEREBY EXPRESSLY STIPULATED AND AGREED

4   by and between the parties that the deposition of RAY

5   TAYLOR may be taken on February 23, 2021, at the United

6   States Federal Courthouse, 201 S. Vine Street, Urbana,

7   Illinois, pursuant to the Rules of the Federal Court

8   and the Rules of Federal Procedure governing said

9   depositions.

10

11          IT IS FURTHER STIPULATED that the

12  necessity for calling the Court Reporter for

13  impeachment purposes is waived.

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  We are on the record.  My

2   name is Wayne Rutherford.  I am the videographer.  The

3   date is 02/23/21.  The time is 1:09 p.m.

4          We are located at 201 South Vine Street,

5   Urbana, Illinois, in reference to the case Palmer v.

6   City of Decatur, et al., 317-CV-3268.  The name of the

7   witness is Ray Taylor.

8          Would the court reporter please swear in the

9   witness?

10

11                    RAY TAYLOR,

12   the witness herein, having been first duly sworn to

13   tell the truth, the whole truth and nothing but the

14   truth, was examined and testified as follows:

15

16   EXAMINATION,

17        QUESTIONS BY MS. BRADY:

18        Q.   Good morning, Mr. Taylor.  Can you see and

19   hear me okay?

20        A.   Yeah.

21        Q.   Okay.  My name is Rachel Brady and I represent

22   the plaintiff in this civil lawsuit so I represent

23   Charles Palmer.

24          Mr. Taylor, as the Court informed you

25   earlier, you are under arrest until you complete this

1  deposition.  You understand that, right?

2      A.   Yes.

3          MS. BRADY: Does defense counsel want to read

4  in the admonishment that the Court included in its

5  earlier docket entry?

6          MR. DiCIANNI: Yes.  Mr. Taylor, my name is

7  Thomas DiCianni and I represent the City of Decatur and

8  a number of the police officers who have been sued by

9  Charles Palmer.

10         The deposition today is, the general subject

11 matter of it is your involvement in the investigation

12 of the murder of William Helmbacher and Charles

13 Palmer's involvement as well.

14         You have the right to refuse to answer any

15 question if you believe that a truthful answer to it

16 could be self-incriminating, it could get you in

17 trouble.

18         So you have the right to refuse any question

19 that is asked of you.  Any testimony you give can be

20 used against you in any kind of legal proceeding so

21 including if somebody wanted to charge you for

22 something.

23         And I believe you have been given a

24 reasonable opportunity to speak to counsel prior to any

25 questioning and I would ask you, are you going to seek

1    any additional time to consult with any other

2    attorneys?

3              MR. TAYLOR: No.  I don't need nothing.

4              MR. DiCIANNI: That is all I have.

5    BY MS. BRADY:

6         Q.   Mr. Taylor, can you please state your name and

7    spell it for the record?

8         A.   Ray Anthony Taylor.

9         Q.   Can you spell it please?

10        A.   R-a-y, a-n-t-h-o-n-y, t-a-y-l-o-r.

11        Q.   Okay.  I am going to add counsel for the

12   defense representing the police officers in the City of

13   Decatur just admonished you.

14             You do have the right to remain silent in

15   this deposition if you believe that a truthful answer

16   could be incriminating for you.

17             Anything you say could be used against you in

18   future legal proceedings and you do have a right to

19   consult with counsel before answering any questions.

20             And I think that you just testified that you

21   do not have any intention to seek further counsel for

22   this deposition; is that right?

23        A.   That is right.

24        Q.   Okay.  And accordingly if you choose to assert

25   your right not to answer a question, you should state

1  that you are invoking your 5th amendment right.  Is

2  that fair?

3      A.   Okay.

4      Q.   Okay.  Mr. Taylor, you were subpoenaed to take

5  a deposition in this case over two years ago.  Is that

6  right?

7      A.   Yes.

8      Q.   And you refused to attend the deposition?

9      A.   No.  It wasn't that I refused.  It is just

10  that I didn't think it was necessary.  I don't think

11  that I just didn't go.  I for sure it was two different

12  times.  I think the first one, it was like at a motel

13  or something.  Did you know that?

14      Q.   That is right.

15      A.   No.  They sent me money to go and I didn't go.

16  I sent them their money back.  And I said no.

17      Q.   Yeah.  That is right.  So you received the

18  deposition subpoena and a witness check to testify at

19  the deposition as required under federal rules of civil

20  procedure.  And you declined to attend that deposition;

21  is that right?

22      A.   Yep.  I didn't go.  I sent them their money

23  back.

24      Q.   Okay.  And then you were served with two

25  additional types of paperwork; one was an order about a

1  hearing to show cause why you should not be held in

2  contempt for failing to appear at your deposition; is

3  that right?

4      A.   Not for sure if that happened.

5      Q.   Okay.  If I told you that we had a document,

6  an affidavit, establishing that you were served with

7  those papers, would you have any reason to dispute

8  them?

9      A.   Yes.  Because I have never been served with no

10  papers to go to no hearing or anything.  No one ever

11  give me any papers.

12      Q.   Okay.  So I ask the court reporter to hand the

13  witness what has been previously marked as Taylor

14  Exhibit U.  For the record this is a one page document.

15  This is Docket No. 58 in this case.

16          Mr. Taylor, this is an affidavit from our

17  process server testifying or stating under oath that he

18  served you a motion for an order to show cause why you

19  should not be held in contempt.  Do you see that as

20  Paragraph 4?

21      A.   I am looking at it, but this is not true.  He

22  hadn't served me anything.

23      Q.   Okay.  So if Mr. Smith were to come to trial

24  and testify that he served you with these papers, you

25  are saying that he would be lying at trial?

1      A.    Yes.

2      Q.    Okay.  And then after Mr. Smith served you

3  with that paperwork, the Court issued an order that you

4  would be in contempt for failing to appear at your

5  deposition.

6            And I personally put a copy of this paperwork

7  in your door at 1177 Cottage Hill.  And then one of our

8  process servers also confirmed that you had received a

9  copy of this paperwork.  Do you recall that?

10     A.    No.

11           MR. DiCIANNI: I object to the form of the

12  question.  It is assuming a fact not in evidence.  You

13  can answer.

14     A.    No.  I didn't get any papers in my door.  So

15  if something was for me, it should have been put --

16  mailed to me and put in my mailbox.  And it wasn't.

17  BY MS. BRADY:

18     Q.    What is your address?

19     A.    1177 Cottage Hill Avenue, Decatur.

20     Q.    Okay.  Can the court reporter please hand the

21  witness what has been previously marked as Taylor

22  Exhibit V?

23     A.    Exhibit 3?

24     Q.    It says Exhibit 3 on the very front page,

25  yeah.  And then if you can turn to the --

1      A.    First page?

2      Q.    The first page.  For the record this is

3   document Docket No. 70-3 and we are now looking at

4   Page 2 of 3 it says on the top.

5           Mr. Taylor, this is an affidavit from another

6   one of our process servers stating that he attempted to

7   confirm that you had received the order to show cause.

8           He went to 1177 and confirmed that the papers

9   I had put in your front door were no longer there.  Do

10  you see that in Paragraph 4?

11     A.    They attempted to confirm that I received the

12  papers?

13     Q.    Yeah.

14     A.    So --

15     Q.    And it says I observed that the papers were no

16  longer in the screen door at 1177 Cottage Hill Avenue.

17  Do you see that?

18     A.    Yeah.

19     Q.    Okay.  And if you turn the next page and look

20  at Paragraph 6?

21     A.    What was wrong with the mailbox?

22     Q.    Paragraph 6 says on March 15, 2019, around

23  1:00 p.m., I went to ET Flowers and Home Decor New and

24  Used Furniture, 708 E. Wood Street in Decatur, a

25  business owned by Ray Taylor's parents.

1          And then Paragraph 7 says while talking to

2    Ray Taylor's father, Robert Taylor, in the furniture

3    store, I showed him a copy of the order to show cause.

4    Robert told me Ray had received the same paperwork in

5    his door a couple of days ago.  Robert told me Ray

6    showed him the same order and letter I had with me.  Do

7    you see that here?

8          A.   I see it on this paper here, but I don't

9    recall that.

10          Q.   Okay.  If Mr. Tyler came to trial and

11    testified that he had that conversation with your dad,

12    are you saying that he would be lying or that you just

13    don't recall?

14          A.   I don't recall.  And plus he wouldn't be able

15    to come anyway because he has been terminally ill.  So

16    him and my mom, they both got sick right behind one

17    another so they are both not even capable of coming and

18    giving any kind of statements about anything right now

19    in their condition.  So that is out of the question.

20          Q.   Okay.  So, Mr. Taylor, the truth is that you

21    do not want to be involved in this case anymore; is

22    that right?

23          A.   Why do I want to be involved in this?  This

24    is --

25          Q.   So you do not want to be involved in this case

1  anymore; is that correct?

2       A.   If I don't have to be.  I don't need to be

3  involved in it if I don't have to.  Why would I want to

4  be?

5       Q.   Okay.  And the only reason you are here today

6  is because you got arrested; is that right?

7       A.   Well, they were talking about the deposition

8  so my boss told me that he had knew about that and that

9  they were going to come and probably pick me up to come

10  for this deposition.

11           I was like I am not afraid.  I said that is

12  fine, you know what I mean.  But he didn't want to make

13  a big scene at my job about this.  And when they come

14  this morning, there wasn't a big scene because it was

15  the beginning of the work day so I was really the only

16  one in my work area, so.

17       Q.   And when you testified at Charles Palmer's

18  criminal trial, you had also been arrested; is that

19  right?

20       A.   Um, no.

21           MR. DiCIANNI: Object to form of the question.

22       A.   That has been 30 years ago.

23           MR. ZOPF: Ray.

24       A.   Sorry.

25

1  BY MS. BRADY:

2      Q.   You were facing criminal charges at the time

3  you testified at Charles Palmer's criminal trial; is

4  that right?

5      A.   I don't remember that.

6      Q.   Okay.  You had no legitimate basis to

7  implicate Charles Palmer in his original criminal

8  trial; is that right?

9      A.   Say that again.

10      Q.   You had no legitimate basis to implicate

11  Charles Palmer in his original criminal trial; is that

12  right?

13          MR. DiCIANNI: Object to form.  You can go

14  ahead and answer.

15      A.   I don't know what you really mean.

16  BY MS. BRADY:

17      Q.   You testified against Charles Palmer at his

18  criminal trial in April of 2000, right?

19      A.   I guess there was a date.  I don't know.

20      Q.   Do you remember testifying at Charles Palmer's

21  criminal trial?

22      A.   Kind of a little way maybe.  Depends.

23      Q.   And you had no legitimate basis to testify

24  against him, right?

25          MR. DiCIANNI: Object to form of the question.

1  BY MS. BRADY:

2      Q.   You can answer the question if you understand.

3      A.   No, I didn't understand.  Say it again.

4      Q.   So you had no legitimate basis to testify

5  against Charles Palmer at his criminal trial, right?

6           MR. DiCIANNI: Same objection.

7      A.   No.  I wasn't like out to get him or nothing

8  like that if that is what you mean.

9  BY MS. BRADY:

10     Q.   No.  I am saying that you had no truthful

11 basis on which to testify against Charles Palmer at his

12 criminal trial; is that right?

13          MR. DiCIANNI: Object to form.

14     A.   Everything always has been truthful that I

15 have said, so.  It has never been nothing false about

16 nothing that I had said.

17 BY MS. BRADY:

18     Q.   Okay.

19     A.   During none of these proceedings about

20 nothing.

21     Q.   Okay.  And you recall the judge, Judge Long,

22 admonishing you this morning that if you wanted to be

23 released, you had to testify truthfully today, right?

24     A.   I testified truthfully all the time.

25     Q.   Okay.  So I am going to start by asking you

1  some questions today about the Decatur Police

2  Department investigation of the murder of William

3  Helmbacher.  In August of 1998 you lived at 351 W. Main

4  Street in Decatur above William Helmbacher, right?

5      A.   If that is the date, I don't know.  That has

6  been 20, 30 years ago, lady.  I don't know if that is

7  the same date or whatever.  But I did live --

8      Q.   Um --

9      A.   Go ahead.

10     Q.   Did you kill William Helmbacher?

11     A.   No.  I am not a murderer.  I wouldn't be --

12     Q.   You were not involved in his murder in any

13  way, right?

14     A.   No.  No, no, no.

15     Q.   And you were not there when the murder

16  happened, correct?

17     A.   No.  I was nowhere around.

18     Q.   Okay.  And separately the night before he was

19  killed, William Helmbacher was burglarized.  You had

20  nothing to do with the burglary of Helmbacher's

21  apartment that took place the night before he was

22  killed, did you?

23     A.   No.

24     Q.   And you didn't help burglarize him, did you?

25     A.   Did I burglarize him?  What did you say, did I

1  burglarize him?  No.

2      Q.    That was my question.

3      A.    Huh?

4      Q.    My question was:  Did you burglarize him?

5      A.    No.

6      Q.    You didn't help burglarize him, did you?

7      A.    No.

8      Q.    You didn't help get rid of any property that

9  was taken in after he was burglarized, right?

10      A.    No.

11      Q.    And then after William Helmbacher was killed,

12  you did six interviews with the Decatur police.  So I

13  want to ask you about some of the interviews you did

14  with the Decatur police after Helmbacher was killed.

15          So around midnight right after the murder, a

16  police officer had knocked on your door.  Do you

17  remember that?

18      A.    Not exactly, no.

19      Q.    Okay.  The court reporter is going to hand you

20  what has been previously marked as Taylor Exhibit A.

21      A.    See, you got to understand you are asking me

22  things from 20, 30 years ago, so.  I have no idea about

23  knowing exact dates of such and such, you know what I

24  mean.  No clue.  I don't remember that stuff.

25      Q.    Okay.  So I am going to show you some

1 documents that will hopefully refresh your recollection

2 about some of those conversations.  So the court

3 reporter is going to hand you a document.

4     A.    Maybe.

5     Q.    That has been marked Taylor Exhibit A.

6     A.    This is --

7     Q.    For the record --

8     A.    I need glasses.  I said these, this writing is

9 so small I need glasses.

10     Q.    Do you have a pair of glasses with you?

11     A.    No.

12     Q.    Can you read what is on the paper?

13     A.    Say on this date.

14     Q.    So you can read it without glasses?  It is

15 just harder for you to read.  Is that fair?

16     A.    Yeah.  It is going to take a while.  I can't

17 read it like a normal reading through a sentence

18 because the letters are so small.  See how big that

19 Taylor Exhibit A is?  Now that is fine.  I can see,

20 that is very clear to me.  But this stuff is --

21     Q.    I will direct your attention to a couple of

22 places in this report that you can look at.  So for the

23 record this is a document that is Bates stamped Decatur

24 179 through 180.

25         This is a police report written by Officer

1    Welker documenting your first conversation with police

2    the night of the murder.  Okay?

3         So this document recounts a conversation that

4    you allegedly had with a Decatur police officer on the

5    night of the murder.  Okay?  Did you tell Officer

6    Welker that you had not seen or heard anything unusual

7    that night?

8         A.    Probably.  I am not for sure.  That has been

9    20 years ago.

10        Q.    Okay.  So this report if you look at the

11   second paragraph from the bottom of the first page?

12        A.    Yeah.

13        Q.    It starts Apartment No. 3 appears to be

14   vacant.  Do you see that?

15        A.    I see apartment.

16        Q.    The second paragraph in the bottom.

17        A.    Apartment 3.  What about it?  I mean, I can

18   barely read this, but I do see Apartment 3.

19        Q.    Okay.  So the third line says the resident was

20   a Ray A. Taylor B/M 05/03/63.  Ray stated that he had

21   been home since approx. 2100 08/27/98.  Ray stated that

22   he had not seen or heard anything unusual tonight.  Do

23   you see that?

24        A.    No.  But if they came and asked me, I would

25   assume that that is what happened, that I didn't.  If

1  they came to my apartment, I am sure that I wasn't

2  there or didn't hear anything.

3      Q.   So you have no reason to dispute what is in

4  this report; is that right?

5      A.   Not just from what you are just saying.  I can

6  barely read this.  So from what you just said though, I

7  just read it.  I mean, I am not just reading it because

8  I probably wasn't -- I mean, I probably didn't hear

9  anything.

10      Q.   Okay.

11      A.   That happened because if I was there at home.

12      Q.   Okay.  And you did not say anything to police

13  about Charles Palmer during that interview, right?

14      A.   No.

15      Q.   It is important when I say Charles Palmer, you

16  know who I am referring to, right?

17      A.   Charlie B.

18      Q.   Did you always call him Charlie B.?

19      A.   Yeah.  Ever since we were little.

20      Q.   And you called him Charlie B. in your

21  conversations with the police?

22      A.   No.  I doubt that.

23      Q.   Why do you doubt that?

24      A.   Because I guess I was being more on a

25  professional level than to call him his nickname like

1    that.  Because everybody in my family name to him

2    pretty much, so.

3        Q.   Okay.  The court reporter is now going to hand

4    you what has been previously labelled as Taylor Exhibit

5    B.  Okay?

6             This is a two page document Bates labelled

7    Decatur 181 through 182 which is a report about your

8    second conversation with the Decatur police after

9    Helmbacher was killed.

10            This is a conversation you had with Detective

11   Chabak and Detective -- I'm sorry -- Sergeant Chabak

12   and Detective Welker later in the morning after the

13   murder.  Do you remember talking to those officers the

14   morning after Helmbacher was killed?

15       A.   No, because I don't remember talking to

16   anybody the day after he was killed.  I don't know

17   those dates just like that.  So I would have no idea.

18       Q.   So do you recall telling the officers that you

19   knew nothing about the homicide?

20       A.   Always have told them that.

21       Q.   Sorry?  Say that answer again please.

22       A.   Always have told them that I don't know

23   nothing about the homicide, that I wasn't involved.  So

24   I don't know.

25       Q.   So if you look at this document in front of

1  you, there is the very first paragraph kind of a big

2  one, right in the middle it says Taylor advised me he

3  knows nothing about the homicide.

4      A.   And?

5      Q.   Do you have any reason to dispute that you

6  told that to the police?

7      A.   No.  I didn't so why would I have any dispute

8  against that.  I have no idea.

9      Q.   Okay.  The report also says that you told the

10 detectives that you knew Helmbacher.  That was true,

11 right?

12     A.   Yeah.  He was my landlord.

13     Q.   Okay.  And you never said anything to the

14 police during that interview about Charles Palmer,

15 right?

16     A.   No.  Why would I?

17     Q.   Okay.  And you told officers the truth, right?

18     A.   Of course.

19     Q.   The court reporter is now going to hand you

20 another document that is labelled Taylor Exhibit C.

21 For the record this is a two page document beginning on

22 Bates label Decatur 309.  This is a report of an

23 interview that Officer Applegate wrote on September 1.

24     A.   What year was this?

25     Q.   Do you remember -- sorry?

1      A.    What year was this?

2      Q.    This is also 1998.  So this is just a couple

3   of days after the murder.

4      A.    Oh.  I wouldn't know that either.

5      Q.    Okay.  So do you remember having any

6   conversation with Detective Applegate a couple of days

7   after the murder?

8      A.    I am not sure.  I don't remember that.

9      Q.    Okay.  Do you recall telling Detective

10  Applegate that you had no knowledge of who committed

11  the murder?

12     A.    Always have said that.  I told him the day

13  after or the day before that was the truth, so.

14     Q.    So this report says in the second paragraph

15  from the bottom and I know it is a little small.

16     A.    Okay.

17     Q.    The second paragraph from bottom says Ray

18  states he has no knowledge who committed this murder of

19  Bill Helmbacher and he saw no one around either coming

20  or going that evening.  Do you see that?

21     A.    No.  But I can hear you.  I don't see it.

22     Q.    Okay.  Do you have any reason to dispute that

23  that is what you told to Detective Applegate?

24     A.    No.  I don't dispute anything that I say that

25  is truthful so I have no reason to dispute that.

1      Q.   Okay.  And that was true that you had no

2   knowledge of who committed the murder?

3      A.   Yes.  That was true.

4      Q.   And you never mentioned Charles Palmer during

5   that interview, correct?

6      A.   Correct.

7      Q.   The court reporter is now going to hand you

8   what has been marked as Taylor Exhibit D.  This is a

9   one page document Bates labelled Decatur 29.

10           So this is now a report written by Frank

11   Hubbard of an interview that you had with him on

12   September 2, 1998.  So this is now the 4th interview

13   that you gave to a Decatur police officer within a

14   couple of days of the murder?

15      A.   So wait a minute.  Can I stop you one second?

16   So where was this interview taken place at?

17      Q.   So this report says that if you look at the

18   4th paragraph down, I will read to you what it says.

19   It says I then made contact with Ray Taylor of 351 W.

20   Macon, Apartment No. 5.  Do you see that?

21      A.   No.  But I can hear you.

22      Q.   Okay.  It says upon speaking with Ray Taylor,

23   I identified myself as a Decatur police detective.  Ray

24   Taylor stated he understood and that he had spoken to

25   numerous police officers on recent days.  Do you see

1 that?

2     A.   No, but I can just hear you.  I can't see.  I

3 told you the letters are so small I am just going by

4 what you are saying.

5     Q.   I think I am reading it correctly.  It appears

6 from this report that this conversation took place at

7 your apartment.  Do you recall speaking with Detective

8 Hubbard at your apartment on September 2, 1998?

9     A.   No.  I don't recall that.

10     Q.   Do you have any reason to dispute that you did

11 have this conversation with Detective Hubbard?

12     A.   No.  If I say I did and I don't remember, I

13 don't.

14     Q.   The second paragraph from the bottom says I

15 then asked Ray Taylor if he would be willing to take a

16 polygraph exam reference the attached case.  Ray Taylor

17 first stated sure, I guess.  Ray Taylor then stated

18 that before he would consent to a polygraph test, he

19 would have to check with his father.  Do you see that?

20     A.   No.  But I am listening to you.  I don't see

21 it.

22     Q.   Okay.

23     A.   But that --

24     Q.   Do you have any reason to dispute that

25 Detective Hubbard asked you to take a polygraph exam?

1      A.   No.  People would always try to get you to

2  take a polygraph, but I didn't have no problem in

3  taking a polygraph.  And I still ended up taking one,

4  so.

5      Q.   And the reason you didn't have a problem with

6  it is because you were telling the truth, right?

7      A.   Yes, ma'am.

8      Q.   Okay.  And you didn't tell Detective Hubbard

9  anything else about the murder because you didn't know

10  anything, right?

11      A.   That is right.

12      Q.   Okay.  And you never mentioned Charles Palmer

13  to him, right?

14      A.   Never.

15      Q.   The court reporter is going to now hand you

16  what has been marked as Taylor Exhibit E.

17           MR. DiCIANNI: Do you have a Bates stamp

18  number on this?

19           MS. BRADY: Yes.  This is a one page document

20  labelled Decatur 40.

21           MR. DiCIANNI: 440 or 40?

22           MS. BRADY: Just 40.

23  BY MS. BRADY:

24      Q.   Okay.  So, Mr. Taylor, this is the recorded

25  5th time that Decatur police came back to talk to you

1   after the murder.  Okay?  This is a report written by

2   Michael Beck documenting a conversation that they had

3   with you on September 3, 1998.

4          Did you ever wonder why the police were

5   coming to you so many times to ask you about a case

6   that you didn't know anything about?

7       A.   Um, no.  I thought -- well, I could say yes

8   and no because after a while I thought maybe they

9   thought that I am the one that committed this crime.

10          And other than that though, I really wasn't

11   that worried about that part me being charged because I

12   knew I was innocent anyway.

13          And, like I said, I was willing to take the

14   polygraph test.  I didn't have no problem with that.

15   That will prove my innocence right here.  I don't know

16   if -- yeah.

17       Q.   Okay.  Did you feel like they were pressuring

18   you during these interactions?

19       A.   No.  I felt like they were interrupting my

20   life because of something that somebody else had got

21   involved in and did.  And I was just living near there.

22       Q.   Okay.  So would it be fair to say that you

23   felt like you were being harassed or bothered by the

24   police?

25       A.   Yes.  In a way, yes.  Yes.  They were

1  following me around.  I would leave.  I would leave the

2  the house and I may come back in, but I had another way

3  to leave my house.  You know, I was in an apartment

4  complex.

5          And I would see them, they would be on the

6  corners peeking at me and watching me all the time, you

7  know, seeing where I am going and stuff.  So they were

8  harassing me to be following me and spying on me like

9  that, you know.  And I had nothing to do with this

10  stuff, so.

11      Q.   Yeah.  You noticed that the Decatur police

12  were following you?

13      A.   I don't know if it was the Decatur police or

14  if it was the detective from the Decatur Police

15  Department.  But I knew they were cops and they were

16  following me, you know, and looking at my stuff.

17      Q.   Okay.  Do you remember if they followed you to

18  work?

19      A.   No.

20      Q.   Do you remember where they followed you?

21      A.   Where?

22      Q.   Yeah.

23      A.   Where they followed me?  Any time I would

24  leave my apartment building, I would see them, you

25  know, and then I knew that they was looking at me.

1 And, you know, keeping trying to watch me seeing what I

2 was doing.

3        And I may go one direction, then I might

4 decide to go back the other direction and they came

5 back the other direction.  So I know they were

6 following me and watching me.  So that is how I knew.

7 This has been years ago and I knew they were spying on

8 me.

9     Q.  Okay.  And you thought that they started to

10 suspect that you had been involved in the murder; is

11 that right?

12     A.  I mean, what was the other reason to be doing

13 that?  Only logical reason for them to do that.  They

14 must have thought to be watching me.

15     Q.  So you think maybe they suspected you were

16 involved in the murder?

17     A.  Yes.  To answer your question, yeah, I did.

18     Q.  Okay.  And do you recall telling the detective

19 that you were tired of being harassed by the police?

20     A.  No.  Not particularly I don't.

21     Q.  Okay.  Would you look at --

22     A.  You are saying all these different times I

23 talked with them.  I don't recall all of these

24 different times of talking with them and these

25 different stories, you know what I am saying.

1          I have no idea that this stuff happened, but

2   whatever it happened and things like that that you have

3   on there, I never lied to them.  So that is about I

4   have never lied to them about this whole situation.  So

5   I wasn't so worried and shaken up in conversation.

6       Q.   Okay.  So in the first week after the murder,

7   this is now the 5th time that somebody from the police

8   department came to talk to you.

9          In the second paragraph of this report it

10  says Taylor stated that he was tired of being harassed

11  by the police and that he was not going to take a

12  polygraph.  Do you see that?

13      A.   That I was what the polygraph?

14      Q.   That you were not going to take the polygraph.

15      A.   I never told them that I wasn't going to take

16  the polygraph.  That is a lie.

17          MR. DiCIANNI: What exhibit number is this

18  again?

19          MS. BRADY: This is Taylor Exhibit E.

20          MR. DiCIANNI: Okay.

21          MS. BRADY: This is a one page document Bates

22  labelled Decatur 40.

23          MR. DiCIANNI: Yeah, I have it.

24      A.   I never told them that I wouldn't take the

25  polygraph.  I am the one that really suggested that I

1    would take the polygraph.  So I don't know.  All of

2    these things and whatever you are reading is not true

3    because I have always said that I would take it.  I

4    volunteer.  Well, if you don't believe me, let me take

5    it, I will take a polygraph.

6    BY MS. BRADY:

7        Q.    Okay.  So you volunteered to take a polygraph?

8        A.    Yeah.

9        Q.    This statement that you said you were not

10   going to take a polygraph, that that is not true?

11       A.    That is not true.  I never told them I

12   wouldn't take a polygraph.  I told them that I would

13   take it.  I volunteered.

14       Q.    But it was true that you were tired of being

15   harassed by the police, right?

16       A.    Of course.  Wouldn't you?  Think if it was

17   split the other way.  That is common sense.  It is

18   definitely not uncommon sense.

19       Q.    All right.  And you did not mention Charles

20   Palmer's name to Detective Beck?

21       A.    No.  I had no reason to be mentioning him.

22       Q.    So by September 3 which is within a week

23   following the murder, multiple officers from the

24   Decatur police had come to interview you at least five

25   times since Helmbacher was killed, right?

1    A.    Maybe.  I don't know the dates, like I said.

2  If officers came to me, they came to harass me and

3  threaten me.  A couple of them did threaten me.  I

4  said, well, I need to talk to an attorney and

5  everything.  You don't have an attorney.  You are going

6  to jail and stuff like that.

7        But other than that, hey, that is how things

8  went then.  Like I said, I don't know exact dates, but

9  I know I can remember some involvement with these

10  policemen that was steady following me around and stuff

11  like that and then when they did come to me.

12        Normally it was the same detectives that came

13  to me, approached me, all the time.  I was walking down

14  the street one day and he come (descriptive sound)

15  around the corner, stopped right there, get your hands

16  up and blah-blah-blah and said you are going to jail.

17  I am like, well, take me in then.  You can talk to my

18  lawyer.  He tell me I don't have a lawyer and I am too

19  poor to have a lawyer.  Things like that.  I remember

20  that.

21    Q.    Okay.

22    A.    So.

23    Q.    Yeah.  And was that in connection was the

24  Helmbacher homicide?

25    A.    This was after then.  After that had happened

1  when I was getting these little mishaps with these

2  officers after.

3      Q.  Yeah.  Okay.  So within the week or so

4  following the Helmbacher homicide, you talked to police

5  officers at least five times based on the reports that

6  we have looked at.  And you never told them anything

7  about the murder, right?

8      A.  I didn't have no reason for them to be coming

9  and talking to me to talk about the murder.  Only

10  thing --

11      Q.  And you  --

12      A.  Go ahead.

13      Q.  You told them you did not know anything about

14  the murder, right?

15      A.  Yeah.

16      Q.  And you told them truthful information, right?

17      A.  All the things I tell you is truthful.

18      Q.  And you have never at any point reached out to

19  anybody from the police department to give them more

20  information, did you?

21      A.  No.

22      Q.  And you never mentioned Charles Palmer's name

23  to any officers up to this point, right?

24      A.  No.  Why would I?

25      Q.  And you felt like the police were harassing

1  you and threatening you; is that right?

2      A.   What do you call it?  Haven't you heard the

3  story what has been said?  So wouldn't you call that

4  harassment?  I think you would.

5      Q.   Yeah.  So, I mean, you felt like the police

6  were harassing you, yeah?

7      A.   You can say that.

8      Q.   Yes.  Okay.  So after you told the Decatur

9  police on September 3, so this last time when you said

10 that the officer falsely recorded that you told them

11 you were not going to take a polygraph and you told

12 them to leave you alone, there was a couple of weeks

13 that passed before you saw them again.  Do you remember

14 that?

15     A.   No.

16          MR. DiCIANNI: Object to the form of the

17 question.  Compound and convoluted.  You can answer it

18 if you can, Mr. Taylor.

19     A.   Do you want to repeat that?

20 BY MS. BRADY:

21     Q.   Sure.  So we just looked at a report from

22 September 3.  That was when we looked at it and it said

23 you said that you weren't going to take a polygraph and

24 you said that was a lie, that you always volunteered to

25 take a polygraph.  Right?

1          A.    I have always volunteered.

2          Q.    Okay.  And then after that conversation a

3    couple of weeks passed before you heard anything else

4    from the police; is that right?

5          A.    I am not for sure because I wasn't keeping

6    time on that so I don't remember that.  I don't know.

7          Q.    Okay.  So the next time that it is documented

8    that you saw somebody from the Decatur Police

9    Department was when you got arrested on September 21

10   for burglarizing Helmbacher.  Do you remember that?

11         A.    I don't think I was taken downtown for no

12   burglary, no.

13         Q.    You said just a couple of minutes ago that

14   there was a point when one of the detectives kind of

15   rushed at you and tried to apprehend you?

16         A.    No.  I didn't say that.  I said they turned

17   the corner and jumped out of their car and threatened

18   me with words saying you are going to jail,

19   blah-blah-blah, that you don't have an attorney to

20   support you and you are poor so you are going to jail.

21   That is what I said.

22              Don't take my words around please because I

23   know exactly what I said because this is the truth and

24   it is easy to recall that and remember that.  As long

25   as it is the truth, you can always remember that.  When

1  it is a lie, that is when you have problems.

2      Q.   Okay.  So that incident that you just told me

3  about, were you arrested that day or did they just

4  threaten you?

5      A.   No.  They just pretty much threatened me.  No,

6  I wasn't arrested that day.  Like I said, I wasn't

7  arrested that day when that happened, but you telling

8  me dates about September this, September that, I don't

9  recall that stuff.  I don't remember.  So that is kind

10 of difficult when you telling me these different dates

11 and dates and dates and dates.  I don't remember no

12 dates.

13     Q.   Sure.  Sure.  And like you said, it was more

14 than 20 years ago, I can respect that.  So I am trying

15 to ask you about just general time frames right now.

16 So if I get specific dates is less important, but what

17 I am wondering is if there was a point when the police

18 kind of left you alone for a little while before they

19 brought you down to the station.  Do you remember that?

20     A.   I don't know if you call it leaving me alone.

21 Maybe they just didn't see me and I didn't see them

22 because, you know, I am not always on the same schedule

23 of doing things.

24          So that could have had a lot of things to do

25 with it because of what you are saying.  Because I

1   don't do the same things daily, you know what I mean.

2   And at that time I definitely wasn't doing the same

3   things daily, so.

4       Q.  Okay.  So our records that we got from the

5   police say that on September 21 you were arrested.  Do

6   you remember being arrested for burglarizing

7   Helmbacher?

8       A.  No.  I am laughing because you keep saying

9   these dates and I am like what year was this that you

10  just said?  What year?

11      Q.  1998.

12      A.  '98.  Oh, my God.  I don't remember that.  I

13  have no idea.

14      Q.  Okay.  So just to be clear I am still asking

15  about what happened around the time that Helmbacher was

16  killed.  So I just asked you a bunch of questions about

17  immediately after the murder, the police are kind of

18  looking around, doing some interviews.  And then about

19  three weeks later do you remember being arrested for

20  burglarizing Helmbacher?

21      A.  No.  And, see, they didn't just say you are

22  arrested, we arresting you for this burglary for him.

23  It didn't never happen like that.  So what you are

24  saying is --

25      Q.  So you were -- so you were never arrested for

1  burglarizing Helmbacher?

2       A.   They might have charged me, but I don't know

3  about the arrest part.  They might have charged me with

4  that.  But arrested and charged I think are two

5  different things.

6       Q.   Okay.  Do you remember going down to the

7  station and giving an interview with police?

8       A.   No.  The only time I went to the station is

9  probably when they took me down there.  I don't think I

10 volunteered to go down there to the police station.

11      Q.   So that is the interaction that you just

12 mentioned I think is what I am going to ask you about.

13 I will ask you some more questions about it in just a

14 second.  But you did not commit the burglary, right?

15      A.   No.

16      Q.   And you did not participate in the burglary,

17 right?

18      A.   No.  No.

19      Q.   Do you recall the Decatur police telling you

20 that they found your fingerprints on evidence that was

21 connected to the burglary?

22      A.   They call that evidence, I call it my trash

23 bag.  And of course my trash bag came out of my

24 kitchen, my house.  Of course my prints would have been

25 on it if I threw my garbage out.  All they had to do

1    was get my garbage out of the trash container.  Of

2    course my prints are going to be on it.  Even if that

3    statement was even true.

4             Because when they came and told me about this

5    fingerprint thing, I wasn't so sure about how truthful

6    that was anyway.  Because if you got my garbage, of

7    course my prints going to be on there.  I have no

8    reason to be denying that.  If it is my garbage.

9             But don't tell me you got my garbage and none

10   of my personal stuff is in there and nothing with my

11   name on it was in there, I definitely don't believe

12   you.

13       Q.    Okay.  So you had nothing to do with the

14   burglary.  They told you that your fingerprints were

15   connected to the burglary.  Do you recall that?

16       A.    No.  They didn't tell me that my fingerprints

17   were connected to the burglary.

18       Q.    Do you remember what they told you?

19       A.    That they found Mr. Helmbacher's business

20   cards, his business cards in my trash bag.  I do

21   remember that.  I don't know how they got in there

22   because I didn't put them in there.

23       Q.    Okay.  And you had no idea how anything that

24   was from Mr. Helmbacher's apartment got into your trash

25   bag; is that right?

1    A.    No.

2    Q.    It is not right or you don't know?

3    A.    I don't know how they could have got in there,

4  his things could have got in there.  Whoever it was,

5  they had to go and get it from him, you know, out of

6  his place or out of his pocket, one of the two.

7         But either way it goes, they said they found

8  my trash bag on Millikin homestead property.  And that

9  is like several blocks from where I live at.  So if I

10  was going to do that, why would I put it on Millikin

11  property where the groundskeeper people come all the

12  time and I got common sense to know that much, you

13  know.  So they can find it.

14         Why would I put it on there like 5 blocks,

15  6 blocks from where I lived at.  And he got all of

16  these dumpsters all around the neighborhood, that would

17  have been much better to throw the trash in one of them

18  than to put it on a personal, somebody's private

19  property, but anyway.

20    Q.    Okay.  So if I am hearing you correctly, would

21  it be fair to say that you do not know how Helmbacher's

22  stuff got in your garbage bag?

23    A.    I have no idea.

24    Q.    Okay.  You recall that you were charged with

25  the burglary, right?

1     A.   No.

2     Q.   You don't recall being charged with the

3 burglary?

4     A.   Oh, yeah, yeah, yeah.  Yeah, I do.

5     Q.   You were charged with the burglary?

6     A.   If that is what they said.  Accusing me,

7 charging me.  Whatever you want to call it.

8     Q.   All right.  Do you remember actually having

9 charges filed, not just them kind of saying we think

10 you did it, but actually being charged criminally with

11 the burglary?

12     A.   No.  I don't know.  I don't even recall that

13 ever being like in the Tribune with my name in there

14 for burglary or nothing like that.  So I don't know

15 when that would have happened.

16     Q.   I want to change topics again and ask you real

17 quickly about a conversation that you had with some

18 people from my law firm.  Okay?  Do you remember about

19 sometime in 2019 talking to some of my colleagues from

20 my firm?

21     A.   Who are your colleagues?  And where was this

22 taken place at?

23     Q.   Sure.  Mort Smith, Allison Left, Steve Art?

24     A.   I know Morty.  I don't know what the lady and

25 the guy's name is though, but I remember talking to

1    them.  I don't know what their name is, but I remember

2    talking with them.

3        Q.   Okay.  And you remember having a conversation

4    you were in the park near the library?

5        A.   Yes.  Yeah.  We supposed to meet at the

6    library.  I told them to meet me -- I told them to go

7    there.  We walked to the park, the city park.

8        Q.   Okay.

9        A.   In Decatur.

10       Q.   And you remember telling Mort Smith and those

11   lawyers about the conversations you had with the

12   Decatur police?

13       A.   With who?  Decatur police?  No, I don't

14   remember.  It depends on what they asked me, you know,

15   to have a conversation about.  You have to ask me

16   something.  It is just not like common sense, let me

17   tell you this conversation.  They had to ask me

18   something for me to even refer to them, so.

19       Q.   Sure.

20       A.   Sensible --

21       Q.   Generally -- oh, I am sorry.  Say that again?

22       A.   I say we got to be sensible and reasonable

23   about this.  That is what I said.  They have to ask me

24   something for me to even say something.

25       Q.   Sure.  Do you remember them asking you about

1    the conversations you had with Decatur police about the

2    Helmbacher murder?

3        A.   No.  They didn't ask me specifically, no.  Not

4    making sense to me.

5        Q.   Okay.  I am going to ask you now about the

6    other conversations you had with the Decatur police

7    that I think my colleagues asked you about when they

8    met with you in the park.  Okay?

9        A.   Okay.

10       Q.   So you told my colleagues that on

11   September 21, and I know you don't remember the

12   specific dates, but based on the reports you told my

13   colleagues that on September 21 you were interviewed at

14   the Decatur police station by one officer.  Do you

15   recall that?

16       A.   No.  I do not.

17       Q.   You don't recall telling my colleagues that?

18       A.   No.

19       Q.   Do you recall being interviewed at the

20   station?

21       A.   Really I don't.  It depends on you got to be

22   more specific to clue me in as to what are you talking

23   about and what you are trying to get to with this

24   because I don't remember that stuff.

25       Q.   Okay.  So this is now about three weeks after

1  the murder.  This is after the police find your garbage

2  bag at Millikin.  Okay?  Do you remember going the

3  police station to give that interview about your

4  garbage bag?

5       A.   No.  You just think I went down to the police

6  station to give an interview about the garbage bag?

7  Come on, now.  No.

8       Q.   You never went to the police station to give

9  an interview about the garbage bag?

10       A.   No.  How would I have known for me to just

11  volunteer to go -- that is not making sense.  I don't

12  just go down to the police station.

13       Q.   Okay.  But do you remember being taken?  Do

14  you remember being taken to the police station to give

15  an interview about your garbage bag?

16       A.   I might have been already down there and they

17  came up with that.  But I don't remember specifically

18  going down there to then having this discussion about

19  no garbage bag.  That is not making any sense and I

20  wouldn't do that.

21       Q.   Do you recall having an interview at the

22  station about your garbage bag?

23       A.   I remember them saying that somewhat, it is

24  blurry, about them saying that my fingerprints were on

25  the garbage -- or, no, that the guys, that the prints

1  was on my garbage bag and they found some business

2  cards in there.  But other than that, I didn't

3  volunteer to go down there and talk to them about

4  nothing.

5      Q.   Okay.  So I want to ask you about that

6  interaction you had with the police, okay, when they

7  asked you about the garbage bag at the station.

8           The police told you that they had found your

9  fingerprints on a garbage bag containing property that

10  belonged to William Helmbacher; is that right?

11     A.   Yes.  Once again, yes.

12     Q.   You were interviewed by only one police

13  officer that day, right?

14     A.   As far as I know, yeah.

15     Q.   And the officer accused you of burglarizing

16  Helmbacher, right?

17     A.   I don't know about.  See, this has been so

18  long ago, I don't know if he said you did it or you

19  attempted to do it.  I am not for sure.  That has been

20  20 years ago.  I don't know for sure.

21     Q.   The officer tried to blame you or suggest that

22  you were involved in a burglary.  Would that be fair?

23     A.   All the time, yes.  That is fair.  They always

24  thought I was involved in and did it.  But my whole

25  community know that, they know that I didn't.  The

1    whole community, the whole state, everybody knows me

2    knows I don't do that type of mischief, you know what I

3    am saying, to kill somebody or to murder somebody or to

4    beat somebody up or something like that.  Or, you know,

5    I just, that is not in my character.

6          Q.    Okay.  So to be clear, I am talking about the

7    burglary, not the murder.

8          A.    I know.  Okay.

9          Q.    They suggested you might have been involved in

10    the burglary.  Right?

11          A.    As far as I know.

12          Q.    Okay.  And you told them that you had nothing

13    to do with the burglary, right?

14          A.    Right.

15          Q.    Okay.  And the officer repeatedly accused you

16    of the burglary and told you that you were going to go

17    down for the burglary.  Do you remember that?

18          A.    No, I don't.  Because I remember him

19    constantly repeatedly repeatedly telling me nothing

20    like that.  They never constantly repeatedly said

21    things like that to me.

22                Only thing they was really interested in was

23    who killed that lawyer, the attorney.  My landlord.

24    That is what they was really focussing on.  They wasn't

25    worried about no burglary or nothing like that.  That

1  is the only thing they wanted to have a suspect.

2          And they was kind of in the way wanting to

3  put the suspect on me because they didn't have no place

4  else to go so they want to point the finger at me.  And

5  I said no, no, no, wrong finger to be pointing at, so.

6          Q.    Okay.  So when you were talking about one

7  detective or that one officer, he asked you about the

8  burglary and he also asked you about the murder.  Is

9  that right?

10         A.    I don't know if it went in that order.  I said

11 I don't know if it went in that order.

12         Q.    But he did ask you about the burglary and the

13 murder that day, right?

14         A.    I don't know if it was the same day is what I

15 am saying.

16         Q.    Did you go to the station more than once to

17 talk to the officers?

18         A.    I went down to the station probably, no, not

19 about this situation.  I don't think so.  I don't think

20 I was only down there that one time when they asking

21 me.  When I took that lie detector test, that is when I

22 was down there.

23         Q.    Okay.  So while you were down there that one

24 time, the time you took the lie detector test, they

25 asked you about the burglary and the murder, right?

1      A.   I am sure they did.  I am not for sure.

2           MR. DiCIANNI: Let me object to if he is

3   guessing and not sure, then that should be stricken

4   from the record.

5      A.   Yeah.  I don't know if it was the same time.

6   You are asking me about the same times and then asking

7   me same, different dates and stuff, I don't know.  I

8   don't remember.

9   BY MS. BRADY:

10     Q.   Okay.  So you just told me that you went, you

11  were at the station only once to talk about the

12  burglary and the murder.

13     A.   I said I was at the station, but I don't know

14  if it was the same time that we talked about both of

15  those things.  Because then -- they didn't go from like

16  one case to the other case, you know, from murder to

17  burglary.  They wasn't going like that with this story.

18          As far as me remembering, it wasn't even like

19  that.  So it was just like they was after one situation

20  and then another situation come up.  But it wasn't just

21  like interrogation about blah-blah-blah, the same thing

22  or something.  It wasn't like that.

23     Q.   Okay.  So you know that the burglary happened

24  the night before the murder.

25     A.   I don't know about that.

1       Q.   Okay.  When you were at the station about the

2  burglary and the garbage bag, you told them that you

3  did not burglarize Helmbacher, right?

4       A.   That I did -- say that again?

5       Q.   That you did not burglarize Helmbacher?

6       A.   Of course.  I never burglarized.  I have

7  always said I never did and still say to this day.

8       Q.   And when the officer eventually asked you

9  about the murder, you told them that you knew nothing

10  about the murder, right?

11       A.   Didn't you say that to me a few seconds ago?

12       Q.   I asked you about the burglary.

13       A.   And the murder.

14       Q.   Okay.  So now I am asking you about the murder

15  when you were at the station.

16       A.   And I told you the whole, all the time about

17  the murder that I had no involvement with it.  That is

18  when the lie detector thing came up.

19           So it is all in the same question that you

20  are asking me again and the answer and the story is

21  still the same, that I wasn't involved and the time

22  that they asked me, that is the time that they asked

23  me.  It wasn't like no specific thing like that.

24       Q.   Okay.  And you told me that you felt like they

25  were maybe accusing you or suggesting that you were

1   involved in the murder, right?

2       A.   Of course.  That is what detectives do.

3       Q.   Okay.  And --

4       A.   Hey, my microphone is apart.  It is okay.

5       Q.   We can wait for you to get that all fixed.

6       A.   I fixed it.

7       Q.   Okay.  And when you felt like they were

8   accusing you of the murder, they told you that you were

9   going to go down for the murder, didn't they?

10        MR. DiCIANNI: I will object to form of the

11   question.  You can answer.

12       A.   Yeah, no, I said that, remember I said I was

13   leaving my house.  The police came up on me like

14   (descriptive sound) like I said and that is when they

15   were telling me about this little story or something

16   like that, I was going down, that I am guilty, that I

17   am poor, I don't have any money, I don't have no

18   lawyer.  So that is what I told you previously and that

19   is what I meant.  That is the truth.

20       Q.   Okay.  So they wanted you to lie about your

21   involvement in the murder, didn't they?

22       A.   I am sure they did.  That is what detectives

23   do  --

24       Q.   And -- go ahead.

25       A.   That is what a lot of detectives do.

1          MR. DiCIANNI: I am going to object to your

2    asking him to intuit what the police department and

3    move that that be stricken.

4    BY MS. BRADY:

5          Q.   Sorry, I had a bit of background noise.  I had

6    to go on mute for a second.  So the officers who talked

7    to you made clear that they were putting pressure on

8    you, right?

9          MR. DiCIANNI: Objection.  That has been asked

10   and answered and denied.

11   BY MS. BRADY:

12         Q.   You can answer.

13         A.   Didn't we just do this?  I said they

14   approached me and made these allegations and little

15   threats saying that like I am a real small person in

16   the world.  That is what they did.

17             That is what they come across because they

18   put a lot of people in that category that they are not

19   supposed to be in.  That is to satisfy their own

20   personal ideas and thoughts and stuff.  You just can't

21   do that to people because it is not right.  So that is

22   what they were doing.

23             MR. DiCIANNI: I object to move that that be

24   stricken.  I understand what you are saying, but I

25   object and move that be stricken.

1  BY MS. BRADY:

2      Q.   You never gave into their pressure, right?

3      A.   No.

4           MR. DiCIANNI: Object to the form of the

5  question.  Assumes facts not in evidence and has been

6  rejected.

7  BY MS. BRADY:

8      Q.   And the detectives or the police officers

9  asked you to tell them information that you had already

10 told them was false.  Didn't they?

11     A.   Like what for instance?

12     Q.   About your involvement in a burglary or the

13 murder?

14     A.   Of course.  They wanted me to confess to

15 something that I wasn't guilty of, of course.  That is

16 what they do.

17     Q.   And during that conversation, the police

18 brought up Charles Palmer's name, didn't they?

19     A.   I don't know.  It has been 20 some years ago.

20 I don't remember what they brought up or what they said

21 for real.  I know one thing.  I can remember them

22 telling me how low and small I was in the world.  I

23 remember that.  I never forget that.

24     Q.   You never brought up Charles Palmer's name

25 when talking to the police, right?

1     A.   No.  Not that I can recall.  I don't remember,
2  no.
3     Q.   The police told you that they wanted you to
4  give them evidence to implicate Charles Palmer, didn't
5  they?
6     A.   Did the police tell me that?
7     Q.   Yeah.
8     A.   The police never said that to me.
9     Q.   Did you get the impression that they wanted
10  you to provide them with false information about
11  Charles Palmer?
12     A.   I don't know if Charles Palmer or James
13  Palmer, but of course anybody to help them clear their
14  case.  It didn't have to be necessarily Charles.  It
15  could have been anybody.
16     Q.   Okay.  And then after your interview with
17  police, you went to take a polygraph exam, right?
18     A.   I was already there.
19     Q.   Okay.  And then they took you in a different
20  room to take a polygraph, right?
21     A.   Um-hum.  Yeah.
22     Q.   Okay.  And then after the polygraph exam, you
23  did not give any more information to the police; is
24  that right?
25          MR. DiCIANNI: Object to the lack of

1  foundation.  You can answer, Mr. Taylor.

2      A.  I am not for sure.  I don't remember all of

3  those little itty-bitty detail things like that.  I

4  just don't remember because I don't know.

5  BY MS. BRADY:

6      Q.  Okay.  And do you remember the polygraph?

7      A.  Yeah.  I remember taking the polygraph.

8      Q.  Okay.

9      A.  Because I am the one that offered to take the

10  polygraph.  Of course I remember that.

11      Q.  Yep.  And do you remember having more

12  interviews with the police after the polygraph exam?

13          MR. DiCIANNI: Object.  Asked and answered.

14  He just said he didn't remember.

15  BY MS. BRADY:

16      Q.  You can answer.

17      A.  I don't remember.

18      Q.  Okay.  So we just talked about conversation

19  that you remember with the police.  And now I am going

20  to ask you about the reports that the police wrote that

21  contains their version of what happened at these

22  interviews.  Okay?

23      A.  I am sure.

24      Q.  So the court reporter is going to hand you

25  what has been marked as Taylor Exhibit F.

1        MR. DiCIANNI: What is the Bates number?

2        MS. BRADY: This is a three page document

3    Bates labelled Decatur 103.

4    BY MS. BRADY:

5        Q.   This report was written by T. J. Carlton

6    documenting an interview that happened on September 21,

7    1998.  Do you see that document in front of you?

8        A.   I see it in front of me.

9        Q.   This report says that you were interviewed by

10   a Detective Bell on the day of your arrest.  Do you

11   recall that?

12       A.   The day of my arrest for what?

13       Q.   The burglary.  The burglary.

14       A.   So this was already at the station, right,

15   correct?  Okay.

16       Q.   Okay.  This report says Detective Bell asked

17   you about your fingerprints being on the garbage bag

18   with Helmbacher's stuff inside.  Okay?

19       A.   That is what you said.

20       Q.   Okay.  The report says that Charles Palmer

21   came to your apartment on August 26, 1998, which was

22   the day before the murder.  Okay?  You never told

23   anyone that, did you?

24       A.   I don't remember.

25       Q.   Okay.  The report says that Charles came to

1  your apartment and had some, a number of items with him

2  including a change and some beer.  That is not true, is

3  it?

4      A.    I don't remember this.

5      Q.    Charles Palmer never brought beer or change or

6  other items to your apartment the day before Helmbacher

7  was killed, did he?

8      A.    I don't remember him ever doing that.

9      Q.    The report says that Charles Palmer asked you

10  for a trash bag to put the stolen items in and that you

11  gave him a trash bag and that he put the items inside

12  the bag.  That didn't happen, did it?

13      A.    No.

14      Q.    And you never told police that that happened,

15  did you?

16      A.    I never told them, no.

17      Q.    You never told the police anything about the

18  burglary, did you?

19      A.    No.  Because I didn't know nothing about no

20  burglary.

21      Q.    Okay.  So everything in this report that says

22  that you told them things about the burglary, that is

23  all just made up, isn't it?

24          MR. DiCIANNI: Objection.  Form of the

25  question.  Lack of foundation.  You can answer.

1    BY MS. BRADY:

2         Q.    You can answer.

3         A.    Okay.  So what did you say?  Did I tell

4    police?

5         Q.    Everything in this report --

6         A.    I didn't tell police --

7         Q.    Say that again.

8         A.    I didn't tell the police anything.

9         Q.    You didn't tell them anything about the

10   burglary?

11        A.    No.

12        Q.    Okay.  So if there is something in this report

13   that says you told them something about the burglary,

14   that is just made up, isn't it?

15             MR. DiCIANNI: Object to form of question.

16   BY MS. BRADY:

17        Q.    What was your answer?

18        A.    Most likely.  You know what I am thinking?

19   You asking me these specific little questions here, I

20   am thinking about how can we put the person that wrote

21   these articles and talking about this interview stuff

22   that is who needs to be going and taking a lie detector

23   test because you can't just say I said such and such

24   and I know that I didn't, so.

25        Q.    Okay.  So the court reporter is going to hand

1  you another exhibit.

2          MR. DiCIANNI: Before you get to that one,

3  what was -- I am a little behind.  What was the exhibit

4  number or letter on 103?

5          MS. BRADY: That was Taylor Exhibit F, like

6  frank.

7  BY MS. BRADY:

8      Q.    So now the court reporter is going to hand you

9  what is being marked as Taylor Exhibit G which is a

10  four page document starting at Decatur 438.

11          So this is another report that somebody from

12  the Decatur Police Department wrote about your

13  interview at the station.  The same one that we have

14  been talking about.  Okay?  When you were at the

15  station and they were asking you about the garbage bag.

16  Okay?

17          This report documents a second conversation

18  that you had with a different detective.  You didn't

19  have a second conversation with anybody at the station,

20  did you?

21      A.    I don't remember.

22      Q.    The report at, like, can you see just at the

23  top it says interview of Ray A. Taylor kind of in bold

24  there?  Do you see that?

25      A.    No.

1     Q.  So there is the first paragraph at the very

2  top.  And then in bold there is a line that says

3  interview of Ray A. Taylor.

4     A.  Yeah.  I see that.

5     Q.  Okay.  And now I am going to read you a couple

6  of sentences from the next paragraph after that.  Okay?

7     A.  Okay.

8     Q.  It says Ray for some time totally denied

9  having any knowledge of the burglary and also denied

10  having handled the bag where his prints had been

11  located.  Okay?  That is true, right?  We have talked

12  about this a bunch.

13     A.  Yes.

14     Q.  That is all true, right?

15     A.  Yes.

16     Q.  Okay.  But then if you look at the next

17  paragraph, the second sentence says Ray stated that his

18  cousin Charles Palmer had in fact burglarized Mr.

19  Helmbacher's apartment and then brought some of the

20  property up to Ray's apartment.

21     A.  I don't remember saying that.

22     Q.  Do you see that?

23     A.  Yeah.  I am listening to you.  I don't see it,

24  but I don't recall.  I don't remember saying anything.

25     Q.  You never said anything like that to Detective

1  Bell, did you?

2      A.   No.

3      Q.   And you never said anything like that to any

4  of the police officers, right?

5      A.   No.

6      Q.   And that is because Charles never brought any

7  stolen property into your apartment at any time, did

8  he?

9      A.   No.

10     Q.   Okay.  And this whole sentence that I read is

11 just completely made up, isn't it?

12          MR. DiCIANNI: Objection.

13     A.   Apparently.

14 BY MS. BRADY:

15     Q.   So then the next sentence, and just going to

16 keep reading that same paragraph, Ray stated that

17 Charles asked Ray for a bag and Ray already had a

18 garbage bag in his garbage can.  Ray stated that

19 Charles put some things into this bag and Ray stated

20 that he then tied up the bag and took it out and threw

21 it in the dumpster.  Do you see that?

22     A.   No.  But I am listening to you.

23     Q.   Okay.  That is totally made up too, isn't it?

24 You never said that to Detective Bell, did you?

25     A.   I don't remember telling him nothing like

RAY TAYLOR


1    that.

2         Q.   And that never happened, did it?

3         A.   I don't remember that.  Like I said, I don't

4    remember that.

5         Q.   You don't remember taking out a bag and with

6    Helmbacher's stolen stuff and throwing it in the

7    dumpster, right?

8         A.   No.  How would I know what Helmbacher's stuff

9    would be in my bag, no.  That don't make sense.

10        Q.   So then I want to look at the top of Page 2.

11   So the next page of this document.  The very first

12   sentence says that at this point the interview was

13   stopped and a polygraph examination was administered to

14   Ray Taylor.  That is when you took the polygraph.

15             And then it says at the conclusion of the

16   polygraph at approximately 1925 hours this date this

17   detective resumed my interview of Ray.

18        A.   Yes.

19        Q.   Okay.  Do you recall going back and continuing

20   your interview?

21             MR. DiCIANNI: Objection.

22   BY MS. BRADY:

23        Q.   After the polygraph?

24             MR. DiCIANNI: Objection.  Asked and answered

25   several times.  He said he didn't recall.


Area Wide Reporting and Video Conferencing
1-800-747-6789

1          A.    I think when you start doing the polygraph, I

2    don't think you stop and then go back and start it

3    over.

4    BY MS. BRADY:

5          Q.    Okay.  And then in this part of the interview

6    that you don't remember, it says -- now I am still on

7    the first paragraph, four lines from the bottom.  Wait.

8    Sorry.  I am three lines from the top.  That was

9    confusing.

10               He says I asked Ray to again explain what had

11   occurred in reference to the original burglary at Bill

12   Helmbacher's apartment.  Ray stated that Charles had

13   come over and Ray saw him outside.

14               Ray stated he went outside and Charles told

15   Ray that he was going into the apartment and wanted to

16   look out for anyone coming -- and wanted Ray to look

17   out for anyone coming.  Do you see that?

18         A.    No, but I am listening to you, but it is not

19   true.  And I will take a polygraph to that too.

20         Q.    So you never told that to the detective?

21         A.    No.  I wouldn't say -- no.

22         Q.    And that is because it never happened, right?

23         A.    That is right.

24         Q.    Okay.  The next sentence says I asked Ray why

25   Charles would have picked this apartment.  Ray stated

1  he had talked to Charles in the past about the fact

2  that the landlord of the apartment building was an

3  attorney and lived in the building.  Do you see that?

4       A.   Not true.  No, I don't see it, but it is not

5  true.

6       Q.   It is not true that you told him that?

7       A.   No.  I did not tell him that or discuss that.

8       Q.   And it is not true that you even had that

9  conversation with Charles Palmer ever, right?

10      A.   That is right.  Never.

11      Q.   Continuing on, Ray stated he assumes Charles

12 thought because this man was an attorney that he would

13 have money.  You never told that to the police, did

14 you?

15      A.   No.  But most people think that anyway.  You

16 are an attorney, you got money.  But I didn't have no

17 discussion with nobody about that specific situation.

18      Q.   The next paragraph, now I am on the second

19 paragraph of Page 2 of this report.  It says Ray stated

20 that when he went downstairs to Bill's apartment,

21 Charles went to the side window and opened it up and

22 crawled in.  That didn't happen, did it?

23      A.   Not true.  No.

24      Q.   That sentence I just read is not true, right?

25      A.   Not true.  No.

1     Q.   And you have never told that to any police

2  officer, did you?

3     A.   No.

4     Q.   The next sentence says Ray stated that he was

5  standing by the front door and Charles came to the

6  front door and opened it and told Ray to look out for

7  anyone.  That didn't happen either, did it?

8     A.   No.  It didn't happen.  That don't even make

9  sense.

10     Q.   And you never told that to anybody at Decatur,

11  did you?

12     A.   No.  It don't make sense.

13     Q.   Okay.  The next sentence says Ray stated that

14  he did in fact step inside the apartment and look

15  through the curtains out the front window to see if

16  anyone was coming.

17     A.   No.

18     Q.   That didn't happen, did it?

19     A.   No.  Why would I go inside to peek out the

20  window to see if anybody coming.  It would be better

21  chance standing outside.  It just don't make any sense.

22     Q.   Okay.  And --

23     A.   Sorry.  I'm saying the answer to your question

24  is no.  I never.

25     Q.   So the answer is it didn't happen and also you

1  have never told this to anyone, correct?

2      A.   Correct.

3      Q.   And then the last sentence of that paragraph

4  says he, meaning you, stated that he told Charles to

5  hurry up and he stated that while he was looking out,

6  Charles grabbed a bunch of stuff.  That didn't happen

7  either, did it?

8      A.   No.  It didn't happen.

9      Q.   And you never told this to anybody at Decatur

10  police, right?

11      A.   No.  And I never been in there either.

12      Q.   Say that again?

13      A.   I never been in there anyway.

14      Q.   In the, in Helmbacher's apartment?

15      A.   Yeah.  I never been in it.

16      Q.   So going on to the next paragraph --

17          THE VIDEOGRAPHER:  This is the

18  videographer --

19  BY MS. BRADY:

20      Q.   It says Charles then went up to Ray's

21  apartment and they looked through what Charles had.

22          MR. DiCIANNI: Rachel?

23  BY MS. BRADY:

24      Q.   Ray stated that Charles had four beers and he

25  stated that they were Icehouse brand.  He stated that

1  he had some change in a jar and some cards.  That

2  didn't happen, did it?

3          THE VIDEOGRAPHER:  Excuse me.  This is the

4  videographer.  I need to change tapes before we

5  continue.

6          MR. DiCIANNI: Can we take a break?

7          MS. BRADY: Yeah.  Let's take a quick break.

8          THE VIDEOGRAPHER:  Off the record.  The time

9  is 2:28.

10         (Discussion held off the record.)

11         THE VIDEOGRAPHER:  On the record, 2:35.

12 BY MS. BRADY:

13     Q.   Okay.  Mr. Taylor, before we broke I had read

14 you another couple of sentences from this report.  And

15 since we took a break before you answered, I am going

16 to read them again and just ask you the same question.

17         So the third paragraph of this document which

18 we are looking at is still Taylor Exhibit G, says Ray

19 stated that he and Charles then went up to Ray's

20 apartment and they looked through what Charles had.

21         Ray stated that Charles had four beers and he

22 stated that they were Icehouse brand.  He stated that

23 he had some change in a jar and some cards.  He stated

24 they were something like baseball cards.  Okay.  Do you

25 see where I read that from this report?

1     A.   No, but I am just listening to you.  I can't

2  hardly see the papers so I am just going by what you

3  are saying.

4     Q.   Okay.  That didn't happen, did it?  You never

5  told anyone from Decatur that that happened, right?

6     A.   No.  No.

7     Q.   And in fact that series of events did not ever

8  happen, right?

9     A.   No.  I don't remember nothing.

10     Q.   Then it says he stated he also thought that

11  Charles had some type of a phone or something, but he

12  could not recall exactly.  That didn't happen, did it?

13     A.   No.  First time hearing it today.

14     Q.   And you never told that to police, right?

15     A.   No.

16     Q.   It then says he stated that they put a bunch

17  of stuff in the garbage bag and Ray stated that he

18  himself grabbed the garbage bag and carried it out the

19  door.

20     A.   I don't remember that.

21     Q.   That never happened, did it?

22     A.   No.

23     Q.   You never told that to the police, did you?

24     MR. DiCIANNI: I believe he just said he

25  didn't remember.

1  BY MS. BRADY:

2      Q.   It never happened though, did it?

3      A.   I don't remember.  Same thing.  I don't

4  remember.  It never happened.

5      Q.   Okay.  And you never told that to the police,

6  did you?

7      A.   No.

8      Q.   Okay.  Then it says Ray stated that he and

9  Charles took the four beers with them and they drank

10  them while they were walking down the alley.

11           Ray stated that they went to the backyard of

12  the Arts Building at Decatur Street and College and he

13  stated that they put the garbage bag in a dumpster

14  behind this building.  Did that happen?

15      A.   No.

16      Q.   And you never told that to the police, did

17  you?

18      A.   No.  I would have no reason to have a

19  conversation like that to the cops, no.

20      Q.   You didn't just make up all that information?

21      A.   Pretty much, yeah, because --

22           MR. DiCIANNI: Objection.  Form of the

23  question.

24  BY MS. BRADY:

25      Q.   And you would never tell them all of those

1  things because they were totally made up, right?

2        MR. DiCIANNI: Object to form of the question.

3      A.  No.  I didn't tell them anything.

4  BY MS. BRADY:

5      Q.  Okay.  The next page, so now I am on Page 3 of

6  this exhibit which is Bates labelled Decatur 440.  The

7  first full paragraph says I asked Ray if there were any

8  other times that he and Charles talked about this

9  homicide.

10        Ray stated that a couple of weeks ago they

11  were downtown at the bus stop.  He stated that he was

12  talking to Charles and Charles stated that he could not

13  believe he had done that for $11.  Do you see that?

14      A.  No.  But I am just listening to you.  That is

15  not true.  It is not true.

16      Q.  It is not true that that conversation happened

17  at the bus stop?

18      A.  Never happened.

19      Q.  Okay.  And you never told police that it

20  happened, did you?

21      A.  Never happened.

22      Q.  Sorry?  Say that again?

23      A.  No.  It never happened.

24      Q.  And you never told the police that it did

25  happen, right?

1          A.    No.  Why would I tell the police that?

2          Q.    Okay.  The next paragraph says Ray advised the

3    detective that he has told this to one other person and

4    when asked, he stated he told his dad the day after

5    Bill had been killed.

6               He stated that he asked his dad if he knew

7    about Bill being killed and he stated he told his dad

8    that he knew who had done it.  He stated he told his

9    dad that it was his dad's nephew, Charles Palmer, who

10   had in fact killed Bill.  Do you see that?

11         A.    No.  I'm just listening to you.  I told you I

12   can't hardly see this writing.

13         Q.    Sorry?

14         A.    I told you I can't hardly see this writing on

15   this paper so I am just listening to you, what you are

16   saying.

17         Q.    Okay.

18         A.    But I never told dad that.  Never.

19         Q.    You never had that conversation with your dad,

20   did you?

21         A.    No.

22         Q.    You never told your dad that Charles Palmer

23   committed the murder?

24         A.    No.

25         Q.    And you never told police that you told that

1  to your dad, did you?

2      A.    No.

3      Q.    So, Mr. Taylor, we just went through a lot of

4  statements in these police reports marked as Taylor

5  Exhibit F and G.  And they are full of statements about

6  what happened that you testified are not true.  Is that

7  a fair summary?

8      A.    That is it.

9      Q.    Would you agree that the two police reports we

10  just looked at are full of things that are not true?

11      A.    Yeah.  I agree with that because --

12            MR. DiCIANNI: I'm going to object to the form

13  of the question.

14  BY MS. BRADY:

15      Q.    You can answer.

16      A.    I never said none of that stuff.

17      Q.    Okay.  They are full of statements that you

18  never said?

19      A.    It never happened.  It was all made up stuff.

20      Q.    Okay.  And the detectives you talked to tried

21  to get you to say a lot of things that were not true,

22  didn't they?

23      A.    I am sure.  Everybody has their little sneaky

24  way of trying to get people to say things.

25            MR. DiCIANNI: Object to speculation.

1  BY MS. BRADY:

2      Q.   And you told the detectives the things they

3  were trying to get you to say were false, didn't you?

4      A.   Did I tell the police that?  Yeah.  I told the

5  police it was false.

6      Q.   And they tried to get you to say them anyway,

7  didn't they?

8      A.   Majority of the things.  I don't know what

9  they was trying to do or -- but I said what I said.

10  And that is what I meant.  So I don't know what their

11  motives were or nothing.  So I don't know.  I can't

12  answer that for them.

13      Q.   Okay.  I am going to change topics again and

14  ask you about a written statement.  So I will ask the

15  court reporter to hand you what has been labelled as

16  Taylor Exhibit H.  This is a form with handwriting on

17  it and this is a form that the Decatur police say you

18  wrote on September 21, 1998.

19           So my first question is apart from when my

20  colleagues Mort Smith and the two other attorneys

21  showed you this document back in June of 2019, have you

22  ever seen this document before?

23      A.   No.

24      Q.   And at the bottom of the page where it says

25  signed?

1    A.   Yes.  Signature --

2    Q.   Is that your signature?

3    A.   It is my signature.

4    Q.   So now let's look above that.  There is a

5  bunch of handwritten texts.  Do you see that?

6    A.   What, about the witness and stuff?

7    Q.   Yeah.  No.  Below that there is a bunch of

8  handwriting.  Do you see the chunk in the middle, looks

9  like it is handwritten?

10    A.   What are you looking at?  Next to my name,

11  where I signed my name?

12    Q.   Above where you signed your name there is a

13  bunch of kind of blank lines.

14    A.   Oh, yeah.

15    Q.   And then above that there is a bunch of

16  handwriting.

17    A.   Yes.

18    Q.   Okay.  You don't recognize that handwriting as

19  your own, do you?

20    A.   No.  I don't remember this stuff.

21    Q.   My question was whether, was that you don't

22  recognize the handwriting as your own handwriting,

23  right?

24    A.   I don't remember it, no.  Looks like my

25  signature.

1      Q.   The handwriting isn't yours, is it?

2           MR. DiCIANNI: I object that he answered that

3  twice now.  He doesn't remember.

4  BY MS. BRADY:

5      Q.   I am sorry.  I just didn't catch your answer

6  about whether the handwriting is yours.

7      A.   I don't recall or remember this stuff.

8      Q.   Okay.  Do you recall placing your signature on

9  this page back in 1998?

10     A.   No.

11     Q.   And you don't know what was written on the

12  page at the time you placed your signature on it,

13  right?

14          MR. DiCIANNI: Object to speculation.  If he

15  had no memory of it, how does he know anything about

16  it.

17          MS. BRADY:Tom, I would ask that you refrain

18  from speaking objections.  You are coaching the

19  witness.

20          MR. DiCIANNI: No, I don't think I am.  But I

21  will object to the speculation that you are asking him

22  to engage in.

23  BY MS. BRADY:

24     Q.   Do you remember my question?

25     A.   I don't recall.  I don't remember this stuff.

1     Q.   Okay.  So my question was:  You said that you

2  recognized your signature, but you don't recall whether

3  this writing was on it when you signed it; is that

4  right?

5          MR. DiCIANNI: Objection.  That is a

6  mischaracterization of his testimony.

7     A.   No.

8  BY MS. BRADY:

9     Q.   All right.  The lines might have been blank at

10  the time your signature got placed on this form?

11          MR. DiCIANNI: Objection, speculation.

12     A.   It is a possibility.

13  BY MS. BRADY:

14     Q.   You don't remember writing out this statement,

15  do you?

16          MR. DiCIANNI: Objection.  Asked and answered.

17     A.   Three times, no.

18  BY MS. BRADY:

19     Q.   So this statement says -- I am just going to

20  read the part with handwriting on it.  He came to my

21  house and then in the margin it says Charles Palmer.

22          And then it says he came to my house and

23  wanted a garbage bag to put items taken in theft.  I

24  took the garbage and threw it in the dumpster.  You

25  never wrote that, did you?

1      A.   No.  That don't even make sense.

2           MR. DiCIANNI: I object to mischaracterization

3  and form of the question.

4  BY MS. BRADY:

5      Q.   Okay.  That never happened, right?

6      A.   Right.

7      Q.   And you never told the police that, right?

8      A.   Right.  I don't remember that stuff, no.

9      Q.   In fact you told the police that this did not

10 happen, didn't you?

11          MR. DiCIANNI: Object to form of the question.

12 Mischaracterizes testimony.

13     A.   I never told them that it did happen.

14 BY MS. BRADY:

15     Q.   You told them that -- strike that.  Okay.  Can

16 you look at how Charles Palmer's name is written off to

17 the margin?  Do you see that in the corner there?

18     A.   No.

19     Q.   Okay.  So at the top of where the handwriting

20 portion starts?

21     A.   Yeah.  I see at the top.  I see it now.

22     Q.   Yeah.  So Charles Palmer is handwritten off to

23 the side.  Do you have any idea why his name would have

24 been added to the the margin of this document?

25     A.   No.  You know what, I am looking at this

1  paper, but I wasn't reading it really.  Just little

2  parts of it because you were talking to me, but I never

3  saw Charles Palmer's name up there until you just said

4  that.  So how or why would he even be on here, I have

5  no idea.  It shouldn't have been I don't think.

6       Q.  Okay.  The court reporter is now going to hand

7  you what has been marked as Taylor Exhibit I.  And this

8  is a three page document starting at Decatur 1051.

9  This is a copy of the polygraph examiner's report.

10 Have you ever seen it?

11      A.  No.  They never showed it to me.

12      Q.  Okay.

13      A.  They never told me I was guilty either.

14      Q.  Say that again?

15      A.  I said they never said that I had failed the

16 test either.

17      Q.  Okay.  No one from the Decatur Police

18 Department ever told you that you failed?

19      A.  No.

20      Q.  And nobody from the Decatur Police Department

21 ever told you that they thought you had lied during the

22 polygraph exam?

23      A.  No.  They just only said that I was truthful

24 about it so they ain't even worry about it no more.

25      Q.  And you never took another polygraph exam,

1  right?

2      A.    For what?  No.

3      Q.    Relating to the Helmbacher homicide.  You only

4  took it once?

5      A.    Only need to take it once.

6      Q.    And you never talked to the police again after

7  this polygraph exam, right?

8          MR. DiCIANNI: Objection.  Asked and answered.

9  BY MS. BRADY:

10     Q.    About the Helmbacher homicide.

11         MR. DiCIANNI: Objection.  That has been asked

12  and answered several times.  He said he didn't

13  remember.

14     A.    I don't remember.

15  BY MS. BRADY:

16     Q.    Okay.

17     A.    You are asking me the same repeated questions

18  a whole bunch of times and I don't know why are you

19  doing that.  Are you not believing me or what?

20         MR. DiCIANNI: I join in Mr. Taylor's

21  objection.

22  BY MS. BRADY:

23     Q.    So you were charged with burglarizing

24  Helmbacher and then you were taken to jail.  Do you

25  remember that?

1     A.   No.  It didn't happen like that.

2     Q.   Okay.  How did it happen?

3     A.   I was already downtown for the third time.

4 Already downtown when they said anything about a

5 burglary.  I was already downtown when they said

6 anything about a burglary.

7     Q.   Okay.  And you never went to court for the

8 burglary, right?

9     A.   Not that I can remember.  No.

10    Q.   You did not see Charles Palmer down at the

11 police station on the day you were there relating to

12 the burglary, did you?

13    A.   I don't know if it was the day related to the

14 burglary or other day, but he was down there.  I

15 remember seeing him down there.  I don't know if it was

16 the burglary, the murder, the assault, I don't know.

17 But I remember seeing him down there.

18    Q.   Okay.  You were never brought by the Decatur

19 police into a room where Charles was being held, were

20 you?

21    A.   Why would I?  No.

22    Q.   Okay.  And you were never asked by Detective

23 Carlton or Detective Bell or anyone at the Decatur

24 police station to look at the shoes that Charles Palmer

25 was wearing at the police station, were you?

1     A.   I don't remember.

2     Q.   Okay.  You don't recall being asked to

3 identify a pair of Fila shoes belonging to Charles

4 Palmer, do you?

5          MR. DiCIANNI: Objection.  Asked and answered.

6 He said he didn't remember.

7     A.   It has been so long ago.  I don't know.  These

8 are petty little questions that you keep asking me back

9 and forth with is, I don't remember that stuff.  I

10 don't remember.

11 BY MS. BRADY:

12    Q.   Okay.

13    A.   20 some years ago.  22 years ago.  Something

14 like that.

15    Q.   Okay.  You don't recall making an

16 identification of any shoes belonging to Charles, do

17 you?

18          MR. DiCIANNI: Objection.  Asked and answered.

19 Says he doesn't recall.

20    A.   Long time ago, I don't remember that stuff.

21 You asking me the same things like 2 or 3 times in a

22 different form.  I don't know why.  The answer is still

23 going to be the same.  I don't remember.

24 BY MS. BRADY:

25    Q.   Do you remember talking to my colleagues in

1 the park?  If I told you that Mort Smith had signed a

2 declaration under oath saying that you told him that

3 you did not identify a pair of shoes belonging to

4 Charles Palmer, would you disagree with that?

5     A.   Yeah.  Because me and Morton never talked

6 about any shoes or anything of that nature never.  Did

7 Mort tell you about -- wait one second.

8         Did Mort tell you that he was over there

9 knocking on my door and started pulling on the door

10 trying to brake into my house?  He didn't tell you that

11 part, did he?

12         So what he did was told a bunch of little

13 lies and stuff too, but I am not going to go along to

14 cover him up.  And like you don't go to people's houses

15 and pulling on their windows, bang on their windows,

16 pulling on the windows like you are going to break into

17 the house.

18         So that is what he did and I have witnesses

19 that saw him do this.  But, anyway, me and Morton never

20 had no discussion about those shoes or nothing like

21 that to answer to your question.

22     Q.   So if Mort came to trial and testified that

23 when you and he and my colleagues had that conversation

24 in the park last summer that you told him that you were

25 never asked to identify a pair of shoes, are you saying

1  that he would be lying?

2      A.   Yes, ma'am.

3      Q.   Okay.

4      A.   Because we never discussed that.  Yes.  He

5  would be lying.  Through his teeth.  He lied to the

6  court anyway, all this stuff to start this procedure

7  here.  They never gave me subpoenas, stuff like that.

8  They never give it to me.

9          Because if they had have, they would have

10  handed it to me in my hand.  The sheriff would have

11  handed it to me in my hand.  That never happened.

12          You don't put something like that in nobody's

13  door for a court appearance.  You don't stick that in

14  the door.  Anybody can get that.  The dog can come by

15  or whatever, you know what I mean.  Anybody can come

16  over.  Somebody can come visit you and take that up and

17  throw it away.

18      Q.   We talked about that already.  I want to ask

19  you --

20      A.   Okay.  Then you know.

21      Q.   Sure.  So I want to ask you now about some of

22  the other reports that police wrote about things that

23  they say that you said.  Okay?

24          So the court reporter is going to hand you

25  what has been marked as Taylor Exhibit J, a one page

1   document Bates labelled Decatur 113.

2          A.   Okay.

3          Q.   Okay.  So this is a police report written by

4   Decatur Police Detective Ryan about statements that

5   they say you made the day after you were at the station

6   and they asked you about the fingerprints.  Okay.

7               The report, the very first sentence says this

8   date Detective Patton and I escorted Ray A. Taylor to a

9   DPD interview room.  You don't recall being in an

10  interview room that day, right?

11         A.   That day could be a lot of days.  I mean, what

12  was the --

13         Q.   September 22, 1998, which is the day after you

14  gave the polygraph exam.

15         A.   I don't even remember that.  I remember giving

16  the polygraph, but I don't remember no date.  I told

17  you that from the beginning, I don't remember dates and

18  stuff like that and days, things like that.  I don't

19  remember that.

20         Q.   Okay.

21         A.   Other things I can, but dates and stuff like

22  that is just out of the question.  I deal with too many

23  numbers to worry about that.

24         Q.   The court reporter is now going to hand you

25  what has been marked as Taylor Exhibit K which is a

1  three page document Bates labelled Decatur 119.  This

2  is another report about statements that you apparently

3  or that the Decatur police say that you made, okay, the

4  day after your arrest.  And I just want to ask you

5  about one paragraph of this report.

6          So this is the report written by Tim Carlton.

7  The very bottom paragraph of the first page says I then

8  took the Fila shoes which Charles was wearing, the same

9  shoes Ray Taylor said Charles had told him he had to

10  get rid of because he had blood on them from killing

11  William Helmbacher.  The shoes were shown to Ray Taylor

12  and Ray stated they looked like the same shoes Charles,

13  that he had gotten rid of because of the blood.  That

14  didn't happen, did it?

15          MR. DiCIANNI: Objection.  Asked and answered.

16      A.    No.

17  BY MS. BRADY:

18      Q.    Okay.  You never looked at Charles Palmer's

19  Fila shoes at the Decatur police station, right?

20          MR. DiCIANNI: Objection.  Asked and answered.

21  He has already said he didn't remember.

22      A.    I don't remember that.  Are you waiting on me

23  to answer?  I don't remember.  I don't remember that.

24  BY MS. BRADY:

25      Q.    Okay.  And you were shown a pair of Fila shoes

1  at trial.  Do you recall that?

2      A.   No.

3      Q.   Do you recall testifying that you never saw

4  Charles Palmer wearing those Fila shoes around the

5  night that Helmbacher was found dead or the night

6  before?

7      A.   I don't -- I don't remember those specific

8  little things, especially a shoestring.  I don't

9  remember that.

10     Q.   Okay.  So at the criminal trial of Charles

11 Palmer on April 24, 2000, you testified at Page 27,

12 Lines 10 through 14.  The question was:

13          "Mr. Taylor, you have looked at these shoes.

14 Can you say for sure that these are the shoes you saw

15 Charles Palmer wearing?

16          Answer: No, I don't think they are the same

17 ones."  Okay.  Do you recall being asked that question

18 and giving that answer?

19     A.   It is a possibility if it was asked of me.

20 That would have been the truthful answer that I

21 wouldn't have remembered.

22     Q.   Okay.  I want to change subjects again and ask

23 you about a couple of interactions that you had with

24 William Helmbacher before he was killed.  Okay?

25          So about four months before Helmbacher was

1    killed, the Decatur police were called to your building

2    relating to a conflict between a man named Doug Lee,

3    Helmbacher and yourself.  Do you remember that?

4         A.   No.

5         Q.   Do you recall being arrested for a fight that

6    you had with Lee and Helmbacher in April of 1998?

7         A.   No, because I wasn't.

8         Q.   You weren't arrested for fighting Lee and

9    Helmbacher in 1998?

10        A.   For my landlord?  That is my landlord's

11   brother.  I never got arrested for having no conflict

12   with him.  I never had no conflict with his brother or

13   Helmbacher, my landlord.  So I don't know where you

14   came up with that one, but it is not true.

15        Q.   Okay.  The court reporter is going to hand you

16   what has been marked as Taylor Exhibit L.

17        A.   Looks like more than L to me.

18        Q.   Does this document remind you now about

19   whether you were ever arrested for a conflict with

20   Helmbacher and Lee?

21        A.   I do not -- I never went to jail for them,

22   from Helmbacher.  And this stuff is so small, I can't

23   even see it.

24        Q.   Okay.

25        A.   I don't remember this stuff.  And I definitely

1    don't remember having no kind of altercation with

2    Helmbacher's brother.

3        Q.   Okay.

4        A.   Nobody at my apartment building.

5        Q.   Do you remember arguing with Helmbacher and

6    Lee?

7        A.   No.  I never had an argument with them, no.

8    Never.  I don't remember that.

9        Q.   Okay.  Do you remember anybody from Decatur

10   Police Department asking you about whether you ever had

11   a fight with Helmbacher and Lee?

12       A.   No.  I don't remember that.  But I know I

13   ain't get into no altercation with them.

14       Q.   Okay.  All right.  So going back to when you

15   were at the station, they were talking about your

16   fingerprints on the garbage bag.  You were concerned

17   that the Decatur police might implicate you in

18   Helmbacher's murder, right?

19       A.   I thought about it.  I wasn't so concerned.  I

20   wasn't too worried, but I thought about it, of course.

21       Q.   And then when the Decatur police came to you

22   saying they found your fingerprints on a garbage bag

23   with Helmbacher's stuff, they were accusing you of the

24   burglary and the murder, right?

25       A.   I don't know what they was accusing me of.  I

1    can't read their minds.

2         Q.   They were asking you about your role in the

3    burglary and the murder, weren't they?

4         A.   Is that what they were doing?

5         Q.   That is what I am asking you.

6         A.   I wouldn't know what they were -- I don't know

7    what they was up to.

8         Q.   But that you recall that they asked you about

9    your role in the burglary and the murder, right?

10         A.   Well, they asking me questions, I am sure they

11    were wanting to know my role, did I have any

12    involvement.  But other than that, I have no knowledge

13    what they were up to or didn't really care because I

14    just knew that I was innocent, so.

15         Q.   Okay.  And the police introduced Charles

16    Palmer's name to you, didn't they?

17         A.   I don't know when they did and when they

18    didn't.  I don't know.

19              MR. DiCIANNI: That has been asked and

20    answered.  Objection, asked and answered.

21    BY MS. BRADY:

22         Q.   The Decatur police were the ones who brought

23    up Charles Palmer's name into the Helmbacher inquiry,

24    right?

25              MR. DiCIANNI: Objection.  Asked and answered.

1          MR. STOCKS: Join.

2      A.   As far as I know.  This altercation thing with

3  the Lee thing, I ain't never had no altercation with

4  them.  I don't know where this stuff come from.  I know

5  this ain't my handwriting.  I do know that.

6          On this report about Helmbacher and Lee about

7  having an altercation with them or a fight or whatever.

8  That is not my handwriting.  That was the first time I

9  heard of it today.

10  BY MS. BRADY:

11      Q.   Okay.  And then you recall testifying at

12  Charles Palmer's criminal trial, right?

13      A.   And what you need to know.  I was probably

14  there, yes.  Yes.  Okay.

15      Q.   So you recall Charles Palmer was charged with

16  murdering William Helmbacher?

17      A.   Charged with murdering what?

18      Q.   William Helmbacher.

19      A.   Oh.  I didn't understand what you had said.

20  Helmbacher.

21      Q.   Sure.  Do you recall that Charles was charged

22  with murdering Helmbacher?

23      A.   I don't know if it was the same time or what.

24  I keep telling you that has been 20 something years

25  ago.  I don't know if it was all the exact same time

1  that these questions that you are putting together was

2  the same or not.

3       Q.    Right.  So William Helmbacher was murdered.

4       A.    Yeah.

5       Q.    In 1998.  You remember that?  Right?

6       A.    Yeah.  You told me the date.  I don't know the

7  date.

8       Q.    Okay.  You remember Helmbacher was murdered?

9       A.    Yeah.  I remember he got killed.

10      Q.    You remember that Charles Palmer was charged

11  with that murder?

12      A.    I know they had arrested him.  Yeah.

13      Q.    And you testified at Charles Palmer's trial,

14  correct?

15      A.    Didn't I just answer that?  Didn't I answer

16  that for you?

17      Q.    Can you answer it again please?

18      A.    Yes.

19      Q.    Okay.  And then at the time you testified, you

20  had already been convicted of a felony battery earlier

21  that year, right?

22      A.    Now you are jumping into something.  How do I

23  know what year was that supposed to have happened?

24  Felony battery, I don't even know if I had a charge of

25  that.  What year are you talking about?

1     Q.  If I told you that you did have a conviction

2 for a felony battery earlier that year, would you have

3 any reason to dispute that?

4     A.  Felony battery that year?  I mean --

5     Q.  Yeah.

6     A.  -- I don't understand what that would have

7 anything to do with why we are here for or --

8     Q.  Sure.

9     A.  I don't know.  What you say, convicted of it?

10    Q.  Yes.

11    A.  Well, can you tell me more details about this

12 situation?

13    Q.  Yeah.  So let me give you a little bit of

14 context for why I am asking you these questions.  When

15 you testified at Charles Palmer's trial, they asked you

16 some questions about whether you had other charges

17 pending.

18       So I am just establishing what those charges

19 were and what your previous convictions were.  I am not

20 asking you about what happened during those convictions

21 or anything like that.

22    A.  But I didn't have no charges and stuff like

23 that during that time though.  That is something from

24 previous that you are talking about.  It has to be

25 because there wasn't nothing going on as far as no

1  charges against me during that time of his trial or

2  hearing or whatever he supposedly been having.  So that

3  has nothing to do with my charges if I had any which I

4  don't think I did.  I don't remember.

5      Q.   Okay.  If I told you that you did have some

6  criminal activity on your record around the time of the

7  trial including a felony battery conviction and two

8  pending parole violations, would you dispute that?

9      A.   Yeah.

10     Q.   Okay.  So your testimony now is that you did

11 not have pending parole violations at the time of your

12 testimony at Charles Palmer's criminal trial?

13     A.   That is true.  I never had no parole

14 violation.  So I don't know where you got that

15 information from, but I never had any parole violation.

16 So you pulled that out because I want to know about

17 that myself.

18     Q.   Okay.

19     A.   Never was violated.

20     Q.   So when you testified in Macon County on

21 April 24, 2000, you were asked the following questions

22 and gave the following answers:

23         "Question: Now you have been charged and are

24 currently charged with an offense of residential

25 burglary for a burglary to William Helmbacher's

1    apartment; is that right?

2            Answer: Yes."  Do you recall being asked that

3    question and you giving that answer?

4        A.    No.  And I don't recall the parole violation

5    either.  What happened to that?  Did you find that?

6        Q.    Okay.  In the same testimony that we just

7    talked about in Macon County, April 24, 2000, on

8    Page 5, Line 12 you were asked the following questions

9    and gave the following answers:

10            "Have you been made any promises about the

11    outcome of your case in respect to your testimony

12    today?

13            Answer: No, sir.

14            Question: Have you been told that your

15    cooperation would be taken into account?

16            Answer: Yes.

17            Question: Have you been made any specific

18    promises about what would happen to your case?

19            Answer: No.

20            Question: You also have to be up front with

21    the jurors, right?  You have a prior conviction for an

22    aggravated battery; is that right?

23            Answer:  Yes."  Do you recall being asked

24    those questions and giving those answers?

25        A.    No.  And what year was that and what would

1  that have to do with this Charles case?

2      Q.  I am just asking you about whether you

3  testified to that and do you recall giving that

4  testimony.

5      A.  Because, I mean, if I had to testify, it

6  wouldn't have had nothing to do with no Charles case,

7  for one.  For two, I mean the way that you are throwing

8  it at me, I mean, you got to keep it all together to

9  keep up with you because you can't compare something

10  from '89 to '98.  So they have to coincide with one

11  another for it to have any logic to it.

12      Q.  Right.  So I am not asking you about whether

13  they were related.  I am just asking you if you gave

14  that testimony.

15      A.  I don't remember.

16      Q.  Okay.  I am looking here at the transcripts.

17  Do you have any reason to dispute that you gave this

18  testimony?

19      A.  Transcripts of what?  Which case are we

20  talking about now?

21      Q.  The criminal trial for Charles that you

22  testified at in 2000.

23      A.  What about it?  Do I have any disputes against

24  it?

25      Q.  Whether, yeah.  My question is whether you

1    dispute that you gave that testimony.

2        A.    I am sure if I gave it to them at the trial, I

3    am sure it was the truth so I would have no reason to

4    turn my answer backwards, you know.  So whatever I

5    testified about was true.  So it just can't be flipped

6    around from truth to false.  It is either one or the

7    either, you know what I mean.

8        Q.    Okay.  Give me one second.  Okay.  So now I am

9    asking you again about testimony that you gave during

10   Charles Palmer's criminal trial on April 24, 2000.  And

11   on Page 37 at Line 23 you were asked the following

12   questions and you gave the following answers:

13           "So, Mr. Taylor, in this case 97-CF-1703

14   where you were convicted of aggravated battery, you

15   were also convicted of domestic battery with a prior

16   conviction; is that correct?

17           Answer: Yes.

18           Question: And you were placed on probation in

19   that case; is that correct?

20           Answer: Yes.

21           Question: And you have a violation of your

22   probation pending; is that correct?

23           Answer:  Just, no.

24           Question:  You don't have a court date of

25   June 5, 2000 on that case?

1              Answer:  That was for this case.  The only

2    case that I knew about was for June 5.

3              Question: That is the only case you knew

4    about?

5              Answer: Yeah."  Do you recall being asked

6    those questions and giving those answers?

7       A.    Say that again?  Do I recall what?

8       Q.    Do you recall being asked those questions and

9    giving those answers?

10      A.    No.  That has been a long time ago.  I mean,

11   if I had a case pending, a probation, if I had

12   probation, I would never violate it or parole.  I would

13   never violate it.

14             I completed all of the probation and parole.

15   I completed all of that stuff successfully so if that

16   stuff came up in a different time or close to the stuff

17   about the Charles stuff, my cases were all completely

18   and fulfilled.  So I didn't have no violations is what

19   I want to say.

20      Q.    Okay.  So I want to ask you now about some

21   particular things you said when you testified at

22   Charles Palmer's trial.  Okay?

23             So first you testified about the burglary.

24   And you said that the day before Helmbacher was

25   murdered you saw Charles crawl into the side window of

1  Helmbacher's apartment and come through Helmbacher's

2  front door.  Do you recall that testimony?

3      A.   That is not true.  I never told nobody that or

4  said that.

5      Q.   You never testified that?

6      A.   I didn't testify that I saw Charles crawl into

7  a window, no.  I don't remember that.

8      Q.   Okay.  So I want to again read you some

9  portions from this transcript.  On April 24, 2000, you

10 testified in criminal court of Macon County at Page 7,

11 Lines 17 through 21 you were asked the following

12 questions and gave the following answers:

13          "Question: What did you see happen?

14          Answer: Well, he said he was going into the

15 apartment, into Bill's apartment and he went into the

16 side window of Bill's apartment and came through the

17 front door."  Do you remember being asked that question

18 and giving that answer?

19     A.   I don't remember that, no.

20     Q.   Okay.  And you testified you didn't know

21 anything about the burglary, right?  I mean, you

22 testified today you didn't know anything about the

23 burglary.  So the testimony that I just read to you at

24 trial was not true, correct?

25     A.   That is not correct.  What I said at trial was

1  correct.

2      Q.  Okay.  So I just read you a portion of what

3  you testified at trial.

4      A.  Yeah.

5      Q.  Which was that you said Charles went into

6  Bill's apartment and went into the side window and came

7  through the front door.

8      A.  I don't remember that.

9      Q.  Okay.  You told me earlier today that that was

10 not true, that you never saw that happen.  Do you

11 remember telling me that earlier today?

12     A.  Huh?

13     Q.  Do you remember telling me that earlier today?

14     A.  No.  Because you was going back question to

15 question to question to question so I don't know, I

16 don't remember.  The bottom line, I don't remember.

17     Q.  Okay.  So you told me earlier today that you

18 didn't know anything about the burglary at Helmbacher's

19 apartment. Right?

20     A.  Didn't you already ask me that?  And what did

21 I say?  No.

22     Q.  Okay.  So then when you testified at trial in

23 2000 about the burglary, you testified about some

24 things you saw.  That testimony was not true, was it?

25     A.  No.  Because I don't remember seeing nothing.

1    I don't know what you are talking about.  I don't

2    remember no stuff like that.

3            MR. DiCIANNI: Wait a minute now.  Let's be

4    careful because when you said no, what he meant was he

5    didn't remember.

6            MS. BRADY: Oh, Tom, I am going to stop you

7    right there.  You cannot interpret the witness's

8    testimony.  His testimony is what it is.  You can clear

9    it up on cross if you want to.

10            MR. DiCIANNI: Fair enough.

11        A.    I don't remember.  Bottom line.  You are

12    asking me questions that the same, just saying the same

13    things; yes, yes, yes, no, no, no, I don't remember,

14    remember.

15            So if you change the words around, then that

16    give you a reason to think, man, like what did you

17    really ask me or what am I answering to.  Well, the

18    truth is truth.  You can't switch the questions around

19    and expect to get a different answer, result, you know

20    what I mean.

21        Q.    Right.  So let me just say this up front.  I

22    am not trying to trick you.

23        A.    I am not worried about you tricking me.

24        Q.    I am trying to ask you questions about what

25    you remember and what you saw and then compare them to

1  what you testified about at trial.

2       A.   In 1982?

3       Q.   What's that?

4       A.   In 1982?

5       Q.   In 2000.

6       A.   I don't remember.

7       Q.   Right.  So that is why I am going to read you

8  portions from the trial transcript.  Okay?

9       A.   Okay.  You do that and I still don't remember.

10 It has been so long ago.  I don't know.

11      Q.   Okay.  So then you testified at trial in 2000

12 that Charles Palmer asked you to be a lookout for

13 him --

14      A.   That is a lie.

15      Q.   -- during the burglary the day before William

16 Helmbacher was murdered.

17      A.   That is not true.

18      Q.   So it is not true that Charles Palmer asked

19 you to be a lookout for him?  If you testified about

20 that at trial, that testimony would not be true, would

21 it?

22      A.   What did I testify at trial about that, what

23 you just asked me?

24      Q.   Sure.  So on April 24, 2000, you testified in

25 the criminal court of Macon County at Page 7, Line 22

1   through Page 8, Line 2.  You were asked the following

2   questions and gave the following answers:

3           "Question: What did Charles do when he came

4   to the front door?

5           Answer: He asked me to look out for him.

6           Question: And did you do that?

7           Answer:  No.  I stood there and then I went

8   upstairs."  Okay.  That didn't happen, did it?

9       A.   No.  Because that didn't even make sense what

10  came out of your mouth.  It really didn't.

11      Q.   Okay.  All right.  And then you testified at

12  trial that Charles came to your apartment with stolen

13  items.  Okay.  Do you recall that?

14      A.   No.  I don't remember that.

15      Q.   Okay.  So on April 24, 2000, you testified in

16  the criminal court of Macon County at Page 8, Line 17

17  through Page 9, Line 1:

18          "Question: Did you see him shortly after

19  that?

20          Answer: Yeah, yeah.  He came up to the

21  apartment.

22          Question:  Who came up to your apartment?

23          Answer: Charles came up to my apartment.

24          Question: When he came up to your apartment,

25  did he have anything with him?

1          Answer: He had some items like cards, some

2     change in a jar."  Okay.  Do you recall being asked

3     those questions and giving those answers?

4          A.   No, because that is not true.

5          Q.   Okay.  So --

6          A.   Because he never came up to my apartment with

7     no bag or nothing.  It is not true.  And I don't

8     remember nothing else different.  It is not true.

9          Q.   Okay.

10         A.   That didn't happen.

11         Q.   You testified during Charles' criminal trial

12    that you gave Charles a white plastic bag to put the

13    stolen stuff in.  Do you recall that?

14         A.   I don't recall that.  I don't remember that.

15    No.

16         Q.   Okay.  So in the same criminal trial at Page

17    9, Lines 2 through 15, you were asked the following

18    questions and gave the following answers:

19              "Question: What did you do with these items?

20              Answer: He asked me for a bag to put the

21    stuff in there.

22              Question: Did you have a bag you could give

23    him?

24              Answer: I got my, I just got my garbage can

25    and it had a bag in it."  That wasn't true, right?

1      A.   I don't remember nothing like that.

2      Q.   Okay.

3      A.   It has been so long ago, I do not remember

4 that.  So I am not just going to admit to something I

5 have no knowledge of.  I don't remember that.

6      Q.   Sure.  Okay.

7      A.   And repeatedly you asking me the same

8 questions though, that is what is really blowing me

9 right there because why are you asking me the same

10 things over and over and over.  Same thing.  My truth

11 is good and genuine.

12        You don't have to ask me the same thing and

13 try to say it in a different form to think I am going

14 to give you a different answer when there is only one

15 answer that is the truth.  So they are never going to

16 jump or flip to the false.

17      Q.   Okay.  So let me ask you this then.  I just

18 read you some portions of trial transcript that you

19 tell me today are not true.  And my question is:  Why

20 did you give false testimony at the trial?

21      A.   I don't think I gave false testimony at the

22 trial.  See, you are changing things around.  And then

23 -- I never gave false testimony.

24        The questions you are asking me are so petty,

25 then major, then back to the petty, major, petty,

1  petty, like that.  So that is the way you are asking

2  these questions.  Of course it is not going to be what

3  you are thinking, but it is still all true.  There is

4  no other question about that.  It is all true.  Ain't

5  nothing been said falsely.

6      Q.    Okay.  Let's take a five-minute break and go

7  off the record.

8          THE VIDEOGRAPHER:  Off the record, 3:26.

9          (Discussion held off the record.)

10         THE VIDEOGRAPHER:  On the record 3:42.

11 BY MS. BRADY:

12     Q.    Okay.  Mr. Taylor, before the break we talked

13 about some of the testimony you gave at Charles

14 Palmer's criminal trial in 2000.  We also talked about

15 some of the things you actually remember having

16 happened in 1998 and around the time of the murder.

17         So, for example, you told me earlier today

18 that Charles Palmer was not involved in the burglary

19 and then we looked at your trial testimony that said he

20 was.

21         And then you told me earlier today that

22 Charles Palmer never brought any stolen stuff to your

23 apartment, right.  And then you testified at trial that

24 he did come to your apartment with a bag of stolen

25 stuff.

1          You told me earlier today that you never took

2   that bag of stuff to the dumpster behind the arts

3   building.  Do you remember telling me that?

4        A.   No.  I don't remember.

5        Q.   You don't remember telling me today that you

6   never took a bag of stolen stuff to that dumpster

7   behind the building?

8        A.   No.  No.  I don't remember telling you that.

9        Q.   You testified in 2000 that you and Charles

10  took the garbage bag with Helmbacher's stolen stuff and

11  put it in the dumpster on College and Decatur Street.

12  Do you recall giving that testimony?

13       A.   No.  First you said I told you, that I just

14  told you that.  Then you are saying that is what

15  happened during that time, that me and him did that and

16  I said that and when I didn't.  I don't remember saying

17  nothing like that, no.  And I don't recall your

18  testimony, what you just said.  I don't remember that.

19       Q.   Okay.  So at trial in 2000 you testified that

20  you and Charles took the bag of stolen stuff to the

21  dumpster.  Do you remember that?

22       A.   No.  I don't remember that.  I just answered

23  that.  I said no.  I don't remember that.

24       Q.   So on April 24, 2000, you testified in Charles

25  Palmer's criminal trial in Macon County at Page 10,

1    Lines 19 through Page 11, Line 6, you were asked the

2    following questions and gave the following answers:

3           "Question:  After he, meaning Charles, came

4    upstairs and put the items in the garbage bag, what did

5    you two do?

6           Answer: I told him I was going to get this

7    stuff out of my house and we went to the dumpster and I

8    threw this in the dumpster.

9           Question:  What dumpster did you throw it in?

10          Answer:  We went to the back and then we went

11   down the alley and I went down to about two blocks from

12   the house and threw it in the dumpster behind that.  I

13   don't even know the name of the building.  On College

14   and Decatur Street.  I think it is the Gallery Building

15   now or something like that."

16          Those were the questions you were asked and

17   the answers you gave at trial.  That didn't happen, did

18   it?

19      A.   No.  I don't remember that.

20          MR. DiCIANNI: Objection to the form of the

21   question.

22      A.   No.  I don't remember that.  I don't recall

23   that.

24   BY MS. BRADY:

25      Q.   Okay.  So it never happened that you and the

1  bag with stolen belongings back to the gallery building

2  or --

3      A.   I have a dumpster behind my house.  Why would

4  I need to go down the street to throw it in the

5  dumpster.  And they all had the same garbage people

6  that picked it up.  So that don't even make sense.  No.

7      Q.   So it didn't happen?

8      A.   No.  It didn't happen.

9      Q.   Okay.  And as you testified today and I have

10  asked you a bunch of times and you have graciously

11  answered my question many times.  You have no reason to

12  say that Charles was involved in the burglary, right?

13      A.   Right.

14           MR. DiCIANNI: Objection.  Form of the

15  question.

16  BY MS. BRADY:

17      Q.   Who told you to implicate Charles in the

18  burglary at trial?

19      A.   No one.

20      Q.   Okay.  And the testimony that you gave at

21  trial is basically what is written in the police

22  reports written by Detective Carlton and Bell that we

23  discussed earlier, isn't it?

24           MR. DiCIANNI: Object to the lack of

25  foundation, form of the question.

1       A.   Why did he write that?  I didn't tell him to

2   implicate nobody. I never told nobody to implicate

3   another person.  Never about nothing.  So what do you

4   come up with that at that I implicated or wanted to

5   implicate him.  I never implicated anybody or tried to.

6   BY MS. BRADY:

7       Q.   And you gave the testimony that you gave at

8   trial because you were afraid you would be prosecuted

9   for a murder, right?

10       A.   Who, me?

11       Q.   Yeah.

12       A.   I wasn't that worried about being prosecuted

13   for a murder.

14       Q.   Okay.

15       A.   So I never -- once again, I never lied and I

16   don't make up stuff to make myself look good or better.

17   Because in the end you can't trust -- your lies will

18   always come back on you.

19           I never lied about this whole situation.

20   This whole thing and you asking me these same questions

21   over and over in different form, but they all are the

22   truth.  I never lied to you.

23           So like you just said, you are not trying to

24   confuse me, but that is what you are really trying to

25   do because you are asking me the same questions in a

1  different form.  And they always going to get the same

2  answer, the truth.

3      Q.  Okay.  And you got other charges dropped

4  against you by providing the testimony that you gave at

5  trial, didn't you?

6      A.  No.  Never had a conversation like that at

7  all.  And it is not true.

8      Q.  Okay.  And to be clear, none of the testimony

9  that you gave about Charles burglarizing Helmbacher was

10  true, was it?

11      A.  Oh, my God.

12          MR. DiCIANNI: Objection.  Asked and answered

13  and form of the question.

14      A.  You asking me the same questions back and

15  forth again, the same one I already gave you the

16  answers, the real answer to that which is nothing but

17  the truth, the answer.  But you asking me in a

18  different way.

19  BY MS. BRADY:

20      Q.  Okay.  And you are aware that Charles Palmer

21  was acquitted of the burglary charges at trial, aren't

22  you?

23      A.  I have no knowledge of that.

24      Q.  Okay.  So you also told me earlier today that

25  you did not know anything about who committed the

1   murder, the Helmbacher murder, right?

2            MR. DiCIANNI: I object.  I think that is

3   mischaracterization of the testimony.

4   BY MS. BRADY:

5        Q.   You can answer.

6        A.   I don't know.

7        Q.   What was your answer?

8        A.   What was your question?

9        Q.   My question was that you told me earlier today

10  that you did not know anything about who committed the

11  Helmbacher murder, right?

12           MR. DiCIANNI: Objection, form of the

13  question.  Mischaracterization.

14       A.   So if I already answered that for you, how

15  come you are asking me that again?

16  BY MS. BRADY:

17       Q.   You need to answer the question.

18       A.   I am trying to be as good about this as

19  possible, but I just don't understand why you are

20  asking me the same thing like ten minutes later.

21       Q.   Sure.  So --

22       A.   Ask the question again.

23       Q.   Okay.  You told me earlier today that you did

24  not know anything about who committed the Helmbacher

25  murder, right?

1      A.    Maybe.  I don't think I did.

2      Q.    Okay.  And you told me earlier today that you

3  don't know how Helmbacher was killed, didn't you?

4            MR. DiCIANNI: Objection to the form of the

5  question and mischaracterizes his testimony.

6  BY MS. BRADY:

7      Q.    You can answer.

8      A.    What was read in the paper.

9      Q.    Okay.  So let me ask you a different question.

10  Just to summarize, you told me earlier today that when

11  you told the police you didn't know anything about the

12  Helmbacher murder, you were telling them the truth,

13  right?

14     A.    Yes.  I was telling them the truth.

15     Q.    Okay.  You testified at trial that Charles

16  Palmer had confessed to you that he killed William

17  Helmbacher.  Do you remember that?

18     A.    I don't know about this confession thing.

19     Q.    You testified at trial that Charles Palmer

20  confessed to you or told you that he killed William

21  Helmbacher.  Do you remember that testimony?

22     A.    It wasn't at trial they said this stuff.

23  Yeah, a long time ago.

24     Q.    Okay?

25     A.    He said he beat this man to death or he said

1  there was blood everywhere.  That is what he said.

2  But, hey, I didn't know who they were talking about.

3      Q.   That wasn't true, was it?

4      A.   Huh?

5      Q.   That wasn't true, was it?  Charles Palmer

6  never told you that, did he?

7      A.   Yeah.  He said it.  He said it.

8      Q.   Okay.

9      A.   He said -- and then he said that, he said

10  there was blood everywhere.  And I was like I didn't

11  know who he was talking about.  And, you know, after he

12  said that lawyer guy.

13          And I was like so I really didn't think no

14  more about it.  I went ahead and continued doing what I

15  was doing that day.  I didn't find out until later on

16  that night when that happened.

17      Q.   Okay.  And then you testified at trial that

18  you saw Charles a couple of hours before dark on

19  August 27, 1998, which is the date that Helmbacher was

20  killed.

21      A.   That is not true.

22      Q.   Do you recall that testimony?

23      A.   No.  That is not true.

24      Q.   Okay.  So on April 24, 2000, you testified in

25  criminal court of Macon County at Page 30, Lines 20

1    through Page 31, Line 3, you were asked the following

2    questions and gave the following answers:

3              "Question: What time of evening did he tell

4    you this?

5              Answer: It was in the evening time.

6              Question: Sometime at night?

7              Answer: It wasn't dark yet.

8              Question: Was it getting dark?

9              Answer:  It was probably getting close to it.

10   Maybe in a couple of hours or so."

11              Those were the questions you were asked and

12   the answers you gave.  So to be clear, you testified

13   that a conversation you had with Charles Palmer

14   happened a couple of hours before dark, didn't you?

15       A.   I think I told them I saw him downtown and he

16   asked me, he was on this side of the street and I was

17   on this side of the street and he was coming towards me

18   and asked me was the police still coming by my house,

19   by the apartment.  And I told him yeah.

20              And he went his way and I went my way.  And

21   that was it.  So it wasn't no two hours after the

22   situation had happened.  It was just another time that

23   I ended up seeing him downtown which I hadn't seen him.

24       Q.   Okay.  So when Charles Palmer allegedly

25   confessed that he had beaten Helmbacher, that was when

1  you were downtown?

2      A.   No.  That wasn't when I was downtown.  I said

3  when I saw him again, he was downtown.

4      Q.   Okay.  When was that?

5      A.   I don't know for sure.  I have no idea.  This

6  was after then, I know that.  It was after the fact

7  that I ended up seeing him downtown.

8      Q.   Okay.  So you never had a conversation with

9  Charles Palmer the night Helmbacher was killed or the

10  day Helmbacher was killed where Charles Palmer told you

11  he beat him?

12          MR. DiCIANNI: Objection to form of the

13  question.

14      A.   I didn't know he had killed that man.  Like I

15  said, he told me it was blood everywhere.  He beat him

16  or something.  I didn't know who in the hell he was

17  talking about.  No idea.  I didn't find out until later

18  on, you know, when that happened.

19  BY MS. BRADY:

20      Q.   Okay.  So you testified at Charles's criminal

21  trial that the day Helmbacher was killed Charles Palmer

22  confessed to killing him.  And that testimony was not

23  true, was it?

24      A.   I didn't say that it wasn't true.  He is the

25  one that said it.  He said it.

1     Q.   So I want to talk about why we know that the

2  testimony about Palmer confessing to you is totally

3  false.  Okay.  So for starters you testified at length

4  at trial that Charles Palmer had done the burglary with

5  you involved, right?  And you told me earlier that that

6  was false.

7         So is the jury supposed to believe that you

8  provided some true testimony implicating Charles and

9  then some false testimony?

10         MR. DiCIANNI: I object to the form of the

11  question and to the mischaracterization of the

12  testimony.

13         MR. STOCKS: Join, argumentative.

14         MR. DiCIANNI: You can answer.

15     A.   Yes.

16  BY MS. BRADY:

17     Q.   You can answer my question.

18         MR. DiCIANNI: If you are able to, Mr. Taylor,

19  you can answer the question.  If you are able to.

20     A.   I don't know because she keeps changing things

21  around.  I mean, you are going from one thing to the

22  other.  Now what do you want to know exactly here?

23         I am not giving you no false information or

24  testimony.  Even before I didn't give you false

25  testimony.  But if you putting these dates and days

1    together, then I am getting kind of confused here.

2          So you can tell me one thing happened and

3    then jump to like for instance you talking about the

4    murder, then you talking about the burglary, then you

5    are talking about parole and that stuff.  I mean, you

6    keep on going on too many different things at one time.

7    But everything you asked me, I told you the truth.

8    BY MS. BRADY:

9          Q.    Okay.  So you testified at length at trial --

10         A.    At length?

11         Q.    -- that Charles Palmer and you did the

12    burglary together.

13         A.    No.

14         Q.    And you told me today that is not true.

15         A.    That is not true, no.  Because me and him

16    ain't did no burglary together.  That is not true.

17         Q.    When you testified at trial that you did the

18    burglary together and disposed of his stolen stuff

19    together, that was false?

20         A.    I don't remember going to trial and

21    testifying --

22         Q.    Is the jury supposed to believe -- you need to

23    let me ask my questions.  Okay?

24         A.    Go ahead.

25         Q.    You provided false testimony at trial about

1  the burglary.  Is the jury supposed to believe that you

2  provided some true testimony and some false testimony?

3         MR. DiCIANNI: I am going to object to the

4  form of the question and that it mischaracterizes

5  testimony and it is argumentative.

6     A.   I don't know what the jury is going to think.

7  I can't answer that question.  But I know I --

8  BY MS. BRADY:

9     Q.   So during the 5 or 6 interviews you gave to

10  the Decatur police before you were arrested for the

11  burglary, you never mentioned Charles Palmer, did you?

12     A.   I don't recall  --

13         MR. DiCIANNI: Objection.  Asked and answered.

14  BY MS. BRADY:

15     Q.   And you never told the police that Charles

16  Palmer had told you that he had beat to someone to

17  death and got covered with blood, right?

18         MR. DiCIANNI: Objection.  Asked and answered.

19     A.   You asking me things that was happened at like

20  different times of this case.  I mean, they didn't

21  happen like the same day the next day.  You are asking

22  me things that happened like days and maybe weeks away

23  from one another.  So you can't characterize and put

24  them together.

25

1  BY MS. BRADY:

2      Q.   Yeah, it is just hard to keep track of your

3  story because --

4      A.   No.   Your story, miss.

5      Q.   You are saying that something happened and

6  then you are saying that it didn't happen.  So you told

7  me that you never participated in a burglary and that

8  Charles Palmer didn't come up to your apartment with a

9  bag of stolen stuff and that you never disposed of it

10  in the dumpster behind the arts building.  Right?

11         You told me all these things today.  And told

12  me you never told the police that you did those things.

13  And then at trial in 2000 you testified that those

14  things did in fact happen.  Right?

15         I am trying to figure out which story is

16  right.  And it seems to me like you don't have a clear

17  idea of what happened that night.  You don't remember

18  Charles Palmer confessing to you on the day of the

19  murder.  You think he confessed to you a couple of

20  weeks later.  I am just trying to figure out what

21  happened.

22         MR. DiCIANNI: I object to the form of the

23  question.  I don't think there is a question.  And

24  mischaracterizing the testimony.

25      A.   Everything I told you was true now.  I don't

1    know how the forms that you are putting this stuff in,

2    it needs to be in one place, not scattered all over the

3    place and then making me look like my testimony, I mean

4    what I am saying is not true.  Because everything that

5    I told you is true.

6              Then you are jumping back to other situations

7    here that making it seem like it is not true.  Well, I

8    talked to -- nothing, see  --

9        Q.   So I am going to stop you.  You are not

10   answering my question.  I am going to start a new line

11   of questioning about what you testified at Charles

12   Palmer's criminal trial.  Okay.

13             You testified at length at Charles Palmer's

14   criminal trial that he had done the burglary and you

15   were involved.  Okay?  And then you told me today that

16   that didn't happen.  Right?  You weren't involved in

17   the burglary.  Okay.

18       A.   Right.  I wasn't involved in the burglary.

19       Q.   Okay.  In addition during this six or so

20   interviews that you gave to police before you were

21   arrested for the Helmbacher burglary, you never

22   mentioned Charles Palmer's name.  You told me that

23   earlier.  We looked at the reports.  Okay.  And you

24   told me today that you didn't say his name because he

25   wasn't involved.

1          MR. DiCIANNI: Objection.

2    BY MS. BRADY:

3      Q.   You didn't know that he was involved.  You

4    didn't think he was involved.  You didn't know anything

5    about the Helmbacher murder.  Right?

6      A.   I don't know if that is right or not because I

7    don't know what you are talking about.

8          MR. DiCIANNI: I object to mischaracterizing

9    testimony.

10   BY MS. BRADY:

11     Q.   In fact Charles Palmer's name never came up

12   until you were arrested for burglarizing Helmbacher the

13   day before he was killed; is that right?

14         MR. DiCIANNI: Objection.  Asked and answered.

15     A.   No.  That is not right because I don't

16   remember that and that couldn't be true.  So, I mean

17   Palmer's name don't come up because I got arrested and

18   stuff because when I went down and was talking to them

19   and took the lie detector test, that is when all the

20   little stuff come up.

21   BY MS. BRADY:

22     Q.   And when Charles Palmer's name came up, it was

23   the police who brought it up the first time, right?

24         MR. DiCIANNI: Objection.  Asked and answered.

25     A.   You asked me the same thing over and over.

1          MR. DiCIANNI: Over and over again.

2    BY MS. BRADY:

3          Q.   And your answer is yes, right?

4          MR. DiCIANNI: Objection.  Asked and answered.

5          A.   Yes.

6          MR. DiCIANNI: He didn't remember.

7    BY MS. BRADY:

8          Q.   When the police arrested you for burglarizing

9    Helmbacher, you were under a lot of pressure, weren't

10   you?

11         A.   No.

12         Q.   You had a long criminal history at that point,

13   didn't you?

14         A.   No.  Because --

15         Q.   They came up with --

16         A.   They come up with that charge out of the blue.

17   No, I wasn't under pressure.

18         MR. DiCIANNI: Objection, argumentative.

19   BY MS. BRADY:

20         Q.   Okay.  And you had a previous altercation with

21   William Helmbacher and Doug Lee, right?

22         A.   Wrong.  That is false.

23         MR. DiCIANNI: Objection.  Asked and answered.

24   BY MS. BRADY:

25         Q.   The Decatur police were telling you that they

1  were going to take you down for burglarizing Helmbacher

2  and murdering him, weren't they?

3      A.   That is not true.  That is a lie.

4          MR. DiCIANNI: Objection.  Asked and answered.

5  I think we might need Court intervention soon.

6  BY MS. BRADY:

7      Q.   Okay.  You were willing to say whatever the

8  police wanted you to say, weren't you?

9          MR. DiCIANNI: Objection, asked and answered,

10  mischaracterizing, argumentative.

11     A.   No.  That is not right.  Why would I do that?

12  BY MS. BRADY:

13     Q.   And so the police made up a story for you to

14  tell.

15         MR. DiCIANNI: Objection, asked and answered,

16  mischaracterization.

17     A.   That is also  --

18         MR. DiCIANNI: And we are now going on three

19  hours of questioning which has been repetitive,

20  argumentative and asked and answered.  And I think it

21  is getting into a bad state situation.

22     A.   It really is.

23  BY MS. BRADY:

24     Q.   And we went over a couple of police reports

25  from September 21 and 22.

1      A.    I don't remember.

2      Q.    And you told me earlier that they were full of

3   lies, right?  The police report included a bunch of

4   things that they said you said that you did not

5   actually say, right?

6            MR. DiCIANNI: Objection, mischaracterizes

7   testimony.  I would ask that we have an opportunity to

8   talk to the judge about the behavior going on at this

9   deposition.  We have gone beyond the point where --

10           MR. STOCKS: Join.

11           MS. BRADY: Are you stopping the deposition --

12           MR. DiCIANNI: Well, I am asking the court

13   clerk -- is the court clerk here?  No?  Is there anyone

14   -- I will direct my question to the bailiff?

15           COURT STAFF: Court staff.

16           MR. DiCIANNI: Is the judge available?

17           COURT STAFF: I will have to call the clerk's

18   office to have him called in to  --

19           MR. DiCIANNI: Okay.

20           MR. ZOPF: He told us he would be.

21           COURT STAFF: But it is going to be a minute.

22           MR. DiCIANNI: Okay.  We understand.

23           MS. BRADY: I can't hear what she is saying.

24           MR. DiCIANNI: She is going to contact the

25   clerk to ask the judge to join us.

1          MS. BRADY: Okay.  Can I keep asking questions

2     in the meantime?  I am very close to being done.

3          MR. DiCIANNI: No.  I don't think so.  I don't

4     think we should do that.

5          MS. BRADY: Tom, I am pretty close to being

6     done.  Can I just finish?

7          MR. DiCIANNI: Well, that depends.  If it is

8     going to be the same kind of behavior, then I would say

9     no.  But if you have got some good faith questions to

10    ask that aren't badgering the poor guy and asking him

11    things over and over and mischaracterizing things, then

12    I say we need to see the judge.

13         MS. BRADY: Let's just continue.  Okay?

14         MR. DiCIANNI: All right.  Let's give it a

15    shot.

16    BY MS. BRADY:

17       Q.   So, Mr. Taylor, you testified at trial that

18    Charles Palmer confessed to murdering Helmbacher a

19    couple of hours before dark on the day Helmbacher was

20    killed.  I just read you that transcript, those

21    transcript pages.

22              I want to talk about why we know that

23    testimony was not true.  Okay.  Helmbacher was still

24    alive at 7:00 p.m. on the day he was murdered.  Are you

25    aware of that?

1          MR. DiCIANNI: Objection, mischaracterization

2   of testimony.

3      A.   Why would I need to know that?

4   BY MS. BRADY:

5      Q.   My question was whether you were aware that he

6   was alive at 7 p.m. on the day that he was murdered?

7      A.   How could I possibly know that?  I wasn't even

8   home.  I wasn't even nowhere near his place of

9   residence.  So I would have no idea what time the man

10  died or none of that.

11     Q.   Okay.  So the court reporter is going to hand

12  you what has been marked as Taylor Exhibit P.

13     A.   Oh, my goodness.

14          COURT STAFF: This is Judge Long's clerk.  Do

15  you want to tell her --

16          MR. DiCIANNI: Mrs. Clerk, we want to --

17          THE COURT REPORTER:  Are we off the record?

18          MR. DiCIANNI: No.  We are on the record.  I'm

19  sorry.  Mrs. Clerk, we wanted to talk to the judge

20  because we thought that the deposition behavior has

21  gotten abusive frankly.

22          And I never say that lightly because I think

23  lawyers have the opportunity and the capability and

24  should be allowed to stretch things at depositions.

25  But this has gone beyond.

1          And I feel sorry for the poor guy, the way he

2    is being treated.  Repetitive questions, argumentative

3    questions, mischaracterization of testimony, things

4    that well beyond what we think is appropriate, what I

5    think the judge would think is appropriate.  And there

6    is a record  --

7          THE CLERK: Just one moment.  I will be right

8    back.

9          MS. BRADY: Can we continue?

10          MR. DiCIANNI: I don't think so.  Let's hear

11    what the clerk has to say.

12          MS. BRADY: Are you on the phone, Tom?

13          MR. DiCIANNI: No.

14          MS. BRADY: Is the clerk in the courtroom with

15    you?

16          MR. DiCIANNI: Yes.  Well, she was.  She just

17    left.

18          MS. BRADY: Okay.  Tom, I am going to be done

19    in like ten minutes.  Can we keep this moving please

20    and then you can say whatever you want to to the judge

21    after I am done.

22          MR. DiCIANNI: I am all in favor of keeping it

23    moving because we have got questions too and I think

24    the judge said we are done at 5:00.  So I think ten

25    minutes is too long.  Let's continue.  Go ahead.  Is

1    there a question pending?

2    BY MS. BRADY:

3         Q.   There was.  I would ask the court reporter to

4    hand Mr. Taylor an exhibit which is a document

5    beginning at Decatur 854.

6              MR. DiCIANNI: I don't think I have that

7    document.  Just tell me what it is.

8              MS. BRADY: A handwritten report by Officer

9    Swaggry.

10   BY MS. BRADY:

11        Q.   And, Mr. Taylor, on the very final page of

12   this report --

13             JUDGE BRUCE:  All right.  So I have been told

14   that you would like me to adjudicate some dispute that

15   is taking place.  Who is raising the objection?  And

16   I'm sorry, I don't know anybody's name.  You have to

17   tell me who you are.

18             MR. DiCIANNI: Thomas DiCianni.  I represent

19   the defendants, the Decatur defense in the lawsuit.

20             JUDGE BRUCE: Mr. DiCianni, go ahead.

21             MR. DiCIANNI: Well, we asked for judge

22   intervention because I thought the questioning that was

23   taking place repeatedly over objection over the

24   complaints of the witness had gotten abusive.

25             And Judge Long told us earlier if you are

1  having any problems, please let me know and he would be

2  happy to intervene if it would help.  And we were

3  having problems.  The questions were being repeated

4  over and over and over again.  There was constant

5  mischaracterization of what the witness had testified

6  before.  There were efforts being made I think to

7  confuse the witness.

8          And let me just say I think attorneys are

9  entitled to a lot of latitude in depositions so I don't

10  make these objections and complaints easily.  And I

11  think if you were to look at the record, you would

12  agree.

13          JUDGE BRUCE:  Again, I don't know where

14  anybody is.  So let me know who is asking the questions

15  that --

16          MR. DiCIANNI: It is counsel for the

17  plaintiff, Mrs. Brady  --

18          MS. BRADY: Hi, your Honor.  My name is Rachel

19  Brady and I represent the plaintiff in this suit.  Mr.

20  Taylor is an adverse witness who implicated our client

21  in this wrongful conviction case at trial.

22          He has been difficult to pin down for this

23  deposition and had to be arrested to come here today.

24  And so we are treating this as a trial -- I have about

25  ten minutes of questions left and I really would just

1  like to wrap up.  It has taken -- we were on the record

2  for less than three hours at this point.  So I would

3  just ask that, you know, we be allowed to wrap up our

4  exam and let the witness go.

5          JUDGE BRUCE:  You are asking the same

6  questions and you are unhappy with the response or what

7  is your position on this?

8          MS. BRADY: Your Honor, I don't think that we

9  are asking questions and hoping for a different

10  response.  Essentially I guess without revealing too

11  much about our strategy trying to get the question and

12  answer pairs for summary judgment and also kind of

13  clear up the multiple different stories that the

14  witness has given between what he has told me today,

15  has changed his story and what he testified at trial

16  which is different than what he told the police.

17          And I am really just trying to pin down the

18  witness on what his testimony actually is.  And I am

19  certainly not intentionally asking questions more than

20  once.  It is in an effort to clarify what the witness

21  is saying.

22          JUDGE BRUCE:  Well, Judge Long is gone.  I

23  was working on other things, but I will now stop what I

24  was doing and actually sit here and listen to some of

25  the questions unless either side objects.

1          Now and I am raising that right now because

2    if this matter goes to trial, there is a good chance it

3    will go to trial before me.  If you don't want me to

4    hear parts of the deposition now, obviously summary

5    judgment motion I have access to depositions, but if

6    anybody wants to speak up now and tell me they don't

7    want me here, do it now.

8          Otherwise I will take some time to sit here

9    and listen to the questions and the answers and that

10   way I can make an informed ruling.  Mr. Zopf, I do know

11   you.

12          MR. ZOPF: Judge, there is one other issue

13   here.  My client, Mr. Taylor, I was appointed to

14   represent has been exceedingly patient with plaintiff's

15   counsel.

16          Defense counsel wants to ask some questions.

17   The problem is Mr. Taylor is going to be frustrated

18   with all the lawyers if this continues.  So I would

19   strongly suggest that plaintiff be stopped now, defense

20   ask their questions and then we see where we are at.

21          MR. DiCIANNI: I would agree with that, your

22   Honor, certainly.

23          JUDGE BRUCE: What do you think about that

24   solution from Mr. Zopf?

25          MS. BRADY: I'm sorry.  I didn't hear what he

1  said.

2          JUDGE BRUCE:  All right.  Mr. Zopf is

3  offering a solution.  He said why don't you pause your

4  questioning, have the defense ask their questions and

5  see if that provides what you want.  And if you need

6  to, you can go back to your questions.

7          Mr. Zopf is obviously representing Mr. Taylor

8  in a limited capacity.  I know because I got him

9  appointed.  That seems to me to be a good resolution

10 unless for some reason you think it is better just to

11 forge ahead on your own.

12         MS. BRADY: Yeah.  I think, your Honor, I have

13 maybe ten minutes of questions left about a couple of

14 key issues that we haven't gone over yet including, you

15 know, the evidence that led to Charles Palmer's

16 exoneration.  And, oh, there you are.  And some of the

17 other evidence that we --

18         JUDGE BRUCE:  Okay.  I heard you say that

19 before.  You said you had ten minutes before.  I got

20 that part.  Mr. Zopf is offering, he is trying to come

21 up with a compromise in a way to get this concluded in

22 the time we have remaining.

23         What he is, Mr. Zopf is suggesting is you

24 pause your questioning for a moment, let the defense

25 ask their questions and then if necessary revisit your

1  questions.  Do you have a problem with that?

2        MS. BRADY: I think, your Honor, because this

3  is our subpoena, respectfully we would request we be

4  allowed to finish up our questioning.

5        Like I said, it is not very much and it is

6  over new material.  And then after that, you know,

7  defense counsel can ask their questions.  We just want

8  to finish our exam.

9        JUDGE BRUCE:  I will stay for a little while

10  unless anybody is going to object to that.

11        MR. STOCKS: No objection.

12        JUDGE BRUCE:  Hearing no objections, go ahead

13  and ask some questions and then we will go from there.

14  Go ahead.

15  BY MS. BRADY:

16     Q.  So, Mr. Taylor, before this interlude, we had

17  talked about how you testified at trial that Charles

18  Palmer confessed to you a couple of hours before dark.

19  Do you remember discussing that?

20     A.  No.  I don't remember him confessing to me no

21  couple of hours before nothing.  What are you talking

22  about?

23     Q.  So I read to you the portion of your trial

24  testimony where you said that Mr. Palmer confessed to

25  you a couple of hours before it got dark.  Do you

1  remember me reading that transcript to you?

2      A.   No.

3      Q.   Okay.  And after I read you that portion of

4  the transcript, I told you that Mr. Helmbacher was

5  still alive at 7:00 p.m. on the day he was murdered.

6  Okay?

7          And we were looking at the police report

8  where the police officer wrote in here, I am on Page 7

9  of this report, that Tonya, the daughter, said about

10  1900 hours she saw the victim sitting in his front room

11  in a black chair facing east with no shirt reading a

12  book.

13          Okay.  That is the exhibit that the court

14  reporter handed you just a couple of minutes before

15  Judge Bruce came in.  Do you see the exhibit in front

16  of you?

17      A.   No.

18      Q.   There is a piece of paper in front of you if

19  you turn to your left a little bit and that is an

20  exhibit.  It is Taylor Exhibit P.  And I asked you

21  about something that is written in that police report.

22  Okay?  That police report says that the witness saw Mr.

23  Helmbacher alive at 7:00 p.m.

24          So my question for you is how do you explain

25  that Charles confessed to you before dark when the

1  witness or when the victim was still alive at the time

2  that you say he confessed to you?

3           MR. DiCIANNI: I will object to the form of

4  the question.  Lack of foundation.  Assumes

5  contentions.

6           JUDGE BRUCE:  Mr. Taylor, do you understand

7  the question?

8      A.   I don't know when somebody saw him still

9  alive.  All I know, I don't know what time I saw

10 Charles when he the one said that.  So I don't even

11 know what time that was then so I have no idea.

12 BY MS. BRADY:

13     Q.   Okay.  And today we know that Charles did not

14 commit the murder because of the DNA evidence.  Okay.

15 Are you aware of the DNA evidence in this case?

16          MR. DiCIANNI: Objection.  That is a hotly

17 disputed fact in this case.  So she is raising -- I

18 object to the form of the question.

19          JUDGE BRUCE:  Ask it in a different way.  It

20 is like I am at trial.  Ask it a different way.

21 BY MS. BRADY:

22     Q.   Mr. Taylor, are you aware that DNA evidence

23 from underneath the victim's fingernails and in the

24 palm of his hand excludes Charles Palmer as a potential

25 contributor to the DNA?

1       A.    And it excludes me also.

2       Q.    It does.  That is right.

3       A.    Yeah.

4       Q.    You are aware of that?

5       A.    Yes.  Since you just told me.

6       Q.    And you knew that it excluded you as well,

7    right?

8       A.    They haven't came to arrest me for murder.

9       Q.    Okay.  And you are aware that based on that

10   DNA evidence Charles Palmer's conviction was reversed

11   and the State dropped charges against him, right?

12       A.    As far as I know.

13       Q.    And that shows that your story about Charles

14   Palmer confessing to this murder couldn't be squared

15   with that physical evidence, right?

16            MR. DiCIANNI:  I object to the form of the

17   question.

18            JUDGE BRUCE:  Ask a different -- that is not

19   an appropriate question, is it?  You are actually

20   confusing me so I know Mr. Taylor is not going to

21   understand it.  Ask a simpler more straightforward

22   question.

23   BY MS. BRADY:

24       Q.    Sure.  Mr. Taylor, so we just discussed you

25   are aware that the DNA evidence excludes you and

1  Charles Palmer as a contributor, right?

2      A.   Is that what you say?

3          MR. DiCIANNI: Object to the form of the

4  question.  Lack of foundation to his knowledge.

5          JUDGE BRUCE: Just go ahead.  Go ahead with

6  your -- Mr. Taylor, do you understand what she is

7  asking you?

8      A.   She is saying the DNA excludes me.  I mean, I

9  already knew I was excluded.  I don't have nothing to

10  do with it period.

11          JUDGE BRUCE:  Okay.  Go ahead and ask your

12  question.

13  BY MS. BRADY:

14      Q.   Sure.  And the DNA also excludes Charles

15  Palmer as a contributor.  Okay?

16          MR. DiCIANNI: Well, object to that.

17          JUDGE BRUCE:  If he knows that.  Ask another

18  question.  I don't know if it is written in the record,

19  he has knowledge of that, but if he hasn't, ask a

20  different question.

21          MS. BRADY: Your Honor, I am asking if he

22  knows that.

23      A.   By you telling me.  You telling me, yeah.  I

24  know when you told me.

25

1  BY MS. BRADY:

2      Q.   Okay.  And you are aware that Charles Palmer's

3  conviction was reversed because of that DNA, right?

4      A.   No.  You just told me it was.  What does that

5  have to do with me though?

6      Q.   Okay.  And I also want to ask you about a pair

7  of shoes that you were shown at trial.  Do you remember

8  looking at a pair of shoes at the criminal trial in

9  2000?

10         MR. DiCIANNI: Object.  This has been asked

11  and answered.  We have been through this.

12         MS. BRADY: Tom, I haven't asked this question

13  before.

14         JUDGE BRUCE:  Go ahead and answer the

15  question, Mr. Taylor.

16     A.   Yeah.  I remember seeing those shoes at the

17  trial.

18  BY MS. BRADY:

19     Q.   Do you recall testifying that the shoes that

20  you saw at trial were not the same shoes that you saw

21  Charles Palmer wearing around the day of the burglary

22  and the murder?

23         MR. DiCIANNI: Objection.

24     A.   I said they don't look like the shoes I saw

25  before.  I remember telling them that.  I don't

1  remember seeing the shoes before.  That is what I told

2  them at the trial.

3  BY MS. BRADY:

4      Q.   Okay.  Mr. Taylor, when this case goes to

5  trial, you will be required to come back and testify

6  under oath again.  And do you understand that you might

7  be called to testify at trial?

8      A.   No.  I wasn't aware of that.

9      Q.   Do you plan to leave the jurisdiction before

10  trial?

11     A.   No.  I got to go to work.  I should be there

12  right now.

13     Q.   Okay.  And so if you get a subpoena to testify

14  at this civil trial, will you appear?

15     A.   I don't have no problem appearing.  You know

16  what, when they acting like I am just skipping out on

17  the disposition stuff, I was never served.  No one, the

18  sheriff or somebody supposed to bring you the paper to

19  serve you to come to a hearing.  Nobody ever served me.

20          You tell me later on today you talk about,

21  oh, we put it in your door.  You don't put nothing like

22  that in your door when a person needs to come to a

23  court hearing thing.  You give this to the sheriff, the

24  marshal to serve it to the person.  Not to a family

25  member.  To the person themselves.  You didn't do that.

1              JUDGE BRUCE:  Ask a question.

2    BY MS. BRADY:

3         Q.   Mr. Taylor, what is the best way to get in

4    touch with you to serve you with a subpoena in the

5    future?

6         A.   (217) 454-9562.  That is my phone number.

7         Q.   That is the best way to get in touch with you?

8         A.   Yeah.  That is the only way you can really get

9    in touch with me.  I don't want you coming to my job

10   disturbing them.

11             MS. BRADY: Okay.  I don't have any more

12   questions at this time.

13             JUDGE BRUCE: Are my services needed at this

14   point?

15             MR. DiCIANNI: I wouldn't think so.

16             JUDGE BRUCE: Mr. Zopf, how about you?

17             MR. ZOPF: We are fine, Judge.

18             JUDGE BRUCE:  Anything else before I leave?

19             MS. BRADY: Um, I'm sorry, are you asking me,

20   your Honor?

21             JUDGE BRUCE:  Yes.

22             MS. BRADY: No, thanks.  We are all set.

23   Thank you.

24             THE WITNESS: Are you related to the owner of

25   my company?

1          MS. BRADY: I am not, no.

2          JUDGE BRUCE: I am presuming you are going to

3    be able to wrap this up by 5:00?

4          MR. DiCIANNI: Yes, we will.

5          JUDGE BRUCE: All right.  I am talking to the

6    marshals right now.  All right.

7          MR. DiCIANNI: All right.  Mr. Taylor, I have

8    some questions.

9      A.    Okay.

10

11   EXAMINATION,

12       QUESTIONS BY MR. DiCIANNI:

13       Q.    So you have been asked many questions today

14   that required you to try to remember things that took

15   place over 20 years ago.  Is that correct?

16       A.    Correct.

17       Q.    And would you agree with me it is very

18   difficult for you to remember much, almost all of what

19   you were asked about?

20       A.    Yeah.  That is true.  I don't remember none of

21   that stuff, man.

22       Q.    All right.  Some of the questions you were

23   asked were confusing to you; is that correct?

24       A.    Yeah.  Because you asking it one way, then you

25   change it to another way.  And then you asking one

1  question and then you jump to something else and then

2  want to go back to that question, of course.  That is

3  confusing to anybody.

4      Q.  And at times you were answering questions

5  hoping you understood what they were, but not sure,

6  correct?

7      A.  No.  I was sure about -- I mean, no, I wasn't

8  sure about some of the questions, right.

9      Q.  Several times you said I don't know what you

10  are asking me and why are you asking me that when I

11  thought you asked me that already.  You asked that

12  several times today, didn't you?

13      A.  Right.

14      Q.  All right.  You did your best to answer the

15  questions today, correct?

16      A.  Sure.  Yes.

17      Q.  Now counsel asked you about a bunch of

18  questions about this report and that report and when

19  did you talk to this police officer, etc.  You didn't

20  have an opportunity to review any records before today,

21  right?

22      A.  No.

23      Q.  You didn't have a chance to study your trial

24  transcript testimony from the trial?

25      A.  No.  I didn't think I would have to.

1    Q.   Right.  Right.  You don't remember when you

2  talked to a lot of the police officers, right?

3    A.   Of course I don't.  I don't know them by name

4  like that.

5    Q.   You don't remember how many times you talked

6  to police officers?

7    A.   No.  Because it wasn't like the same way

8  conversation like that, but it wasn't no conversation

9  like that, well, I talked to this one, I talked to that

10  one.

11         But I don't remember talking to them having

12  conversations with them like that for them to be

13  writing stuff down.  Even some of this stuff is not my

14  writing.  Somebody else wrote that stuff.  It sure

15  wasn't me.

16    Q.   A lot of the questions you were asked about,

17  you answered just doing your best based on your memory,

18  right?

19    A.   Yes.

20    Q.   And you didn't know what order a lot of the

21  events happened that you were asked about, correct?

22    A.   Correct.

23    Q.   You didn't remember a lot of the details about

24  much of what was asked of you, correct?

25    A.   That is correct.

1      Q.   And you testified today to the best of your

2  memory, right?

3      A.   Yes.

4      Q.   Is it very possible that maybe your memory was

5  a little off on some things?

6      A.   No.  Actually at the time that I answered

7  those, was asked those questions and stuff, I had it

8  precise.  There wasn't nothing made up.  That is why it

9  was truthful.  That is why I have no problem saying it

10 again.

11     Q.   Yeah.  But you would agree with me that your

12 memory could be wrong on certain things.  Wouldn't you

13 agree with me?

14     A.   Yeah.  Certain little things, yeah.  I agree

15 with you.

16     Q.   Thank you.  One of the things that I am sure

17 you have no mistake over is that when you gave your

18 testimony at the trial, you told the truth, didn't you?

19     A.   Yes, sir.

20     Q.   You told the truth based on what you knew

21 about what had happened, correct?

22     A.   Correct.

23     Q.   Now counsel was correct.  There were some

24 things you said in your testimony that was a little

25 different from what you talked about today.  That

1   doesn't mean you lied at the trial, does it?

2       A.   No.

3       Q.   It just means your memory was off, correct?

4       A.   Correct.  I agree with that.

5       Q.   Okay.  You understand that when you are under

6   oath, you have to do your best to tell the truth,

7   correct?

8       A.   Correct.

9       Q.   When you told, when you testified at the

10  criminal trial, you did your best to tell the truth,

11  correct?

12      A.   Of course.  Yes.

13      Q.   Okay.

14      A.   I always do.  I don't want to go to prison.

15      Q.   Right.  Right.  So there were times counsel

16  asked you when these police officers would come to talk

17  to you and you said you didn't know anything about the

18  murder and that was true, you were talking about

19  yourself, right?  You had nothing to do with the

20  murder, right?

21      A.   Nothing at all.

22      Q.   What Charlie B. might have told you about what

23  he did, you weren't thinking about that when you were

24  being questioned.  You were talking about what your

25  involvement was and you had no involvement, correct?

1     A.   You better know it, right.  I had nothing to

2  do with it.

3     Q.   You didn't lie at the trial about Charlie B.

4  telling you that he beat Mr. Helmbacher, correct?

5     A.   Correct.

6     Q.   When the police came to talk to you, you said

7  they came to talk to you a lot of times.  Now that

8  wasn't unusual, you didn't think that was wrong, did

9  you?

10     A.   No.  They was just getting in my way on my

11  nerves.  They was interrupting my lifestyle, my

12  business.

13     Q.   You didn't like it, but you understood you

14  lived in the same building as the person who was

15  murdered, right?

16     A.   My landlord, yeah.

17     Q.   So it is not surprising to you, I know you

18  didn't like it, but it wasn't surprising to you --

19     A.   Hm-mm.

20     Q.   -- that they would be asking you all of these

21  questions, right?

22     A.   That wouldn't surprise me, no.

23     Q.   You really wanted to just get them out of the

24  way and stop bothering me so I can go about my

25  business; isn't that correct?

1    A.   Yeah.  Get on with my life, yeah.  Sorry about

2  the man, but.

3    Q.   Now you were asked a lot of questions about

4  the burglary and you testified about the burglary at,

5  during the criminal trial.  What you told the jury at

6  the criminal trial, that was the truth, wasn't it?

7    A.   Yeah.  All of them was true.

8    Q.   You can't remember everything you told the

9  jury?  I mean, you told the jury at trial, right?

10    A.   No.  I don't think I could.  You have to be

11  very specific in something to trigger me to trigger

12  what I had said for me to remember that I believe.

13    Q.   Correct.  It would be different if we gave you

14  a time a couple of days to read this transcript and

15  think about it and think about what really happened,

16  what really didn't happen.  Your testimony today might

17  have been different, right?

18    A.   Possibility, yes.

19    Q.   Thank you.  Mr. Taylor, can we all be

20  confident, all of us, that what you told the jury at

21  the criminal trial was the truth?

22    A.   Yes.  It all was the truth.  Was nothing made

23  up.

24    Q.   And your memory about what happened back then

25  would have been a lot better than it is today 22 years

1   later, right?

2       A.   Yes.  It sure would have been.

3       Q.   All right.

4       A.   See, I was supposed to be at work now, not

5   dealing with this.

6       Q.   Well, we will be done real soon, I promise

7   you.  You spoke to Mr. Smith in the park a year and a

8   half or so ago, correct?  Mort Smith?

9       A.   Mr. Morton?

10      Q.   Yes.

11      A.   Yeah.  It was summertime, yeah.

12      Q.   Pardon me?

13      A.   I said it was summertime.

14      Q.   And you had the feeling that Mr. Smith was

15  trying to get you to say things that you didn't think

16  were correct, right?

17      A.   That is true.

18      Q.   Did Mr. Smith offer you any money?

19      A.   No.  He don't look like he had any.  No,

20  sorry.  But the thing was, I see him and his little

21  associates, you know, they were saying things that was

22  never said.

23           They said what the police had said this and

24  had said that and they was asking me was that true and

25  all that.  No.  I never said that, I never said this.

1  They had a whole bunch of checkmarks off of things.  So

2  we had this little meeting for probably about an hour

3  and a half maybe, but they brought up a lot of things

4  that was said about this case that wasn't true.

5          So they was asking me to verify it and I

6  would let them know like, no, that wasn't true.  Yeah,

7  that was true, but that wasn't, that wasn't, that

8  wasn't, but okay.

9      Q.    Now I just heard you say that they had like a

10 checklist that they were checking?

11     A.    Yeah.  Something like that, yeah.

12     Q.    They were taking notes during this meeting?

13     A.    Yeah.  And asking me different questions.

14 Yeah, they were.

15     Q.    And they were writing things down?

16     A.    Writing things down.

17     Q.    You are certain of that?

18     A.    I am sitting right there at the table with

19 them at the park.

20     Q.    You could see it easily?

21     A.    Yeah.  They writing things down and asking me

22 questions.  Yep.  Because it was so disturbing for them

23 -- I told them to meet me downtown or meet me at the

24 library because I got tired of them coming knocking on

25 my door.

1           Now if I wasn't there, they were going to my

2    neighbor's house, knocking on them asking them had they

3    seen me.  I was like you got to be kidding.  Something

4    got to be done with them because I am going to file

5    charges against them.  It was crazy, man.

6           Q.    You said something about Mr. Smith having

7    damaged your door or something.  What was that about?

8           A.    No.  What happened, they came over.  I was at

9    home and I was just about getting ready to eat

10   breakfast.  So he was knocking on the door.

11          It was him.  And there was three of them;

12   Mort and the guy and a girl.  And they was knocking on

13   the door.  And I am like I got to finish eating.  I

14   didn't think about them.  I ain't got time.  I got

15   other things to take care of.

16          So my neighbor stay right down the street.

17   My mom stays straight across the street.  My brother

18   stays straight across the street.  And they could see

19   them, that Morton, he was knocking on my door banging

20   on it, banging on it and they was pulling on my windows

21   and then started pulling on the door.

22          He said like he was trying to pull it open to

23   break in, but they didn't want to do that one.  And it

24   is a good thing that they didn't get it open, but they

25   were doing that.  My neighbors and them told me and my

1    brother.  Yeah, it was crazy.

2        Q.   Did they show you what notes they were writing

3    down, what they were writing down?

4        A.   No.  They were just asking me questions and

5    stuff and then they didn't show me anything.

6        Q.   Okay.  They didn't ask you to sign something?

7        A.   Not that I can remember, no.

8        Q.   All right.  They didn't give you any reports

9    to look at so you would have time to think about

10   things, right?

11       A.   No.

12       Q.   They just started telling you what they wanted

13   you to say?

14       A.   Right.

15       Q.   Is that fair?

16       A.   Yep.

17            MS. BRADY: Objection, form, foundation as to

18   what the attorneys wanted Mr. Taylor to say.  Also

19   calls for hearsay.

20   BY MR. DiCIANNI:

21       Q.   Mr. Taylor, I don't want to be confusing you

22   or asking you any questions that, like counsel did that

23   are hard for you to answer.  So you let me know if you

24   have any problems with my questions at all.  Okay?

25       A.   Okay.  Sure.

1    Q.   All right.  In the beginning you didn't want
2  even though Charlie B. had told you he killed Mr.
3  Helmbacher, you didn't want anything to do with any of
4  this, right?
5    A.   No.  I didn't, no.
6         MS. BRADY: Objection.  Mischaracterizes that
7  evidence.  Also calls for hearsay.
8  BY MR. DiCIANNI:
9    Q.   You didn't want to be the one to have to go to
10  court and talk about what Charlie told you and do all
11  of that to get all involved in the case, right?
12    A.   No.  I didn't want no involvement.
13    Q.   You had no interest in that?
14    A.   Not at all.
15    Q.   And Charlie was your cousin?
16    A.   My first cousin.  My dad's nephew.
17    Q.   The two of you were close, right?
18    A.   Yeah.
19    Q.   You probably, it probably broke your heart to
20  have to talk, tell on him?
21    A.   Yeah, but you know what, I wasn't so surprised
22  as what had happened and what he had did to this lawyer
23  guy because he had did this previously years earlier.
24         He did it to a guy that had got his social
25  security check.  Killed the guy and gave his girlfriend

1    some of the bloody money.  And they caught the girl

2    with their bloody money and put her in prison.

3         Q.   Charlie B. did that?

4         A.   Yeah.

5         Q.   When did that happen?

6         A.   This happened probably 23 years ago before

7    this Bill Helmbacher thing happened.  So he had already

8    did this previously.

9         Q.   What is the name of the girl?  Do you

10   remember?

11        A.   I don't know.  But when I was at the police

12   station, they said that they knew about that incident.

13   But anyway.

14        Q.   What happened with -- did he, did Charlie B.

15   get convicted of murder for that?

16        A.   No.  They put it on the girl because they

17   caught her with the money, the bloody money and stuff.

18   So he got out of it and the girl ended up going to

19   prison and stuff for that.

20        Q.   The girl went to prison?

21        A.   Yeah, but she is out now though.

22        Q.   But Charlie B. did the murder?

23        A.   Yes.  That is what I heard.

24             MS. BRADY: Objection.  Calls for hearsay.

25        A.   Sorry.

1    BY MR. DiCIANNI:

2         Q.   You think that was 43 years ago?

3         A.   Or less.  Maybe 30.

4         Q.   Okay.  And you and Charlie B. are very close,

5    right?

6         A.   Yeah.  When I --

7         Q.   Back then?

8         A.   Yeah.  Back then, yeah.  A long time ago, yes.

9    When I was growing up, yes, because he stayed down the

10   street at his sister's house.  But I would always see

11   him though when he wasn't in prison.

12        Q.   He spent a lot of time in prison?

13        A.   All the time.  His whole life.

14        Q.   Yeah.  Did you -- did he ever stay over at

15   your place?

16        A.   No.

17        Q.   Never?

18        A.   Never.

19        Q.   So if he said, if he told the police or

20   testified at the trial that he was staying at your

21   place right about the time of this murder, he wasn't?

22   He is lying?

23        A.   Yes, he was lying because, no, he never stayed

24   at my place, no.

25        Q.   Did you know his friend Mike Callaway?

1      A.   Mike Callaway, no.

2      Q.   I think he lived over near John Bradford.

3      A.   Oh, Mike.  Mike must have stayed upstairs from

4 John.

5      Q.   Charlie used to stay over there?

6      A.   Yeah.  Used to be over there, yeah.  With that

7 Mike guy.

8      Q.   Right.

9      A.   I forgot all about him.

10     Q.   You forgot about that?

11     A.   Mike, yeah.

12     Q.   Now they asked you a lot of questions about

13 these shoes and I know you said you have no memory

14 about what happened in the police station, but you did

15 testify at the criminal trial about the shoes and they

16 said, well, you didn't know, you thought they weren't

17 the right ones.  But you don't remember that, right?

18     A.   No.

19     Q.   Let me read to you what we, what you actually

20 testified about.  So on Page 19 beginning at Line 5, I

21 am going to read you some questions and read you your

22 answers and let me just ask you if you have any memory

23 of that.

24        "Question: Do these, talking about the shoes,

25 in any way resemble the tennis shoes you had seen on

1  Charlie B. the day that you had, that he had told you

2  that he had beat the dude?

3       Answer: Actually I thought they was a

4  different kind.  What kind are those?  I thought he had

5  like some different colored ones, really, like some red

6  ones.

7       Question: You are not able to tell from this

8  though?

9       Answer: Well, you know, it has been a while,

10  but they might be the ones."

11       Do you remember that testimony?

12       A.   The shoes at the trial?

13       Q.   Yeah.  If you don't, you don't.  That is fine.

14       A.   I remember him previously, you know, like that

15  was maybe days or a week before that he had on some

16  like new shoes, but the shoes they showed me at the

17  trial wasn't the same shoes.

18       Q.   You didn't have a memory.  You just said right

19  here you couldn't tell really.  You didn't think so,

20  but you weren't sure?

21       A.   Right.  I wasn't sure.

22       Q.   You weren't sure.  And then there was another

23  time when they asked you the same question.  This is on

24  Page -- give me a second.  Well, I will come back to

25  this in a second.  I will find it.

1      So you talked about a time when you ran into

2  Charlie and this was after the murder and he asked you

3  are the police still coming to talk to you all the

4  time.  Do you remember when you told Mrs. Brady about

5  that?

6      A.   I remember that.

7      Q.   That was in Downtown Decatur, right?

8      A.   Yeah, downtown.  Yeah, that is when the city,

9  the transit used to meet down there instead of the

10  library.

11      Q.   So you had that conversation with him.  You

12  guys were on the, almost on different sides of the

13  street.  Then you got on a bus, right?

14      A.   No.  We didn't get on a bus.  He was across

15  the street and I was on the other side.  He walked

16  across the street and he asked me, he said, he said did

17  the detectives and stuff still coming to the house.

18  And I am like yeah.  And he walked on down and I went

19  on down that way.

20      Q.   You said you were at a transit?

21      A.   Yeah.  A transit where they used to meet right

22  there on Williams Street right there by where the old

23  crossing jewelry store used to be, that corner right

24  there.  It used to be right there, but it is not no

25  more though.  They moved down by the library.

1     Q.  I see.  Well, all the time that you are

2  telling the police that you don't know what is, you

3  don't know anything about it, what you are meaning is I

4  didn't do it, right?

5     A.  Of course I didn't do it.  Right.

6     Q.  I am going to let Mr. Stocks go and then I am

7  going to find the spot I was looking for in this

8  transcript.

9       MS. BRADY: So I am going to object to Mr.

10  Stocks asking any questions.  We have been treating

11  this as a trial exam and defense counsel wouldn't get

12  to cross at trial so I don't think that Mr. Stocks

13  should be allowed to ask any questions now.  So we

14  object to any questions asked by a different defense

15  attorney.

16       MR. DiCIANNI: Well, we would take a different

17  position on that.

18

19  EXAMINATION,

20     QUESTIONS MR. STOCKS:

21     Q.  Mr. Taylor, back in your trial testimony,

22  looking at Page 21 of that transcript --

23       MS. BRADY: Jerry, I can't hear you at all.

24       MR. STOCKS: Can you -- I will just turn this

25  over.  Can you hear me now?

1    MS. BRADY: Yeah.  Thank you.

2    A.   Loud and clear.

3  BY MR. STOCKS:

4    Q.   When you testified at trial as I am looking at

5  your transcript, you were shown a pair of shoes at

6  trial -- or excuse me.  You testified that the officers

7  when you were at the county jail brought you some shoes

8  while you were at the county jail.  This is Page 21

9  starting at Lines 10.  And they asked:

10    "Did they bring you some shoes while you were

11  up at the county jail?

12    Answer:  Right.

13    Question: Did they ask you to look at some

14  shoes?

15    Answer:  Yes.

16    Question:  Did you look at them?

17    Answer: Yes.

18    Question: Were you able to say about those

19  shoes -- what were you able to say about those shoes at

20  that time?

21    Answer: I told them, meaning the police, that

22  they were the shoes that Charles had on."

23    Back in 2000 you gave that testimony.  Was

24  that testimony truthful and accurate?

25    A.   No.  They never brought me shoes when I was in

1  the county.

2       Q.   When you were at the county jail?

3       A.   They never brought me shoes.  They never

4  brought me shoes at the county jail.

5       Q.   So the transcription is wrong?

6       A.   Yes, sir.

7       Q.   But they did bring you some shoes when you

8  were somewhere?

9       A.   No.  They brought me some shoes and put them

10  in front of me when I was at trial.

11       Q.   Is that the first time you ever saw shoes?

12       A.   Yeah.  Saw the shoes that they were showing

13  me.  They asked me were these the shoes.  They brought

14  the shoes in there and they sat them down, they looked

15  at them.  They was all tore up like they had got eaten

16  up by a rat or something.

17       And I said they don't look like them.  That

18  is what I told them.  They could have been, but don't

19  look like the ones I saw him wearing, you know, before.

20       Q.   Did you ever -- were you ever shown any shoes

21  at any other time?

22       A.   No, sir.

23       Q.   Did you ever see any shoes at any other time?

24       A.   No.

25       Q.   When you testified at trial that you had seen

1    some shoes in the county jail shown to you by the

2    police officers, do you know what you were referencing

3    at that time?

4         A.   I never was shown those shoes in the county

5    jail.

6         Q.   When you testified at the trial, do you know

7    what you were talking about when you described

8    seeing --

9         A.   About the shoes?

10        Q.   Yeah.

11        A.   Well, they brought me these raggedy looking

12   shoes.  They wasn't new looking or nothing.  They

13   looked old and ran down like they had been washed maybe

14   4 or 5 times to 8 times.  You know what I mean?  They

15   was looking all ratty.

16        Q.   And you told them that "those were the shoes

17   Charles had on"?

18        A.   No.  I told them those wasn't the shoes.  I

19   said they don't look like the shoes.  I remember that

20   much.

21        Q.   Could it be that you may have seen some shoes

22   on a prior occasion and just forgot at the time of

23   trial?

24        A.   Not after seeing them at trial?

25        Q.   No.  Let me ask this: Do you have an

1  explanation for your testimony at trial that you looked

2  at some shoes, you were asked what you were able to say

3  about those shoes and you told them, the police, that

4  they were the shoes Charles had on?

5       A.  I said they weren't the shoes.  I never told

6  them they were the shoes.

7       Q.  I am not asking what you said at trial, but

8  you were recalling a past event where you had seen some

9  shoes.  Do you remember --

10          MS. BRADY: Objection.  Mischaracterizes the

11  testimony.

12  BY MR. STOCKS:

13      Q.  Let me finish the question.  Do you remember

14  what you were telling the jury that you recalled in the

15  past?

16      A.  Probably not.

17      Q.  Pardon me?

18      A.  Probably not.  Not if you want me to identify

19  something that I ain't never saw, I mean, they didn't

20  look familiar to me.  But you got to remember, that was

21  20 some years ago, man.

22      Q.  So your memory could be fuzzy about what may

23  or may not have happened?

24      A.  Yeah.  Put it like this, it wasn't that fuzzy

25  that I didn't know the difference between raggedy

1  shoes, used shoes and a new pair of shoes.  So I can't

2  testify that they -- my memory wasn't that fuzzy.

3      Q.   Do you have Exhibit H in front of you still?

4      A.   No.  This is P.  I can't hardly see what it

5  say.

6      Q.   Do you have all the exhibits in front of you?

7      A.   I just have this --

8      Q.   If you could hand Exhibit H.

9      A.   This is H.

10     Q.   At the very top where it says I, Ray Taylor,

11 is that Ray Taylor, is that part something that you had

12 written?  At the very top just the I, Ray Taylor.

13     A.   I am trying to find it.

14     Q.   Right under the date.

15     A.   Yeah.

16     Q.   And Ray Taylor there, the printed Ray Taylor,

17 that was your printing?

18     A.   It looks like it.

19     Q.   All right.  Thank you.  And do you know Tim

20 Carlton or when he was living did you know Tim Carlton?

21     A.   Wasn't he a police officer?

22     Q.   Would you be able to recognize him if you saw

23 him?

24     A.   Probably not.

25     Q.   In terms of what you may have said to one

1  officer or another officer, would you be able to recall

2  what statement you made to one vs. statements to

3  another?

4      A.   No.  I ain't even going to pretend to.

5      Q.   As far as identifying what any officer said to

6  you, would you be able to identify Tim Carlton as

7  saying anything or making any comments to you during

8  the course of this investigation?

9      A.   No, sir.

10          MS. BRADY: Objection, foundation and calls

11  for speculation.  Impossible to know if he would know

12  based on a photograph who Tim Carlton was.

13  BY MR. STOCKS:

14      Q.   So in terms of identifying anything that Tim

15  Carlton did or did not do based on your observation,

16  you are unable to say one way or another?

17      A.   True.

18          MR. STOCKS: That is all I have.

19          MR. DiCIANNI: I will go back to what I was

20  looking for and then I will turn it back to Rachel.

21

22  EXAMINATION,

23      QUESTIONS BY MR. DiCIANNI:

24      Q.   Mr. Taylor, before I couldn't find the section

25  I was looking for, but now I found it.  So we were

1  talking about the shoes and your testimony about the

2  shoes at the trial.  And you weren't sure that these

3  were the shoes that you saw before, right?

4          MS. BRADY: Tom, I'm going to object to these

5  questions as procedurally improper.  You concluded your

6  questioning and it is not proper for defense counsel to

7  switch off their cross.

8          MR. DiCIANNI: Well, I was, I did that out of

9  convenience because I was just, I was, I couldn't find

10  my section.  So I found it now.  So I understand your

11  objection.

12  BY MR. DiCIANNI:

13      Q.   Page 27, Line 10.  You were asked this

14  question.  I am going ask you some question and answer

15  that was shown at your trial and trial testimony and

16  ask you if you remember this:

17          "Mr. Taylor, you have looked at these shoes.

18  Can you say for sure that these are the shoes that you

19  saw Charles Palmer wearing?

20          Answer: No, I don't think they are the same

21  ones.

22          Question: You don't think they are the same

23  shoes?

24          Answer: No, not from looking at them, no.

25          Question: And you have had an opportunity to

1  look at them here in the courtroom and you do not

2  believe those are the same shoes?

3          Answer: I am not for sure about that."

4          So you weren't sure whether those were the

5  same shoes?  They didn't look the same, but they, you

6  weren't sure, correct?

7       A.   Correct.  I wasn't sure.

8       Q.   They were all cut up by that time, correct?

9       A.   Yeah.

10      Q.   How could you recognize the shoes after they

11  had been sliced up the way they were, right?

12      A.   I couldn't.

13      Q.   So when the lawyers were asking you if these

14  are the same shoes, that is really not fair to you

15  because these are all ripped up now, right?

16      A.   Right.

17          MR. DiCIANNI: That is all I have.

18          MS. BRADY: Let's take a two-minute break and

19  then I just have a couple of questions on redirect.

20          MR. DiCIANNI: Well, the judge says we are

21  done at 5.

22          MS. BRADY: Yep.  I will be done by 5.

23          THE VIDEOGRAPHER:  Off the the record, 4:57.

24          (Discussion held off the record.)

25          THE VIDEOGRAPHER:  We are on the record 4:59.

1  EXAMINATION,

2      QUESTIONS BY MS. BRADY:

3      Q.   Mr. Taylor, you told Mr. DiCianni that Charles

4  Palmer committed a murder 43 years ago.  Mr. Taylor?

5      A.   What you say?

6      Q.   That is what I am asking you, a question.  You

7  just told Mr. DiCianni, the person who just asked you

8  questions, that Charles Palmer committed a murder

9  43 years ago?

10     A.   I heard that he did.

11     Q.   Okay.  Did you witness that crime?

12     A.   No.

13     Q.   Did you tell police about that crime in 1998?

14     A.   Did I tell them?  They said they knew about

15 it.

16     Q.   Okay.  And is today the first time you have

17 mentioned to any authorities that this crime took

18 place?

19     A.   No.  I ain't had no other reason to.

20     Q.   So you have never told any authorities about

21 it until right now; is that right?

22     A.   Until right now.  The police officers are the

23 ones saying it so I figured everybody else knew.  They

24 were the one that handled his case anyway, you know

25 what I am saying, about the murder case now.

1          So he said he knew about it so why wouldn't

2   -- I mean, I wouldn't have volunteered to talk to every

3   officer there, yeah, you know, he did that.

4          Q.    Thank you.  That was my question.  And Mr.

5   DiCianni asked you if we can all be confident about

6   some things that happened so I just wanted to see if

7   there is some things we can be confident about.  Can we

8   be confident that you did not participate in the

9   Helmbacher burglary?

10         A.    That I did not what now?

11         Q.    That you did not participate in burglarizing

12  Helmbacher?

13         A.    Purchase?

14         Q.    You did not participate in burglarizing

15  Helmbacher?

16         A.    No, I didn't participate in it.  No.

17         Q.    Okay.  And can we be confident that Charles

18  Palmer did not bring up a bunch of stolen stuff to your

19  apartment and you helped throw it away?

20         A.    No.  That is not true.

21         Q.    Okay.  And when you told the police that you

22  didn't know anything about the Helmbacher murder, you

23  were telling the truth, right?

24         A.    No.  I wouldn't say no I didn't.  I know he

25  told me that later, but I don't know how soon they were

1  to one another that he supposedly did that.

2      Q.   Okay.  And you never said anything to the

3  police about what Charles Palmer supposedly told you a

4  couple of hours before dark on the day Helmbacher was

5  killed until you were at the station being asked about

6  your fingerprints on the bag of stolen stuff, right?

7      A.   I am not sure.  I don't remember exactly when

8  or precisely when that was.

9      Q.   Okay.  And you have never saw the shoes that

10  they showed you at trial until the trial itself, right?

11      A.   Yeah, they showed me the shoes at trial, yeah.

12      Q.   You didn't see them --

13      A.   I don't know where they come from, but I saw

14  some.

15      Q.   And you had never seen them until the trial,

16  right?

17      A.   Right.  I had never seen them, right.

18      Q.   Okay.  And to the extent that you gave

19  testimony that was consistent with what you said was a

20  lie in the police reports, that was false testimony,

21  right?

22      A.   All depends what you are talking about.

23      Q.   Sure.  So earlier I read you some stuff from

24  the police reports and you said there was a lot of

25  stuff in there that you never told them, right, that

1  the police made up a bunch of stuff and put it in the

2  reports.  Right?

3      A.   If it says in there that I told you I didn't

4  know nothing about it, that was the truth, yeah.

5      Q.   And so to the extent that you said anything at

6  trial that was in one of the police reports that you

7  told me today was false, that testimony was all made up

8  too, right?

9      A.   I didn't tell you nothing false.  Not making

10  sense.  I never told you anything false.

11      Q.   Okay.  So we looked at a bunch of police

12  reports, right?  And I said did you ever tell them this

13  and you said no, I never said that.  Do you remember

14  that?

15      A.   Yeah.  If they are saying that I said such and

16  such, yeah, I am sure they said some things that I

17  don't agree with, no.  I understand that part.  At

18  first I didn't understand you.

19      Q.   So that is the stuff I am talking about.  In

20  those reports, the things that you said were false or

21  that you never said?

22      A.   True.

23      Q.   Or that the police made up and put in there?

24          MR. DiCIANNI: I object.  This has all been

25  asked and answered.

1  BY MS. BRADY:

2       Q.   If you testified about those things at trial

3  and they were false when you told them to the police,

4  then they were false at trial, right?

5            MR. DiCIANNI: Objection.  Asked and answered.

6  Argumentative.

7       A.   I don't even understand what you are talking

8  about.  Are you going back to the same thing though.  I

9  mean, either this or either that.  You just can't keep

10 slicing it and put it in the middle of the thing.

11           I mean, you are asking the question and I am

12 giving you the answer and you want to keep flipping

13 around and you want to chop it in half the way I am

14 looking at it and seeing it.

15           And it is not making any sense to me because

16 I am not sure as to why you ruin that, but it is really

17 confusing and misinterpreting what you are really

18 asking me.

19 BY MS. BRADY:

20      Q.   Let me ask a simpler question.  We talked

21 earlier about some interviews that you did with the

22 police and we looked at stuff that was in the police

23 report and you said I never said that.  The police had

24 written it in the report, but you never told them --

25      A.   Of course.

1      Q.   Like, for example, that you committed a

2  burglary.

3      A.   Huh?  Who committed --

4      Q.   Do you remember those questions?

5      A.   No.

6      Q.   You don't remember me --

7      MR. DiCIANNI: I am going to object to this

8  continuing because I cut my questioning short in order

9  to be done by 5:00.  And it is now after 5:00.  So if

10  we are going to keep going, then I think there is, it

11  has to be fair.

12      MS. BRADY: Okay.  This will be my final

13  question.

14  BY MS. BRADY:

15      Q.   The police wrote in their report that you and

16  Charles helped burglarize William Helmbacher.  That was

17  false, right?

18      A.   Right.  That is false.

19      MS. BRADY: Okay.  I don't have any more

20  questions.

21      A.   Okay.

22      MR. DiCIANNI: What do we do about signature?

23      MR. ZOPF: Mr. Taylor, you have the right to

24  review your transcript and make corrections or you can

25  waive that right in which case you don't have to do it.

1   It is entirely up to you.  What would you like to do,

2   sir?

3          THE WITNESS: I don't know.  What do you

4   suggest?

5          MR. ZOPF: I suggest that you waive signature.

6          THE WITNESS: Okay.

7          MS. BRADY: Is he being advised about

8   signature?

9          MR. DiCIANNI: Yes.  He is waiving it.

10         MS. BRADY: Okay.

11         THE VIDEOGRAPHER: Deposition is concluded.

12   Time is 5:06.

13

14

15

16

17

18

19

20

21

22

23

24

25

1  STATE OF ILLINOIS   )
                    )  SS
2  COUNTY OF VERMILION )

3     I, BECKY L. JESSUP, CSR, a Notary Public in and for
the County of Vermilion, State of Illinois, do hereby
4  certify that RAY TAYLOR, the deponent herein, was by me
first duly sworn to tell the truth, the whole truth and
5  nothing but the truth in the aforementioned cause of
action.
6     That the foregoing deposition was taken on behalf
of the Plaintiff, on February 23, 2021.
7     That said deposition was taken down in stenograph
notes and afterwards reduced to typewriting under my
8  instruction; and that the typewritten transcript is a
true and accurate record of the testimony given by said
9  deponent; and that it was agreed by and between the
witness and attorneys that said signature on said
10  deposition would be waived.
     I do hereby certify that I am a disinterested
11  person in this cause of action; that I am not a
relative or attorney of any of the parties, or
12  otherwise interested in the event of this cause of
action, and am not in the employ of the attorneys for
13  either party.
     IN WITNESS WHEREOF, I have hereunto set my hand and
14  affixed my notarial seal this 26th day of February,
2021.
15

16

17                 Becky L. Jessup, CSR

18

19

20

21

22

23

24

25